# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| OLURO OLUKAYODE,<br>individually and on behalf of all<br>others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITEDHEALTH GROUP,<br>OPTUM, INC. and<br>THE ADVISORY BOARD<br>COMPANY,<br><br>　　　　　Defendants. | Civil Action No. 0:19-cv-01101<br>(DSD/HB)<br><br><br>**MEMORANDUM IN SUPPORT OF<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

## INTRODUCTION

**"We are a highly skilled team. We are not like general consultants."**

**"We are allowed to work as independently as possible. We are not micromanaged. You are supposed to show up at your assigned place and then do the work."**

**"I'm a businessman."**

- **Plaintiff Oluro Olukayode**

Plaintiff is a licensed physician and is skilled in specific electronic medical record ("EMR") software. Defendants engaged him to assist in hospitals' implementation of new EMR projects on three occasions in 2016 and 2017, totaling twelve weeks of work. Despite his autonomy, his expertise, and his brief, project-based tenure with Defendants, Plaintiff claims he was misclassified as an independent contractor. The record, including his own testimony, proves otherwise.

Plaintiff's testimony and the undisputed record demonstrates that he was a contractor under the controlling Fair Labor Standards Act ("FLSA") "economic realities" test. In particular:

- Plaintiff worked unsupervised, and rarely even saw his project manager;

- Plaintiff was not trained by Defendants; indeed, he was engaged precisely <u>because</u> he already knew how to do the work;

- The parties' relationship was brief, episodic, and project-based;

- Plaintiff had sufficient economic power to negotiate the price for his work, had unreimbursed expenses that were netted against that price, and therefore managed his profit (or loss);

- The only "equipment" necessary for the job was Plaintiff's know-how, which was entirely his personal investment;

- Plaintiff's medical and EMR-software expertise constituted special skills;

- Plaintiff was not economically dependent on Defendants, given the small volume of his work for Defendants and his work for competitors and in another field; and

- Plaintiff ran (and runs) an independent business, and fashions himself a businessman.

As such, the Court should dismiss Plaintiff's FLSA and corresponding state claims as a matter of law.

2

4835-0830-3573

Should the Court deny summary judgment on the merits, it must consider whether Defendants willfully violated the FLSA or, to the contrary, acted in good faith. A plaintiff's burden of proving willfulness—which extends the statute of limitations under the FLSA from two years to three years—is a heavy one. Findings of willfulness are generally reserved for conduct that an employer knows to be illegal, such as when an employer continues to violate the FLSA despite having notice of the unlawful nature of its actions via past DOL investigations, prior agreements to pay wages, or previous promises to comply with the FLSA.

Plaintiff can present no evidence in this case to satisfy his burden. Meanwhile, the record establishes that Defendants took substantial steps to ensure that their use of independent contractors complied with the FLSA and other wage and hour laws— including multiple levels of review and obtaining legal advice from <u>two different</u> national law firms that specialize in labor and employment law. Defendants made classification decisions on a case-by-case basis, using factors and information considered under the IRS guidelines for independent contractor status. Defendants' business could not engage an independent contractor without first obtaining legal approval for the classification of that contractor. Leadership received training on contractor engagement, including the requirement for legal approval, as well as other FLSA training. And at all times, Defendants' inside and outside legal counsel advised that Defendants' use of independent contractors was lawful. Courts have found that <u>any one</u> of these items is enough to preclude a finding of willfulness—in this case the record <u>overwhelmingly</u> supports a

conclusion that Defendants' actions were not willful, and instead that Defendants had a good faith basis to classify Plaintiff as an independent contractor.

Should the Court grant Defendants' motion for summary judgment on willfulness, Plaintiff's FLSA claim should be dismissed as untimely under the standard two-year statute of limitations.

## STATEMENT OF FACTS

## I.   FACTS REGARDING THE MERITS

### A.   EMR Implementation Business

#### 1.   At-The-Elbow Work.

The Advisory Board Company ("ABC") began performing EMR implementation work—which is often referred to as "legacy Clinovations" work—when it purchased Clinovations in or around January 2014. (Clark Decl. ¶ 5.[1]) Optum, Inc. ("Optum") acquired ABC in 2018. (James Decl. Ex. A, Clark Dep. 13:16-22 (hereafter "Clark").) "Legacy Clinovations" work includes "at-the-elbow support," which means "at the time an electronic medical record or electronic health record is implemented, is turned on, at a hospital, physicians and nurses find it valuable to have a colleague, you know, quite literally standing at the elbow while they navigate this new computer system." (Clark 21:9-15.)

Because "at-the-elbow" support during a health system's implementation of a new EMR system is episodic and requires specialized expertise, ABC and later Optum have

---

[1] The Declaration of Daniel Clark (doc. no. 41) was submitted on June 26, 2019 in support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Conditional Certification.

4835-0830-3573

often contracted with independent contractors to perform the services. (Clark Decl. ¶ 7.) Indeed, these projects were "sufficiently spaced out and not great enough in number to keep anybody for any period of time working full time." (James Decl. Ex. B, Optum Dep. 108:22-25 (hereafter "Optum").) These are the types of services that Plaintiff contracted to perform for ABC. (Clark Decl. ¶ 7.) In particular, Plaintiff trained physicians to use new EMR software. (James Decl. Ex. C, Olukayode Dep. 83:22-24 (hereafter "Olukayode").)

### 2.     ABC and Optum Engage Clinicians with Medical and Software Expertise.

ABC and Optum have followed the legacy Clinovations model of using actual clinicians to perform the at-the-elbow support. (Clark Decl. ¶ 8; Olukayode 82:17-25.) The clinicians include licensed and practicing physicians, foreign medical graduates, resident physicians, physician researchers, nurses, pharmacists, and other medical professionals. (Clark Decl. ¶ 8.) By contracting with clinicians, the goal is to provide high quality at-the-elbow support, rather than the cheapest available support. (*Id*. ¶ 9.) This business model is very unusual, and is a distinct marketplace advantage, as compared to other healthcare IT firms, which more commonly contract with IT professionals to perform at-the-elbow support. (*Id*.)

To accomplish their goal of promoting quality over cutting costs, Defendants provide "like-to-like" at-the-elbow support during the EMR implementation phase. For example, Defendants engage (a) oncologists to provide at-the-elbow support to oncologists, (b) registered nurses to provide at-the-elbow support to registered nurses,

4835-0830-3573

and (c) pharmacists to provide at-the-elbow support to pharmacists, each of whom can provide unique support tailored to the specific EMR challenges applicable to the position at issue. (*Id.* ¶ 10; *see also* Olukayode 51:14-52:5, 53:22-54:21.) In contrast, other healthcare IT firms typically only provide general IT/software support, without trying to match at-the-elbow expertise to a particular department going through EMR implementation. (*Id*.)

The clinicians with whom Defendants contract also must have specialized knowledge about the particular third-party EMR software (e.g., Cerner, Epic Systems) which is being implemented by the health system. (*Id.* ¶ 11; James Decl. Ex. D, Kamieniecki Dep. 86:22-87:8 (hereafter "Kamieniecki").) Defendants do not provide this training. (Optum 104:22-10:2.) The clinicians can gain this specialized knowledge by, for example (a) participating in their own independent training through software companies, or (b) seeking out experience with the software through their other jobs or through working on projects for other healthcare consulting firms. (Clark Decl. ¶ 12.) Ultimately, "the reason [ABC] paid them the premium hourly rate that we paid the contractors is because they came to the project with the appropriate background and experience on the systems they were supporting." (Optum 104:24-105:2.)

ABC (and other companies in this industry) engage people like Plaintiff, who are knowledgeable about a particular field of medicine and the particular software designed for that field. (Olukayode 54:8-21.) In Plaintiff's words, "the special thing about us was that, because we had the medical background, we could relate better to the doctors." (Olukayode 87:10-12.)

4835-0830-3573

### 3. The Contractors Can Work for Competitors and Decline Projects.

The independent contractors can work for Defendants' competitors before or after performing services for Defendants. (Clark Decl. ¶¶ 13-14.) Indeed, Defendants view experience with other companies, including their competitors, as an added value. (*Id.* ¶ 13.) Accordingly, independent contractors such as Plaintiff do not sign non-competition agreements. (*Id.* ¶ 14.) Many independent contractors, including Plaintiff, do, in fact, provide competitive services to Defendants' competition. (*Id.* ¶ 15; James Decl. Ex. E, Plaintiff's Answers to Interrog. No. 5 and 7; Olukayode 65:2-19.)

Independent contractors such as Plaintiff can and often do decline projects. (Clark Decl. ¶ 16.) This happens often and for a variety of reasons; for example, sometimes the independent contractor is already performing consulting services for another company, including Defendants' competitors. (*Id.*) Other times the independent contractor might be too busy working as a practicing physician or as a physician researcher. (*Id.*) Declining a project is not a strike against an independent contractor, and Defendants would not hesitate to ask such a contractor if they are interested in a future project that matches their specialization. (*Id.*)

### B. Plaintiff's Expertise

Plaintiff obtained a medical degree in Nigeria in 2004. (Olukayode 43:24-44:1.) He passed an exam in the United States in 2013 and is certified to practice medicine here. (*Id.* 69:8-21; 91:14-23.) Similar to his medical knowledge, Plaintiff learned about EMR software on his own. (*Id.* 142:20-22.)

Plaintiff understands that "Clinovations works with doctors, alone." (*Id.* 51:13-14.) Consistent with this understanding, Plaintiff admitted that the consultants are "a high-skilled team…not like general consultants." (*Id.* 51:14-15.) Plaintiff is sought because he is a specialist in oncology and the particular software, Beacon, used in an oncology department. (*Id.* 51:19-52:1.) He also specializes in Optime, a software suite for operating rooms. (*Id.* 57:10-13.)

Beyond Defendants, Plaintiff has provided similar at-the-elbow consulting services to various other organizations in the industry, including Encore, DB Health, HCTec, and HCI. (James Decl. Ex. E, Plaintiff's Answers to Interrog. No. 5 and 7; Olukayode 65:2-19.) Plaintiff also worked as a clinic manager at an urgent care center in Fairfax, Virginia between at-the-elbow projects. (Olukayode 67:17-68:13.)

### C.    Plaintiff's Experience With ABC and Optum

Plaintiff entered into an independent contractor agreement with ABC for his at-the-elbow services ("Agreement"). (James Decl. Ex. F.) Plaintiff separately entered into contractor agreements and statement of works for subsequent projects. (James Decl. Ex. G.) Plaintiff testified that the Agreement accurately described his relationship with ABC. (Olukayode 104:22-106:8.) Among other things, the Agreement provided that: (a) the relationship is that of an independent contractor, (b) Plaintiff had the right to control the method and manner of his performance of services, (c) Plaintiff had the right to provide services to other (including competitive) businesses, (d) Plaintiff must provide his own equipment and materials, (e) he could not participate in ABC's benefit plans, and

(f) he was only paid for fees that were agreed upon and properly and timely invoiced. (James Decl. Ex. F.)

Plaintiff successfully negotiated different contract terms, including a raise in his hourly rate. (Olukayode 108:23-109:14.) Plaintiff believes his services are worth an even higher hourly rate now, as a result of the fact that he's "more skilled [and] more competent." (*Id*. 186:16-23.) Moreover, Plaintiff had the ability to accept a project midstream because he had travel plans at the outset of the project, or decline a project because he did not accept the offered hourly rate. (*Id*. 148:8-18, 195:16-196:13.)

Plaintiff testified that no one supervised him while he was working on a project. (*Id.* 126:13-16.) He admitted that the sole training he received was an orientation session conducted by hospital leadership and ABC explaining what they want to achieve with the project. (*Id.* 127:13-24.) For a typical orientation session, this was a two-hour online meeting. (*Id.* 201:13-22, 204:14-24.) Plaintiff explained, "[s]o we are allowed to work as independently as possible. We are not micromanaged. You are supposed to show up at your assigned place and then do the work." (*Id.* 135:25-136:3.) He acknowledged that he never received a performance evaluation or discipline from Defendants. (*Id.* 228:2-6.) More broadly, Defendants "didn't ever do any sort of formal evaluation of [the contractors'] skills or competence." (Clark 82:5-6.)

Even as to the schedule, Plaintiff believes that his work hours were "mutually scheduled." (Olukayode 190:2-10.) But ultimately, Plaintiff worked a particular schedule specified by a project manager because "[i]t's part of the logistics that [he/she] need[s] to

obviously give to the consultant group, when they come onsite to support, they need to know what hours they are working, where they need to report to." (Kamieniecki 31:2-6.)

In Plaintiff's experience, sometimes a project manager was on-site at the hospital; other times, only the contractors were on-site. (*Compare* Olukayode 124:7-9 with 140:7-10.) For one project, Banner Health, Plaintiff admitted that he <u>never</u> interacted with the project manager. (*Id.* 163:18-23.) Ultimately, the project managers did not tell the contractors how to do the job; "that's what [the contractors are] supposed to know how to do." (*Id.* 137:3-7.) Again, the "project managers did not supervise the independent contractors." (Clark 46:9-11.)

No equipment was necessary for Plaintiff's work. (Olukayode 126:19-21, 142:23-25.) However, Plaintiff admitted that he incurred a variety of unreimbursed business expenses, including liability insurance, office maintenance, education, and phone bills, in order "to be on the top of [his] game to be able to compete and be available for [companies to engage him]." (*Id.* 185:1-16.) Plaintiff managed his hourly rate to account for these expenses. (*Id.* 188:7-14.) Consequently, Plaintiff views himself as a "businessman" who "shouldn't be doing business as a loss." (*Id.* 191:8-10.) Indeed, contractors had to solicit business: "the nature of the independent contractors is that when they were looking for the next project, they would often call our staffing coordinator, our HR person, and say, 'Hey, I'm going to be available, do you have a project?'" (Clark 84:25-85:5.)

Plaintiff received "nonemployee compensation" via IRS Form 1099 and filed his taxes as such. (*Id.* 160:25-161:2; James Decl. Ex. H.) Defendants "lump all payments

together"; his hourly rate and travel expenses are not itemized, for example. (Olukayode 190:20-191:2.) He maintained a corporate organization, Jedidiah Holdings, LLC, which he formed in 2014, well before he worked with Defendants. (*Id*. 98:16-99:12.)

In 2016 and 2017, he worked on three projects for ABC across a total of twelve weeks. (James Decl. Ex. I.) Plaintiff last performed at-the-elbow services for Defendants in April 2017. (*Id*.; Olukayode 169:15-17.)

## II.    FACTS REGARDING WILLFULNESS AND GOOD FAITH

### A.    Clinovations' Analysis of Contractor Status

The EMR implementation work at issue is frequently called "legacy Clinovations work" because the busines model of providing like-to-like support for EMR implementation, as well as the decision to engage independent contractors for EMR implementation, was initially made by non-party Clinovations, which was subsequently acquired by ABC. (Clark Decl. ¶¶ 5, 8; Optum 22:20-23.) In making the decision to engage independent contractors, Clinovations relied on the independent contractor guidelines promulgated by the Internal Revenue Service ("IRS"), found at https://www.irs.gov/businesses/small-businesses-self-employed/independent-contractor-self-employed-or-employee. (James Decl. Ex. J; Optum 29:20-30:9.) The IRS guidelines incorporate common law factors of independent contractor status including financial control, behavioral control, and the type of relationship between the parties. (*Id.*) Specifically, the IRS guidelines state that "[a]n independent contractor is generally free to seek out business opportunities," and that "[i]ndependent contractors often advertise, maintain a visible business location, and are available to work in the relevant market."

(*Id.*) The IRS guidelines further note that the permanency of the relationship between the parties is a relevant factor—where the working relationship is expected to continue indefinitely, the relationship suggests employer-employee status; and if the relationship is temporary or project based, the relationship evidences independent contractor status. (*Id.*)

Clinovations' *de facto* General Counsel, Neil Richman, believed that its use of independent contractors for EMR implementation was appropriate (among other reasons) because of the short, distinct project-based work, and because the contractors "move on to provide their services elsewhere" including for competitors. (James Decl. Ex. K; Clark Decl. ¶ 13; Optum 31:13-23, 34:9-16.) Indeed, the fact that clinicians had implementation experience with other companies, even competitors, was valuable and a factor in clinician engagement. (Clark Decl. ¶ 13.)

Clinovations had never been sued with regard to its use of independent contractors for EMR implementation work, and no independent contractor has ever disputed such classification by Clinovations. (James Decl. Ex. L.)

**B.    ABC's Acquisition of Clinovations and Due Diligence Regarding Contractor Classification**

ABC purchased Clinovations on or around January 2014. (Clark Decl. ¶ 5.) Optum subsequently acquired ABC, and the legacy Clinovations work is currently performed by the Provider Technology Services division at Optum. (*Id.* ¶ 6.)

When ABC purchased Clinovations, it inquired as to Clinovations' use of independent contractors. (James Decl. Ex. M.) Clinovations explained that it used

independent contractors pursuant to the IRS guidelines, and affirmed that no independent contractors disputed the classification. (James Decl. Ex. J, L.)

Rather than merely rely on Clinovations' representations, ABC sought legal advice from its outside counsel at Cooley LLP ("Cooley") regarding Clinovations' use of independent contractors for EMR implementation. (James Decl. Ex. K.) Cooley labor and employment attorney Lois Voelz obtained information from Clinovations' General Counsel Richman regarding the nature of EMR implementation work, analyzed the classification of the EMR clinicians pursuant to FLSA requirements, and agreed that the clinicians utilized to perform EMR implementation work were appropriately classified as independent contractors. (*Id.*) In particular, Voelz agreed that the short-term, project-based nature of the work, along with the contractor's ability to freely work in the marketplace, supported the classification of the EMR clinicians as independent contractors under the FLSA: "contractors engaged in short-term focused projects, who serve other clients otherwise, tend to be properly classified as independent contractors." (*Id.*; Optum 35:24-36:19.)

## C.  Defendants' Continued Legal Review of Contractor Engagement for EMR Implementation

Defendants have continued the EMR implementation business after ABC's purchase of Clinovations. As noted above, this includes the use of independent contractor clinicians to provide like-to-like EMR implementation. (Clark Decl. ¶¶ 7, 10.)

Defendants also undertook substantial measures to ensure their continued use of independent contractors remained lawful. ABC's in-house labor and employment

counsel, Jaqueline Depew, validated the proper engagement of independent contractors after ABC's acquisition of Clinovations. (Optum 41:13-22.) Depew developed and utilized a Worker Status Questionnaire for Defendants' engagement of independent contractors. (James Decl. Ex. N; Optum 42:3-9.) The Questionnaire sought specific information regarding the potential contractor and the project at issue that goes directly to the analysis and factors of independent contractor status at common law and under the IRS Guidelines, including:

- Will the Company train the person to perform tasks in a specific way?;

- Will the Company provide more than general instructions regarding the method to use in performing the assignment?;

- Can the person choose the order or sequence of his or her work?;

- Will the person perform regular and continuous services for you?;

- Will the person provide services on a substantially full-time basis?;

- Will the Company be the sole or major source of income for the individual?;

- Will the Company pay the individual's travel and business expenses?;

- Will facilities, tools or equipment be provided to the individual?; and

- Does the person make his or her services available to the general public?

(*Id*.) The aim of the Worker Status Questionnaire is to determine whether—for each independent contractor engaged for each project—the circumstances actually support independent contractor status or suggest otherwise. (Optum 42:3-18.)

4835-0830-3573

Before the business could engage an independent contractor, Depew had to review the Worker Status Questionnaire, or equivalent information, to approve the engagement: "I have to review this information first to ensure that the independent contractor classification is appropriate." (James Decl. Ex. O, P.) Managers and executives involved in planning EMR implementation projects were trained on the process of engaging independent contractors, and were specifically told that legal had to approve the engagement before the business could bring on the contractor.[2] (James Decl. Ex. Q; Optum 42:10-18.) Determinations about independent contractor status were made on a case-by-case basis, not as a global classification. (Optum 42:10-18.)

Additionally, in 2015 and 2016, Defendants engaged additional outside counsel to review Defendants' use of independent contractors. Defendants hired Jackson Lewis, P.C., a national law firm specializing in labor and employment law, to advise and opine regarding Defendants' use and engagement of independent contractors, including the EMR clinicians, as well as to review various documents, including the Worker Status Questionnaire, Scope of Work documents, and the independent contractor agreements. (James Decl. Ex. S.) Jackson Lewis analyzed the material and had no concerns with the contractor classification. (*Id.*) As such, ABC "used yet another outside law firm to validate the correct classification of contractors." (Optum 50:8-16.)

---

[2] Taking its obligations under the FLSA seriously, Defendants also provide additional training on wage and hour compliance to managers. (James Decl. Ex. R.)

4835-0830-3573

### D.    Absence of Litigation, Audits and Complaints

ABC "has not been subject to any lawsuits regarding misclassification of employees, other than this lawsuit." (James Decl. Ex. T, Interrog. Nos. 2, 4.) Likewise, ABC "has not been subject to any [federal Department of Labor or state labor agency] investigations regarding misclassification of employees." (*Id.*) Meanwhile, Optum has not been subject to any litigation or investigations regarding the independent contractors at issue in this litigation. (*Id.*) And UnitedHealth Group is not in the EMR implementation business at all. (Optum 64:8-14.) Finally, there is no evidence of complaints from Plaintiff or the opt-ins before this litigation. (Olukayode 87:13-16; James Decl. Ex. U, Emelue Dep. 94:11-14; Ex. V, Hutton Dep. 70:13-71:3; Ex. W, Ogbechie Dep. 104:3-6.)

## <u>ARGUMENT</u>

## I.    STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Lenzen v. Workers Comp. Reinsurance Ass'n*, 843 F. Supp. 2d 981, 990 (D. Minn. 2011), *aff'd*, 705 F.3d 816 (8th Cir. 2013). The moving party bears the initial burden of demonstrating there are no genuine issues of material fact. *Gilkerson v. Nebraska Colocation Centers, LLC*, 859 F.3d 1115, 1118 (8th Cir. 2017), *reh'g denied* (Aug. 1, 2017). "If the movant does so, the non-moving party must then present evidence showing a genuine issue of material fact." *Id.*

16

To survive summary judgment, "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). A plaintiff's rebuttal must be based on "more than mere speculation, conjecture, or fantasy," and a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). "A mere scintilla of evidence is insufficient to defeat summary judgment." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (quotation marks omitted).

All facts must be viewed in the light most favorable to the nonmoving party. *Gilkerson*, 859 F.3d at 1118. However, the court "is not required to accept unreasonable inferences or sheer speculation as fact." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (quotation makes omitted). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the applicable law." *Hammer v. City of Osage Beach, MO*, 318 F.3d 832, 837 (8th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS

Plaintiff's primary claim is that he was misclassified as a contractor under the FLSA. (S*ee generally* Complaint Count I.) To answer the "employee v. contractor" question, "courts generally look to the economic reality of the arrangement." *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005). As this Court has explained:

> The factors in this economic realities test, although not exhaustive, include: (1) the degree of control over the manner in which the work is performed; (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.

*Le v. Regency Corp*., 957 F. Supp. 2d 1079, 1089 (D. Minn. 2013). "It is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Id.* Indeed, "any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Womack v. RCM Tech. (USA), Inc.,* No. 07-2111(DWF/AJB), 2008 WL 5382318, at *10 (D. Minn. Dec. 23, 2008).

Plaintiff also asserts misclassification claims under Maine, New York, and Maryland law. (S*ee* Complaint Counts II-IV.) Maine and Maryland adopt the federal "economic realities" test. *Director of Bureau of Labor Standards v. Cormier*, 527 A.2d 1297, 1300 (Me. 1987); *see also Affo v. Granite Bay Care, Inc.*, 2013 WL 2383627 at *7, 11 (D. Me. 2013) (holding that the Maine Supreme Court has adopted the FLSA "economic realities" test, and applying FLSA analysis to Maine state law claim);

*McFeeley v. Jackson St. Entertainment, LLC*, 47 F.Supp.3d 260, 267 (D. Md. 2014) ("Courts analyze employee status under the MWHL using the same six-prong economic realities test as the FLSA"); *Randolph v. Power Const., Inc.*, 7 F.Supp.3d 561, 569 (D. Md. 2014) (simultaneously applying the six-factor economic realities test to its analysis of FLSA and MWHL claims).

New York's contractor classification test focuses on the element of control. *Bynog v. Cipriani Group, Inc.*, 802 N.E.2d 1090, 1092-93 (N.Y. App. 2003) ("the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results"). Relevant factors to determine the degree of control include "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* at 1093. However, the five factors are not exhaustive, and a holistic evaluation of the amount of supervision is appropriate. *Rose v. Northwestern Mut. Life Ins.*, 220 F.Supp.3d 363, 373 (E.D.N.Y. 2016). "Minimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship." *Bhanti v. Brookhaven Memorial Hosp. Medical Center, Inc.*, 260 A.D.2d 334, 335 (N.Y. S. Ct. App. Div. 1999); *see also Rose*, 220 F.Supp.3d at 373 ("the mere retention of general supervisory powers over an independent contractor does not create an employment relationship"). Moreover, the existence of an independent contractor

19

agreement "is to be considered, but is not dispositive." *Araneo v. Town Bd. for Town of Clarkston*, 55 A.D.3d 516, 519 (N.Y. S. Ct. App. Div. 2008).

In the interest of brevity and due to the substantial overlap in factors, Defendants will analyze Plaintiff's federal and state claims concurrently using the economic realities test, pointing out differences in the analysis under the New York control test, where appropriate.

### A.      Degree of Control

The first "economic realities" factor considers "the degree of control over the manner in which the work is performed." *Le*, 957 F. Supp. 2d at 1089. Quite simply, Plaintiff testified that no one supervised or otherwise controlled the manner or means of his performance. Aside from brief training on the hospital's particular goals, he was expected to rely on his medical and software expertise. In his own words: "we are allowed to work as independently as possible. We are not micromanaged. You are supposed to show up at your assigned place and then do the work." Plaintiff's Agreement confirmed his right to control the means and manner of performance. *Lester v. Wildwood Fin. Grp., Ltd.*, 205 F.3d 1346 (8th Cir. 2000) ("Although contract language is not solely determinative of employment status, the district court could properly consider the language as one circumstance of the whole activity"); *Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir.1997) (contract language one factor supporting independent contractor classification).

Plaintiff never received a performance evaluation or discipline. In fact, sometimes the project manager was not on-site with him, eliminating any opportunity for

supervision. For one of his three relevant projects, Plaintiff <u>never</u> interacted with the project manager. Ultimately, as Plaintiff himself explained, the project managers did not tell the contractors how to do the job; "that's what [the contractors are] supposed to know how to do." (Olukayode 137:3-7.)

Plaintiff also exercised control by accepting a project midstream because he had travel plans at the outset of the project. Further, Plaintiff testified that he could decline a project because, for example, he did not accept the offered hourly rate. And, as perhaps the clearest indicator of control, Plaintiff worked for a variety of competitors during the same years that he worked on Defendants' projects. In *Saleem v. Corp. Transp. Group*, 854 F.3d 131, 141 (2nd Cir. 2017), the court reasoned:

> [t]he fact that Plaintiffs could (and did) work for CTG's business rivals and transport personal clients while simultaneously maintaining their franchises without consequence suggests, in two respects, that CTG exercised minimal control over Plaintiffs. First, on its face, a company relinquishes control over its workers when it permits them to work for its competitors. Second, when an individual is able to draw income through work for others, he is less economically dependent on his putative employer. This lack of control, while not dispositive, weighs in favor of independent contractor status.

854 F.3d 131, 141 (2nd Cir. 2017) (citing numerous circuit court decisions regarding the importance of a plaintiff's work for competitors). Of course, Plaintiff's actual work for competitors was consistent with his Agreement, which explicitly allowed it.

Plaintiff likely will argue that the project manager's role in creating a schedule suggests control. But Plaintiff himself described his hours as "mutually scheduled." (Olukayode 190:2-10.) And the practical reality is that the hospital needed to be staffed

with clinicians 24/7 during the EMR implementation, thus forcing the hospital to coordinate a schedule with the clinicians.[3]

In any event, the need to maintain a schedule is hardly dispositive of the element of control. For example, in *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993), the employer "assigned the [contractor-welders] to specific welding work and maintained daily time records for each Welder. … [The employer] required the Welders to work the same days and hours as the remainder of [its] crew, including taking the same daily break periods." Nevertheless, the Fifth Circuit held that the welders were properly classified as contractors, relying on many of the same facts present here. *Id*. at 334 (observing, for example, that "the relationship with [the employer] was on a project-by-project basis; the Welders worked from job to job and from company to company; many of the Welders spent little time working for Sunland; the Welders worked while aware that Sunland classified them as independent contractors, and many of them classified themselves as self-employed; [and] the Welders were highly skilled"). In short, the fact that the project managers maintained schedules for the clinicians, if relevant at all, certainly does not overcome the other facts demonstrating that Plaintiff controlled the means and manner of his work.

Likewise, Plaintiff may attempt to characterize the pre-project orientation session conducted by the hospital and ABC as an indicia of control. However, the Department of

---

[3] Contrast this type of work, where being available real-time to the hospital staff is essential, to a project which has a deliverable, where scheduling work hours is unnecessary and demonstrates control.

Labor recently rejected this argument. In a 2019 Opinion Letter addressing contractor status under the FLSA, the DOL observed that:

> Once the service providers begin to use its virtual platform, it provides them with information on how the virtual marketplace works, such as tips on best practices through an online resource center, and feedback from existing users (both consumers and service providers) on the level of service that consumers generally expect.

WHD Opinion Letter, U.S. Dept. of Labor, FLSA2019-6 (Apr. 29, 2019). Nevertheless, the DOL concluded that the company does not "require them to undergo training." *Id*. Plaintiff could hardly dispute that same conclusion here, having admitted that no one tells them how to do the job: "that's what we're supposed to know how to do." (Olukayode 137:3-7.)

In Plaintiff's own words, "we are allowed to work as independently as possible. We are not micromanaged. You are supposed to show up at your assigned place and then do the work." (*Id*. 135:25-136:3.) As such, the control element supports contractor status.[4]

---

[4] The same outcome is even more clear under New York's control test. Plaintiff worked at his own convenience (free to decline projects), was free to engage in other employment (which he did with Defendants' competitors), did not receive fringe benefits (earning only what he contracted for, and certainly not paid time off, health insurance, or a retirement plan), and was not on the employer's payroll (receiving payment as a 1099 contractor). *See Bynog v. Cipriani Group*, 802 N.E.2d 1090, 1092-93 (N.Y. App. 2003) (finding contractor status where waiters worked at their own discretion, worked for competitors, and the instruction was limited to sharing "the particular customer menu and the timing of the various courses being served"). Even the "fixed schedule" factor does not favor employee status under New York law, given the inherent need for Plaintiff (and peers) to work a schedule that ensures 24/7 coverage at the hospital. *Browning v. Ceva Freight, LLC*, 885 F.Supp.2d 590, 602 (E.D.N.Y. 2012) ("Even independent contractors, although 'independent' in name, are required to keep to a schedule. The fact that an

### B.    Opportunity for Profit or Loss

Plaintiff's business investment and opportunity to profit and loss also belie any claim of employee status. He incurs a variety of unreimbursed expenses, such as liability insurance, office maintenance, and education expenses "to be on the top of [his] game to be able to compete and be available for [companies to engage him]." (*Id.* 185:1-16.) In response to these costs, Plaintiff manages his hourly rate to remain profitable. Indeed, he has successfully negotiated his compensation with ABC. And he must evaluate whether to decline work due to unacceptable compensation. Meanwhile, Plaintiff supplements his consulting income with clinical work with patients at a facility in Fairfax, Virginia. With multiple skills to market and work in two different medical fields, all while managing his bottom line, it's no wonder that Plaintiff views himself as a "businessman" who "shouldn't be doing business as a loss." (*Id.* 191:8-10.)

Plaintiff's right (which he regularly exercised) to work for competitors also supports contractor status as to this element. *Lester*, 1999 WL 35793739, at *5-6 (finding that plaintiff had sufficient control over his profitability to render him an independent contractor in part because he could "affect his profitability by providing his services to other businesses in addition to [defendant]"). Likewise, Plaintiff's ability to "choose different types of jobs with different prices, take as many jobs as [he] see[s] fit, and negotiate the price of [his] jobs" demonstrates an opportunity for profit or loss. WHD Opinion Letter, U.S. Dept. of Labor, FLSA2019-6 (Apr. 29, 2019).

---

independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor.")

4835-0830-3573

Ultimately, landing a three-week project will not get the job done. Plaintiff must continually develop his expertise in an evolving industry, market himself to numerous companies, negotiate profitable rates, earn income in a separate field doing direct clinical work, establish and maintain his company, and manage his costs to make his profession work. Thus, this factor also supports contractor status.[5]

### C.     Investment in Equipment or Materials

Plaintiff admits that no equipment is necessary for his work. Rather, it is Plaintiff's know-how that is essential for the job. *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1540-41 (7th Cir. 1987) (Easterbrook, J. concurring) (observing that "the bar sells human capital rather than physical capital, but this does not imply that lawyers are 'employees' of their clients under the FLSA"). As such, Plaintiff has made a substantial personal investment in his medical education and EMR software expertise. And, as discussed above, Plaintiff also has various expenses, including liability insurance, office maintenance, and education expenses. While this factor is not particularly probative in this case and merits little weight, it nevertheless favors contractor status.[6]

### D.     Special Skill

Plaintiff's work undoubtedly requires a special skill – two such skills, in fact. Plaintiff is an oncology and operating room specialist. He has a medical degree and is certified to practice medicine in the United States. Additionally, Plaintiff has specific

---

[5] Likewise, in New York, Plaintiff's ability to accept or decline projects, work for competitors and do clinical work, negotiate his rate, and manage his bottom line, evidence control.

[6] Plaintiff's decisions whether and how to invest in his career and manage his costs once again demonstrates control under New York law.

knowledge of the software suites being implemented in his specialty hospital departments, including Beacon and Optime. Plaintiff obtained both his medical expertise and his EMR software expertise on his own and must remain "on top of [his] game." (Olukayode 43:24-44:1, 142:20-22, 185:1-16.) And Defendants undisputedly required these special skills for engagement; indeed, its business model necessitated these specialists to differentiate from the competition. It is self-evident that very few people have the requisite combination of medical and technical knowledge to perform the clinician's role.

Plaintiff himself touts his special skills and distinguishes himself from mere employees. In his words, the clinicians are "a high-skilled team…not like general consultants." (Olukayode 51:14-15.) Moreover, "the special thing about us was that, because we had the medical background, we could relate better to the doctors." (*Id*. 87:10-12.) And these skills are not superfluous; Plaintiff admits "Clinovations works with doctors, alone." (*Id*. 51:13-14.) *Lester*, 1999 WL 35793739, at *5-6 (affording weight to the plaintiff's presentation of himself as having special skills).

Undeniably, Plaintiff's special medical and technical skills weigh heavily in favor of contractor status.[7]

### E.   Permanence of the Relationship

The duration of Plaintiff's relationship with Defendants also supports contractor status. Initially, it has been almost four years since Plaintiff last worked for Defendants.

---

[7] Plaintiff's unique skills also provide him particular control in his career for purposes of the New York test.

26

And before that, in 2016 and 2017, he worked with ABC for a total of twelve weeks. Meanwhile, Plaintiff was working for Defendants' competitors and performing direct clinical work. Thus, his relationship with Defendants was neither lengthy nor frequent.

It is also notable that Plaintiff was engaged on a project-by-project basis. In *Parrish v. Premier Directional Drilling, L.P.*, the court held that the plaintiffs' project-based work "counsels heavily in favor of IC status; and, in this instance, it persuasively counsels in favor of it." 917 F.3d 369, 387 (5th Cir. 2019). The plaintiffs responded that, like Defendants' episodic EMR implementation work, "the up-and-down nature of the oil business supports showing the relationship was more, than less, permanent." *Id*. The court dismissed this argument, because, like Plaintiff, "the plaintiffs were not paid during the down-period, and there was no guarantee they would receive more work." *Id*.

As in *Parrish*, Plaintiff's project-by-project work confirms the impermanence of the relationship, and yet another factor weighs strongly in favor of contractor status.[8]

## F.    Services Rendered as an Integral Part of the Business

Defendants concede that this factor weighs in favor of employee status. Of course, this is but one factor in the analysis, and is hardly dispositive.[9] Indeed, workers are frequently deemed contractors in more integrated settings. *See e.g. Karlson v. Action Process Service & Private Investigations,* LLC, 860 F.3d 1089, (8th Cir. 2017) (holding that process server was an independent contractor of service company); *Chao v.*

---

[8] For purposes of the New York test, it is noteworthy that Defendants could not exercise control over Plaintiff's career with such a brief tenure.

[9] Note that this factor is not part of the New York test and does not bear on control.

27

*Mid-Atlantic Installation Services, Inc.*, 16 Fed. Appx. 104 (4th Cir. 2001) (holding that cable television installers were independent contractors of cable installation broker).

### G.     Additional Considerations

The eponymous factor of the "economic realities" test is telling. *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) ("courts generally look to the economic reality of the arrangement"). None of Plaintiff's earnings since 2017 are from at-the-elbow work for Defendants, and even in 2016 and 2017, it represented only a small portion of his overall income. This demonstrates that Plaintiff is not economically dependent on Defendants, in contrast to an employee with one client and one source of income. *Brock v. Mr. W Fireworks*, 814 F.2d 1042, 1054 (5th Cir. 1987) (considering economic dependence "examines whether the workers are dependent on a particular business or organization for their continued employment"); *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1385 (3rd Cir. 1985) (same).

Moreover, Plaintiff maintains an LLC to manage his at-the-elbow business. Plaintiff received "nonemployee compensation" via Form 1099, and filed his taxes as such, representing to the IRS that he was a contractor (and therefore not subject to his share of payroll taxes). Plaintiff's corporate formalities also support contractor status. S*ee Barlow v. C.R. England, Inc.*, 703 F.3d 497 (10th Cir. 2012) (giving weight to the plaintiff's formation of a limited liability company); *Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089, 1095 (8th Cir. 2017) (finding "especially indicative of an independent contractor relationship" the fact that defendant did not provide fringe benefits, contribute to worker's compensation, or withhold taxes for

plaintiff, but provided a Form 1099-MISC, and plaintiff subsequently filed a Schedule C (Profit or Loss From Business) tax form deducting certain expenses).

Finally, the parties reduced their arrangement to an independent contractor Agreement, which Plaintiff admitted was accurate. Among other things, the Agreement explicitly stated that the relationship was that of a contractor, the Plaintiff had the right to control the means and manner of performance, and the Plaintiff could work for other (including competitive) businesses. The Agreement also confirmed, for example, that Plaintiff was not eligible to participate in employee benefit plans. While not dispositive alone, the Agreement further supports contractor status.[10] *Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir.1997) (contract language one factor supporting independent contractor classification); *Bonet v. Now Courier, Inc.*, 203 F.Supp.3d 1195, 1208 (S.D. Fla. 2016) (agreement "shed light on Plaintiff's understanding of the 'economic reality' of his relationship with Defendants").

Ultimately, five of the six "economic realities" factors, along with the totality of the circumstances, support Plaintiff's contractor classification. Summary judgment is appropriate.

---

[10] While not dispositive under New York law, the existence of a contractor agreement "is to be considered." *Araneo v. Town Bd. for Town of Clarkston*, 55 A.D.3d 516, 519 (N.Y. S. Ct. App. Div. 2008). The contract, Plaintiff's independent business, and his lack of economic dependence on Defendants, all signal control over his profession.

### III.   PLAINTIFF CANNOT ESTABLISH A WILLFUL VIOLATION OF THE FLSA; MEANWHILE, DEFENDANTS HAVE ESTABLISHED GOOD FAITH

#### A.   Plaintiff Cannot Meet His Burden to Establish a Willful Violation.

A violation of the FLSA is presumptively subject to a two-year statute of limitations. *See* 29 U.S.C. § 255. However, the FLSA's statute of limitations may be extended to three years if the employee demonstrates that the employer's violation is willful, *i.e.*, the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Importantly, Plaintiff bears the burden of showing that Defendants' conduct was willful for purposes of extending the statute of limitations from two to three years. *Smith v. Heartland Auto. Servs., Inc.*, 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006). The willfulness standard "requires more than mere negligence." *Johnson v. Derhaag Motor Sports, Inc.*, No. 13-CV-2311 SRN/FLN, 2014 WL 5817004, at *21 (D. Minn. Nov. 10, 2014). The mere failure to seek legal advice about a classification decision is insufficient to show willfulness, "[b]ut consulting with an attorney about the classifications may preclude a finding of willfulness." *Id.*, *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 923-24 (E.D. La. 2009).

Even unreasonableness is not sufficient to establish a willful violation. *McLaughlin*, 486 U.S. at 135 n. 13. Instead, "willful violations are generally found in cases where an employer had information that its practices were <u>illegal</u>." *Hanscom v. Carteret Mortg. Corp.*, No. CIV.A. 1:06-CV-2483, 2008 WL 4845832, at *5 (M.D. Pa.

Nov. 5, 2008) (emphasis added). "[C]ourts have found willful violations where the employer continued to violate the FLSA despite having notice of the Act's requirements via past investigations, prior agreements to pay wages, and promises to comply." *Tiffey v. Speck Enterprises, Ltd.*, 418 F. Supp. 2d 1120, 1124-25 (S.D. Iowa 2006).

Plaintiffs have no evidence to fulfill their burden of showing that Defendants knew or recklessly disregarded whether their use of independent contractors for EMR implementation violates the FLSA. Defendants have not been subject to any past investigations, prior agreements to pay wages, or promises to comply that would suggest their use of independent contractors was unlawful. Nor have Defendants been sued regarding their use of independent contractors, or even received complaints from independent contractors regarding their classification.

Meanwhile, Defendants affirmatively took several measures to ensure that their use of independent contractors for EMR implementation complied with the FLSA, including review by two different outside legal counsel:

- When ABC purchased Clinovations, it ensured that Clinovations had a proper basis for using independent contractors—the IRS guidelines;

- ABC also confirmed that Clinovations had not received any complaints about misclassification and was not in any disputes with independent contractors over the classification;

- ABC sought legal advice through outside counsel at Cooley LLP on the use of independent contractors for EMR implementation, and counsel opined that Defendants' use of independent contractors was proper under the law;

4835-0830-3573

- ABC's in-house counsel developed and utilized the Worker Status Questionnaire, which specifically addressed the factors considered for independent contractor status, and was designed to certify that the circumstances for each contractor engagement and each project supported independent contractor status;

- As such, determinations about independent contractor status were made on a case-by-case basis, not wholesale;

- The business could not engage independent contractors without first obtaining legal approval for the classification based on the Worker Status Questionnaire or equivalent information;

- Executives and managers were trained on contractor engagement, including the requirement for legal approval, as well as trained on other obligations under the FLSA and wage and hour laws;

- Defendants hired Jackson Lewis, P.C., a national law firm specializing in labor and employment law, to review Defendants' use and engagement of the EMR clinicians;

- Jackson Lewis also specifically reviewed the Worker Status Questionnaire, Scope of Work documents, and the independent contractor agreements; and

- Jackson Lewis did not counsel against Defendants' use of independent contractors.

4835-0830-3573

The facts of this case are, thus, like the facts in *Nerland v. Caribou Coffee Co.*, No. 05-CV-1847 PJS/JJG, 2007 WL 1170770, at *3-4 (D. Minn. Apr. 19, 2007), in which the Court granted summary judgment to the defendant on willfulness. In *Nerland*, the Court found that Caribou's review of its manager classification with outside counsel precluded a finding of willfulness:

> Plaintiffs have submitted no evidence that would permit a reasonable jury to find that Caribou knew that it was violating the FLSA or that it acted in reckless disregard of the FLSA's requirements when it classified its store managers as exempt. Far from showing reckless disregard, Caribou has reviewed the classification of its store managers with legal counsel several times since 2000.

*Id.* The Court rejected the argument that Caribou could have done more in complying with the FLSA, such as interview store managers and keep better records of its compliance efforts, finding that any such shortcomings "may show that Caribou was careless, not that it knew that it was violating the FLSA or that it recklessly disregarded the FLSA." *Id.*

In fact, Defendants took even more steps to ensure compliance here than the employer in *Nerland*. Defendants developed the Worker Status Questionnaire, required case-by-case analysis of the EMR clinician classifications, provided training regarding FLSA requirements, and tasked inside legal counsel with continued compliance efforts.

Defendants' substantial efforts towards compliance with the FLSA and its review of independent contractor engagement with outside counsel preclude a finding of willfulness. No reasonable jury could find that, notwithstanding the care that Defendants took to comply with the FLSA, and notwithstanding the advice that Defendants received

33

from their attorneys, Defendants nevertheless knew that the clinicians should not have been classified as independent contractors or acted with reckless disregard of its obligations under the FLSA. As such, the Court should hold that Plaintiff has not met his burden to prove willfulness as a matter of law.

### B.   Defendants Have Established a Good Faith Basis to Classify Plaintiff as a Contractor.

If Defendants establish that they classified Plaintiff as a contractor in good faith and under reasonable grounds, Plaintiff is not entitled to liquidated damages. 29 U.S.C. §260. "The 'good faith' requirement is a subjective standard where the employer must establish an honest intention to ascertain and follow the dictates of the FLSA." *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008). "To carry his burden, a defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions" and "must also prove its position was objectively reasonable." *Id*.

Defendants' compliance efforts discussed above, including specific consideration of classification law and the engagement and review of various internal and external legal counsel, demonstrate that they maintained both a good faith belief and reasonable grounds to conclude that they properly classified Plaintiff as an independent contractor. *Hultgren v. County of Lancaster, Neb.*, 913 F.2d 498, 509-510 (8th Cir. 1990) (holding that defendant met the good-faith and reasonable-grounds standards where it reviewed the law and consulted with legal counsel). Thus, the Court should preclude liquidated damages as a matter of law.

4835-0830-3573

## **CONCLUSION**

For the reasons stated herein, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss Plaintiff's Complaint in its entirety. If the Court does not dismiss Plaintiff's FLSA claim on the merits, it should hold as a matter of law that Plaintiff has not met its burden of proving a willful FLSA violation, rendering his federal claim time-barred. Additionally, the Court should hold that Defendants acted in good faith and with reasonable grounds, such that Plaintiff is not entitled to liquidated damages.

NILAN JOHNSON LEWIS PA

Dated: January 15, 2021      By: s/ Joseph G. Schmitt
           Joseph G. Schmitt (Reg. No. 231447)
           Sandra L. Jezierski (Reg. No. 267132)
           David A. James (Reg. No. 337389)
           Jason P. Hungerford (Reg. No. 0395908)
           250 Marquette Avenue South, Suite 800
           Minneapolis, MN 55401
           Phone: 612-305-7500
           Fax: 612-305-7501
           jschmitt@nilanjohnson.com
           sjezierski@nilanjohnson.com
           djames@nilanjohnson.com
           jhungerford@nilanjohnson.com

           ATTORNEYS FOR DEFENDANTS

4835-0830-3573