# EXHIBIT G

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT ("**Agreement**") is made and entered into as of February 4, 2016 (the "**Effective Date**"), by and between The Advisory Board Company, a Delaware corporation, with offices at 2445 M Street, NW, Washington, DC 20037 ("**ABC**"), and Jedidiah Holdings LLC, a Virginia corporation, with offices at 6042 Selwood Place Springfield, Virginia 22152 ("**Contractor**").  ABC and Contractor may be referred to herein individually as a "**Party**" and together as the "**Parties**."

ABC desires to engage the services of Contractor and Contractor desires to accept such engagement to perform the services described herein upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, ABC and Contractor hereby agree as follows:

1.   **Services and Scope of Work**.

1.1   Services.  Contractor agrees to provide to ABC specific contractor services as described in such scope of work as executed by both Parties, consecutively numbered and annexed hereto as part of **Exhibit A – Scope of Work** (each "**SOW**").  By executing this Agreement, without execution of any SOW, ABC is not committing or obligating itself to use Contractor's services.  Contractor shall provide the specific contractor services described in an executed SOW ("**Services**") in accordance with the provisions of this Agreement and the applicable SOW.  In the event of any conflict between the provisions of a SOW and of this Agreement, the Agreement shall prevail. Contractor shall provide a Rate Schedule that sets forth the rates for each corresponding title or skill set for all applicable services in **Exhibit B** – Rate Schedule.

1.2   Scope of Work (SOW).  Each SOW shall contain a description of the work to be performed by Contractor and any deliverables to be produced ("**Deliverables**"), timing for performance, a statement of Contractor's rates for performance and a payment schedule, and term for the SOW. Contractor shall not perform any services until an applicable SOW is finalized and fully executed. If Contractor begins to perform any services prior to the execution of an applicable SOW, Contractor hereby acknowledges:  (a) that the terms and conditions of this Agreement (other than the payment provisions) shall apply; and (b) that Contractor does so at its own risk and ABC is not obligated to pay Contractor for any time, work, or costs incurred, unless otherwise agreed in writing.

1.3   Other Work.  Contractor has the right to perform services for others during the Term (as defined below) as long as such other engagement or performance does not interfere in any way with the timely and professional performance of the Services to be provided hereunder or compromise ABC's Confidential Information.

1.4   Performance of Services.  Unless otherwise agreed to by the Parties in a SOW, Contractor shall furnish all equipment and materials used to perform the Services.  In performing the Services, Contractor shall, and shall ensure that its Assistants (as defined below):  (a) comply with all applicable ABC rules, policies and guidelines regarding safety, security, and conduct including but not limited to those listed at: http://downloads.advisory.com/lgl ; (b) perform to the best of their abilities and in a competent and professional manner, and in accordance with ABC's standards; and (c) comply with all applicable local, state and federal laws and regulations. In addition, before commencing Services under this Agreement, Contractor, as the sole Assistant (as defined below), must successfully complete a background investigation that may include without limitation, a

1

OLU000083

criminal background check and verification of education and employment history.  Without limiting the foregoing, Contractor will comply with all applicable international, national, state/provincial and local laws and applicable international standards regarding employment in performing its obligations hereunder; Contractor will promptly notify ABC in writing of any allegation of non-compliance.

**2.**     **Relationship of Parties; Independent Contractor Status.**

2.1  Independent Contractor. Contractor's relationship to ABC is that of an independent contractor, not an agent, employee or servant.  Contractor is fully and solely responsible for the use and employment of its employees, representatives, contractors, or consultants (collectively "Assistants"), and Contractor's Assistants shall not be considered agents, employees or servants of ABC for any purpose.  Contractor and its Assistants shall not represent itself or themselves or hold itself or themselves out to third parties as agents, employees, or servants of ABC. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party.

2.2  Control, Supervision, and Training.  Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services. Contractor shall also be solely responsible for the supervision and training of its Assistants.

2.3  Compensation of Assistants.  Contractor is solely responsible for the payment or non-payment of compensation or salary, including any required overtime payments, to Contractor's Assistants. Contractor is responsible and shall comply with all federal, state and local laws and regulations regarding compensation, hours of work, workplace safety and other conditions of employment.

2.4  No Benefit Plans.  Contractor acknowledges and agrees that  neither it nor its Assistants is eligible for, and shall not participate in, any of ABC's employee benefit plans or programs, including, without limitation, bonus, vacation, health, retirement fund, incentive compensation or other employee programs or policies ("**Benefits Plans**").  If, for any reason, Contractor or any of its Assistants  are deemed to be a statutory or common law employee of ABC by any governmental agency, court, or other entity, Contractor hereby waives any right to, and agrees to neither seek nor accept, any benefits under the Benefits Plans, and agrees to indemnify and hold harmless ABC from any claims, demands, actions, damages, liabilities, costs and expenses arising from or relating to such claims by it or its Assistants relating to such Benefit Plans.

2.5  Assistant Substitution or Removal.  Substitutions of Assistants that are essential to the Services are not permitted without the prior approval of ABC.  Any proposed substitutions must include an explanation of the circumstances necessitating the substitution, and other information requested by ABC necessary to consider the proposed substitution.  All proposed substitutes must have qualifications that are equal to or higher than the personnel being substituted.  ABC will promptly notify the Contractor of approval or disapproval thereof.  ABC retains the right to approve or disapprove all Assistants, and, to request the removal of any Assistant.

**3.**     **Project Management**.  Each Party shall designate a project manager for each SOW who shall act as a liaison between the Parties.

*Confidential*

Updated 04/2015

OLU000084

**4.**     **Fees, Expenses, Records, and Taxes**.

4.1     Fees.  Contractor's entire compensation for performing Services hereunder is set forth in this Agreement.  Each SOW shall set forth the fees due for the Services to be provided thereunder, and Contractor shall invoice ABC as set forth in the SOW.  All Services to be performed on a time and materials basis shall be invoiced in arrears.

4.2     Expenses.      Contractor shall be responsible for all expenses incurred by Contractor in the performance of the Services, unless otherwise set forth in the SOW.

4.3     Payment.  The fees and/or expenses invoiced in accordance with this Section 4, except for any amounts disputed by ABC, shall be payable by ABC within forty-five (45) days of ABC's receipt of each invoice.

4.4     Maximum Dollar Amount.  ABC shall not be liable for any fees and/or expenses under any SOW in excess of the maximum dollar amount specified on such SOW.

4.5     Taxes.  Contractor shall be responsible for determining the applicability of any sales, use, excise, or similar transactional taxes that may be applicable to the performance of the Services, if any, and shall include such on Contractor's invoice for the corresponding Services.  ABC shall pay applicable taxes on the invoice or, in lieu of the payment of any such taxes, ABC may provide Contractor with a certificate acceptable to the taxing authorities exempting ABC from payment of such taxes.  Contractor shall pay all taxes collected from ABC to the appropriate taxing authority.  Contractor represents and warrants that Contractor and its Assistants qualify as independent contractors under the provisions of the Internal Revenue Code.  Contractor further represents and warrants that the payments it receives pursuant to this Agreement shall not be considered "wages" for purposes of income tax withholding, the Federal Insurance Contributions Act ("**FICA**"), and unemployment taxes.  Further, Contractor shall pay and be solely responsible for all taxes, contributions and assessments on payrolls or other charges or payments under all applicable federal, state and local laws, including without limitation withholding from wages of its employees or other Assistants.  Contractor agrees to fully indemnify ABC from any and all liability that might be assessed against ABC for ABC's failure to pay taxes on such compensation.

**5.**     **Acceptance of Services**.

5.1     General. All Services and Deliverables delivered by the Contractor pursuant to this Agreement and the attached SOWs shall be subject to acceptance by ABC.

5.2     Delivery of Software.  If applicable, Contractor shall deliver any software licensed pursuant to this Agreement from its designated server to ABC's designated server by electronic means, such as an FTP download site, and not by tangible media, such as compact discs, tapes or disks.

5.3     Acceptance Criteria.  Each Deliverable shall be subject to acceptance testing by ABC to verify that the Deliverable satisfies the acceptance criteria, if any, mutually agreed to in writing by the Parties and set forth in the applicable SOW.  If no acceptance criteria have been set forth in the applicable SOW, the acceptance criteria shall be as determined by ABC in its sole discretion based upon completeness and quality of the Deliverable and its delivery within the time frames set forth in the applicable SOW.

5.4     Acceptance Testing.  If elected by ABC, acceptance testing for any Deliverable shall commence within ten (10) days of the date on which Contractor notifies the ABC Project Manager, in writing,

3

that the Deliverable has been satisfactorily completed, in Contractor's opinion, and is ready for acceptance testing by ABC.  Acceptance testing shall continue for the period of time specified in the acceptance criteria or, if no such time period has been agreed upon by the Parties, for a period of thirty (30) days (the "**Initial Acceptance Period**").  In the event that any Deliverable does not conform to the acceptance criteria within the Initial Acceptance Period, ABC shall give Contractor written notice thereof.  ABC shall cooperate with Contractor in identifying in what respects the Deliverable has failed to conform to the criteria.  Contractor shall promptly correct any deficiencies that prevent such Deliverable from conforming to the criteria.  If the Deliverable does not conform to the acceptance criteria within thirty (30) days after the end of the Initial Acceptance Period, ABC may do any one or more of the following:

(a)     extend the period of time for Contractor to make corrections;

(b)     direct Contractor to use a third party to make the necessary corrections at Contractor's expense after reasonable consultation with Contractor;

(c)     after reasonable consultation with Contractor, directly or by use of a third party make the necessary corrections and charge to Contractor an amount equal to the costs incurred by ABC in making such correction itself or through a third party contractor, Contractor will, at no additional charge to ABC, provide all necessary cooperation and assistance in connection with ABC or any third party contractor engaged by ABC making the necessary corrections to the Deliverable;

(d)     after reasonable consultation with Contractor, accept the Deliverable in its non-conforming condition and reduce Contractor's charges for the Deliverable by an amount which the Parties, cooperating in good faith, determine reasonably reflects its reduced value; or

(e)     terminate one or more of the applicable SOWs for cause, in whole or in part, as of a date specified in a written notice of termination from ABC to Contractor and without financial liability or obligation.  In the event of such termination, ABC shall be entitled to recover an amount equal to all fees paid for the affected Deliverable, plus all fees paid to Contractor for Services related to the Deliverable and for any other products furnished by Contractor to ABC that were provided in conjunction with the Deliverable and that cannot be utilized effectively or completely by ABC without using the Deliverable.

5.5     Warranty Period.  Contractor represents and warrants to ABC that the Deliverables will perform in accordance with the requirements set forth in the applicable SOW and documentation for a period of ninety (90) days from the date of acceptance by ABC.  In the event the Deliverables fail to do so and such failure is not due to changes in the Deliverables made solely by ABC, and Contractor does not bring the Deliverables into conformance within the timeframe set forth in the applicable SOW and documentation, then upon ABC's notice, ABC may terminate the applicable SOW or this Agreement for cause, and Contractor will return to ABC all monies paid to Contractor to date under the applicable SOW.

**6.     Term and Termination.**

6.1     Term.  This Agreement shall commence on the Effective Date and shall continue in full force and effect thereafter until the second anniversary of the expiration date of the last outstanding SOW, unless this Agreement is terminated earlier in accordance with the provisions of this Agreement (the "**Term**").

4

6.2     <u>Termination For Breach.</u>  Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after thirty (30) days' written notice thereof (or such shorter period as may be specified in this Agreement or in any applicable SOW).

6.3     <u>Termination Upon Notice.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder for any reason by giving the Contractor fourteen (14) days' prior written notice of its election to terminate this Agreement or the SOW.

6.4     <u>Termination by Customer.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder immediately in the event of termination of the agreement or any statement of work between ABC and its Customer receiving any Services and/or Deliverables provided by Contractor under this Agreement or any SOW.

6.5     <u>Termination for Bankruptcy/Insolvency.</u>  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party:  (a) becomes or is declared insolvent or bankrupt; (b) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) days; or (c) makes an assignment for the benefit of creditors.

6.6     <u>ABC Rights and Payment Upon Termination.</u>  In the event of termination of this Agreement, ABC agrees to pay Contractor for all expenses incurred by the Contractor with ABC's approval and as outlined in the SOW up to the effective date of termination.  In the event ABC terminates this Agreement or any SOW prior to the completion of the Services to be rendered:  (a) Contractor shall be compensated with (i) a pro-rata share of the fees due  or (ii) the hours of work completed by Contractor under the applicable SOW(s); and (b) if applicable, ABC shall pay Contractor for all progress milestones (as set forth in the applicable SOW(s)) completed and accepted by ABC and a pro-rata share of the progress milestone Contractor is working to complete at the time the applicable SOW(s) is/are terminated.  Termination under this Agreement shall not affect ABC's rights in and to all Work (as defined below) created for or provided to ABC pursuant to this Agreement prior to the effective date of termination.

**7.     <u>ABC Property/Trademarks</u>.**

7.1     <u>No Rights Transferred.</u>  Nothing in this Agreement shall convey to Contractor or any of its Assistants any right, license, title, or interest in or to the Work, or any other intellectual property or other property interest, license or right of ABC or its licensors.  In addition, Contractor and its Assistants shall have no right to use any ABC trade name, trademark or service mark without the express written permission of ABC.

7.2     <u>Proprietary Rights.</u>  Except for Contractor's Pre-existing Materials (defined below), all work, services, materials, and Deliverables and other Materials (as defined below), provided, performed or created under any SOW ("**Work**"), including, without limitation:  (a) names, characters, protectable organizational structures, or other "brand" components; (b) all materials, specifications, designs, writings, code, products, or other Deliverables developed or prepared for ABC by Contractor under such SOW (whether or not such SOW is completed) or provided or delivered to ABC by Contractors, Assistants or their agents pursuant to this Agreement (collectively, "**Materials**"); and (c) any and all new or improved idea, design, concept, or other invention made or developed by Contractor or its Assistants during the course of rendering the Services or developing or preparing the Materials (collectively, "**Invention**"), are the property of ABC and all title and interest therein shall vest in ABC and shall be deemed to be a work made for hire and made in the course of Services rendered hereunder. As between the Parties, all Work shall be

5

OLU000087

deemed the Confidential Information of ABC.  Contractor shall promptly and completely disclose to ABC in writing any and all Inventions and Contractor shall ensure that its Assistants promptly and completely disclose to ABC in writing any and all Inventions.

To the extent that title to any Work may not, by operation of law, vest in ABC or such Work may not be considered works made for hire, Contractor hereby irrevocably assigns to ABC all right, title and interest in and to any Work.  All Work shall belong exclusively to ABC, and ABC shall have the right to obtain, and to hold in its own name, copyrights, registrations, patents, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Upon ABC's request, Contractor shall, and shall cause its Assistants to, promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist ABC to prosecute, register, perfect or record its rights in or to any Work.  In the event that ABC is unable, after reasonable effort, to obtain Contractor's signature on such papers and documents, Contractor irrevocably designates and appoints ABC as Contractor's agent and attorney-in-fact, to act for and on Contractor's behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other intellectual property related to the Work with the same legal force and effect as if Contractor executed such papers and documents.

If Contractor becomes aware of any breach of this Section 7 by an Assistant, it shall immediately enforce its rights to the fullest extent under its written agreement with such Assistant and immediately notify ABC of such breach.

Unless otherwise requested by ABC, upon the completion of the Services to be performed under each SOW or upon the earlier termination of such SOW, Contractor and its Assistants shall immediately turn over to ABC all Work developed pursuant to such SOW.

For purposes of this Agreement, "**Contractor's Pre-existing Materials**" means any materials, code, methodology, process, technique, or intellectual property right developed, licensed or otherwise acquired by Contractor independent of the Agreement and services to be rendered hereunder and which are not based upon and do not incorporate any ABC Confidential Information or other intellectual property rights of ABC.  Contractor hereby grants to ABC a perpetual, irrevocable, fully paid-up, worldwide, non-exclusive, assignable, sublicensable license to use, reproduce, display, perform, distribute, and make derivative works of any of Contractor's Pre-existing Materials that are incorporated into the Work, in any medium hereby known or hereafter invented for any purpose.

7.3     Third Party Materials.  Contractor shall not bundle with or incorporate into any Work any third party products, ideas, processes, or other techniques ("**third party materials**"), without the prior written approval of ABC; provided, however, if such third party materials are incorporated into any Work as approved by ABC in writing, Contractor hereby assigns to ABC any and all manufacturer's or supplier's warranties, guarantees, representations, service agreements and indemnities, if any, with respect to any third party materials acquired from a third party and provided by Contractor under a SOW to the extent the same are assignable by Contractor.  To the extent any such warranties, guarantees, representations, service agreements and indemnities are not assignable by Contractor, Contractor agrees that ABC may assert or enforce any right that Contractor may have to enforce the same, or if such right can only be enforced by Contractor and in its own name, upon the request of ABC, Contractor will take all reasonable action requested by ABC to enforce the same.

6

OLU000088

8.    **Confidentiality**.

8.1    Introduction.  Each Party (the "**Recipient**") acknowledges that:  (i) the other Party and its Subsidiaries (defined below, and, collectively with such other Party, "**Discloser**") are the owners of valuable trade secrets and other confidential information and license the same from others; and (ii) in the performance of its obligations hereunder, the Recipient shall receive or become aware of such information.

8.2    Definition of Confidential Information.  For the purposes of this Agreement, "**Confidential Information**" shall mean any information relating to or disclosed during the Term, which is or should be reasonably understood to be confidential or proprietary to Discloser and its customers, Subsidiaries, licensors and business partners, including, without limitation, the material terms of this Agreement, information about Discloser's customers, information concerning the relationship of Discloser with third parties, technical processes and formulas, trade secrets, drawings, inventions, know-how, protocols, software programs, source codes, product designs, sales, cost and other unpublished financial information, product and related business plans, methods of operation, technology assessments, database contents, forecasts, market assessments, strategies, projections, marketing data, and other non-public information owned by Discloser and its customers, Subsidiaries, licensors and business partners.  Such Confidential Information may be prepared by the Discloser, or any of its respective directors, officers, employees, consultants, attorneys, and other representatives.  The provisions of this paragraph shall not apply to Confidential Information that:  (i) was in Recipient's possession before receipt from Discloser, as proven by Recipient; (ii) is or becomes a matter of public knowledge through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; (iv) is independently developed by Recipient, as proven by Recipient; (v) is disclosed under operation of law, provided that Recipient will use reasonable efforts to provide Discloser with prompt written notice of any such requirement in order to enable Discloser to seek an appropriate protective order or other remedy, and that Recipient will disclose only such information as is legally required and will use reasonable efforts to obtain confidential treatment for any Confidential Information that is so disclosed; or (vi) is disclosed by Recipient with Discloser's prior written approval.

All Confidential Information that is entitled to protection under the attorney-client privilege, work product doctrine and other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

To the extent that a non-disclosure agreement is executed between the Parties regarding the Services or Deliverables, the non-disclosure agreement will terminate as to such Services and Deliverables and be replaced by the terms of this Section 8.

8.3    Protection of Confidential Information.  Contractor will maintain and follow commercially reasonable and legally compliant information security standards and practices with respect to any of ABC's Confidential Information in Contractor's possession or control and protect such information against any loss, alteration, theft or corruption.  Contractor shall promptly advise ABC after learning of any such unauthorized access, loss, alteration, theft or corruption.  Contractor shall take necessary corrective action within Contractor's reasonable control.  If Contractor believes such corrective action is in the reasonable control of ABC, then Contractor shall advise ABC of the corrective action that it believes ABC should take.  At ABC's request, Contractor shall provide copies of its information security policies, processes, and procedures.  Contractor will notify ABC of any material changes to its policies, processes or procedures that relate to the security of ABC's Confidential Information in Contractor's possession.  Contractor shall comply with all information security and privacy laws, rules or regulations applicable to Contractor as a result of and in

7

OLU000089

connection with its use, protection and retention of ABC Confidential Information and shall be responsible for any breach of such laws, rules or regulations by Contractor or its employees, agents or subcontractors.  Any personal identifying information disclosed to Contractor under this Agreement shall remain protected as Confidential Information under this Agreement for an indefinite period.

8.4    <u>Obligations and Destruction of Confidential Information</u>.  Recipient agrees that Confidential Information may only be used by Recipient as reasonably necessary to carry out the purposes of this Agreement and for the sole benefit of Discloser.  Except as directed by Discloser or as permitted in this paragraph, Recipient will not at any time during or after the Term use Confidential Information for any other purpose or disclose any Confidential Information to any person, or permit any person to examine and/or make copies of any reports or any documents prepared by Recipient or that come into Recipient's possession or under Recipient's control by reason of performance of Recipient's obligations under this Agreement.  Notwithstanding the foregoing, and without limiting the generality of Section 2.1, Contractor, as Recipient, may disclose ABC's Confidential Information to Contractor's Assistants, when, and only to the extent, reasonably necessary to perform the Services; provided that, prior to such disclosure to such Assistants, Contractor shall have informed such Assistants of its confidentiality obligations herein and have executed with such Assistants a written agreement containing confidentiality obligations no less restrictive than those herein.  Contractor shall be responsible for any use or disclosure of Confidential Information by its Assistants in breach of this Agreement.  Recipient agrees to use the same degree of care to protect Discloser's Confidential Information that it uses to protect its own Confidential Information of a like nature from unauthorized disclosure, but in no case less than a reasonable degree of care.

Upon termination of this Agreement, Recipient will turn over to Discloser or destroy all documents, papers, and other matter in Recipient's possession or under Recipient's control that contain or relate to such Confidential Information, and provide written certification of such to Discloser.

8.5    <u>Injunctive Relief</u>.  Recipient acknowledges that misuse or disclosure of any Confidential Information by Recipient may give rise to irreparable injury to Discloser or the owner of such information, inadequately compensable in damages.  Accordingly, Discloser or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other remedies available at law or in equity.  Recipient acknowledges and agrees that the covenants contained in this Section 8 are necessary for the protection of legitimate business interests of Discloser and its customers, Subsidiaries, licensors and business partners, and are reasonable in scope and content.

**9.    <u>Representations and Warranties</u>.**

9.1    <u>Contractor Representations and Warranties</u>.  Contractor represents and warrants to ABC that:  (A) Contractor and each of its Assistants has or shall have the proper skill, training, and background so as to be able to perform the Services in a competent and professional manner and that all work will be performed in accordance with applicable standards for similar services and Contractor shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; (B) each Assistant is properly licensed, if required by applicable law, to perform the Services;  (C) each Assistant has executed written agreements securing for Contractor the intellectual property rights set forth in this Agreement.  Upon the request of ABC, Contractor agrees to provide copies of such written agreements.  If such written agreements do not secure the necessary intellectual property rights based on the review of ABC, ABC may require any Assistant

8

to execute a new or revised written agreement to secure the intellectual property rights provided for in this Agreement; (D) ABC shall receive free, good and clear title to all Work which may be developed by Contractor or its Assistants under this Agreement or which is provided or delivered to ABC by Contractor or Contractor's Assistants pursuant to this Agreement, which title shall be free and clear of any and all liens, encumbrances, claims or litigation, whether pending or threatened; (E) no Work or other materials delivered by Contractor to ABC hereunder shall infringe on or violate (i) any copyright, trademark, or patent right, (ii) any other proprietary or other right of any third party, including but not limited to any third party right to privacy, or (iii) any applicable law or regulation; (F) no Work or other materials delivered by Contractor to ABC hereunder shall contain any scandalous, libelous or unlawful matter or material; (G) Contractor will not publish, broadcast, display or distribute in any media, or allow others to publish, broadcast, display or distribute in any media, the Work or any third party content or any portion thereof without the prior written consent of ABC; and (H) software licensed to ABC by Contractor, if any, contains no code that would directly or indirectly (i) create, or purport to create obligations on ABC with respect to ABC's use or distribution of any software that incorporates, is combined with, or is derived from such software, except as explicitly set forth in this Agreement, (ii) grant, purport to grant, or require ABC to grant to any third party any rights or immunities under ABC's intellectual property or proprietary rights in any software that incorporates, is combined with, or is derived from such software, or (iii) require as a condition of its use, modification, or distribution, that any software incorporated into, derived from, or distributed with such software must be disclosed or distributed in any form.

9.2   <u>Federal Health Care Participation</u>.  Contractor represents to ABC that neither Contractor nor any Assistant is excluded from participating in the U.S. Government's Medicare or Medicaid program (each, a "**Federal Health Care Program**") nor currently debarred or suspended or listed on the U.S. Government's General Services Administration's (the "**GSA**") List of Parties Excluded from Federal Procurement or Nonprocurement Programs in accordance with Executive Orders 12549 and 12689, "*Department and Suspension*", and Contractor warrants to ABC that, during the Term, it will not perform any act that shall cause Contractor to be excluded from such participation or so debarred, suspended or listed.  Contractor further represents to ABC that no adverse action by the U.S. Government that will or may result in exclusions from a Federal Health Care Program has occurred or is pending or threatened against Contractor or any Assistant.  Contractor shall immediately notify ABC if it or any Assistant becomes so excluded, debarred, suspended or listed during the Term.

9.3   <u>Mutual Representations and Warranties</u>.  Each Party represents and warrants to the other Party that: (a) such Party has the full corporate right, power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (b) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (d) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof which are not expressly provided for in this Agreement.

**10.   Indemnification; Limitations; Insurance**.

10.1   <u>Indemnity</u>.  Contractor shall defend, indemnify and hold harmless ABC, its Subsidiaries and its and their officers, directors, agents, and employees from any and all third party claims, demands,

9

liabilities, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses ("**Liabilities**") resulting from:  (a) actual or alleged infringement of any patent, trademark, copyright, or other intellectual property right (including, without limitation, misappropriation of trade secrets) based on any software, program, Services and/or other materials furnished to ABC by Contractor or Contractor's Assistants pursuant to the terms of this Agreement, including, without limitation, the Work or the use thereof by ABC; (b) Contractor's payment or nonpayment of compensation or salary asserted by an Assistant of Contractor; (c) any claim that Contractor or any Assistant stands in any relationship with ABC other than as an independent contractor, including but not limited to employment, co-employment and joint employment; (d) any governmental determination that Contractor has failed to maintain its independent-contractor status or litigation determining a change of Contractor's independent-contractor status, including liability for taxes and other penalties assessed upon ABC because of Contractor's change or lack of independent contractor status; (e) any errors, acts or omissions of Contractor or its Assistants in connection with performing Services to the extent resulting in death, personal injury, or damage to real or tangible personal property; (f) Contractor's or Contractor's Assistant's material breach of any obligation, duty, representation or warranty contained in this Agreement or in any SOW attached hereto; (g) the negligence or willful misconduct of Contractor or its Assistants in performing the Services or other obligations hereunder; and (h) a failure on the part of Contractor or its Assistants to comply with applicable law or regulations in performing the Services.

10.2    Additional Remedy.  Should ABC's use of any service, program, or other material (including, without limitation, the Work) furnished to ABC by Contractor be enjoined by any court, Contractor shall promptly obtain, at no expense to ABC, the right to continue to use the items so enjoined or, at no expense to ABC, to provide ABC promptly with modified or substitute items that are functionally equivalent to the enjoined products.  If Contractor cannot secure ABC's right to continue using such items or substitute such items as provided herein, Contractor agrees to refund all sums paid to Contractor under this Agreement relating to the provision of such items.

10.3    Limitations.  EXCEPT IN CONNECTION WITH A BREACH OF THE CONFIDENTIALITY OR INDEMNITY PROVISIONS HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, OR ARISING FROM ANY OTHER PROVISION OF THE AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

Insurance.  During the Term, if Contractor employs *more than thirty (30) individuals* as employees, Contractor shall maintain in full force and effect the following insurance coverage:  (a) Commercial General Liability insurance with limits of no less than $1 million per occurrence and $2 million annual aggregate for claims due to bodily injury (including death) or property damage caused by or arising from acts or omissions of Contractor or Contractor's Assistants (the Commercial General Liability policy should include coverage for premises and operations, products and completed operations, broad form property damage and blanket contractual liability); (b) Workers' Compensation insurance in compliance with all statutory requirements; (c) Professional Liability insurance with limits of no less than $1 million per claim and $3 million as an annual aggregate (the professional liability policy must extend coverage for copyright and trademark infringement, defamation and misappropriation of ideas as well as any other error, omission or negligent act, and coverage should include, but not be limited to, loss of data, content or indirect loss to ABC); and (d) Umbrella Liability insurance with limits of no less than $5 million per occurrence and $5 million as an annual aggregate.  If during the Term, Contractor employs *thirty (30) individuals or less* as employees, Contractor shall maintain in full force and effect the

10

OLU000092

following adequate insurance coverage: (a) commercial general liability insurance; (b) workers' compensation insurance in compliance with all statutory and regulatory requirements; and (c) professional liability insurance, in each case with insurance policy limits sufficient to protect and indemnify ABC and its subsidiaries, and each of its and their officers, directions, agents, and employees from any losses resulting from Contractor or its employees, agents, contractors, or servants conduct, acts or omissions.

With respect to the foregoing, ABC shall be named as an additional insured on all such policies with the exception of Workers Compensation.  Policies shall be written with a licensed insurance company with a Best's rating of no less than A-.  Contractor shall provide a certificate of insurance evidencing all such required coverage upon ABC's request.  The certificate shall provide:  (a) thirty (30) days' prior written notice of cancellation or any material change in any such policy to ABC's Legal and Business Affairs Department; and (b) a renewal certificate fifteen (15) days prior to the renewal of any such policy.  Insurance required by ABC shall in no way reduce or limit Contractor's actual obligation to indemnify and defend ABC for claims, suits or allegations brought as a result of, or as related to, the performance of this Agreement.  With respect to claims made policies (e.g., Professional Liability), Contractor agrees to maintain insurance for a period of two years after the Term.

**11.**   **Communications**.

11.1   Notice.  Any notice required under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes:  (a) on the delivery date if delivered by confirmed facsimile; (b) on the delivery date if delivered personally to the Party to whom the same is directed; (c) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt; or (d) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available.

In the case of ABC, such notice will be provided to both the ABC Project Manager and ABC Legal and Business Affairs (fax no. 202-266-5700), each at the address of ABC set forth in the first paragraph of this Agreement, or another address as specified by like notice.

In the case of Contractor, except as otherwise specified herein, the notice address shall be the address for Contractor set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax number as provided to  ABC.

11.2   Duty to Inform.  Contractor shall promptly inform ABC of any information related to the Services, including, without limitation, the Work, which could reasonably lead to a claim, demand or liability of or against ABC and/or its Subsidiaries by any third party.

11.3   Publicity.  Contractor agrees that it will not, without the prior written consent of ABC in each case, use in advertising, publicity, or otherwise the name or logo of ABC, or images of ABC facilities and employees, or refer to the existence of this Agreement in press releases, advertising, or materials distributed to prospective customers.

11.4   Statements to Third Parties.  During the Term, Contractor shall not make, publish, or otherwise communicate, or cause to be made, published, or otherwise communicated, any deleterious remarks whatsoever to any third parties concerning ABC, its Subsidiaries or its or their directors, officers,

11

OLU000093

employees or agents, including, without limitation, ABC's business projects, business capabilities, performance of duties and services, or financial position.

**12.** <u>**Non-solicitation**</u>.  During the Term and for a period of one (1) year thereafter, unless ABC expressly authorizes in writing in advance, Contractor shall not solicit, offer work to, employ, or contract with, directly or indirectly, on its own behalf, any of ABC's Personnel or the Personnel of ABC's  Subsidiaries.  For purposes of this Section, "**Personnel**" means any individual or entity whom or which ABC employs or has employed as a partner, employee or independent contractor and with whom or which the Contractor comes into direct contact in the course of performing its obligations under this Agreement.  This Section shall not apply with respect to Personnel who respond to indirect, general solicitations for employment (such as employment agency referrals and Internet postings), as opposed to solicitations targeted to Personnel.

**13.** <u>**Audits; Right to Examine**</u>.

13.1   <u>Maintenance of Records</u>.  Contractor will keep, at its principal place of business, accurate books and records (in whatever form or medium such books and records are stored) regarding the Services performed under each SOW.  Contractor will preserve all books and records for a period of at least seven (7) years from the completion or termination of the applicable SOW or until all pending matters relating to this Agreement are closed.

13.2   <u>Audit Right</u>.  ABC or its authorized representatives will have the right to perform regular audits to examine Contractor's performance of the Services with respect to Contractor's:  (a) compliance with ABC-approved security standards and procedures; (b) compliance with Contractor's internal practices and procedures; (c) use of the systems utilized to provide the Services;  (d) security, disaster recovery and back-up procedures; and (e) fulfillment of any other Contractor obligations (including the obligations of Assistants) under this Agreement.  ABC may elect, at its own expense, to have a full or part-time employee, contractor, or authorized representative on-site at Contractor's facilities for the purpose of ensuring compliance with the terms and conditions of this Agreement.  Contractor agrees to provide such person with all necessary assistance including unrestricted access to Contractor's facilities, dedicated space and a suitable computer workstation.  Contractor shall not be relieved of its responsibility to comply with security provisions even if ABC inspects and detects system failures, fails to inspect, or has the right to inspect, Contractor's facilities, systems and procedures.

**14.** <u>**Protected Health Information**</u>.  Contractor shall comply with the terms and conditions contained in the Business Associate Agreement, attached hereto as <u>**Exhibit C**</u> and incorporated herein by this reference.  Any PHI or EPHI, as defined therein, shall be deemed Confidential Information.

**15.** <u>**Miscellaneous**</u>.

15.1   <u>Force Majeure</u>.  Neither Party shall be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of fire, strike, war, terrorism, insurrection, government restriction or prohibition, or any other causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence (a "Force Majeure Event").  A Party whose performance is impacted by a Force Majeure Event shall give notice to the other Party, stating the period of time the occurrence is expected to continue and shall use diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event.  During the Force Majeure Event, the non-impacted Party may suspend its performance obligations until such time as the impacted Party resumes performance.  The non-impacted Party may terminate this Agreement

12

or any applicable SOWs if such failure or delay continues for a period of thirty (30) days or more and, if the non-impacted Party is ABC, receive a refund for any amounts paid to Contractor in advance for the impacted Services.

15.2    No Waiver.  The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement shall not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same shall be and remain in full force and effect.

15.3    Entire Agreement.  This Agreement, together with all Schedules, Exhibits, SOWs and any other documents incorporated herein by reference, set forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein.  Neither Party shall be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.  For clarification, any additional or different terms appearing on any invoice or other document including terms and conditions in standard or preprinted documents or on Contractor's website that are inconsistent with this Agreement shall be void and have no force or effect.

15.4    Amendment.  No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment.

15.5    Further Assurances.  Contractor shall take such action (including, without limitation, the execution, acknowledgment and delivery of documents) as may reasonably be requested by ABC for the implementation or continuing performance of this Agreement.

15.6    Assignment.  Contractor shall not assign this Agreement or any right, interest or benefit under this Agreement, nor delegate any of its duties or obligations hereunder, without the prior written consent of ABC.  Assumption of the Agreement by any successor to Contractor (including, without limitation, by way of merger, consolidation or sale of all or substantially all of Contractor's stock or assets) shall be subject to ABC's prior written approval.  Except as permitted by the foregoing, any attempted assignment or delegation shall be null, void, and of no effect.  Subject to the foregoing, this Agreement shall be fully binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assigns.

15.7    Construction; Severability.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement:  (a) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law; and (b) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect.

15.8    Interpretation.  For purposes of this Agreement, unless the context otherwise requires, references herein: (i) to Sections, Schedules, Exhibits and SOW(s) refer to the Sections of, and Schedules, Exhibits and SOW(s) attached to this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and

13

any regulations promulgated thereunder. The Schedules, Exhibits and SOW(s) referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

15.9   <u>Remedies</u>.  Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15.10   <u>Applicable Law; Jurisdiction</u>. This Agreement shall be interpreted, construed and enforced in all respects in accordance with the laws of the District of Columbia except for its conflicts of laws principles.  Each Party irrevocably consents and submits to the exclusive jurisdiction of the courts situated in the District of Columbia, in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

15.11   <u>Export Controls</u>.  Contractor agrees to fully comply with all applicable export control laws, regulations, rules, and orders of the United States, and will not export, re-export, release, or transfer (collectively, "**Export**"), directly or indirectly, any commodities, software or technology, including any direct products thereof, or enter into any transactions, for any proscribed end-use, or to or with any proscribed country, entity, or person (wherever located), including but not limited to those entities and persons listed on the U.S. Government's Denied Persons List, Unverified List, Entity List, Debarred Parties List or Specially Designated Nationals List, without first obtaining at its own expense written authorization from the U.S. Government.  Contractor further agrees to provide all technical and operational information and documentation necessary for ABC to Export any Work produced by Contractor and to obtain any required U.S. Government authorizations for the same.

15.12   <u>Headings; Interpretations</u>.  The captions and headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.  This Agreement shall be construed fairly according to its terms, without regard to the drafter of any provision hereof.  The Parties acknowledge and agree that each of them has participated in the negotiation of this Agreement.  The Parties agree that any rule of law requiring construction of a document against a Party by reason of such Party having prepared such document shall not apply to this Agreement.

15.13   <u>Subsidiary</u>.  "**Subsidiary**" means any entity in which a Party owns, directly or indirectly, at least 50% of the equity securities or other ownership interest.  ABC shall have the right to share all or any part of this Agreement (as may be amended) and all associated Work (pursuant to ABC's ownership of such Work) with any of its Subsidiaries.  ABC Subsidiaries located in the United States shall be entitled to purchase Services from Contractor in accordance with the pricing and other terms and conditions of this Agreement.  Any such Subsidiary may obtain Services pursuant to a SOW executed by Contractor and the Subsidiary, and will be bound to the terms of this Agreement, and shall be solely responsible for fulfillment of the respective obligations, and shall have the sole right to exercise the respective rights, conferred upon ABC under this Agreement.  ABC shall have no liability for any of its Subsidiary's actions or failure to comply with any obligations hereunder.

15.14   <u>Counterparts; Facsimile</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile shall be effective to the same extent as if such Party had delivered a manually executed counterpart.

14

15.15   <u>Surviving Sections</u>.  The following Sections shall survive the expiration or termination of this Agreement: 2.1; 2.4; 4.4; 4.5; 6.5; 7; 8; 9; 10; 11; 12; 13; 14; and 15.  In addition, any provisions of this Agreement which expressly or by implication are intended to survive or by implication are intended to survive termination or expiration of the Agreement will survive and continue to bind the Parties.

15.16   <u>Prohibition on Discrimination and Affirmative Action.</u>  **As applicable, ABC and Contractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

15.17   <u>Time.</u>  All references to 'days' in this Agreement refer to calendar days unless other provided herein**.**

*Confidential*

Updated 04/2015

OLU000097

**IN WITNESS WHEREOF**, each Party's duly authorized representative has executed this Agreement as of the Effective Date.

**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**

By:_____        By:_____

Print Name: Amy Schartner                         Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                         Title: Contractor

16

OLU000098

**EXHIBIT A**

**SCOPE OF WORK**

**SCHEDULE NO. 1 EFFECTIVE FEBRUARY 4, 2016**
**TO**
**INDEPENDENT CONTRACTOR AGREEMENT**
**BETWEEN**
**THE ADVISORY BOARD COMPANY ("ABC") AND**
**JEDIDIAH HOLDINGS LLC ("Contractor")**
**DATED AS OF FEBRUARY 4, 2016 the "Agreement")**


1. **Detailed description of project to be accomplished by Contractor:**

   Clinovations will accomplish the following:

   - Provide at-the-elbow, go live support for specialty physicians clinical support staff;
   - Coordinate with an on-site Epic go-live team in order to streamline deployment efforts;
   - Provide supplemental training to specialists and office staff;
   - Deliver guidance for providers on key workflows and Epic functionality (e.g., chart navigation, documentation and e-prescribing);
   - Ensure activities and events associated with go-live efforts are clearly communicated across the HSS practice locations;
   - Create, communicate and manage the detailed go-live support schedule for the Clinovations team;
   - Capture, track and report patient safety concerns, build issues and workflow concerns;
   - Discuss issue resolution and communication with project leadership;
   - Assess processes in the medical office to determine the level of operational efficiency with particular emphasis on the following:
     - Patient flow;
     - Point of care documentation;
     - Clinical documentation strategy and tactics;
     - In-office communication;
     - Chart abstraction;
     - Document management;
   - Evaluate the use of Epic functionality and make recommendations for optimization to complete the following:
     - Improve operational efficiency;
     - Increase productivity;
     - Standardize routine operational tasks;
   - Modify standard workflows based on the current office environment, organizational goals and recommended practices.

2. **Deliverables to be produced by Contractor:**

   N/A

*Confidential*                                                           Updated 04/2015

OLU000099

**3.**    **Time for Performance/Delivery for each Deliverable:**

N/A

**4.**    **Acceptance testing criteria for each Deliverable:**

Not Applicable

**5.**    **Payments:**

(a)    Fee (Choose one)

Time and Materials

Regular Time:   $125/hour

Contractor will submit weekly time reports via OpenAir reflective of billable hours according to approved SOW and Client guidelines. In addition, Contractor will submit an invoice according to reimbursement schedule and after Project Manager approval.

(b)    Expenses

Contractor shall be entitled to reimbursement for expenses preapproved by ABC while performing Services outlines in the Statement of Work in Exhibit A, Expenses are not to exceed $1,500 per week. Approved travel expense reimbursements are paid per ABC and its Clients' policies, provided Contractor has submitted expenses on time, with proper supporting documentation and Project Manager approval.

(c)    Payment SOW

All fees and expenses due shall be invoiced by Contractor in arrears:

| | |
|---|---|
| _____ | Monthly |
| _____ | Upon Completion |
| ___X___ | Other (describe: Weekly) |
| _____ | Progress Payments as follows: |

Progress Payments                    Progress Milestones

$_____          _____

$_____          _____

$_____          _____

$_____          _____

(d)    Maximum Amount

Not Applicable

*Confidential*                                                           Updated 04/2015

OLU000100

7.      **Contractor Project Manager:**          Name:  Dan Clark
                                                 Ph#:    330-801-0131
                                                 Email:  ClarkD@advisory.com


8.      **ABC Project Manager:**                 Name:  Dan Clark
                                                 Ph#:    330-801-0131
                                                 Email:  ClarkD@advisory.com


9.      **Term of this SOW:**                    This term of this SOW is January 29, 2016 through February 13, 2016.


10.     **Additional Terms and Conditions:**  None


**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**


By:_____              By:_____

Print Name: Amy Schartner                         Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                      Title: Contractor

19

*Confidential*                                   Updated 04/2015

OLU000101

**<u>EXHIBIT B</u>**

**RATE SCHEDULE**

N/A

*Confidential*

Updated 04/2015

OLU000102

## EXHIBIT C

### BUSINESS ASSOCIATE AGREEMENT

This Business Associate Subcontractor Agreement ("**BA Agreement**"), effective as of February 4, 2016 (the "**Effective Date**"), is entered into by and between Jedidiah Holdings LLC ("**Provider**") and The Advisory Board Company ("**Advisory Board**") (each a "**Party**" and collectively the "**Parties**").

1.   **BACKGROUND AND PURPOSE.**  The Parties have entered or are entering into one or more agreements for the provision by Provider of Consulting ("**Services**") **("Underlying Agreements")** that are in fulfillment of services that the Advisory Board is obligated to provide for or on behalf of Covered Entities (each a "**Covered Entity**"), which Covered Entities are Advisory Board members.  Each Covered Entity has an arrangement directly with the Advisory Board under which Covered Entity has provided or may provide to the Advisory Board, or the Advisory Board may create, Protected Health Information ("**PHI**") (as defined in 45 C.F.R. § 160.103) subject to the federal privacy regulations ("**Privacy Rule**") and federal security regulations ("**Security Rule**") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 and its implementing regulations, ("**HITECH Act**") as each is amended from time to time (collectively referred to herein as **"HIPAA")**, to the Advisory Board and pursuant to which the Advisory Board, or the Covered Entity, on behalf of the Advisory Board, is providing or may provide the PHI to Provider and/or Provider may create PHI in its performance of the Services.  The purpose of this BA Agreement is to allow for the Advisory Board's compliance with its obligations under HIPAA and its agreements with its Covered Entity members.

2.   **DEFINITIONS**.  Unless otherwise specified in this BA Agreement, all capitalized terms used in this BA Agreement not otherwise defined have the meanings established for purposes of HIPAA, as is amended from time to time.

2.1   "Breach" shall mean the acquisition, access, use or disclosure of PHI in a manner not permitted by the Privacy Rule that compromises the security or privacy of the PHI as defined, and subject to the exceptions set forth, in 45 C.F.R. § 164.402.

2.2   "EPHI" shall mean Electronic Protected Health Information, as defined in 45 C.F.R. § 160.103, limited to the information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.3   "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.4   "Privacy Rule" shall mean the federal privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & E).

2.5   "Security Rule" shall mean the federal security regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & C).

21

OLU000103

3.        **OBLIGATIONS OF THE PARTIES WITH RESPECT TO PHI.**

3.1      <u>Permitted Uses and Disclosures of PHI by Provider</u>. Provider may use and disclose PHI only as permitted by Section 3.2(a) of this BA Agreement.

3.2      <u>Obligations of Provider</u>.  With regard to its use and/or disclosure of PHI, Provider agrees to:

A.        use and/or disclose PHI only as necessary to provide the Services set forth in the Underlying Agreements, as permitted or required by this BA Agreement, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e) or as otherwise Required by Law;

B.        use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by the BA Agreement;

C.        implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the EPHI that it creates, receives, maintains, or transmits on behalf of the Advisory Board in compliance with the Security Rule;

D.        secure all PHI by rendering all PHI unusable, unreadable, or indecipherable to unauthorized individuals in accordance with the United States Department of Human Services Guidance to Render Unsecured Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals, including by encrypting PHI;

E.        without unreasonable delay, and in any event no later than one (1) business day after discovery, report to the Advisory Board in writing: (i) any use or disclosure of PHI of which it becomes aware that is not permitted by this BA Agreement; and/or (ii) any Security Incident of which Provider becomes aware;

F.        without unreasonable delay, and in any event no later than two (2) business days after its discovery by Provider, notify the Advisory Board in writing of any incident that involves an unauthorized acquisition, access, use, or disclosure of PHI, even if Provider believes the incident will not rise to the level of a Breach. The notification shall include: (i) the identification of all individuals whose PHI was or is believed to have been involved, (ii) a brief description of what happened, including the date of the incident and the date of the discovery of the incident, (iii) a description of the types PHI that were involved in the incident, (iv) a brief description of what Provider is doing to investigate the incident, to mitigate harm to individuals, and to protect against any further breaches, (iv) all other information reasonably requested by the Advisory Board to enable the Advisory Board or the applicable Covered Entity to perform and document a risk assessment in accordance with HIPAA and any applicable state breach notification laws with respect to the incident to determine whether a Breach occurred, and (v) all other information reasonably necessary to provide notice to individuals, HHS, state agencies, and/or the media, as required by applicable law. Notwithstanding the foregoing, in the Advisory Board's sole discretion and in accordance with its directions, Provider shall conduct, or pay the costs of conducting, an investigation of any incident required to be reported under this Section 3.2(f) and shall provide, and/or pay the costs of providing, the required notices as set forth in this Section 3.2(f).

G.        require all of its subcontractors and agents that create, receive, maintain, or transmit PHI to agree, in writing, to the same restrictions, conditions, and requirements that apply to Provider under this BA Agreement, including but not limited requiring any subcontractor or agent to implement reasonable and appropriate safeguards in compliance with the Security Rule to protect the EPHI consistent with the requirements of this BA Agreement;

22

OLU000104

H.    make its internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS or to the Advisory Board or applicable Covered Entity within a reasonable timeframe for purposes of determining compliance with HIPAA;

I.    document such disclosures of PHI as would be required for the applicable Covered Entity to respond to a request by an Individual for an accounting of disclosures in accordance with 45 C.F.R. § 164.528 and provide, within ten (10) days after the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) requests the information in writing, the information necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to make an accounting of disclosures of PHI about an Individual, in accordance with 45 C.F.R. § 164.528;

J.    make available within ten (10) days after receiving a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) all PHI necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to respond to an Individuals' request for access to PHI about them, in accordance with 45 C.F.R. § 164.524, in the event that the PHI in Provider's possession constitutes a Designated Record Set, and, when directed by the Covered Entity or the Advisory Board, make the PHI available directly to the Individual;

K.    make available PHI for amendment and incorporate within ten (10) days after a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) any amendments or corrections to the PHI in accordance with 45 C.F.R. § 164.526, in the event that the PHI in Provider's possession constitutes a Designated Record Set;

L.    request, use and/or disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure in compliance with the Privacy Rule's minimum necessary standard and any guidance issued by the United States Department of Health and Human Services;

M.    not directly or indirectly receive remuneration in exchange for any PHI as prohibited by the HITECH Act;

N.    not make or cause to be made any communication about a product or service that is prohibited by the HITECH Act;

O.    not make or cause to be made any written fundraising communication that is prohibited by the HITECH Act;

P.    to the extent Provider is to carry out, on behalf of the Advisory Board, one or more of a Covered Entity's obligations under HIPAA, comply with the requirements of HIPAA that apply to Covered Entity in the performance of such obligations; and

Q.    promptly return to the Advisory Board or destroy (and retain no copies), all PHI in its possession, including such information in the possession of its subcontractors, following the termination or expiration of this BA Agreement, if it is feasible to do so. If Provider determines, and if and only if the Advisory Board agrees, that return or destruction is infeasible, Provider agrees to extend any and all protections, limitations, and restrictions contained in this BA Agreement to Provider's use and/or disclosure of any retained PHI, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the PHI infeasible.

*Confidential*

Updated 04/2015

OLU000105

3.3     Effect of Changes to the Law or Contractual Obligations.  To the extent that any relevant provision of HIPAA is amended in a manner that changes the obligations of Provider or the Advisory Board that are embodied in the terms of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these revised obligations.  If the Advisory Board is required to comply with any provision under the terms of its business associate agreement with any Covered Entity that is not already included in this BA Agreement or is more stringent than a provision of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these additional or more stringent obligations.

4.     **TERMINATION BY ADVISORY BOARD**.  In the event of a material breach of the terms of this BA Agreement by Provider, the Advisory Board shall provide Provider written notice of that breach and may either (i) immediately terminate this BA Agreement and the underlying services agreement with Provider, or (ii) afford Provider an opportunity to cure the breach, provided, however, that if Provider fails to cure the breach within a reasonable time specified by the Advisory Board, the Advisory Board may terminate this BA Agreement and the Underlying Agreements with Provider.

5.     **INDEMNIFICATION**.  Provider shall indemnify, defend and hold harmless the Advisory Board and its officers, directors, trustees, employees and agents (the Advisory Board's "**Personnel**") from any and all third party claims, liabilities and expenses which the Advisory Board or its Personnel may incur as a result of, arising out of, or relating to, a breach of the Provider's obligations under this BA Agreement.

6.     **MISCELLANEOUS.**

6.1     Construction of Terms:  Any unclear terms of this BA Agreement shall be construed in a manner that allows the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to comply with HIPAA.

6.2     Survival.  Sections 1, 2, 3, 4, 5 and 6 of this BA Agreement shall survive termination of this BA Agreement and continue indefinitely solely with respect to PHI Provider retains in accordance with Section 3.2(q).

6.3     No Third Party Beneficiaries.  Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, each of the undersigned has caused this BA Agreement to be duly executed in its name and on its behalf.

**Jedidiah Holdings LLC**                                    **The Advisory Board Company**

By: _____          By: _____

Print Name: Oluro Olukayode Oladimeji, MD     Print Name: Amy Schartner

Print Title: Contractor                       Print Title: Senior Vice President

25

OLU000107

# Signature Certificate



 Document Reference:  `PKED2HJIB35M5S4JG3XGDY`



**Oluro Olukayode**
Party ID: M6ZFYXJP93NNRJVL4VLL6R
IP Address: 172.56.34.232

| VERIFIED EMAIL: | yehudak12@yahoo.com |



| Multi-Factor Digital Fingerprint Checksum | `f3ffddaa0596b557c855f24364894b7fd0720a25` |





**Amy Schartner**
Party ID: DWBURDJVWLSDWBKP8VM4RF
IP Address: 173.79.219.67

| VERIFIED EMAIL: | schartna@advisory.com |



| Multi-Factor Digital Fingerprint Checksum | `e4a16169a98309845ee96ad9eae3ce7b7da0477f` |



| Timestamp | Audit |
|---|---|
| 2016-02-04 18:09:18 -0800 | All parties have signed document. Signed copies sent to: Charles Wright, Jeremy Geneaux, Neil Rothberg, Konrad Kraszewski, Sharon Charron, Megan Linehan, Jacqueline Dagg, Oluro Olukayode, and Amy Schartner. |
| 2016-02-04 18:09:17 -0800 | Document signed by Oluro Olukayode (yehudak12@yahoo.com) with drawn signature. - 173.251.110.210 |
| 2016-02-04 14:54:27 -0800 | Document viewed by Oluro Olukayode (yehudak12@yahoo.com). - 172.56.34.232 |
| 2016-02-04 14:27:45 -0800 | Document signed by Amy Schartner (schartna@advisory.com) with drawn signature. - 173.79.219.67 |
| 2016-02-04 13:53:11 -0800 | Document viewed by Amy Schartner (schartna@advisory.com). - 173.79.219.67 |
| 2016-02-04 13:15:53 -0800 | Document created by Jacqueline Dagg (daggj@advisory.com). - 76.106.84.170 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

OLU000108

**EXHIBIT A**

**SCOPE OF WORK**

**SCHEDULE NO. 2 EFFECTIVE MARCH 20, 2017**
**TO**
**INDEPENDENT CONTRACTOR AGREEMENT**
**BETWEEN**
**THE ADVISORY BOARD COMPANY ("ABC") AND**
**JEDIDIAH HOLDINGS LLC ("Contractor")**
**DATED AS OF FEBRUARY 4, 2016 the "Agreement")**

1.  **Detailed description of project to be accomplished by Contractor:**

Contractor will support the physician and clinical staff at SMHC on behalf of Clinovations:

- Physician Informaticists will participate in a session to become acclimated to the MaineHealth build, workflows and practice nuances via a GoToMeeting.
- Physician Informaticist will provide at the elbow support.
- Physician Informaticists should all have specific experience supporting Epic implementations.
- Physician Informaticists will continue teaching the staff and technicians efficient ways to use the system as designed and built.
- Physician Informaticists will follow MaineHealth Policies and Code of Conduct while onsite, and an onboarding guide will be provided by project management to outline specific work and travel expectations.
- Physician Informaticist shifts and schedules will be set by the Clinovations Project Manager, but is subject to change based off feedback from SMHC.

2.  **Deliverables to be produced by Contractor:**

N/A

3.  **Time for Performance/Delivery for each Deliverable:**

N/A

4.  **Acceptance testing criteria for each Deliverable:**

Not Applicable

5.  **Payments:**

(a)   Fee (Choose one)

Time and Materials

1

Regular Time:  $125/hour

Contractor will submit weekly time reports via OpenAir reflective of billable hours according to approved SOW and Client guidelines. In addition, Contractor will submit an invoice according to reimbursement schedule and after Project Manager approval.

(b)     Expenses

Contractor shall be entitled to reimbursement for expenses preapproved by ABC while performing Services outlines in the Statement of Work in Exhibit A, Expenses are not to exceed $1,500 per week. Approved travel expense reimbursements are paid per ABC and its Clients' policies, provided Contractor has submitted expenses on time, with proper supporting documentation and Project Manager approval.

(c)     Payment SOW

All fees and expenses due shall be invoiced by Contractor in arrears:

| | |
|---|---|
| _____ | Monthly |
| _____ | Upon Completion |
| ___X____ | Other (describe: Weekly) |
| _____ | Progress Payments as follows: |

Progress Payments                Progress Milestones

$_____                        _____

$_____                        _____

$_____                        _____

$_____                        _____

(d)     Maximum Amount

Not Applicable


**7.     Contractor Project Manager:**          Name:  Preston Raulerson
                                                Ph#:    321-961-8326
                                                Email:  RaulersP@advisory.com




**8.     ABC Project Manager:**                 Name:  Preston Raulerson
                                                Ph#:    321-961-8326
                                                Email:  RaulersP@advisory.com

2

*Confidential*                                                              Updated 04/2015

OLU000030

**9.**     <u>**Term of this SOW**</u>**:**          This term of this SOW is March 25, 2017 through April 7, 2017.

**10.**     <u>**Additional Terms and Conditions:**</u>  None

**THE ADVISORY BOARD COMPANY**          **JEDIDIAH HOLDINGS LLC**

By: _____          By: _____

Print Name: Amy Schartner          Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President          Title: Contractor

*Confidential*                                        Updated 04/2015

OLU000031

# Signature Certificate



🔒 Document Reference:  BSBZ4AJ9XK626JBGRVBLUL



**Oluro Olukayode**
Party ID: UST4REITP25NH5WEEZ3GZ8
IP Address: 173.66.245.250

| VERIFIED EMAIL: | yehudak12@yahoo.com |



Multi-Factor
**Digital Fingerprint Checksum**   c0929bb831ff9d4bad5973099a37cbe09172dc57





**Amy Schartner**
Party ID: CWC2RKI5RISJYD6ZVI2XTE
IP Address: 50.194.2.154

| VERIFIED EMAIL: | schartna@advisory.com |



Multi-Factor
**Digital Fingerprint Checksum**   32001250faf4e8cb4d76175ab5afebd2a0b8384f



| Timestamp | Audit |
|---|---|
| 2017-03-21 16:55:32 -0700 | All parties have signed document. Signed copies sent to: Jeremy Geneaux, Charles Wright, Neil Rothberg, Megan Linehan, Jacqueline Dagg, Oluro Olukayode, and Amy Schartner. |
| 2017-03-21 16:55:32 -0700 | Document signed by Oluro Olukayode (yehudak12@yahoo.com) with drawn signature. - 173.66.245.250 |
| 2017-03-21 16:53:52 -0700 | Document viewed by Oluro Olukayode (yehudak12@yahoo.com). - 173.66.245.250 |
| 2017-03-21 08:32:50 -0700 | Document signed by Amy Schartner (schartna@advisory.com) with drawn signature. - 50.194.2.154 |
| 2017-03-21 08:27:20 -0700 | Document viewed by Amy Schartner (schartna@advisory.com). - 50.194.2.154 |
| 2017-03-21 06:17:16 -0700 | Document created by Jacqueline Dagg (daggj@advisory.com). - 76.106.84.170 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

OLU000032

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT ("**Agreement**") is made and entered into as of May 9, 2016 (the "**Effective Date**"), by and between The Advisory Board Company, a Delaware corporation, with offices at 2445 M Street, NW, Washington, DC 20037 ("**ABC**"), and Jedidiah Holdings LLC, a Virginia corporation, with offices at 6042 Selwood Place, Springfield, VA 22152 ("**Contractor**").  ABC and Contractor may be referred to herein individually as a "**Party**" and together as the "**Parties**."

ABC desires to engage the services of Contractor and Contractor desires to accept such engagement to perform the services described herein upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, ABC and Contractor hereby agree as follows:

1.    **Services and Scope of Work**.

    1.1    Services.  Contractor agrees to provide to ABC specific contractor services as described in such scope of work as executed by both Parties, consecutively numbered and annexed hereto as part of **Exhibit A – Scope of Work**  (each "**SOW**").  By executing this Agreement, without execution of any SOW, ABC is not committing or obligating itself to use Contractor's services.  Contractor shall provide the specific contractor services described in an executed SOW ("**Services**") in accordance with the provisions of this Agreement and the applicable SOW.  In the event of any conflict between the provisions of a SOW and of this Agreement, the Agreement shall prevail. Contractor shall provide a Rate Schedule that sets forth the rates for each corresponding title or skill set for all applicable services in **Exhibit B** – Rate Schedule.

    1.2    Scope of Work (SOW).  Each SOW shall contain a description of the work to be performed by Contractor and any deliverables to be produced ("**Deliverables**"), timing for performance, a statement of Contractor's rates for performance and a payment schedule, and term for the SOW. Contractor shall not perform any services until an applicable SOW is finalized and fully executed. If Contractor begins to perform any services prior to the execution of an applicable SOW, Contractor hereby acknowledges:  (a) that the terms and conditions of this Agreement (other than the payment provisions) shall apply; and (b) that Contractor does so at its own risk and ABC is not obligated to pay Contractor for any time, work, or costs incurred, unless otherwise agreed in writing.

    1.3    Other Work.  Contractor has the right to perform services for others during the Term (as defined below) as long as such other engagement or performance does not interfere in any way with the timely and professional performance of the Services to be provided hereunder or compromise ABC's Confidential Information.

    1.4    Performance of Services.  Unless otherwise agreed to by the Parties in a SOW, Contractor shall furnish all equipment and materials used to perform the Services.  In performing the Services, Contractor shall, and shall ensure that its Assistants (as defined below):  (a) comply with all applicable ABC rules, policies and guidelines regarding safety, security, and conduct including but not limited to those listed at: http://downloads.advisory.com/lgl ; (b) perform to the best of their abilities and in a competent and professional manner, and in accordance with ABC's standards; and (c) comply with all applicable local, state and federal laws and regulations.  In addition, before commencing Services under this Agreement, Contractor, as the sole Assistant (as defined below), must successfully complete a background investigation that may include without limitation, a

1

OLU000033

criminal background check and verification of education and employment history.  Without limiting the foregoing, Contractor will comply with all applicable international, national, state/provincial and local laws and applicable international standards regarding employment in performing its obligations hereunder; Contractor will promptly notify ABC in writing of any allegation of non-compliance.

**2.**      **Relationship of Parties; Independent Contractor Status.**

     2.1 <u>Independent Contractor.</u> Contractor's relationship to ABC is that of an independent contractor, not an agent, employee or servant.  Contractor is fully and solely responsible for the use and employment of its employees, representatives, contractors, or consultants (collectively "Assistants"), and Contractor's Assistants shall not be considered agents, employees or servants of ABC for any purpose.  Contractor and its Assistants shall not represent itself or themselves or hold itself or themselves out to third parties as agents, employees, or servants of ABC. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party.

     2.2 <u>Control, Supervision, and Training.</u>  Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services. Contractor shall also be solely responsible for the supervision and training of its Assistants.

     2.3 <u>Compensation of Assistants.</u>  Contractor is solely responsible for the payment or non-payment of compensation or salary, including any required overtime payments, to Contractor's Assistants.  Contractor is responsible and shall comply with all federal, state and local laws and regulations regarding compensation, hours of work, workplace safety and other conditions of employment.

     2.4 <u>No Benefit Plans.</u>  Contractor acknowledges and agrees that  neither it nor its Assistants is eligible for, and shall not participate in, any of ABC's employee benefit plans or programs, including, without limitation, bonus, vacation, health, retirement fund, incentive compensation or other employee programs or policies ("**Benefits Plans**").  If, for any reason, Contractor or any of its Assistants  are deemed to be a statutory or common law employee of ABC by any governmental agency, court, or other entity, Contractor hereby waives any right to, and agrees to neither seek nor accept, any benefits under the Benefits Plans, and agrees to indemnify and hold harmless ABC from any claims, demands, actions, damages, liabilities, costs and expenses arising from or relating to such claims by it or its Assistants relating to such Benefit Plans.

     2.5 <u>Assistant Substitution or Removal.</u>  Substitutions of Assistants that are essential to the Services are not permitted without the prior approval of ABC.  Any proposed substitutions must include an explanation of the circumstances necessitating the substitution, and other information requested by ABC necessary to consider the proposed substitution.  All proposed substitutes must have qualifications that are equal to or higher than the personnel being substituted.  ABC will promptly notify the Contractor of approval or disapproval thereof.  ABC retains the right to approve or disapprove all Assistants, and, to request the removal of any Assistant.

**3.**      **Project Management**.  Each Party shall designate a project manager for each SOW who shall act as a liaison between the Parties.

**4.**      **Fees, Expenses, Records, and Taxes**.

4.1     Fees.  Contractor's entire compensation for performing Services hereunder is set forth in this Agreement.  Each SOW shall set forth the fees due for the Services to be provided thereunder, and Contractor shall invoice ABC as set forth in the SOW.  All Services to be performed on a time and materials basis shall be invoiced in arrears.

4.2     Expenses.    Contractor shall be responsible for all expenses incurred by Contractor in the performance of the Services, unless otherwise set forth in the SOW.

4.3     Payment.  The fees and/or expenses invoiced in accordance with this Section 4, except for any amounts disputed by ABC, shall be payable by ABC within forty-five (45) days of ABC's receipt of each invoice.

4.4     Maximum Dollar Amount.  ABC shall not be liable for any fees and/or expenses under any SOW in excess of the maximum dollar amount specified on such SOW.

4.5     Taxes.  Contractor shall be responsible for determining the applicability of any sales, use, excise, or similar transactional taxes that may be applicable to the performance of the Services, if any, and shall include such on Contractor's invoice for the corresponding Services.  ABC shall pay applicable taxes on the invoice or, in lieu of the payment of any such taxes, ABC may provide Contractor with a certificate acceptable to the taxing authorities exempting ABC from payment of such taxes.  Contractor shall pay all taxes collected from ABC to the appropriate taxing authority.  Contractor represents and warrants that Contractor and its Assistants qualify as independent contractors under the provisions of the Internal Revenue Code.  Contractor further represents and warrants that the payments it receives pursuant to this Agreement shall not be considered "wages" for purposes of income tax withholding, the Federal Insurance Contributions Act ("**FICA**"), and unemployment taxes.  Further, Contractor shall pay and be solely responsible for all taxes, contributions and assessments on payrolls or other charges or payments under all applicable federal, state and local laws, including without limitation withholding from wages of its employees or other Assistants.  Contractor agrees to fully indemnify ABC from any and all liability that might be assessed against ABC for ABC's failure to pay taxes on such compensation.

**5.     Acceptance of Services.**

5.1     General. All Services and Deliverables delivered by the Contractor pursuant to this Agreement and the attached SOWs shall be subject to acceptance by ABC.

5.2     Delivery of Software.  If applicable, Contractor shall deliver any software licensed pursuant to this Agreement from its designated server to ABC's designated server by electronic means, such as an FTP download site, and not by tangible media, such as compact discs, tapes or disks.

5.3     Acceptance Criteria.  Each Deliverable shall be subject to acceptance testing by ABC to verify that the Deliverable satisfies the acceptance criteria, if any, mutually agreed to in writing by the Parties and set forth in the applicable SOW.  If no acceptance criteria have been set forth in the applicable SOW, the acceptance criteria shall be as determined by ABC in its sole discretion based upon completeness and quality of the Deliverable and its delivery within the time frames set forth in the applicable SOW.

5.4     Acceptance Testing.  If elected by ABC, acceptance testing for any Deliverable shall commence within ten (10) days of the date on which Contractor notifies the ABC Project Manager, in writing, that the Deliverable has been satisfactorily completed, in Contractor's opinion, and is ready for acceptance testing by ABC.  Acceptance testing shall continue for the period of time specified in

3

OLU000035

the acceptance criteria or, if no such time period has been agreed upon by the Parties, for a period of thirty (30) days (the "**Initial Acceptance Period**").  In the event that any Deliverable does not conform to the acceptance criteria within the Initial Acceptance Period, ABC shall give Contractor written notice thereof.  ABC shall cooperate with Contractor in identifying in what respects the Deliverable has failed to conform to the criteria.  Contractor shall promptly correct any deficiencies that prevent such Deliverable from conforming to the criteria.  If the Deliverable does not conform to the acceptance criteria within thirty (30) days after the end of the Initial Acceptance Period, ABC may do any one or more of the following:

(a)      extend the period of time for Contractor to make corrections;

(b)      direct Contractor to use a third party to make the necessary corrections at Contractor's expense after reasonable consultation with Contractor;

(c)      after reasonable consultation with Contractor, directly or by use of a third party make the necessary corrections and charge to Contractor an amount equal to the costs incurred by ABC in making such correction itself or through a third party contractor, Contractor will, at no additional charge to ABC, provide all necessary cooperation and assistance in connection with ABC or any third party contractor engaged by ABC making the necessary corrections to the Deliverable;

(d)      after reasonable consultation with Contractor, accept the Deliverable in its non-conforming condition and reduce Contractor's charges for the Deliverable by an amount which the Parties, cooperating in good faith, determine reasonably reflects its reduced value; or

(e)      terminate one or more of the applicable SOWs for cause, in whole or in part, as of a date specified in a written notice of termination from ABC to Contractor and without financial liability or obligation.  In the event of such termination, ABC shall be entitled to recover an amount equal to all fees paid for the affected Deliverable, plus all fees paid to Contractor for Services related to the Deliverable and for any other products furnished by Contractor to ABC that were provided in conjunction with the Deliverable and that cannot be utilized effectively or completely by ABC without using the Deliverable.

5.5      <u>Warranty Period</u>.  Contractor represents and warrants to ABC that the Deliverables will perform in accordance with the requirements set forth in the applicable SOW and documentation for a period of ninety (90) days from the date of acceptance by ABC.  In the event the Deliverables fail to do so and such failure is not due to changes in the Deliverables made solely by ABC, and Contractor does not bring the Deliverables into conformance within the timeframe set forth in the applicable SOW and documentation, then upon ABC's notice, ABC may terminate the applicable SOW or this Agreement for cause, and Contractor will return to ABC all monies paid to Contractor to date under the applicable SOW.

## 6.      <u>Term and Termination</u>.

6.1      <u>Term</u>.  This Agreement shall commence on the Effective Date and shall continue in full force and effect thereafter until the second anniversary of the expiration date of the last outstanding SOW, unless this Agreement is terminated earlier in accordance with the provisions of this Agreement (the "**Term**").

6.2      <u>Termination For Breach</u>.  Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after thirty (30) days' written notice thereof (or such shorter period as may be specified in this Agreement or in any applicable SOW).

4

6.3    <u>Termination Upon Notice.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder for any reason by giving the Contractor fourteen (14) days' prior written notice of its election to terminate this Agreement or the SOW.

6.4    <u>Termination by Customer.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder immediately in the event of termination of the agreement or any statement of work between ABC and its Customer receiving any Services and/or Deliverables provided by Contractor under this Agreement or any SOW.

6.5    <u>Termination for Bankruptcy/Insolvency</u>.  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party:  (a) becomes or is declared insolvent or bankrupt; (b) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) days; or (c) makes an assignment for the benefit of creditors.

6.6    <u>ABC Rights and Payment Upon Termination.</u>  In the event of termination of this Agreement, ABC agrees to pay Contractor for all expenses incurred by the Contractor with ABC's approval and as outlined in the SOW up to the effective date of termination.  In the event ABC terminates this Agreement or any SOW prior to the completion of the Services to be rendered:  (a) Contractor shall be compensated with (i) a pro-rata share of the fees due  or (ii) the hours of work completed by Contractor under the applicable SOW(s); and (b) if applicable, ABC shall pay Contractor for all progress milestones (as set forth in the applicable SOW(s)) completed and accepted by ABC and a pro-rata share of the progress milestone Contractor is working to complete at the time the applicable SOW(s) is/are terminated.  Termination under this Agreement shall not affect ABC's rights in and to all Work (as defined below) created for or provided to ABC pursuant to this Agreement prior to the effective date of termination.

**7.**    **ABC Property/Trademarks**.

7.1    <u>No Rights Transferred</u>.  Nothing in this Agreement shall convey to Contractor or any of its Assistants any right, license, title, or interest in or to the Work, or any other intellectual property or other property interest, license or right of ABC or its licensors.  In addition, Contractor and its Assistants shall have no right to use any ABC trade name, trademark or service mark without the express written permission of ABC.

7.2    <u>Proprietary Rights</u>.  Except for Contractor's Pre-existing Materials (defined below), all work, services, materials, and Deliverables and other Materials (as defined below), provided, performed or created under any SOW ("**Work**"), including, without limitation:  (a) names, characters, protectable organizational structures, or other "brand" components; (b) all materials, specifications, designs, writings, code, products, or other Deliverables developed or prepared for ABC by Contractor under such SOW (whether or not such SOW is completed) or provided or delivered to ABC by Contractors, Assistants or their agents pursuant to this Agreement (collectively, "**Materials**"); and (c) any and all new or improved idea, design, concept, or other invention made or developed by Contractor or its Assistants during the course of rendering the Services or developing or preparing the Materials (collectively, "**Invention**"), are the property of ABC and all title and interest therein shall vest in ABC and shall be deemed to be a work made for hire and made in the course of Services rendered hereunder. As between the Parties, all Work shall be deemed the Confidential Information of ABC.  Contractor shall promptly and completely disclose to ABC in writing any and all Inventions and Contractor shall ensure that its Assistants promptly and completely disclose to ABC in writing any and all Inventions.

5

To the extent that title to any Work may not, by operation of law, vest in ABC or such Work may not be considered works made for hire, Contractor hereby irrevocably assigns to ABC all right, title and interest in and to any Work.  All Work shall belong exclusively to ABC, and ABC shall have the right to obtain, and to hold in its own name, copyrights, registrations, patents, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof.  Upon ABC's request, Contractor shall, and shall cause its Assistants to, promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist ABC to prosecute, register, perfect or record its rights in or to any Work.  In the event that ABC is unable, after reasonable effort, to obtain Contractor's signature on such papers and documents, Contractor irrevocably designates and appoints ABC as Contractor's agent and attorney-in-fact, to act for and on Contractor's behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other intellectual property related to the Work with the same legal force and effect as if Contractor executed such papers and documents.

If Contractor becomes aware of any breach of this Section 7 by an Assistant, it shall immediately enforce its rights to the fullest extent under its written agreement with such Assistant and immediately notify ABC of such breach.

Unless otherwise requested by ABC, upon the completion of the Services to be performed under each SOW or upon the earlier termination of such SOW, Contractor and its Assistants shall immediately turn over to ABC all Work developed pursuant to such SOW.

For purposes of this Agreement, "**Contractor's Pre-existing Materials**" means any materials, code, methodology, process, technique, or intellectual property right developed, licensed or otherwise acquired by Contractor independent of the Agreement and services to be rendered hereunder and which are not based upon and do not incorporate any ABC Confidential Information or other intellectual property rights of ABC.  Contractor hereby grants to ABC a perpetual, irrevocable, fully paid-up, worldwide, non-exclusive, assignable, sublicensable license to use, reproduce, display, perform, distribute, and make derivative works of any of Contractor's Pre-existing Materials that are incorporated into the Work, in any medium hereby known or hereafter invented for any purpose.

7.3   Third Party Materials.  Contractor shall not bundle with or incorporate into any Work any third party products, ideas, processes, or other techniques ("**third party materials**"), without the prior written approval of ABC; provided, however, if such third party materials are incorporated into any Work as approved by ABC in writing, Contractor hereby assigns to ABC any and all manufacturer's or supplier's warranties, guarantees, representations, service agreements and indemnities, if any, with respect to any third party materials acquired from a third party and provided by Contractor under a SOW to the extent the same are assignable by Contractor.  To the extent any such warranties, guarantees, representations, service agreements and indemnities are not assignable by Contractor, Contractor agrees that ABC may assert or enforce any right that Contractor may have to enforce the same, or if such right can only be enforced by Contractor and in its own name, upon the request of ABC, Contractor will take all reasonable action requested by ABC to enforce the same.

**8.**   **Confidentiality**.

8.1   Introduction.  Each Party (the "**Recipient**") acknowledges that:  (i) the other Party and its Subsidiaries (defined below, and, collectively with such other Party, "**Discloser**") are the owners of

6

OLU000038

valuable trade secrets and other confidential information and license the same from others; and (ii) in the performance of its obligations hereunder, the Recipient shall receive or become aware of such information.

8.2     Definition of Confidential Information.  For the purposes of this Agreement, "**Confidential Information**" shall mean any information relating to or disclosed during the Term, which is or should be reasonably understood to be confidential or proprietary to Discloser and its customers, Subsidiaries, licensors and business partners, including, without limitation, the material terms of this Agreement, information about Discloser's customers, information concerning the relationship of Discloser with third parties, technical processes and formulas, trade secrets, drawings, inventions, know-how, protocols, software programs, source codes, product designs, sales, cost and other unpublished financial information, product and related business plans, methods of operation, technology assessments, database contents, forecasts, market assessments, strategies, projections, marketing data, and other non-public information owned by Discloser and its customers, Subsidiaries, licensors and business partners.  Such Confidential Information may be prepared by the Discloser, or any of its respective directors, officers, employees, consultants, attorneys, and other representatives.  The provisions of this paragraph shall not apply to Confidential Information that:  (i) was in Recipient's possession before receipt from Discloser, as proven by Recipient; (ii) is or becomes a matter of public knowledge through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; (iv) is independently developed by Recipient, as proven by Recipient; (v) is disclosed under operation of law, provided that Recipient will use reasonable efforts to provide Discloser with prompt written notice of any such requirement in order to enable Discloser to seek an appropriate protective order or other remedy, and that Recipient will disclose only such information as is legally required and will use reasonable efforts to obtain confidential treatment for any Confidential Information that is so disclosed; or (vi) is disclosed by Recipient with Discloser's prior written approval.

All Confidential Information that is entitled to protection under the attorney-client privilege, work product doctrine and other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

To the extent that a non-disclosure agreement is executed between the Parties regarding the Services or Deliverables, the non-disclosure agreement will terminate as to such Services and Deliverables and be replaced by the terms of this Section 8.

8.3     Protection of Confidential Information.  Contractor will maintain and follow commercially reasonable and legally compliant information security standards and practices with respect to any of ABC's Confidential Information in Contractor's possession or control and protect such information against any loss, alteration, theft or corruption.  Contractor shall promptly advise ABC after learning of any such unauthorized access, loss, alteration, theft or corruption.  Contractor shall take necessary corrective action within Contractor's reasonable control.  If Contractor believes such corrective action is in the reasonable control of ABC, then Contractor shall advise ABC of the corrective action that it believes ABC should take.  At ABC's request, Contractor shall provide copies of its information security policies, processes, and procedures.  Contractor will notify ABC of any material changes to its policies, processes or procedures that relate to the security of ABC's Confidential Information in Contractor's possession.  Contractor shall comply with all information security and privacy laws, rules or regulations applicable to Contractor as a result of and in connection with its use, protection and retention of ABC Confidential Information and shall be responsible for any breach of such laws, rules or regulations by Contractor or its employees, agents or subcontractors.  Any personal identifying information disclosed to Contractor under this

7

Agreement shall remain protected as Confidential Information under this Agreement for an indefinite period.

8.4     Obligations and Destruction of Confidential Information.  Recipient agrees that Confidential Information may only be used by Recipient as reasonably necessary to carry out the purposes of this Agreement and for the sole benefit of Discloser.  Except as directed by Discloser or as permitted in this paragraph, Recipient will not at any time during or after the Term use Confidential Information for any other purpose or disclose any Confidential Information to any person, or permit any person to examine and/or make copies of any reports or any documents prepared by Recipient or that come into Recipient's possession or under Recipient's control by reason of performance of Recipient's obligations under this Agreement.  Notwithstanding the foregoing, and without limiting the generality of Section 2.1, Contractor, as Recipient, may disclose ABC's Confidential Information to Contractor's Assistants, when, and only to the extent, reasonably necessary to perform the Services; provided that, prior to such disclosure to such Assistants, Contractor shall have informed such Assistants of its confidentiality obligations herein and have executed with such Assistants a written agreement containing confidentiality obligations no less restrictive than those herein.  Contractor shall be responsible for any use or disclosure of Confidential Information by its Assistants in breach of this Agreement.  Recipient agrees to use the same degree of care to protect Discloser's Confidential Information that it uses to protect its own Confidential Information of a like nature from unauthorized disclosure, but in no case less than a reasonable degree of care.

Upon termination of this Agreement, Recipient will turn over to Discloser or destroy all documents, papers, and other matter in Recipient's possession or under Recipient's control that contain or relate to such Confidential Information, and provide written certification of such to Discloser.

8.5     Injunctive Relief.  Recipient acknowledges that misuse or disclosure of any Confidential Information by Recipient may give rise to irreparable injury to Discloser or the owner of such information, inadequately compensable in damages.  Accordingly, Discloser or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other remedies available at law or in equity.  Recipient acknowledges and agrees that the covenants contained in this Section 8 are necessary for the protection of legitimate business interests of Discloser and its customers, Subsidiaries, licensors and business partners, and are reasonable in scope and content.

**9.     Representations and Warranties.**

9.1     Contractor Representations and Warranties.  Contractor represents and warrants to ABC that:  (A) Contractor and each of its Assistants has or shall have the proper skill, training, and background so as to be able to perform the Services in a competent and professional manner and that all work will be performed in accordance with applicable standards for similar services and Contractor shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; (B) each Assistant is properly licensed, if required by applicable law, to perform the Services;  (C) each Assistant has executed written agreements securing for Contractor the intellectual property rights set forth in this Agreement.  Upon the request of ABC, Contractor agrees to provide copies of such written agreements.  If such written agreements do not secure the necessary intellectual property rights based on the review of ABC, ABC may require any Assistant to execute a new or revised written agreement to secure the intellectual property rights provided for in this Agreement; (D) ABC shall receive free, good and clear title to all Work which may be developed by Contractor or its Assistants under this Agreement or which is provided or delivered

8

to ABC by Contractor or Contractor's Assistants pursuant to this Agreement, which title shall be free and clear of any and all liens, encumbrances, claims or litigation, whether pending or threatened; (E) no Work or other materials delivered by Contractor to ABC hereunder shall infringe on or violate (i) any copyright, trademark, or patent right, (ii) any other proprietary or other right of any third party, including but not limited to any third party right to privacy, or (iii) any applicable law or regulation; (F) no Work or other materials delivered by Contractor to ABC hereunder shall contain any scandalous, libelous or unlawful matter or material; (G) Contractor will not publish, broadcast, display or distribute in any media, or allow others to publish, broadcast, display or distribute in any media, the Work or any third party content or any portion thereof without the prior written consent of ABC; and (H) software licensed to ABC by Contractor, if any, contains no code that would directly or indirectly (i) create, or purport to create obligations on ABC with respect to ABC's use or distribution of any software that incorporates, is combined with, or is derived from such software, except as explicitly set forth in this Agreement, (ii) grant, purport to grant, or require ABC to grant to any third party any rights or immunities under ABC's intellectual property or proprietary rights in any software that incorporates, is combined with, or is derived from such software, or (iii) require as a condition of its use, modification, or distribution, that any software incorporated into, derived from, or distributed with such software must be disclosed or distributed in any form.

9.2   <u>Federal Health Care Participation</u>.  Contractor represents to ABC that neither Contractor nor any Assistant is excluded from participating in the U.S. Government's Medicare or Medicaid program (each, a "**Federal Health Care Program**") nor currently debarred or suspended or listed on the U.S. Government's General Services Administration's (the "**GSA**") List of Parties Excluded from Federal Procurement or Nonprocurement Programs in accordance with Executive Orders 12549 and 12689, "*Department and Suspension*", and Contractor warrants to ABC that, during the Term, it will not perform any act that shall cause Contractor to be excluded from such participation or so debarred, suspended or listed.  Contractor further represents to ABC that no adverse action by the U.S. Government that will or may result in exclusions from a Federal Health Care Program has occurred or is pending or threatened against Contractor or any Assistant.  Contractor shall immediately notify ABC if it or any Assistant becomes so excluded, debarred, suspended or listed during the Term.

9.3   <u>Mutual Representations and Warranties</u>.  Each Party represents and warrants to the other Party that: (a) such Party has the full corporate right, power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (b) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (d) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof which are not expressly provided for in this Agreement.

**10.**   <u>**Indemnification; Limitations; Insurance**</u>.

10.1   <u>Indemnity</u>.  Contractor shall defend, indemnify and hold harmless ABC, its Subsidiaries and its and their officers, directors, agents, and employees from any and all third party claims, demands, liabilities, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses ("**Liabilities**") resulting from:  (a) actual or alleged infringement of any patent, trademark, copyright, or other intellectual property right (including, without limitation, misappropriation of trade secrets) based on any software, program, Services and/or other materials

9

furnished to ABC by Contractor or Contractor's Assistants pursuant to the terms of this Agreement, including, without limitation, the Work or the use thereof by ABC; (b) Contractor's payment or nonpayment of compensation or salary asserted by an Assistant of Contractor; (c) any claim that Contractor or any Assistant stands in any relationship with ABC other than as an independent contractor, including but not limited to employment, co-employment and joint employment; (d) any governmental determination that Contractor has failed to maintain its independent-contractor status or litigation determining a change of Contractor's independent-contractor status, including liability for taxes and other penalties assessed upon ABC because of Contractor's change or lack of independent contractor status; (e) any errors, acts or omissions of Contractor or its Assistants in connection with performing Services to the extent resulting in death, personal injury, or damage to real or tangible personal property; (f) Contractor's or Contractor's Assistant's material breach of any obligation, duty, representation or warranty contained in this Agreement or in any SOW attached hereto; (g) the negligence or willful misconduct of Contractor or its Assistants in performing the Services or other obligations hereunder; and (h) a failure on the part of Contractor or its Assistants to comply with applicable law or regulations in performing the Services.

10.2    <u>Additional Remedy</u>.  Should ABC's use of any service, program, or other material (including, without limitation, the Work) furnished to ABC by Contractor be enjoined by any court, Contractor shall promptly obtain, at no expense to ABC, the right to continue to use the items so enjoined or, at no expense to ABC, to provide ABC promptly with modified or substitute items that are functionally equivalent to the enjoined products.  If Contractor cannot secure ABC's right to continue using such items or substitute such items as provided herein, Contractor agrees to refund all sums paid to Contractor under this Agreement relating to the provision of such items.

10.3    <u>Limitations</u>.  EXCEPT IN CONNECTION WITH A BREACH OF THE CONFIDENTIALITY OR INDEMNITY PROVISIONS HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, OR ARISING FROM ANY OTHER PROVISION OF THE AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

<u>Insurance</u>.  During the Term, if Contractor employs *more than thirty (30) individuals* as employees, Contractor shall maintain in full force and effect the following insurance coverage:   (a) Commercial General Liability insurance with limits of no less than $1 million per occurrence and $2 million annual aggregate for claims due to bodily injury (including death) or property damage caused by or arising from acts or omissions of Contractor or Contractor's Assistants (the Commercial General Liability policy should include coverage for premises and operations, products and completed operations, broad form property damage and blanket contractual liability); (b) Workers' Compensation insurance where required in compliance with all state regulations and requirements; (c) Professional Liability insurance with limits of no less than $1 million per claim and $3 million as an annual aggregate (the professional liability policy must extend coverage for copyright and trademark infringement, defamation and misappropriation of ideas as well as any other error, omission or negligent act, and coverage should include, but not be limited to, loss of data, content or indirect loss to ABC); and (d) Umbrella Liability insurance with limits of no less than $5 million per occurrence and $5 million as an annual aggregate.   If during the Term, Contractor employs *thirty (30) individuals or less* as employees, Contractor shall maintain in full force and effect the following adequate insurance coverage: (a) commercial general liability insurance; (b) workers' compensation insurance in compliance with all statutory and regulatory requirements; and (c) professional liability insurance, in each case with insurance policy limits sufficient to protect and indemnify ABC and its subsidiaries, and each of its and their officers,

10

directions, agents, and employees from any losses resulting from Contractor or its employees, agents, contractors, or servants conduct, acts or omissions.

With respect to the foregoing, ABC shall be named as an additional insured on all such policies with the exception of Workers Compensation. Policies shall be written with a licensed insurance company with a Best's rating of no less than A-. Contractor shall provide a certificate of insurance evidencing all such required coverage upon ABC's request. The certificate shall provide: (a) thirty (30) days' prior written notice of cancellation or any material change in any such policy to ABC's Legal and Business Affairs Department; and (b) a renewal certificate fifteen (15) days prior to the renewal of any such policy. Insurance required by ABC shall in no way reduce or limit Contractor's actual obligation to indemnify and defend ABC for claims, suits or allegations brought as a result of, or as related to, the performance of this Agreement. With respect to claims made policies (e.g., Professional Liability), Contractor agrees to maintain insurance for a period of two years after the Term.

**11.** **Communications**.

11.1  Notice. Any notice required under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes: (a) on the delivery date if delivered by confirmed facsimile; (b) on the delivery date if delivered personally to the Party to whom the same is directed; (c) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt; or (d) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available.

In the case of ABC, such notice will be provided to both the ABC Project Manager and ABC Legal and Business Affairs (fax no. 202-266-5700), each at the address of ABC set forth in the first paragraph of this Agreement, or another address as specified by like notice.

In the case of Contractor, except as otherwise specified herein, the notice address shall be the address for Contractor set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax number as provided to ABC.

11.2  Duty to Inform. Contractor shall promptly inform ABC of any information related to the Services, including, without limitation, the Work, which could reasonably lead to a claim, demand or liability of or against ABC and/or its Subsidiaries by any third party.

11.3  Publicity. Contractor agrees that it will not, without the prior written consent of ABC in each case, use in advertising, publicity, or otherwise the name or logo of ABC, or images of ABC facilities and employees, or refer to the existence of this Agreement in press releases, advertising, or materials distributed to prospective customers.

11.4  Statements to Third Parties. During the Term, Contractor shall not make, publish, or otherwise communicate, or cause to be made, published, or otherwise communicated, any deleterious remarks whatsoever to any third parties concerning ABC, its Subsidiaries or its or their directors, officers, employees or agents, including, without limitation, ABC's business projects, business capabilities, performance of duties and services, or financial position.

**12.** **Non-solicitation**. During the Term and for a period of one (1) year thereafter, unless ABC expressly authorizes in writing in advance, Contractor shall not solicit, offer work to, employ, or contract with,

11

directly or indirectly, on its own behalf, any of ABC's Personnel or the Personnel of ABC's Subsidiaries. For purposes of this Section, "**Personnel**" means any individual or entity whom or which ABC employs or has employed as a partner, employee or independent contractor and with whom or which the Contractor comes into direct contact in the course of performing its obligations under this Agreement. This Section shall not apply with respect to Personnel who respond to indirect, general solicitations for employment (such as employment agency referrals and Internet postings), as opposed to solicitations targeted to Personnel.

**13.**     **Audits; Right to Examine**.

    13.1     <u>Maintenance of Records</u>. Contractor will keep, at its principal place of business, accurate books and records (in whatever form or medium such books and records are stored) regarding the Services performed under each SOW. Contractor will preserve all books and records for a period of at least seven (7) years from the completion or termination of the applicable SOW or until all pending matters relating to this Agreement are closed.

    13.2     <u>Audit Right</u>. ABC or its authorized representatives will have the right to perform regular audits to examine Contractor's performance of the Services with respect to Contractor's: (a) compliance with ABC-approved security standards and procedures; (b) compliance with Contractor's internal practices and procedures; (c) use of the systems utilized to provide the Services; (d) security, disaster recovery and back-up procedures; and (e) fulfillment of any other Contractor obligations (including the obligations of Assistants) under this Agreement. ABC may elect, at its own expense, to have a full or part-time employee, contractor, or authorized representative on-site at Contractor's facilities for the purpose of ensuring compliance with the terms and conditions of this Agreement. Contractor agrees to provide such person with all necessary assistance including unrestricted access to Contractor's facilities, dedicated space and a suitable computer workstation. Contractor shall not be relieved of its responsibility to comply with security provisions even if ABC inspects and detects system failures, fails to inspect, or has the right to inspect, Contractor's facilities, systems and procedures.

**14.**     **Protected Health Information**. Contractor shall comply with the terms and conditions contained in the Business Associate Agreement, attached hereto as **Exhibit C** and incorporated herein by this reference. Any PHI or EPHI, as defined therein, shall be deemed Confidential Information.

**15.**     **Miscellaneous**.

    15.1     <u>Force Majeure</u>. Neither Party shall be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of fire, strike, war, terrorism, insurrection, government restriction or prohibition, or any other causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence (a "Force Majeure Event"). A Party whose performance is impacted by a Force Majeure Event shall give notice to the other Party, stating the period of time the occurrence is expected to continue and shall use diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event. During the Force Majeure Event, the non-impacted Party may suspend its performance obligations until such time as the impacted Party resumes performance. The non-impacted Party may terminate this Agreement or any applicable SOWs if such failure or delay continues for a period of thirty (30) days or more and, if the non-impacted Party is ABC, receive a refund for any amounts paid to Contractor in advance for the impacted Services.

12

OLU000044

15.2   <u>No Waiver</u>.  The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement shall not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same shall be and remain in full force and effect.

15.3   <u>Entire Agreement</u>.  This Agreement, together with all Schedules, Exhibits, SOWs and any other documents incorporated herein by reference, set forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein.  Neither Party shall be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.  For clarification, any additional or different terms appearing on any invoice or other document including terms and conditions in standard or preprinted documents or on Contractor's website that are inconsistent with this Agreement shall be void and have no force or effect.

15.4   <u>Amendment</u>.  No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment.

15.5   <u>Further Assurances</u>.  Contractor shall take such action (including, without limitation, the execution, acknowledgment and delivery of documents) as may reasonably be requested by ABC for the implementation or continuing performance of this Agreement.

15.6   <u>Assignment</u>.  Contractor shall not assign this Agreement or any right, interest or benefit under this Agreement, nor delegate any of its duties or obligations hereunder, without the prior written consent of ABC.  Assumption of the Agreement by any successor to Contractor (including, without limitation, by way of merger, consolidation or sale of all or substantially all of Contractor's stock or assets) shall be subject to ABC's prior written approval.  Except as permitted by the foregoing, any attempted assignment or delegation shall be null, void, and of no effect.  Subject to the foregoing, this Agreement shall be fully binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assigns.

15.7   <u>Construction; Severability</u>.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement:  (a) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law; and (b) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect.

15.8   <u>Interpretation.</u>  For purposes of this Agreement, unless the context otherwise requires, references herein: (i) to Sections, Schedules, Exhibits and SOW(s) refer to the Sections of, and Schedules, Exhibits and SOW(s) attached to this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Schedules, Exhibits and SOW(s) referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

13

OLU000045

15.9 <u>Remedies</u>.  Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15.10 <u>Applicable Law; Jurisdiction</u>.  This Agreement shall be interpreted, construed and enforced in all respects in accordance with the laws of the District of Columbia except for its conflicts of laws principles.  Each Party irrevocably consents and submits to the exclusive jurisdiction of the courts situated in the District of Columbia, in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

15.11 <u>Export Controls</u>.  Contractor agrees to fully comply with all applicable export control laws, regulations, rules, and orders of the United States, and will not export, re-export, release, or transfer (collectively, "**Export**"), directly or indirectly, any commodities, software or technology, including any direct products thereof, or enter into any transactions, for any proscribed end-use, or to or with any proscribed country, entity, or person (wherever located), including but not limited to those entities and persons listed on the U.S. Government's Denied Persons List, Unverified List, Entity List, Debarred Parties List or Specially Designated Nationals List, without first obtaining at its own expense written authorization from the U.S. Government.  Contractor further agrees to provide all technical and operational information and documentation necessary for ABC to Export any Work produced by Contractor and to obtain any required U.S. Government authorizations for the same.

15.12 <u>Headings; Interpretations</u>.  The captions and headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.  This Agreement shall be construed fairly according to its terms, without regard to the drafter of any provision hereof.  The Parties acknowledge and agree that each of them has participated in the negotiation of this Agreement.  The Parties agree that any rule of law requiring construction of a document against a Party by reason of such Party having prepared such document shall not apply to this Agreement.

15.13 <u>Subsidiary</u>.  "**Subsidiary**" means any entity in which a Party owns, directly or indirectly, at least 50% of the equity securities or other ownership interest.  ABC shall have the right to share all or any part of this Agreement (as may be amended) and all associated Work (pursuant to ABC's ownership of such Work) with any of its Subsidiaries.  ABC Subsidiaries located in the United States shall be entitled to purchase Services from Contractor in accordance with the pricing and other terms and conditions of this Agreement.  Any such Subsidiary may obtain Services pursuant to a SOW executed by Contractor and the Subsidiary, and will be bound to the terms of this Agreement, and shall be solely responsible for fulfillment of the respective obligations, and shall have the sole right to exercise the respective rights, conferred upon ABC under this Agreement.  ABC shall have no liability for any of its Subsidiary's actions or failure to comply with any obligations hereunder.

15.14 <u>Counterparts; Facsimile</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile shall be effective to the same extent as if such Party had delivered a manually executed counterpart.

15.15 <u>Surviving Sections</u>.  The following Sections shall survive the expiration or termination of this Agreement: 2.1; 2.4; 4.4; 4.5; 6.5; 7; 8; 9; 10; 11; 12; 13; 14; and 15.  In addition, any provisions of this Agreement which expressly or by implication are intended to survive or by implication are

14

intended to survive termination or expiration of the Agreement will survive and continue to bind the Parties.

15.16   <u>Prohibition on Discrimination and Affirmative Action.</u> **As applicable, ABC and Contractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

15.17   <u>Time.</u> All references to 'days' in this Agreement refer to calendar days unless other provided herein**.**

   **IN WITNESS WHEREOF**, each Party's duly authorized representative has executed this Agreement as of the Effective Date.

**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**


By:_____          By:_____

Print Name: <u>Amy Schartner_____</u>          Print Name: <u>Oluro Olukayoda Oladimeji MD_____</u>

Title: <u>Senior Vice President_____</u>          Title: <u>Contractor_____</u>

*Confidential*                    Updated 11/2015

OLU000047

<u>**EXHIBIT A**</u>

**SCOPE OF WORK**

**SCHEDULE NO 3. EFFECTIVE MAY 9, 2016**
**TO MAY 20, 2016**
**INDEPENDENT CONTRACTOR AGREEMENT**
**BETWEEN**
**THE ADVISORY BOARD COMPANY ("ABC") AND NELSON AMBE LLC("Contractor")**
**DATED AS OF  JANUARY 7, 2016 the "Agreement")**

1.      <u>**Detailed description of project to be accomplished by Contractor:**</u>

- Participate in training and orientation webcast to orient to environment, understand workflows and acceptable end-user customization
- Provide at-the-elbow support in conjunction with MainHealth staff members
- Work minimum of 45 hours per week
- Help providers personalize Epic and support acceptable modifications allowed by MaineHealth
- Continue to teach providers and clinicians efficient ways to use the system as designed and built
- Share optimization recommendations with the SeHR Epic Manager

2.      <u>**Deliverables to be produced by Contractor:**</u>

**In partnership with the Clinovations team:**

- Capture, track and report build issues, workflow concerns and optimization opportunities
- Participate with MaineHealth leadership in meetings to discuss prioritization, resolution and communications
- Provider personalization assistance to providers which includes the following:
    - Instructions and tip sheets
    - Patient lists settings
    - Order preference lists, Order Set/SmartSet defaults
    - SmartText to SmartPhrase conversions
- Align meaningful use, core measures and menu item metrics to clinical workflows by demonstrating and encouraging adherence to best practices for the following:
    - Problem list management
    - Medication reconciliation
    - Computerized Provider Order Entry
- Identify providers who may require additional support during go-live period and beyond

16

- Coordinate with an on-site Epic go-live team to streamline deployment efforts
- Deliver guidance for providers on key workflows and Epic functionalist
- Ensure activities and events associated with go-live efforts are clearly communicated across practice locations

**3.     Time for Performance/Delivery for each Deliverable:**

Throughout the duration of the engagement.

**4.     Acceptance testing criteria for each Deliverable:**

ABC's decision to accept or reject a Deliverable will be based upon its satisfaction as ABC determines in its sole discretion on the basis of the completeness and quality of the Deliverable and its delivery within the time frames set forth herein – which, collectively, shall constitute the "acceptance criteria".

**5.     Communications and Project Status:**

Not applicable

**6.     Payments:**

(a)     Fee

Time and Materials

Regular Time:  $125/hour

Contractor will submit weekly time reports via OpenAir reflective of billable hours according to approved SOW and Client guidelines.  In addition, Contractor will submit an invoice according to reimbursement schedule and after Project Manager approval.

(b)     Expenses

Contractor shall be entitled to reimbursement for expenses preapproved by ABC while performing Services outlines in the Statement of Work in Exhibit A.  Expenses are not to exceent $1,500 per week.  Approved travel expense reimbursements are paid per ABC and its Clients' policies, provided Contractor has submitted expenses on time, with proper supporting documentation and Project Manager approval.

(c)     Payment SOW

All fees and expenses due shall be invoiced by Contractor in arrears:

*Confidential*

Updated 11/2015

OLU000049

| | |
|---|---|
| _____ | Monthly |
| _____ | Upon Completion |
| ___x___ | Other (describe:  weekly) |
| _____ | Progress Payments as follows: |

(d)    <u>Maximum Amount</u>

The maximum hours payable to Contractor under this SOW:  100 hours.

**7.** **Contractor Project Manager:**     Name:  Oluro Olukayode Oladimeji, MD
Ph#:     571-572-4922
Email:  yehudak12@yahoo.com

**8.** **ABC Project Manager:**     Name:  Steve Strode
Ph#:     815-980-0936
Email:  StrodeS@advisory.com

**9.** **Term of this SOW:**     This term of this SOW is May 9, 2016 through May 20, 2016

**10.** **Additional Terms and Conditions:**  None

**THE ADVISORY BOARD COMPANY**          **JEDIDIAH HOLDINGS LLC**

By:_____          By:_____

Print Name: Amy Schartner          Print Name: Oluro Olukayoda Oladimeji MD

Title: Senior Vice President          Title: Contractor

18

          Updated 11/2015

OLU000050

## **EXHIBIT B**

**RATE SCHEDULE**

N/A

*Confidential*

Updated 11/2015

OLU000051

<u>EXHIBIT C</u>

**BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Subcontractor Agreement ("**BA Agreement**"), effective as of May 9, 2016 (the "**Effective Date**"), is entered into by and between Jedidiah Holdings LLC ("**Provider**") and The Advisory Board Company ("**Advisory Board**") (each a **"Party"** and collectively the "**Parties**").

1.   **BACKGROUND AND PURPOSE.**  The Parties have entered or are entering into one or more agreements for the provision by Provider of Epic go-live support ("**Services**") (**"Underlying Agreements"**) that are in fulfillment of services that the Advisory Board is obligated to provide for or on behalf of Covered Entities (each a "**Covered Entity**"), which Covered Entities are Advisory Board members.  Each Covered Entity has an arrangement directly with the Advisory Board under which Covered Entity has provided or may provide to the Advisory Board, or the Advisory Board may create, Protected Health Information ("**PHI**") (as defined in 45 C.F.R. § 160.103) subject to the federal privacy regulations ("**Privacy Rule**") and federal security regulations ("**Security Rule**") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 and its implementing regulations, ("**HITECH Act**") as each is amended from time to time (collectively referred to herein as "**HIPAA**"), to the Advisory Board and pursuant to which the Advisory Board, or the Covered Entity, on behalf of the Advisory Board, is providing or may provide the PHI to Provider and/or Provider may create PHI in its performance of the Services.  The purpose of this BA Agreement is to allow for the Advisory Board's compliance with its obligations under HIPAA and its agreements with its Covered Entity members.

2.   **DEFINITIONS**.  Unless otherwise specified in this BA Agreement, all capitalized terms used in this BA Agreement not otherwise defined have the meanings established for purposes of HIPAA, as is amended from time to time.

2.1   "Breach" shall mean the acquisition, access, use or disclosure of PHI in a manner not permitted by the Privacy Rule that compromises the security or privacy of the PHI as defined, and subject to the exceptions set forth, in 45 C.F.R. § 164.402.

2.2   "EPHI" shall mean Electronic Protected Health Information, as defined in 45 C.F.R. § 160.103, limited to the information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.3   "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.4   "Privacy Rule" shall mean the federal privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & E).

2.5   "Security Rule" shall mean the federal security regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & C).

**3.**     **OBLIGATIONS OF THE PARTIES WITH RESPECT TO PHI.**

3.1     <u>Permitted Uses and Disclosures of PHI by Provider</u>. Provider may use and disclose PHI only as permitted by Section 3.2(a) of this BA Agreement.

3.2     <u>Obligations of Provider</u>.  With regard to its use and/or disclosure of PHI, Provider agrees to:

A.     use and/or disclose PHI only as necessary to provide the Services set forth in the Underlying Agreements, as permitted or required by this BA Agreement, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e) or as otherwise Required by Law;

B.     use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by the BA Agreement;

C.     implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the EPHI that it creates, receives, maintains, or transmits on behalf of the Advisory Board in compliance with the Security Rule;

D.     secure all PHI by rendering all PHI unusable, unreadable, or indecipherable to unauthorized individuals in accordance with the United States Department of Human Services Guidance to Render Unsecured Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals, including by encrypting PHI;

E.     without unreasonable delay, and in any event no later than one (1) business day after discovery, report to the Advisory Board in writing: (i) any use or disclosure of PHI of which it becomes aware that is not permitted by this BA Agreement; and/or (ii) any Security Incident of which Provider becomes aware;

F.     without unreasonable delay, and in any event no later than two (2) business days after its discovery by Provider, notify the Advisory Board in writing of any incident that involves an unauthorized acquisition, access, use, or disclosure of PHI, even if Provider believes the incident will not rise to the level of a Breach. The notification shall include: (i) the identification of all individuals whose PHI was or is believed to have been involved, (ii) a brief description of what happened, including the date of the incident and the date of the discovery of the incident, (iii) a description of the types PHI that were involved in the incident, (iv) a brief description of what Provider is doing to investigate the incident, to mitigate harm to individuals, and to protect against any further breaches, (iv) all other information reasonably requested by the Advisory Board to enable the Advisory Board or the applicable Covered Entity to perform and document a risk assessment in accordance with HIPAA and any applicable state breach notification laws with respect to the incident to determine whether a Breach occurred, and (v) all other information reasonably necessary to provide notice to individuals, HHS, state agencies, and/or the media, as required by applicable law. Notwithstanding the foregoing, in the Advisory Board's sole discretion and in accordance with its directions, Provider shall conduct, or pay the costs of conducting, an investigation of any incident required to be reported under this Section 3.2(f) and shall provide, and/or pay the costs of providing, the required notices as set forth in this Section 3.2(f).

G.     require all of its subcontractors and agents that create, receive, maintain, or transmit PHI to agree, in writing, to the same restrictions, conditions, and requirements that apply to Provider under this BA Agreement, including but not limited requiring any subcontractor or agent to implement reasonable and appropriate safeguards in compliance with the Security Rule to protect the EPHI consistent with the requirements of this BA Agreement;

21

OLU000053

H.    make its internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS or to the Advisory Board or applicable Covered Entity within a reasonable timeframe for purposes of determining compliance with HIPAA;

I.    document such disclosures of PHI as would be required for the applicable Covered Entity to respond to a request by an Individual for an accounting of disclosures in accordance with 45 C.F.R. § 164.528 and provide, within ten (10) days after the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) requests the information in writing, the information necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to make an accounting of disclosures of PHI about an Individual, in accordance with 45 C.F.R. § 164.528;

J.    make available within ten (10) days after receiving a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) all PHI necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to respond to an Individuals' request for access to PHI about them, in accordance with 45 C.F.R. § 164.524, in the event that the PHI in Provider's possession constitutes a Designated Record Set, and, when directed by the Covered Entity or the Advisory Board, make the PHI available directly to the Individual;

K.    make available PHI for amendment and incorporate within ten (10) days after a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) any amendments or corrections to the PHI in accordance with 45 C.F.R. § 164.526, in the event that the PHI in Provider's possession constitutes a Designated Record Set;

L.    request, use and/or disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure in compliance with the Privacy Rule's minimum necessary standard and any guidance issued by the United States Department of Health and Human Services;

M.    not directly or indirectly receive remuneration in exchange for any PHI as prohibited by the HITECH Act;

N.    not make or cause to be made any communication about a product or service that is prohibited by the HITECH Act;

O.    not make or cause to be made any written fundraising communication that is prohibited by the HITECH Act;

P.    to the extent Provider is to carry out, on behalf of the Advisory Board, one or more of a Covered Entity's obligations under HIPAA, comply with the requirements of HIPAA that apply to Covered Entity in the performance of such obligations; and

Q.    promptly return to the Advisory Board or destroy (and retain no copies), all PHI in its possession, including such information in the possession of its subcontractors, following the termination and expiration of this BA Agreement, if it is feasible to do so. If Provider determines, and if and only if the Advisory Board agrees, that return or destruction is infeasible, Provider agrees to extend any and all protections, limitations, and restrictions contained in this BA Agreement to Provider's use and/or disclosure of any retained PHI, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the PHI infeasible.

*Confidential*

Updated 11/2015

OLU000054

3.3   Effect of Changes to the Law or Contractual Obligations.  To the extent that any relevant provision of HIPAA is amended in a manner that changes the obligations of Provider or the Advisory Board that are embodied in the terms of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these revised obligations.  If the Advisory Board is required to comply with any provision under the terms of its business associate agreement with any Covered Entity that is not already included in this BA Agreement or is more stringent than a provision of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these additional or more stringent obligations.

4.   **TERMINATION BY ADVISORY BOARD**.  In the event of a material breach of the terms of this BA Agreement by Provider, the Advisory Board shall provide Provider written notice of that breach and may either (i) immediately terminate this BA Agreement and the underlying services agreement with Provider, or (ii) afford Provider an opportunity to cure the breach, provided, however, that if Provider fails to cure the breach within a reasonable time specified by the Advisory Board, the Advisory Board may terminate this BA Agreement and the Underlying Agreements with Provider.

5.   **INDEMNIFICATION**.  Provider shall indemnify, defend and hold harmless the Advisory Board and its officers, directors, trustees, employees and agents (the Advisory Board's "**Personnel**") from any and all third party claims, liabilities and expenses which the Advisory Board or its Personnel may incur as a result of, arising out of, or relating to, a breach of the Provider's obligations under this BA Agreement.

6.   **MISCELLANEOUS.**

6.1   Construction of Terms:  Any unclear terms of this BA Agreement shall be construed in a manner that allows the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to comply with HIPAA.

6.2   Survival.  Sections 1, 2, 3, 4, 5 and 6 of this BA Agreement shall survive termination of this BA Agreement and continue indefinitely solely with respect to PHI Provider retains in accordance with Section 3.2(q).

6.3   No Third Party Beneficiaries.  Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, each of the undersigned has caused this BA Agreement to be duly executed in its name and on its behalf.

**Jedidiah Holdings LLC**                    **The Advisory Board Company**

By: _____            By: _____

Print Name: Oluro Olukayoda Oladimeji MD___      Print Name: Amy Schartner_____

Print Title: Contractor                   Print Title: Senior Vice President

23

OLU000055

# Signature Certificate



 **Document Reference:**  `S52DHEIWA5TELXMLBVAN7U`



**Amy Schartner**
Party ID: V2LI3LJRV4KMVSWXXWWJDB
IP Address: 204.19.15.62

| VERIFIED EMAIL: | schartna@advisory.com |



Multi-Factor
**Digital Fingerprint Checksum**   `df5d2d529ce9c97bffffa4b6551917d714031a42`





**Oluro Olukayode**
Party ID: I9NJD7JRH2LS8M7JAP92GG
IP Address: 100.15.73.105

| VERIFIED EMAIL: | yehudak12@yahoo.com |



Multi-Factor
**Digital Fingerprint Checksum**   `eda423f8757e42bbed8ab46a53342e5504ad5190`



| Timestamp | Audit |
|---|---|
| 2016-05-05 09:09:23 -0700 | All parties have signed document. Signed copies sent to: Jeremy Geneaux, Charles Wright, Neil Rothberg, Jacqueline Dagg, Megan Linehan, Sharon Charron, Amy Schartner, and Oluro Olukayode. |
| 2016-05-05 09:09:23 -0700 | Document signed by Amy Schartner (schartna@advisory.com) with drawn signature. - 204.19.15.62 |
| 2016-05-05 09:09:15 -0700 | Document viewed by Amy Schartner (schartna@advisory.com). - 204.19.15.62 |
| 2016-05-05 07:52:39 -0700 | Document signed by Oluro Olukayode (yehudak12@yahoo.com) with drawn signature. - 100.15.73.105 |
| 2016-05-05 07:49:41 -0700 | Document viewed by Oluro Olukayode (yehudak12@yahoo.com). - 100.15.73.105 |
| 2016-05-05 06:16:03 -0700 | Document created by Sharon Charron (charrons@advisory.com). - 71.244.234.27 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

OLU000056

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT ("**Agreement**") is made and entered into as of September 19, 2016 (the "**Effective Date**"), by and between The Advisory Board Company, a Delaware corporation, with offices at 2445 M Street, NW, Washington, DC 20037 ("**ABC**"), and Jedidiah Holdings LLC, a Virginia corporation, with offices at 6042 Selwood Place Springfield, Virginia 22152 ("**Contractor**").  ABC and Contractor may be referred to herein individually as a "**Party**" and together as the "**Parties**."

ABC desires to engage the services of Contractor and Contractor desires to accept such engagement to perform the services described herein upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, ABC and Contractor hereby agree as follows:

1.      **Services and Scope of Work**.

1.1     Services.  Contractor agrees to provide to ABC specific contractor services as described in such scope of work as executed by both Parties, consecutively numbered and annexed hereto as part of **Exhibit A – Scope of Work** (each "**SOW**").  By executing this Agreement, without execution of any SOW, ABC is not committing or obligating itself to use Contractor's services.  Contractor shall provide the specific contractor services described in an executed SOW ("**Services**") in accordance with the provisions of this Agreement and the applicable SOW.  In the event of any conflict between the provisions of a SOW and of this Agreement, the Agreement shall prevail. Contractor shall provide a Rate Schedule that sets forth the rates for each corresponding title or skill set for all applicable services in **Exhibit B** – Rate Schedule.

1.2     Scope of Work (SOW).  Each SOW shall contain a description of the work to be performed by Contractor and any deliverables to be produced ("**Deliverables**"), timing for performance, a statement of Contractor's rates for performance and a payment schedule, and term for the SOW. Contractor shall not perform any services until an applicable SOW is finalized and fully executed. If Contractor begins to perform any services prior to the execution of an applicable SOW, Contractor hereby acknowledges:  (a) that the terms and conditions of this Agreement (other than the payment provisions) shall apply; and (b) that Contractor does so at its own risk and ABC is not obligated to pay Contractor for any time, work, or costs incurred, unless otherwise agreed in writing.

1.3     Other Work.  Contractor has the right to perform services for others during the Term (as defined below) as long as such other engagement or performance does not interfere in any way with the timely and professional performance of the Services to be provided hereunder or compromise ABC's Confidential Information.

1.4     Performance of Services.  Unless otherwise agreed to by the Parties in a SOW, Contractor shall furnish all equipment and materials used to perform the Services.  In performing the Services, Contractor shall, and shall ensure that its Assistants (as defined below):  (a) comply with all applicable ABC rules, policies and guidelines regarding safety, security, and conduct including but not limited to those listed at: http://downloads.advisory.com/lgl ; (b) perform to the best of their abilities and in a competent and professional manner, and in accordance with ABC's standards; and (c) comply with all applicable local, state and federal laws and regulations. In addition, before commencing Services under this Agreement, Contractor, as the sole Assistant (as defined below), must successfully complete a background investigation that may include without limitation, a

1

criminal background check and verification of education and employment history.  Without limiting the foregoing, Contractor will comply with all applicable international, national, state/provincial and local laws and applicable international standards regarding employment in performing its obligations hereunder; Contractor will promptly notify ABC in writing of any allegation of non-compliance.

**2.     Relationship of Parties; Independent Contractor Status.**

2.1 <u>Independent Contractor.</u> Contractor's relationship to ABC is that of an independent contractor, not an agent, employee or servant.  Contractor is fully and solely responsible for the use and employment of its employees, representatives, contractors, or consultants (collectively "Assistants"), and Contractor's Assistants shall not be considered agents, employees or servants of ABC for any purpose.  Contractor and its Assistants shall not represent itself or themselves or hold itself or themselves out to third parties as agents, employees, or servants of ABC. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party.

2.2 <u>Control, Supervision, and Training.</u>  Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services. Contractor shall also be solely responsible for the supervision and training of its Assistants.

2.3 <u>Compensation of Assistants.</u>  Contractor is solely responsible for the payment or non-payment of compensation or salary, including any required overtime payments, to Contractor's Assistants. Contractor is responsible and shall comply with all federal, state and local laws and regulations regarding compensation, hours of work, workplace safety and other conditions of employment.

2.4 <u>No Benefit Plans.</u>  Contractor acknowledges and agrees that  neither it nor its Assistants is eligible for, and shall not participate in, any of ABC's employee benefit plans or programs, including, without limitation, bonus, vacation, health, retirement fund, incentive compensation or other employee programs or policies ("**Benefits Plans**").  If, for any reason, Contractor or any of its Assistants  are deemed to be a statutory or common law employee of ABC by any governmental agency, court, or other entity, Contractor hereby waives any right to, and agrees to neither seek nor accept, any benefits under the Benefits Plans, and agrees to indemnify and hold harmless ABC from any claims, demands, actions, damages, liabilities, costs and expenses arising from or relating to such claims by it or its Assistants relating to such Benefit Plans.

2.5 <u>Assistant Substitution or Removal.</u>  Substitutions of Assistants that are essential to the Services are not permitted without the prior approval of ABC.  Any proposed substitutions must include an explanation of the circumstances necessitating the substitution, and other information requested by ABC necessary to consider the proposed substitution.  All proposed substitutes must have qualifications that are equal to or higher than the personnel being substituted.  ABC will promptly notify the Contractor of approval or disapproval thereof.  ABC retains the right to approve or disapprove all Assistants, and, to request the removal of any Assistant.

**3.     Project Management**.  Each Party shall designate a project manager for each SOW who shall act as a liaison between the Parties.

2

OLU000058

**4.     Fees, Expenses, Records, and Taxes**.

4.1     Fees.  Contractor's entire compensation for performing Services hereunder is set forth in this Agreement.  Each SOW shall set forth the fees due for the Services to be provided thereunder, and Contractor shall invoice ABC as set forth in the SOW.  All Services to be performed on a time and materials basis shall be invoiced in arrears.

4.2     Expenses.     Contractor shall be responsible for all expenses incurred by Contractor in the performance of the Services, unless otherwise set forth in the SOW.

4.3     Payment.  The fees and/or expenses invoiced in accordance with this Section 4, except for any amounts disputed by ABC, shall be payable by ABC within forty-five (45) days of ABC's receipt of each invoice.

4.4     Maximum Dollar Amount.  ABC shall not be liable for any fees and/or expenses under any SOW in excess of the maximum dollar amount specified on such SOW.

4.5     Taxes.  Contractor shall be responsible for determining the applicability of any sales, use, excise, or similar transactional taxes that may be applicable to the performance of the Services, if any, and shall include such on Contractor's invoice for the corresponding Services.  ABC shall pay applicable taxes on the invoice or, in lieu of the payment of any such taxes, ABC may provide Contractor with a certificate acceptable to the taxing authorities exempting ABC from payment of such taxes.  Contractor shall pay all taxes collected from ABC to the appropriate taxing authority. Contractor represents and warrants that Contractor and its Assistants qualify as independent contractors under the provisions of the Internal Revenue Code.  Contractor further represents and warrants that the payments it receives pursuant to this Agreement shall not be considered "wages" for purposes of income tax withholding, the Federal Insurance Contributions Act ("**FICA**"), and unemployment taxes.  Further, Contractor shall pay and be solely responsible for all taxes, contributions and assessments on payrolls or other charges or payments under all applicable federal, state and local laws, including without limitation withholding from wages of its employees or other Assistants.  Contractor agrees to fully indemnify ABC from any and all liability that might be assessed against ABC for ABC's failure to pay taxes on such compensation.

**5.     Acceptance of Services**.

5.1     General. All Services and Deliverables delivered by the Contractor pursuant to this Agreement and the attached SOWs shall be subject to acceptance by ABC.

5.2     Delivery of Software.  If applicable, Contractor shall deliver any software licensed pursuant to this Agreement from its designated server to ABC's designated server by electronic means, such as an FTP download site, and not by tangible media, such as compact discs, tapes or disks.

5.3     Acceptance Criteria.  Each Deliverable shall be subject to acceptance testing by ABC to verify that the Deliverable satisfies the acceptance criteria, if any, mutually agreed to in writing by the Parties and set forth in the applicable SOW.  If no acceptance criteria have been set forth in the applicable SOW, the acceptance criteria shall be as determined by ABC in its sole discretion based upon completeness and quality of the Deliverable and its delivery within the time frames set forth in the applicable SOW.

5.4     Acceptance Testing.  If elected by ABC, acceptance testing for any Deliverable shall commence within ten (10) days of the date on which Contractor notifies the ABC Project Manager, in writing,

3

that the Deliverable has been satisfactorily completed, in Contractor's opinion, and is ready for acceptance testing by ABC. Acceptance testing shall continue for the period of time specified in the acceptance criteria or, if no such time period has been agreed upon by the Parties, for a period of thirty (30) days (the "**Initial Acceptance Period**"). In the event that any Deliverable does not conform to the acceptance criteria within the Initial Acceptance Period, ABC shall give Contractor written notice thereof. ABC shall cooperate with Contractor in identifying in what respects the Deliverable has failed to conform to the criteria. Contractor shall promptly correct any deficiencies that prevent such Deliverable from conforming to the criteria. If the Deliverable does not conform to the acceptance criteria within thirty (30) days after the end of the Initial Acceptance Period, ABC may do any one or more of the following:

(a)     extend the period of time for Contractor to make corrections;

(b)     direct Contractor to use a third party to make the necessary corrections at Contractor's expense after reasonable consultation with Contractor;

(c)     after reasonable consultation with Contractor, directly or by use of a third party make the necessary corrections and charge to Contractor an amount equal to the costs incurred by ABC in making such correction itself or through a third party contractor, Contractor will, at no additional charge to ABC, provide all necessary cooperation and assistance in connection with ABC or any third party contractor engaged by ABC making the necessary corrections to the Deliverable;

(d)     after reasonable consultation with Contractor, accept the Deliverable in its non-conforming condition and reduce Contractor's charges for the Deliverable by an amount which the Parties, cooperating in good faith, determine reasonably reflects its reduced value; or

(e)     terminate one or more of the applicable SOWs for cause, in whole or in part, as of a date specified in a written notice of termination from ABC to Contractor and without financial liability or obligation. In the event of such termination, ABC shall be entitled to recover an amount equal to all fees paid for the affected Deliverable, plus all fees paid to Contractor for Services related to the Deliverable and for any other products furnished by Contractor to ABC that were provided in conjunction with the Deliverable and that cannot be utilized effectively or completely by ABC without using the Deliverable.

5.5     <u>Warranty Period</u>. Contractor represents and warrants to ABC that the Deliverables will perform in accordance with the requirements set forth in the applicable SOW and documentation for a period of ninety (90) days from the date of acceptance by ABC. In the event the Deliverables fail to do so and such failure is not due to changes in the Deliverables made solely by ABC, and Contractor does not bring the Deliverables into conformance within the timeframe set forth in the applicable SOW and documentation, then upon ABC's notice, ABC may terminate the applicable SOW or this Agreement for cause, and Contractor will return to ABC all monies paid to Contractor to date under the applicable SOW.

**6.     <u>Term and Termination</u>.**

6.1     <u>Term</u>. This Agreement shall commence on the Effective Date and shall continue in full force and effect thereafter until the second anniversary of the expiration date of the last outstanding SOW, unless this Agreement is terminated earlier in accordance with the provisions of this Agreement (the "**Term**").

4

6.2     <u>Termination For Breach.</u>  Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after thirty (30) days' written notice thereof (or such shorter period as may be specified in this Agreement or in any applicable SOW).

6.3     <u>Termination Upon Notice.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder for any reason by giving the Contractor fourteen (14) days' prior written notice of its election to terminate this Agreement or the SOW.

6.4     <u>Termination by Customer.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder immediately in the event of termination of the agreement or any statement of work between ABC and its Customer receiving any Services and/or Deliverables provided by Contractor under this Agreement or any SOW.

6.5     <u>Termination for Bankruptcy/Insolvency.</u>  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party:  (a) becomes or is declared insolvent or bankrupt; (b) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) days; or (c) makes an assignment for the benefit of creditors.

6.6     <u>ABC Rights and Payment Upon Termination.</u>  In the event of termination of this Agreement, ABC agrees to pay Contractor for all expenses incurred by the Contractor with ABC's approval and as outlined in the SOW up to the effective date of termination.  In the event ABC terminates this Agreement or any SOW prior to the completion of the Services to be rendered:  (a) Contractor shall be compensated with (i) a pro-rata share of the fees due  or (ii) the hours of work completed by Contractor under the applicable SOW(s); and (b) if applicable, ABC shall pay Contractor for all progress milestones (as set forth in the applicable SOW(s)) completed and accepted by ABC and a pro-rata share of the progress milestone Contractor is working to complete at the time the applicable SOW(s) is/are terminated.  Termination under this Agreement shall not affect ABC's rights in and to all Work (as defined below) created for or provided to ABC pursuant to this Agreement prior to the effective date of termination.

**7.     <u>ABC Property/Trademarks</u>.**

7.1     <u>No Rights Transferred.</u>  Nothing in this Agreement shall convey to Contractor or any of its Assistants any right, license, title, or interest in or to the Work, or any other intellectual property or other property interest, license or right of ABC or its licensors.  In addition, Contractor and its Assistants shall have no right to use any ABC trade name, trademark or service mark without the express written permission of ABC.

7.2     <u>Proprietary Rights.</u>  Except for Contractor's Pre-existing Materials (defined below), all work, services, materials, and Deliverables and other Materials (as defined below), provided, performed or created under any SOW ("**Work**"), including, without limitation:  (a) names, characters, protectable organizational structures, or other "brand" components; (b) all materials, specifications, designs, writings, code, products, or other Deliverables developed or prepared for ABC by Contractor under such SOW (whether or not such SOW is completed) or provided or delivered to ABC by Contractors, Assistants or their agents pursuant to this Agreement (collectively, "**Materials**"); and (c) any and all new or improved idea, design, concept, or other invention made or developed by Contractor or its Assistants during the course of rendering the Services or developing or preparing the Materials (collectively, "**Invention**"), are the property of ABC and all title and interest therein shall vest in ABC and shall be deemed to be a work made for hire and made in the course of Services rendered hereunder. As between the Parties, all Work shall be

5

deemed the Confidential Information of ABC.  Contractor shall promptly and completely disclose to ABC in writing any and all Inventions and Contractor shall ensure that its Assistants promptly and completely disclose to ABC in writing any and all Inventions.

To the extent that title to any Work may not, by operation of law, vest in ABC or such Work may not be considered works made for hire, Contractor hereby irrevocably assigns to ABC all right, title and interest in and to any Work.  All Work shall belong exclusively to ABC, and ABC shall have the right to obtain, and to hold in its own name, copyrights, registrations, patents, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Upon ABC's request, Contractor shall, and shall cause its Assistants to, promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist ABC to prosecute, register, perfect or record its rights in or to any Work.  In the event that ABC is unable, after reasonable effort, to obtain Contractor's signature on such papers and documents, Contractor irrevocably designates and appoints ABC as Contractor's agent and attorney-in-fact, to act for and on Contractor's behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other intellectual property related to the Work with the same legal force and effect as if Contractor executed such papers and documents.

If Contractor becomes aware of any breach of this Section 7 by an Assistant, it shall immediately enforce its rights to the fullest extent under its written agreement with such Assistant and immediately notify ABC of such breach.

Unless otherwise requested by ABC, upon the completion of the Services to be performed under each SOW or upon the earlier termination of such SOW, Contractor and its Assistants shall immediately turn over to ABC all Work developed pursuant to such SOW.

For purposes of this Agreement, "**Contractor's Pre-existing Materials**" means any materials, code, methodology, process, technique, or intellectual property right developed, licensed or otherwise acquired by Contractor independent of the Agreement and services to be rendered hereunder and which are not based upon and do not incorporate any ABC Confidential Information or other intellectual property rights of ABC.  Contractor hereby grants to ABC a perpetual, irrevocable, fully paid-up, worldwide, non-exclusive, assignable, sublicensable license to use, reproduce, display, perform, distribute, and make derivative works of any of Contractor's Pre-existing Materials that are incorporated into the Work, in any medium hereby known or hereafter invented for any purpose.

7.3    <u>Third Party Materials</u>.  Contractor shall not bundle with or incorporate into any Work any third party products, ideas, processes, or other techniques ("**third party materials**"), without the prior written approval of ABC; provided, however, if such third party materials are incorporated into any Work as approved by ABC in writing, Contractor hereby assigns to ABC any and all manufacturer's or supplier's warranties, guarantees, representations, service agreements and indemnities, if any, with respect to any third party materials acquired from a third party and provided by Contractor under a SOW to the extent the same are assignable by Contractor.  To the extent any such warranties, guarantees, representations, service agreements and indemnities are not assignable by Contractor, Contractor agrees that ABC may assert or enforce any right that Contractor may have to enforce the same, or if such right can only be enforced by Contractor and in its own name, upon the request of ABC, Contractor will take all reasonable action requested by ABC to enforce the same.

6

OLU000062

8.    **Confidentiality**.

8.1    Introduction.  Each Party (the "**Recipient**") acknowledges that:  (i) the other Party and its Subsidiaries (defined below, and, collectively with such other Party, "**Discloser**") are the owners of valuable trade secrets and other confidential information and license the same from others; and (ii) in the performance of its obligations hereunder, the Recipient shall receive or become aware of such information.

8.2    Definition of Confidential Information.  For the purposes of this Agreement, "**Confidential Information**" shall mean any information relating to or disclosed during the Term, which is or should be reasonably understood to be confidential or proprietary to Discloser and its customers, Subsidiaries, licensors and business partners, including, without limitation, the material terms of this Agreement, information about Discloser's customers, information concerning the relationship of Discloser with third parties, technical processes and formulas, trade secrets, drawings, inventions, know-how, protocols, software programs, source codes, product designs, sales, cost and other unpublished financial information, product and related business plans, methods of operation, technology assessments, database contents, forecasts, market assessments, strategies, projections, marketing data, and other non-public information owned by Discloser and its customers, Subsidiaries, licensors and business partners.  Such Confidential Information may be prepared by the Discloser, or any of its respective directors, officers, employees, consultants, attorneys, and other representatives.  The provisions of this paragraph shall not apply to Confidential Information that:  (i) was in Recipient's possession before receipt from Discloser, as proven by Recipient; (ii) is or becomes a matter of public knowledge through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; (iv) is independently developed by Recipient, as proven by Recipient; (v) is disclosed under operation of law, provided that Recipient will use reasonable efforts to provide Discloser with prompt written notice of any such requirement in order to enable Discloser to seek an appropriate protective order or other remedy, and that Recipient will disclose only such information as is legally required and will use reasonable efforts to obtain confidential treatment for any Confidential Information that is so disclosed; or (vi) is disclosed by Recipient with Discloser's prior written approval.

All Confidential Information that is entitled to protection under the attorney-client privilege, work product doctrine and other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

To the extent that a non-disclosure agreement is executed between the Parties regarding the Services or Deliverables, the non-disclosure agreement will terminate as to such Services and Deliverables and be replaced by the terms of this Section 8.

8.3    Protection of Confidential Information.  Contractor will maintain and follow commercially reasonable and legally compliant information security standards and practices with respect to any of ABC's Confidential Information in Contractor's possession or control and protect such information against any loss, alteration, theft or corruption.  Contractor shall promptly advise ABC after learning of any such unauthorized access, loss, alteration, theft or corruption.  Contractor shall take necessary corrective action within Contractor's reasonable control.  If Contractor believes such corrective action is in the reasonable control of ABC, then Contractor shall advise ABC of the corrective action that it believes ABC should take.  At ABC's request, Contractor shall provide copies of its information security policies, processes, and procedures.  Contractor will notify ABC of any material changes to its policies, processes or procedures that relate to the security of ABC's Confidential Information in Contractor's possession.  Contractor shall comply with all information security and privacy laws, rules or regulations applicable to Contractor as a result of and in

7

connection with its use, protection and retention of ABC Confidential Information and shall be responsible for any breach of such laws, rules or regulations by Contractor or its employees, agents or subcontractors.  Any personal identifying information disclosed to Contractor under this Agreement shall remain protected as Confidential Information under this Agreement for an indefinite period.

8.4   <u>Obligations and Destruction of Confidential Information</u>.  Recipient agrees that Confidential Information may only be used by Recipient as reasonably necessary to carry out the purposes of this Agreement and for the sole benefit of Discloser.  Except as directed by Discloser or as permitted in this paragraph, Recipient will not at any time during or after the Term use Confidential Information for any other purpose or disclose any Confidential Information to any person, or permit any person to examine and/or make copies of any reports or any documents prepared by Recipient or that come into Recipient's possession or under Recipient's control by reason of performance of Recipient's obligations under this Agreement.  Notwithstanding the foregoing, and without limiting the generality of Section 2.1, Contractor, as Recipient, may disclose ABC's Confidential Information to Contractor's Assistants, when, and only to the extent, reasonably necessary to perform the Services; provided that, prior to such disclosure to such Assistants, Contractor shall have informed such Assistants of its confidentiality obligations herein and have executed with such Assistants a written agreement containing confidentiality obligations no less restrictive than those herein.  Contractor shall be responsible for any use or disclosure of Confidential Information by its Assistants in breach of this Agreement.  Recipient agrees to use the same degree of care to protect Discloser's Confidential Information that it uses to protect its own Confidential Information of a like nature from unauthorized disclosure, but in no case less than a reasonable degree of care.

Upon termination of this Agreement, Recipient will turn over to Discloser or destroy all documents, papers, and other matter in Recipient's possession or under Recipient's control that contain or relate to such Confidential Information, and provide written certification of such to Discloser.

8.5   <u>Injunctive Relief</u>.  Recipient acknowledges that misuse or disclosure of any Confidential Information by Recipient may give rise to irreparable injury to Discloser or the owner of such information, inadequately compensable in damages.  Accordingly, Discloser or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other remedies available at law or in equity.  Recipient acknowledges and agrees that the covenants contained in this Section 8 are necessary for the protection of legitimate business interests of Discloser and its customers, Subsidiaries, licensors and business partners, and are reasonable in scope and content.

## 9.   **Representations and Warranties**.

9.1   <u>Contractor Representations and Warranties</u>.  Contractor represents and warrants to ABC that:  (A) Contractor and each of its Assistants has or shall have the proper skill, training, and background so as to be able to perform the Services in a competent and professional manner and that all work will be performed in accordance with applicable standards for similar services and Contractor shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; (B) each Assistant is properly licensed, if required by applicable law, to perform the Services;  (C) each Assistant has executed written agreements securing for Contractor the intellectual property rights set forth in this Agreement.  Upon the request of ABC, Contractor agrees to provide copies of such written agreements.  If such written agreements do not secure the necessary intellectual property rights based on the review of ABC, ABC may require any Assistant

8

OLU000064

to execute a new or revised written agreement to secure the intellectual property rights provided for in this Agreement; (D) ABC shall receive free, good and clear title to all Work which may be developed by Contractor or its Assistants under this Agreement or which is provided or delivered to ABC by Contractor or Contractor's Assistants pursuant to this Agreement, which title shall be free and clear of any and all liens, encumbrances, claims or litigation, whether pending or threatened; (E) no Work or other materials delivered by Contractor to ABC hereunder shall infringe on or violate (i) any copyright, trademark, or patent right, (ii) any other proprietary or other right of any third party, including but not limited to any third party right to privacy, or (iii) any applicable law or regulation; (F) no Work or other materials delivered by Contractor to ABC hereunder shall contain any scandalous, libelous or unlawful matter or material; (G) Contractor will not publish, broadcast, display or distribute in any media, or allow others to publish, broadcast, display or distribute in any media, the Work or any third party content or any portion thereof without the prior written consent of ABC; and (H) software licensed to ABC by Contractor, if any, contains no code that would directly or indirectly (i) create, or purport to create obligations on ABC with respect to ABC's use or distribution of any software that incorporates, is combined with, or is derived from such software, except as explicitly set forth in this Agreement, (ii) grant, purport to grant, or require ABC to grant to any third party any rights or immunities under ABC's intellectual property or proprietary rights in any software that incorporates, is combined with, or is derived from such software, or (iii) require as a condition of its use, modification, or distribution, that any software incorporated into, derived from, or distributed with such software must be disclosed or distributed in any form.

9.2   Federal Health Care Participation.  Contractor represents to ABC that neither Contractor nor any Assistant is excluded from participating in the U.S. Government's Medicare or Medicaid program (each, a "**Federal Health Care Program**") nor currently debarred or suspended or listed on the U.S. Government's General Services Administration's (the "**GSA**") List of Parties Excluded from Federal Procurement or Nonprocurement Programs in accordance with Executive Orders 12549 and 12689, "*Department and Suspension*", and Contractor warrants to ABC that, during the Term, it will not perform any act that shall cause Contractor to be excluded from such participation or so debarred, suspended or listed.  Contractor further represents to ABC that no adverse action by the U.S. Government that will or may result in exclusions from a Federal Health Care Program has occurred or is pending or threatened against Contractor or any Assistant.  Contractor shall immediately notify ABC if it or any Assistant becomes so excluded, debarred, suspended or listed during the Term.

9.3   Mutual Representations and Warranties.  Each Party represents and warrants to the other Party that: (a) such Party has the full corporate right, power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (b) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (d) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof which are not expressly provided for in this Agreement.

**10.   Indemnification; Limitations; Insurance**.

10.1   Indemnity.  Contractor shall defend, indemnify and hold harmless ABC, its Subsidiaries and its and their officers, directors, agents, and employees from any and all third party claims, demands,

9

OLU000065

liabilities, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses ("**Liabilities**") resulting from:  (a) actual or alleged infringement of any patent, trademark, copyright, or other intellectual property right (including, without limitation, misappropriation of trade secrets) based on any software, program, Services and/or other materials furnished to ABC by Contractor or Contractor's Assistants pursuant to the terms of this Agreement, including, without limitation, the Work or the use thereof by ABC; (b) Contractor's payment or nonpayment of compensation or salary asserted by an Assistant of Contractor; (c) any claim that Contractor or any Assistant stands in any relationship with ABC other than as an independent contractor, including but not limited to employment, co-employment and joint employment; (d) any governmental determination that Contractor has failed to maintain its independent-contractor status or litigation determining a change of Contractor's independent-contractor status, including liability for taxes and other penalties assessed upon ABC because of Contractor's change or lack of independent contractor status; (e) any errors, acts or omissions of Contractor or its Assistants in connection with performing Services to the extent resulting in death, personal injury, or damage to real or tangible personal property; (f) Contractor's or Contractor's Assistant's material breach of any obligation, duty, representation or warranty contained in this Agreement or in any SOW attached hereto; (g) the negligence or willful misconduct of Contractor or its Assistants in performing the Services or other obligations hereunder; and (h) a failure on the part of Contractor or its Assistants to comply with applicable law or regulations in performing the Services.

10.2    <u>Additional Remedy</u>.  Should ABC's use of any service, program, or other material (including, without limitation, the Work) furnished to ABC by Contractor be enjoined by any court, Contractor shall promptly obtain, at no expense to ABC, the right to continue to use the items so enjoined or, at no expense to ABC, to provide ABC promptly with modified or substitute items that are functionally equivalent to the enjoined products.  If Contractor cannot secure ABC's right to continue using such items or substitute such items as provided herein, Contractor agrees to refund all sums paid to Contractor under this Agreement relating to the provision of such items.

10.3    <u>Limitations</u>.  EXCEPT IN CONNECTION WITH A BREACH OF THE CONFIDENTIALITY OR INDEMNITY PROVISIONS HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, OR ARISING FROM ANY OTHER PROVISION OF THE AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

<u>Insurance</u>.  During the Term, if Contractor employs *more than thirty (30) individuals* as employees, Contractor shall maintain in full force and effect the following insurance coverage:  (a) Commercial General Liability insurance with limits of no less than $1 million per occurrence and $2 million annual aggregate for claims due to bodily injury (including death) or property damage caused by or arising from acts or omissions of Contractor or Contractor's Assistants (the Commercial General Liability policy should include coverage for premises and operations, products and completed operations, broad form property damage and blanket contractual liability); (b) Workers' Compensation insurance in compliance with all statutory requirements; (c) Professional Liability insurance with limits of no less than $1 million per claim and $3 million as an annual aggregate (the professional liability policy must extend coverage for copyright and trademark infringement, defamation and misappropriation of ideas as well as any other error, omission or negligent act, and coverage should include, but not be limited to, loss of data, content or indirect loss to ABC); and (d) Umbrella Liability insurance with limits of no less than $5 million per occurrence and $5 million as an annual aggregate.  If during the Term, Contractor employs *thirty (30) individuals or less* as employees, Contractor shall maintain in full force and effect the

10

OLU000066

following adequate insurance coverage: (a) commercial general liability insurance; (b) workers' compensation insurance in compliance with all statutory and regulatory requirements; and (c) professional liability insurance, in each case with insurance policy limits sufficient to protect and indemnify ABC and its subsidiaries, and each of its and their officers, directions, agents, and employees from any losses resulting from Contractor or its employees, agents, contractors, or servants conduct, acts or omissions.

With respect to the foregoing, ABC shall be named as an additional insured on all such policies with the exception of Workers Compensation.  Policies shall be written with a licensed insurance company with a Best's rating of no less than A-.  Contractor shall provide a certificate of insurance evidencing all such required coverage upon ABC's request.  The certificate shall provide:  (a) thirty (30) days' prior written notice of cancellation or any material change in any such policy to ABC's Legal and Business Affairs Department; and (b) a renewal certificate fifteen (15) days prior to the renewal of any such policy.  Insurance required by ABC shall in no way reduce or limit Contractor's actual obligation to indemnify and defend ABC for claims, suits or allegations brought as a result of, or as related to, the performance of this Agreement.  With respect to claims made policies (e.g., Professional Liability), Contractor agrees to maintain insurance for a period of two years after the Term.

**11.**   **Communications**.

11.1   Notice.  Any notice required under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes:  (a) on the delivery date if delivered by confirmed facsimile; (b) on the delivery date if delivered personally to the Party to whom the same is directed; (c) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt; or (d) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available.

In the case of ABC, such notice will be provided to both the ABC Project Manager and ABC Legal and Business Affairs (fax no. 202-266-5700), each at the address of ABC set forth in the first paragraph of this Agreement, or another address as specified by like notice.

In the case of Contractor, except as otherwise specified herein, the notice address shall be the address for Contractor set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax number as provided to  ABC.

11.2   Duty to Inform.  Contractor shall promptly inform ABC of any information related to the Services, including, without limitation, the Work, which could reasonably lead to a claim, demand or liability of or against ABC and/or its Subsidiaries by any third party.

11.3   Publicity.  Contractor agrees that it will not, without the prior written consent of ABC in each case, use in advertising, publicity, or otherwise the name or logo of ABC, or images of ABC facilities and employees, or refer to the existence of this Agreement in press releases, advertising, or materials distributed to prospective customers.

11.4   Statements to Third Parties.  During the Term, Contractor shall not make, publish, or otherwise communicate, or cause to be made, published, or otherwise communicated, any deleterious remarks whatsoever to any third parties concerning ABC, its Subsidiaries or its or their directors, officers,

11

employees or agents, including, without limitation, ABC's business projects, business capabilities, performance of duties and services, or financial position.

**12.**  **Non-solicitation**.  During the Term and for a period of one (1) year thereafter, unless ABC expressly authorizes in writing in advance, Contractor shall not solicit, offer work to, employ, or contract with, directly or indirectly, on its own behalf, any of ABC's Personnel or the Personnel of ABC's  Subsidiaries.  For purposes of this Section, "**Personnel**" means any individual or entity whom or which ABC employs or has employed as a partner, employee or independent contractor and with whom or which the Contractor comes into direct contact in the course of performing its obligations under this Agreement.  This Section shall not apply with respect to Personnel who respond to indirect, general solicitations for employment (such as employment agency referrals and Internet postings), as opposed to solicitations targeted to Personnel.

**13.**  **Audits; Right to Examine**.

13.1  Maintenance of Records.  Contractor will keep, at its principal place of business, accurate books and records (in whatever form or medium such books and records are stored) regarding the Services performed under each SOW.  Contractor will preserve all books and records for a period of at least seven (7) years from the completion or termination of the applicable SOW or until all pending matters relating to this Agreement are closed.

13.2  Audit Right.  ABC or its authorized representatives will have the right to perform regular audits to examine Contractor's performance of the Services with respect to Contractor's:  (a) compliance with ABC-approved security standards and procedures; (b) compliance with Contractor's internal practices and procedures; (c) use of the systems utilized to provide the Services;  (d) security, disaster recovery and back-up procedures; and (e) fulfillment of any other Contractor obligations (including the obligations of Assistants) under this Agreement.  ABC may elect, at its own expense, to have a full or part-time employee, contractor, or authorized representative on-site at Contractor's facilities for the purpose of ensuring compliance with the terms and conditions of this Agreement.  Contractor agrees to provide such person with all necessary assistance including unrestricted access to Contractor's facilities, dedicated space and a suitable computer workstation.  Contractor shall not be relieved of its responsibility to comply with security provisions even if ABC inspects and detects system failures, fails to inspect, or has the right to inspect, Contractor's facilities, systems and procedures.

**14.**  **Protected Health Information**.  Contractor shall comply with the terms and conditions contained in the Business Associate Agreement, attached hereto as **Exhibit C** and incorporated herein by this reference.  Any PHI or EPHI, as defined therein, shall be deemed Confidential Information.

**15.**  **Miscellaneous**.

15.1  Force Majeure.  Neither Party shall be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of fire, strike, war, terrorism, insurrection, government restriction or prohibition, or any other causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence (a "Force Majeure Event").  A Party whose performance is impacted by a Force Majeure Event shall give notice to the other Party, stating the period of time the occurrence is expected to continue and shall use diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event.  During the Force Majeure Event, the non-impacted Party may suspend its performance obligations until such time as the impacted Party resumes performance.  The non-impacted Party may terminate this Agreement

12

or any applicable SOWs if such failure or delay continues for a period of thirty (30) days or more and, if the non-impacted Party is ABC, receive a refund for any amounts paid to Contractor in advance for the impacted Services.

15.2   No Waiver.  The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement shall not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same shall be and remain in full force and effect.

15.3   Entire Agreement.  This Agreement, together with all Schedules, Exhibits, SOWs and any other documents incorporated herein by reference, set forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein.  Neither Party shall be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.  For clarification, any additional or different terms appearing on any invoice or other document including terms and conditions in standard or preprinted documents or on Contractor's website that are inconsistent with this Agreement shall be void and have no force or effect.

15.4   Amendment.  No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment.

15.5   Further Assurances.  Contractor shall take such action (including, without limitation, the execution, acknowledgment and delivery of documents) as may reasonably be requested by ABC for the implementation or continuing performance of this Agreement.

15.6   Assignment.  Contractor shall not assign this Agreement or any right, interest or benefit under this Agreement, nor delegate any of its duties or obligations hereunder, without the prior written consent of ABC.  Assumption of the Agreement by any successor to Contractor (including, without limitation, by way of merger, consolidation or sale of all or substantially all of Contractor's stock or assets) shall be subject to ABC's prior written approval.  Except as permitted by the foregoing, any attempted assignment or delegation shall be null, void, and of no effect.  Subject to the foregoing, this Agreement shall be fully binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assigns.

15.7   Construction; Severability.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement:  (a) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law; and (b) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect.

15.8   Interpretation.  For purposes of this Agreement, unless the context otherwise requires, references herein: (i) to Sections, Schedules, Exhibits and SOW(s) refer to the Sections of, and Schedules, Exhibits and SOW(s) attached to this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and

13

any regulations promulgated thereunder. The Schedules, Exhibits and SOW(s) referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

15.9    Remedies.  Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15.10   Applicable Law; Jurisdiction. This Agreement shall be interpreted, construed and enforced in all respects in accordance with the laws of the District of Columbia except for its conflicts of laws principles.  Each Party irrevocably consents and submits to the exclusive jurisdiction of the courts situated in the District of Columbia, in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

15.11   Export Controls.  Contractor agrees to fully comply with all applicable export control laws, regulations, rules, and orders of the United States, and will not export, re-export, release, or transfer (collectively, "**Export**"), directly or indirectly, any commodities, software or technology, including any direct products thereof, or enter into any transactions, for any proscribed end-use, or to or with any proscribed country, entity, or person (wherever located), including but not limited to those entities and persons listed on the U.S. Government's Denied Persons List, Unverified List, Entity List, Debarred Parties List or Specially Designated Nationals List, without first obtaining at its own expense written authorization from the U.S. Government.  Contractor further agrees to provide all technical and operational information and documentation necessary for ABC to Export any Work produced by Contractor and to obtain any required U.S. Government authorizations for the same.

15.12   Headings; Interpretations.  The captions and headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.  This Agreement shall be construed fairly according to its terms, without regard to the drafter of any provision hereof.  The Parties acknowledge and agree that each of them has participated in the negotiation of this Agreement.  The Parties agree that any rule of law requiring construction of a document against a Party by reason of such Party having prepared such document shall not apply to this Agreement.

15.13   Subsidiary.  "**Subsidiary**" means any entity in which a Party owns, directly or indirectly, at least 50% of the equity securities or other ownership interest.  ABC shall have the right to share all or any part of this Agreement (as may be amended) and all associated Work (pursuant to ABC's ownership of such Work) with any of its Subsidiaries.  ABC Subsidiaries located in the United States shall be entitled to purchase Services from Contractor in accordance with the pricing and other terms and conditions of this Agreement.  Any such Subsidiary may obtain Services pursuant to a SOW executed by Contractor and the Subsidiary, and will be bound to the terms of this Agreement, and shall be solely responsible for fulfillment of the respective obligations, and shall have the sole right to exercise the respective rights, conferred upon ABC under this Agreement. ABC shall have no liability for any of its Subsidiary's actions or failure to comply with any obligations hereunder.

15.14   Counterparts; Facsimile.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile shall be effective to the same extent as if such Party had delivered a manually executed counterpart.

14

15.15   <u>Surviving Sections</u>.  The following Sections shall survive the expiration or termination of this Agreement: 2.1; 2.4; 4.4; 4.5; 6.5; 7; 8; 9; 10; 11; 12; 13; 14; and 15.  In addition, any provisions of this Agreement which expressly or by implication are intended to survive or by implication are intended to survive termination or expiration of the Agreement will survive and continue to bind the Parties.

15.16   <u>Prohibition on Discrimination and Affirmative Action.</u> **As applicable, ABC and Contractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

15.17   <u>Time.</u>  All references to 'days' in this Agreement refer to calendar days unless other provided herein**.**

15

OLU000071

**IN WITNESS WHEREOF**, each Party's duly authorized representative has executed this Agreement as of the Effective Date.

**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**

By:_____            By:_____

Print Name: Amy Schartner                        Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                      Title: Contractor

16

**EXHIBIT A**

**SCOPE OF WORK**

**SCHEDULE NO. 1 EFFECTIVE SEPTEMBER 19, 2016**
**TO**
**INDEPENDENT CONTRACTOR AGREEMENT**
**BETWEEN**
**THE ADVISORY BOARD COMPANY ("ABC") AND**
**JEDIDIAH HOLDINGS LLC ("Contractor")**
**DATED AS OF FEBRUARY 4, 2016 the "Agreement")**

1.   **Detailed description of project to be accomplished by Contractor:**

Clinovations team will accomplish the following:

- Deliver at-the-elbow support with our Cerner-Ambulatory experienced providers for MedStar provider-level clinical staff (e.g., attending and private physicians, fellows, residents and relevant mid-level providers);
- Support the MedStar deployment approach and go-live activities for the Cerner Ambulatory application;
- Coordinate with the on-site Cerner go-live team, and other support resources, to streamline deployment efforts;
- Deliver guidance for providers on chart navigation, order entry, documentation and e-prescribing;
- Create, communicate and manage the detailed go-live support schedule for the Clinovations team;
- Capture, track and report patient safety concerns, build issues and workflow concerns;
- Discuss issue resolution and communication with project leadership;
- Assess processes in the medical office to determine the level of operational efficiency with particular emphasis on:
    - Patient flow;
    - Point-of-care documentation and ordering;
    - Clinical documentation strategy and tactics;
    - In-office communication;
    - Chart abstraction;
    - Document management;
- Evaluate the use of Cerner Ambulatory functionality and make recommendations for optimization to:
    - Improve operational efficiency;
    - Increase productivity;
    - Standardize routine operational tasks;
- Modify standard workflows based on the current office environment, organizational goals and recommended practices.

2.   **Deliverables to be produced by Contractor:**

N/A

17

OLU000073

3.      **Time for Performance/Delivery for each Deliverable:**

N/A

4.      **Acceptance testing criteria for each Deliverable:**

Not Applicable

5.      **Payments:**

(a)      Fee (Choose one)

Time and Materials

Regular Time:  $125/hour

Contractor will submit weekly time reports via OpenAir reflective of billable hours according to approved SOW and Client guidelines. In addition, Contractor will submit an invoice according to reimbursement schedule and after Project Manager approval.

(b)      Expenses

Contractor shall be entitled to reimbursement for expenses preapproved by ABC while performing Services outlines in the Statement of Work in Exhibit A, Expenses are not to exceed $1,500 per week. Approved travel expense reimbursements are paid per ABC and its Clients' policies, provided Contractor has submitted expenses on time, with proper supporting documentation and Project Manager approval.

(c)      Payment SOW

All fees and expenses due shall be invoiced by Contractor in arrears:

| | |
|---|---|
| _____ | Monthly |
| _____ | Upon Completion |
| ___X___ | Other (describe: Weekly) |
| _____ | Progress Payments as follows: |

Progress Payments                     Progress Milestones

$_____                        _____

$_____                        _____

$_____                        _____

$_____                        _____

(d)      Maximum Amount

18

Not Applicable

7.  **Contractor Project Manager:**    Name:  Stephanie Murrill
                                       Ph#:    678-713-6932
                                       Email:  MurrillS@advisory.com


8.  **ABC Project Manager:**          Name:  Stephanie Murrill
                                       Ph#:    678-713-6932
                                       Email:  MurrillS@advisory.com


9.  **Term of this SOW:**             This term of this SOW is November 11, 2016 through January 7, 2017.


10.  **Additional Terms and Conditions:**  None


**THE ADVISORY BOARD COMPANY**              **JEDIDIAH HOLDINGS LLC**


By:_____        By:_____

Print Name: Amy Schartner                   Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                Title: Contractor

*Confidential*                                    Updated 04/2015

OLU000075

## **EXHIBIT B**

**RATE SCHEDULE**

N/A

20

<u>**EXHIBIT C**</u>

**BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Subcontractor Agreement ("**BA Agreement**"), effective as of September 19, 2016 (the "**Effective Date**"), is entered into by and between Jedidiah Holdings LLC ("**Provider**") and The Advisory Board Company ("**Advisory Board**") (each a **"Party"** and collectively the "**Parties**").

1.      <u>**BACKGROUND AND PURPOSE.**</u>  The Parties have entered or are entering into one or more agreements for the provision by Provider of Consulting ("**Services**") **("Underlying Agreements")** that are in fulfillment of services that the Advisory Board is obligated to provide for or on behalf of Covered Entities (each a "**Covered Entity**"), which Covered Entities are Advisory Board members.  Each Covered Entity has an arrangement directly with the Advisory Board under which Covered Entity has provided or may provide to the Advisory Board, or the Advisory Board may create, Protected Health Information ("**PHI**") (as defined in 45 C.F.R. § 160.103) subject to the federal privacy regulations ("**Privacy Rule**") and federal security regulations ("**Security Rule**") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 and its implementing regulations, ("**HITECH Act**") as each is amended from time to time (collectively referred to herein as **"HIPAA")**, to the Advisory Board and pursuant to which the Advisory Board, or the Covered Entity, on behalf of the Advisory Board, is providing or may provide the PHI to Provider and/or Provider may create PHI in its performance of the Services.  The purpose of this BA Agreement is to allow for the Advisory Board's compliance with its obligations under HIPAA and its agreements with its Covered Entity members.

2.      <u>**DEFINITIONS**</u>.  Unless otherwise specified in this BA Agreement, all capitalized terms used in this BA Agreement not otherwise defined have the meanings established for purposes of HIPAA, as is amended from time to time.

2.1     "Breach" shall mean the acquisition, access, use or disclosure of PHI in a manner not permitted by the Privacy Rule that compromises the security or privacy of the PHI as defined, and subject to the exceptions set forth, in 45 C.F.R. § 164.402.

2.2     "EPHI" shall mean Electronic Protected Health Information, as defined in 45 C.F.R. § 160.103, limited to the information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.3     "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.4     "Privacy Rule" shall mean the federal privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & E).

2.5     "Security Rule" shall mean the federal security regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & C).

*Confidential*

Updated 04/2015

OLU000077

**3.**       <u>**OBLIGATIONS OF THE PARTIES WITH RESPECT TO PHI.**</u>

3.1     <u>Permitted Uses and Disclosures of PHI by Provider</u>. Provider may use and disclose PHI only as permitted by Section 3.2(a) of this BA Agreement.

3.2     <u>Obligations of Provider</u>.  With regard to its use and/or disclosure of PHI, Provider agrees to:

A.     use and/or disclose PHI only as necessary to provide the Services set forth in the Underlying Agreements, as permitted or required by this BA Agreement, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e) or as otherwise Required by Law;

B.     use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by the BA Agreement;

C.     implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the EPHI that it creates, receives, maintains, or transmits on behalf of the Advisory Board in compliance with the Security Rule;

D.     secure all PHI by rendering all PHI unusable, unreadable, or indecipherable to unauthorized individuals in accordance with the United States Department of Human Services Guidance to Render Unsecured Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals, including by encrypting PHI;

E.     without unreasonable delay, and in any event no later than one (1) business day after discovery, report to the Advisory Board in writing: (i) any use or disclosure of PHI of which it becomes aware that is not permitted by this BA Agreement; and/or (ii) any Security Incident of which Provider becomes aware;

F.     without unreasonable delay, and in any event no later than two (2) business days after its discovery by Provider, notify the Advisory Board in writing of any incident that involves an unauthorized acquisition, access, use, or disclosure of PHI, even if Provider believes the incident will not rise to the level of a Breach. The notification shall include: (i) the identification of all individuals whose PHI was or is believed to have been involved, (ii) a brief description of what happened, including the date of the incident and the date of the discovery of the incident, (iii) a description of the types PHI that were involved in the incident, (iv) a brief description of what Provider is doing to investigate the incident, to mitigate harm to individuals, and to protect against any further breaches, (iv) all other information reasonably requested by the Advisory Board to enable the Advisory Board or the applicable Covered Entity to perform and document a risk assessment in accordance with HIPAA and any applicable state breach notification laws with respect to the incident to determine whether a Breach occurred, and (v) all other information reasonably necessary to provide notice to individuals, HHS, state agencies, and/or the media, as required by applicable law. Notwithstanding the foregoing, in the Advisory Board's sole discretion and in accordance with its directions, Provider shall conduct, or pay the costs of conducting, an investigation of any incident required to be reported under this Section 3.2(f) and shall provide, and/or pay the costs of providing, the required notices as set forth in this Section 3.2(f).

G.     require all of its subcontractors and agents that create, receive, maintain, or transmit PHI to agree, in writing, to the same restrictions, conditions, and requirements that apply to Provider under this BA Agreement, including but not limited requiring any subcontractor or agent to implement reasonable and appropriate safeguards in compliance with the Security Rule to protect the EPHI consistent with the requirements of this BA Agreement;

22

H.      make its internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS or to the Advisory Board or applicable Covered Entity within a reasonable timeframe for purposes of determining compliance with HIPAA;

I.      document such disclosures of PHI as would be required for the applicable Covered Entity to respond to a request by an Individual for an accounting of disclosures in accordance with 45 C.F.R. § 164.528 and provide, within ten (10) days after the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) requests the information in writing, the information necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to make an accounting of disclosures of PHI about an Individual, in accordance with 45 C.F.R. § 164.528;

J.      make available within ten (10) days after receiving a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) all PHI necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to respond to an Individuals' request for access to PHI about them, in accordance with 45 C.F.R. § 164.524, in the event that the PHI in Provider's possession constitutes a Designated Record Set, and, when directed by the Covered Entity or the Advisory Board, make the PHI available directly to the Individual;

K.      make available PHI for amendment and incorporate within ten (10) days after a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) any amendments or corrections to the PHI in accordance with 45 C.F.R. § 164.526, in the event that the PHI in Provider's possession constitutes a Designated Record Set;

L.      request, use and/or disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure in compliance with the Privacy Rule's minimum necessary standard and any guidance issued by the United States Department of Health and Human Services;

M.      not directly or indirectly receive remuneration in exchange for any PHI as prohibited by the HITECH Act;

N.      not make or cause to be made any communication about a product or service that is prohibited by the HITECH Act;

O.      not make or cause to be made any written fundraising communication that is prohibited by the HITECH Act;

P.      to the extent Provider is to carry out, on behalf of the Advisory Board, one or more of a Covered Entity's obligations under HIPAA, comply with the requirements of HIPAA that apply to Covered Entity in the performance of such obligations; and

Q.      promptly return to the Advisory Board or destroy (and retain no copies), all PHI in its possession, including such information in the possession of its subcontractors, following the termination and expiration of this BA Agreement, if it is feasible to do so. If Provider determines, and if and only if the Advisory Board agrees, that return or destruction is infeasible, Provider agrees to extend any and all protections, limitations, and restrictions contained in this BA Agreement to Provider's use and/or disclosure of any retained PHI, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the PHI infeasible.

*Confidential*                                                                                 Updated 04/2015

OLU000079

3.3    <u>Effect of Changes to the Law or Contractual Obligations</u>.  To the extent that any relevant provision of HIPAA is amended in a manner that changes the obligations of Provider or the Advisory Board that are embodied in the terms of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these revised obligations.  If the Advisory Board is required to comply with any provision under the terms of its business associate agreement with any Covered Entity that is not already included in this BA Agreement or is more stringent than a provision of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these additional or more stringent obligations.

**4.**    **TERMINATION BY ADVISORY BOARD**.  In the event of a material breach of the terms of this BA Agreement by Provider, the Advisory Board shall provide Provider written notice of that breach and may either (i) immediately terminate this BA Agreement and the underlying services agreement with Provider, or (ii) afford Provider an opportunity to cure the breach, provided, however, that if Provider fails to cure the breach within a reasonable time specified by the Advisory Board, the Advisory Board may terminate this BA Agreement and the Underlying Agreements with Provider.

**5**.    **INDEMNIFICATION**.  Provider shall indemnify, defend and hold harmless the Advisory Board and its officers, directors, trustees, employees and agents (the Advisory Board's "**Personnel**") from any and all third party claims, liabilities and expenses which the Advisory Board or its Personnel may incur as a result of, arising out of, or relating to, a breach of the Provider's obligations under this BA Agreement.

**6.**    **MISCELLANEOUS.**

6.1    <u>Construction of Terms</u>:  Any unclear terms of this BA Agreement shall be construed in a manner that allows the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to comply with HIPAA.

6.2    <u>Survival</u>.  Sections 1, 2, 3, 4, 5 and 6 of this BA Agreement shall survive termination of this BA Agreement and continue indefinitely solely with respect to PHI Provider retains in accordance with Section 3.2(q).

6.3    <u>No Third Party Beneficiaries</u>.  Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

[Remainder of page intentionally left blank.]

*Confidential*    Updated 04/2015

OLU000080

IN WITNESS WHEREOF, each of the undersigned has caused this BA Agreement to be duly executed in its name and on its behalf.

**Jedidiah Holdings LLC**                                    **The Advisory Board Company**

By: _____            By: _____

Print Name: Oluro Olukayode Oladimeji, MD        Print Name: Amy Schartner

Print Title: Contractor                                          Print Title: Senior Vice President

*Confidential*                                                                    Updated 04/2015

OLU000081

# Signature Certificate



🔒 **Document Reference:**   NDHSZAINM5EWRLJTNF3A3K



**Oluro Olukayode**
Party ID: GMK2YSJ2GILL2P2LU4JA5T
IP Address: 173.73.9.243

| VERIFIED EMAIL: | yehudak12@yahoo.com |



| Multi-Factor Digital Fingerprint Checksum | c7632a277aa3c0d40a3f0df25d63e9bc1baa57cc |





**Amy Schartner**
Party ID: D7ARVNJ3548IZR3VTIGK9T
IP Address: 67.208.171.62

| VERIFIED EMAIL: | schartna@advisory.com |



| Multi-Factor Digital Fingerprint Checksum | 303ba0b8ca1d684f6abe2514ad91163c6d4bf9dd |



| Timestamp | Audit |
|-----------|-------|
| 2016-09-19 17:30:27 -0700 | All parties have signed document. Signed copies sent to: Charles Wright, Jeremy Geneaux, Neil Rothberg, Megan Linehan, Jacqueline Dagg, Oluro Olukayode, and Amy Schartner. |
| 2016-09-19 17:30:27 -0700 | Document signed by Oluro Olukayode (yehudak12@yahoo.com) with drawn signature. - 173.73.9.243 |
| 2016-09-19 11:36:35 -0700 | Document viewed by Oluro Olukayode (yehudak12@yahoo.com). - 173.73.9.243 |
| 2016-09-19 09:37:30 -0700 | Document signed by Amy Schartner (schartna@advisory.com) with drawn signature. - 67.208.171.62 |
| 2016-09-19 09:37:18 -0700 | Document viewed by Amy Schartner (schartna@advisory.com). - 67.208.171.62 |
| 2016-09-19 09:28:57 -0700 | Document created by Jacqueline Dagg (daggj@advisory.com). - 76.106.84.170 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

OLU000082

## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT ("**Agreement**") is made and entered into as of February 17, 2017 (the "**Effective Date**"), by and between The Advisory Board Company, a Delaware corporation, with offices at 2445 M Street, NW, Washington, DC 20037 ("**ABC**"), and Jedidiah Holdings LLC, a Virginia corporation, with offices at 6042 Selwood Place Springfield, Virginia 22152 ("**Contractor**").  ABC and Contractor may be referred to herein individually as a "**Party**" and together as the "**Parties**."

ABC desires to engage the services of Contractor and Contractor desires to accept such engagement to perform the services described herein upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, ABC and Contractor hereby agree as follows:

1.  **Services and Scope of Work**.

    1.1  <u>Services</u>.  Contractor agrees to provide to ABC specific contractor services as described in such scope of work as executed by both Parties, consecutively numbered and annexed hereto as part of **Exhibit A – Scope of Work**  (each "**SOW**").  By executing this Agreement, without execution of any SOW, ABC is not committing or obligating itself to use Contractor's services.  Contractor shall provide the specific contractor services described in an executed SOW ("**Services**") in accordance with the provisions of this Agreement and the applicable SOW.  In the event of any conflict between the provisions of a SOW and of this Agreement, the Agreement shall prevail. Contractor shall provide a Rate Schedule that sets forth the rates for each corresponding title or skill set for all applicable services in **Exhibit B** – Rate Schedule.

    1.2  <u>Scope of Work (SOW)</u>.  Each SOW shall contain a description of the work to be performed by Contractor and any deliverables to be produced ("**Deliverables**"), timing for performance, a statement of Contractor's rates for performance and a payment schedule, and term for the SOW. Contractor shall not perform any services until an applicable SOW is finalized and fully executed. If Contractor begins to perform any services prior to the execution of an applicable SOW, Contractor hereby acknowledges:  (a) that the terms and conditions of this Agreement (other than the payment provisions) shall apply; and (b) that Contractor does so at its own risk and ABC is not obligated to pay Contractor for any time, work, or costs incurred, unless otherwise agreed in writing.

    1.3  <u>Other Work</u>.  Contractor has the right to perform services for others during the Term (as defined below) as long as such other engagement or performance does not interfere in any way with the timely and professional performance of the Services to be provided hereunder or compromise ABC's Confidential Information.

    1.4  <u>Performance of Services</u>.  Unless otherwise agreed to by the Parties in a SOW, Contractor shall furnish all equipment and materials used to perform the Services.  In performing the Services, Contractor shall, and shall ensure that its Assistants (as defined below):  (a) comply with all applicable ABC rules, policies and guidelines regarding safety, security, and conduct including but not limited to those listed at: http://downloads.advisory.com/lgl ; (b) perform to the best of their abilities and in a competent and professional manner, and in accordance with ABC's standards; and (c) comply with all applicable local, state and federal laws and regulations. In addition, before commencing Services under this Agreement, Contractor, as the sole Assistant (as defined below), must successfully complete a background investigation that may include without limitation, a

1

criminal background check and verification of education and employment history.  Without limiting the foregoing, Contractor will comply with all applicable international, national, state/provincial and local laws and applicable international standards regarding employment in performing its obligations hereunder; Contractor will promptly notify ABC in writing of any allegation of non-compliance.

**2.     Relationship of Parties; Independent Contractor Status.**

2.1  Independent Contractor. Contractor's relationship to ABC is that of an independent contractor, not an agent, employee or servant.  Contractor is fully and solely responsible for the use and employment of its employees, representatives, contractors, or consultants (collectively "Assistants"), and Contractor's Assistants shall not be considered agents, employees or servants of ABC for any purpose.  Contractor and its Assistants shall not represent itself or themselves or hold itself or themselves out to third parties as agents, employees, or servants of ABC. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party.

2.2  Control, Supervision, and Training.  Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services. Contractor shall also be solely responsible for the supervision and training of its Assistants.

2.3  Compensation of Assistants.  Contractor is solely responsible for the payment or non-payment of compensation or salary, including any required overtime payments, to Contractor's Assistants. Contractor is responsible and shall comply with all federal, state and local laws and regulations regarding compensation, hours of work, workplace safety and other conditions of employment.

2.4  No Benefit Plans.  Contractor acknowledges and agrees that  neither it nor its Assistants is eligible for, and shall not participate in, any of ABC's employee benefit plans or programs, including, without limitation, bonus, vacation, health, retirement fund, incentive compensation or other employee programs or policies ("**Benefits Plans**").  If, for any reason, Contractor or any of its Assistants  are deemed to be a statutory or common law employee of ABC by any governmental agency, court, or other entity, Contractor hereby waives any right to, and agrees to neither seek nor accept, any benefits under the Benefits Plans, and agrees to indemnify and hold harmless ABC from any claims, demands, actions, damages, liabilities, costs and expenses arising from or relating to such claims by it or its Assistants relating to such Benefit Plans.

2.5  Assistant Substitution or Removal.  Substitutions of Assistants that are essential to the Services are not permitted without the prior approval of ABC.  Any proposed substitutions must include an explanation of the circumstances necessitating the substitution, and other information requested by ABC necessary to consider the proposed substitution.  All proposed substitutes must have qualifications that are equal to or higher than the personnel being substituted.  ABC will promptly notify the Contractor of approval or disapproval thereof.  ABC retains the right to approve or disapprove all Assistants, and, to request the removal of any Assistant.

**3.     Project Management**.  Each Party shall designate a project manager for each SOW who shall act as a liaison between the Parties.

*Confidential*

Updated 04/2015

OLU000004

**4.**     **Fees, Expenses, Records, and Taxes**.

4.1     Fees.  Contractor's entire compensation for performing Services hereunder is set forth in this Agreement.  Each SOW shall set forth the fees due for the Services to be provided thereunder, and Contractor shall invoice ABC as set forth in the SOW.  All Services to be performed on a time and materials basis shall be invoiced in arrears.

4.2     Expenses.     Contractor shall be responsible for all expenses incurred by Contractor in the performance of the Services, unless otherwise set forth in the SOW.

4.3     Payment.  The fees and/or expenses invoiced in accordance with this Section 4, except for any amounts disputed by ABC, shall be payable by ABC within forty-five (45) days of ABC's receipt of each invoice.

4.4     Maximum Dollar Amount.  ABC shall not be liable for any fees and/or expenses under any SOW in excess of the maximum dollar amount specified on such SOW.

4.5     Taxes.  Contractor shall be responsible for determining the applicability of any sales, use, excise, or similar transactional taxes that may be applicable to the performance of the Services, if any, and shall include such on Contractor's invoice for the corresponding Services.  ABC shall pay applicable taxes on the invoice or, in lieu of the payment of any such taxes, ABC may provide Contractor with a certificate acceptable to the taxing authorities exempting ABC from payment of such taxes.  Contractor shall pay all taxes collected from ABC to the appropriate taxing authority. Contractor represents and warrants that Contractor and its Assistants qualify as independent contractors under the provisions of the Internal Revenue Code.  Contractor further represents and warrants that the payments it receives pursuant to this Agreement shall not be considered "wages" for purposes of income tax withholding, the Federal Insurance Contributions Act ("**FICA**"), and unemployment taxes.  Further, Contractor shall pay and be solely responsible for all taxes, contributions and assessments on payrolls or other charges or payments under all applicable federal, state and local laws, including without limitation withholding from wages of its employees or other Assistants.  Contractor agrees to fully indemnify ABC from any and all liability that might be assessed against ABC for ABC's failure to pay taxes on such compensation.

**5.**     **Acceptance of Services**.

5.1     General. All Services and Deliverables delivered by the Contractor pursuant to this Agreement and the attached SOWs shall be subject to acceptance by ABC.

5.2     Delivery of Software.  If applicable, Contractor shall deliver any software licensed pursuant to this Agreement from its designated server to ABC's designated server by electronic means, such as an FTP download site, and not by tangible media, such as compact discs, tapes or disks.

5.3     Acceptance Criteria.  Each Deliverable shall be subject to acceptance testing by ABC to verify that the Deliverable satisfies the acceptance criteria, if any, mutually agreed to in writing by the Parties and set forth in the applicable SOW.  If no acceptance criteria have been set forth in the applicable SOW, the acceptance criteria shall be as determined by ABC in its sole discretion based upon completeness and quality of the Deliverable and its delivery within the time frames set forth in the applicable SOW.

5.4     Acceptance Testing.  If elected by ABC, acceptance testing for any Deliverable shall commence within ten (10) days of the date on which Contractor notifies the ABC Project Manager, in writing,

3

that the Deliverable has been satisfactorily completed, in Contractor's opinion, and is ready for acceptance testing by ABC. Acceptance testing shall continue for the period of time specified in the acceptance criteria or, if no such time period has been agreed upon by the Parties, for a period of thirty (30) days (the "**Initial Acceptance Period**"). In the event that any Deliverable does not conform to the acceptance criteria within the Initial Acceptance Period, ABC shall give Contractor written notice thereof. ABC shall cooperate with Contractor in identifying in what respects the Deliverable has failed to conform to the criteria. Contractor shall promptly correct any deficiencies that prevent such Deliverable from conforming to the criteria. If the Deliverable does not conform to the acceptance criteria within thirty (30) days after the end of the Initial Acceptance Period, ABC may do any one or more of the following:

(a)     extend the period of time for Contractor to make corrections;

(b)     direct Contractor to use a third party to make the necessary corrections at Contractor's expense after reasonable consultation with Contractor;

(c)     after reasonable consultation with Contractor, directly or by use of a third party make the necessary corrections and charge to Contractor an amount equal to the costs incurred by ABC in making such correction itself or through a third party contractor, Contractor will, at no additional charge to ABC, provide all necessary cooperation and assistance in connection with ABC or any third party contractor engaged by ABC making the necessary corrections to the Deliverable;

(d)     after reasonable consultation with Contractor, accept the Deliverable in its non-conforming condition and reduce Contractor's charges for the Deliverable by an amount which the Parties, cooperating in good faith, determine reasonably reflects its reduced value; or

(e)     terminate one or more of the applicable SOWs for cause, in whole or in part, as of a date specified in a written notice of termination from ABC to Contractor and without financial liability or obligation. In the event of such termination, ABC shall be entitled to recover an amount equal to all fees paid for the affected Deliverable, plus all fees paid to Contractor for Services related to the Deliverable and for any other products furnished by Contractor to ABC that were provided in conjunction with the Deliverable and that cannot be utilized effectively or completely by ABC without using the Deliverable.

5.5     Warranty Period. Contractor represents and warrants to ABC that the Deliverables will perform in accordance with the requirements set forth in the applicable SOW and documentation for a period of ninety (90) days from the date of acceptance by ABC. In the event the Deliverables fail to do so and such failure is not due to changes in the Deliverables made solely by ABC, and Contractor does not bring the Deliverables into conformance within the timeframe set forth in the applicable SOW and documentation, then upon ABC's notice, ABC may terminate the applicable SOW or this Agreement for cause, and Contractor will return to ABC all monies paid to Contractor to date under the applicable SOW.

**6.     Term and Termination.**

6.1     Term. This Agreement shall commence on the Effective Date and shall continue in full force and effect thereafter until the second anniversary of the expiration date of the last outstanding SOW, unless this Agreement is terminated earlier in accordance with the provisions of this Agreement (the "**Term**").

*Confidential*

Updated 04/2015

OLU000006

6.2     <u>Termination For Breach.</u>  Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after thirty (30) days' written notice thereof (or such shorter period as may be specified in this Agreement or in any applicable SOW).

6.3     <u>Termination Upon Notice.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder for any reason by giving the Contractor fourteen (14) days' prior written notice of its election to terminate this Agreement or the SOW.

6.4     <u>Termination by Customer.</u>  Notwithstanding anything to the contrary herein or in any SOW, ABC may terminate this Agreement or any SOW hereunder immediately in the event of termination of the agreement or any statement of work between ABC and its Customer receiving any Services and/or Deliverables provided by Contractor under this Agreement or any SOW.

6.5     <u>Termination for Bankruptcy/Insolvency.</u>  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party:  (a) becomes or is declared insolvent or bankrupt; (b) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) days; or (c) makes an assignment for the benefit of creditors.

6.6     <u>ABC Rights and Payment Upon Termination.</u>  In the event of termination of this Agreement, ABC agrees to pay Contractor for all expenses incurred by the Contractor with ABC's approval and as outlined in the SOW up to the effective date of termination.  In the event ABC terminates this Agreement or any SOW prior to the completion of the Services to be rendered:  (a) Contractor shall be compensated with (i) a pro-rata share of the fees due  or (ii) the hours of work completed by Contractor under the applicable SOW(s); and (b) if applicable, ABC shall pay Contractor for all progress milestones (as set forth in the applicable SOW(s)) completed and accepted by ABC and a pro-rata share of the progress milestone Contractor is working to complete at the time the applicable SOW(s) is/are terminated.  Termination under this Agreement shall not affect ABC's rights in and to all Work (as defined below) created for or provided to ABC pursuant to this Agreement prior to the effective date of termination.

**7.     <u>ABC Property/Trademarks</u>.**

7.1     <u>No Rights Transferred.</u>  Nothing in this Agreement shall convey to Contractor or any of its Assistants any right, license, title, or interest in or to the Work, or any other intellectual property or other property interest, license or right of ABC or its licensors.  In addition, Contractor and its Assistants shall have no right to use any ABC trade name, trademark or service mark without the express written permission of ABC.

7.2     <u>Proprietary Rights.</u>  Except for Contractor's Pre-existing Materials (defined below), all work, services, materials, and Deliverables and other Materials (as defined below), provided, performed or created under any SOW ("**Work**"), including, without limitation:  (a) names, characters, protectable organizational structures, or other "brand" components; (b) all materials, specifications, designs, writings, code, products, or other Deliverables developed or prepared for ABC by Contractor under such SOW (whether or not such SOW is completed) or provided or delivered to ABC by Contractors, Assistants or their agents pursuant to this Agreement (collectively, "**Materials**"); and (c) any and all new or improved idea, design, concept, or other invention made or developed by Contractor or its Assistants during the course of rendering the Services or developing or preparing the Materials (collectively, "**Invention**"), are the property of ABC and all title and interest therein shall vest in ABC and shall be deemed to be a work made for hire and made in the course of Services rendered hereunder. As between the Parties, all Work shall be

5

OLU000007

deemed the Confidential Information of ABC.  Contractor shall promptly and completely disclose to ABC in writing any and all Inventions and Contractor shall ensure that its Assistants promptly and completely disclose to ABC in writing any and all Inventions.

To the extent that title to any Work may not, by operation of law, vest in ABC or such Work may not be considered works made for hire, Contractor hereby irrevocably assigns to ABC all right, title and interest in and to any Work.  All Work shall belong exclusively to ABC, and ABC shall have the right to obtain, and to hold in its own name, copyrights, registrations, patents, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof.  Upon ABC's request, Contractor shall, and shall cause its Assistants to, promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist ABC to prosecute, register, perfect or record its rights in or to any Work.  In the event that ABC is unable, after reasonable effort, to obtain Contractor's signature on such papers and documents, Contractor irrevocably designates and appoints ABC as Contractor's agent and attorney-in-fact, to act for and on Contractor's behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other intellectual property related to the Work with the same legal force and effect as if Contractor executed such papers and documents.

If Contractor becomes aware of any breach of this Section 7 by an Assistant, it shall immediately enforce its rights to the fullest extent under its written agreement with such Assistant and immediately notify ABC of such breach.

Unless otherwise requested by ABC, upon the completion of the Services to be performed under each SOW or upon the earlier termination of such SOW, Contractor and its Assistants shall immediately turn over to ABC all Work developed pursuant to such SOW.

For purposes of this Agreement, "**Contractor's Pre-existing Materials**" means any materials, code, methodology, process, technique, or intellectual property right developed, licensed or otherwise acquired by Contractor independent of the Agreement and services to be rendered hereunder and which are not based upon and do not incorporate any ABC Confidential Information or other intellectual property rights of ABC.  Contractor hereby grants to ABC a perpetual, irrevocable, fully paid-up, worldwide, non-exclusive, assignable, sublicensable license to use, reproduce, display, perform, distribute, and make derivative works of any of Contractor's Pre-existing Materials that are incorporated into the Work, in any medium hereby known or hereafter invented for any purpose.

7.3     Third Party Materials.  Contractor shall not bundle with or incorporate into any Work any third party products, ideas, processes, or other techniques ("**third party materials**"), without the prior written approval of ABC; provided, however, if such third party materials are incorporated into any Work as approved by ABC in writing, Contractor hereby assigns to ABC any and all manufacturer's or supplier's warranties, guarantees, representations, service agreements and indemnities, if any, with respect to any third party materials acquired from a third party and provided by Contractor under a SOW to the extent the same are assignable by Contractor.  To the extent any such warranties, guarantees, representations, service agreements and indemnities are not assignable by Contractor, Contractor agrees that ABC may assert or enforce any right that Contractor may have to enforce the same, or if such right can only be enforced by Contractor and in its own name, upon the request of ABC, Contractor will take all reasonable action requested by ABC to enforce the same.

6

OLU000008

8.     **Confidentiality**.

8.1    <u>Introduction</u>.  Each Party (the "**Recipient**") acknowledges that:  (i) the other Party and its Subsidiaries (defined below, and, collectively with such other Party, "**Discloser**") are the owners of valuable trade secrets and other confidential information and license the same from others; and (ii) in the performance of its obligations hereunder, the Recipient shall receive or become aware of such information.

8.2    <u>Definition of Confidential Information</u>.  For the purposes of this Agreement, "**Confidential Information**" shall mean any information relating to or disclosed during the Term, which is or should be reasonably understood to be confidential or proprietary to Discloser and its customers, Subsidiaries, licensors and business partners, including, without limitation, the material terms of this Agreement, information about Discloser's customers, information concerning the relationship of Discloser with third parties, technical processes and formulas, trade secrets, drawings, inventions, know-how, protocols, software programs, source codes, product designs, sales, cost and other unpublished financial information, product and related business plans, methods of operation, technology assessments, database contents, forecasts, market assessments, strategies, projections, marketing data, and other non-public information owned by Discloser and its customers, Subsidiaries, licensors and business partners.  Such Confidential Information may be prepared by the Discloser, or any of its respective directors, officers, employees, consultants, attorneys, and other representatives.  The provisions of this paragraph shall not apply to Confidential Information that:  (i) was in Recipient's possession before receipt from Discloser, as proven by Recipient; (ii) is or becomes a matter of public knowledge through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; (iv) is independently developed by Recipient, as proven by Recipient; (v) is disclosed under operation of law, provided that Recipient will use reasonable efforts to provide Discloser with prompt written notice of any such requirement in order to enable Discloser to seek an appropriate protective order or other remedy, and that Recipient will disclose only such information as is legally required and will use reasonable efforts to obtain confidential treatment for any Confidential Information that is so disclosed; or (vi) is disclosed by Recipient with Discloser's prior written approval.

All Confidential Information that is entitled to protection under the attorney-client privilege, work product doctrine and other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

To the extent that a non-disclosure agreement is executed between the Parties regarding the Services or Deliverables, the non-disclosure agreement will terminate as to such Services and Deliverables and be replaced by the terms of this Section 8.

8.3    <u>Protection of Confidential Information</u>.  Contractor will maintain and follow commercially reasonable and legally compliant information security standards and practices with respect to any of ABC's Confidential Information in Contractor's possession or control and protect such information against any loss, alteration, theft or corruption.  Contractor shall promptly advise ABC after learning of any such unauthorized access, loss, alteration, theft or corruption.  Contractor shall take necessary corrective action within Contractor's reasonable control.  If Contractor believes such corrective action is in the reasonable control of ABC, then Contractor shall advise ABC of the corrective action that it believes ABC should take.  At ABC's request, Contractor shall provide copies of its information security policies, processes, and procedures.  Contractor will notify ABC of any material changes to its policies, processes or procedures that relate to the security of ABC's Confidential Information in Contractor's possession.  Contractor shall comply with all information security and privacy laws, rules or regulations applicable to Contractor as a result of and in

7

OLU000009

connection with its use, protection and retention of ABC Confidential Information and shall be responsible for any breach of such laws, rules or regulations by Contractor or its employees, agents or subcontractors.  Any personal identifying information disclosed to Contractor under this Agreement shall remain protected as Confidential Information under this Agreement for an indefinite period.

8.4   Obligations and Destruction of Confidential Information.  Recipient agrees that Confidential Information may only be used by Recipient as reasonably necessary to carry out the purposes of this Agreement and for the sole benefit of Discloser.  Except as directed by Discloser or as permitted in this paragraph, Recipient will not at any time during or after the Term use Confidential Information for any other purpose or disclose any Confidential Information to any person, or permit any person to examine and/or make copies of any reports or any documents prepared by Recipient or that come into Recipient's possession or under Recipient's control by reason of performance of Recipient's obligations under this Agreement.  Notwithstanding the foregoing, and without limiting the generality of Section 2.1, Contractor, as Recipient, may disclose ABC's Confidential Information to Contractor's Assistants, when, and only to the extent, reasonably necessary to perform the Services; provided that, prior to such disclosure to such Assistants, Contractor shall have informed such Assistants of its confidentiality obligations herein and have executed with such Assistants a written agreement containing confidentiality obligations no less restrictive than those herein.  Contractor shall be responsible for any use or disclosure of Confidential Information by its Assistants in breach of this Agreement.  Recipient agrees to use the same degree of care to protect Discloser's Confidential Information that it uses to protect its own Confidential Information of a like nature from unauthorized disclosure, but in no case less than a reasonable degree of care.

Upon termination of this Agreement, Recipient will turn over to Discloser or destroy all documents, papers, and other matter in Recipient's possession or under Recipient's control that contain or relate to such Confidential Information, and provide written certification of such to Discloser.

8.5   Injunctive Relief.  Recipient acknowledges that misuse or disclosure of any Confidential Information by Recipient may give rise to irreparable injury to Discloser or the owner of such information, inadequately compensable in damages.  Accordingly, Discloser or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other remedies available at law or in equity.  Recipient acknowledges and agrees that the covenants contained in this Section 8 are necessary for the protection of legitimate business interests of Discloser and its customers, Subsidiaries, licensors and business partners, and are reasonable in scope and content.

**9.   Representations and Warranties.**

9.1   Contractor Representations and Warranties.  Contractor represents and warrants to ABC that:  (A) Contractor and each of its Assistants has or shall have the proper skill, training, and background so as to be able to perform the Services in a competent and professional manner and that all work will be performed in accordance with applicable standards for similar services and Contractor shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; (B) each Assistant is properly licensed, if required by applicable law, to perform the Services;  (C) each Assistant has executed written agreements securing for Contractor the intellectual property rights set forth in this Agreement.  Upon the request of ABC, Contractor agrees to provide copies of such written agreements.  If such written agreements do not secure the necessary intellectual property rights based on the review of ABC, ABC may require any Assistant

8

to execute a new or revised written agreement to secure the intellectual property rights provided for in this Agreement; (D) ABC shall receive free, good and clear title to all Work which may be developed by Contractor or its Assistants under this Agreement or which is provided or delivered to ABC by Contractor or Contractor's Assistants pursuant to this Agreement, which title shall be free and clear of any and all liens, encumbrances, claims or litigation, whether pending or threatened; (E) no Work or other materials delivered by Contractor to ABC hereunder shall infringe on or violate (i) any copyright, trademark, or patent right, (ii) any other proprietary or other right of any third party, including but not limited to any third party right to privacy, or (iii) any applicable law or regulation; (F) no Work or other materials delivered by Contractor to ABC hereunder shall contain any scandalous, libelous or unlawful matter or material; (G) Contractor will not publish, broadcast, display or distribute in any media, or allow others to publish, broadcast, display or distribute in any media, the Work or any third party content or any portion thereof without the prior written consent of ABC; and (H) software licensed to ABC by Contractor, if any, contains no code that would directly or indirectly (i) create, or purport to create obligations on ABC with respect to ABC's use or distribution of any software that incorporates, is combined with, or is derived from such software, except as explicitly set forth in this Agreement, (ii) grant, purport to grant, or require ABC to grant to any third party any rights or immunities under ABC's intellectual property or proprietary rights in any software that incorporates, is combined with, or is derived from such software, or (iii) require as a condition of its use, modification, or distribution, that any software incorporated into, derived from, or distributed with such software must be disclosed or distributed in any form.

9.2   Federal Health Care Participation.  Contractor represents to ABC that neither Contractor nor any Assistant is excluded from participating in the U.S. Government's Medicare or Medicaid program (each, a "**Federal Health Care Program**") nor currently debarred or suspended or listed on the U.S. Government's General Services Administration's (the "**GSA**") List of Parties Excluded from Federal Procurement or Nonprocurement Programs in accordance with Executive Orders 12549 and 12689, "*Department and Suspension*", and Contractor warrants to ABC that, during the Term, it will not perform any act that shall cause Contractor to be excluded from such participation or so debarred, suspended or listed.  Contractor further represents to ABC that no adverse action by the U.S. Government that will or may result in exclusions from a Federal Health Care Program has occurred or is pending or threatened against Contractor or any Assistant.  Contractor shall immediately notify ABC if it or any Assistant becomes so excluded, debarred, suspended or listed during the Term.

9.3   Mutual Representations and Warranties.  Each Party represents and warrants to the other Party that: (a) such Party has the full corporate right, power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (b) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (d) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof which are not expressly provided for in this Agreement.

**10.   Indemnification; Limitations; Insurance**.

10.1   Indemnity.  Contractor shall defend, indemnify and hold harmless ABC, its Subsidiaries and its and their officers, directors, agents, and employees from any and all third party claims, demands,

9

liabilities, losses, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses ("**Liabilities**") resulting from:  (a) actual or alleged infringement of any patent, trademark, copyright, or other intellectual property right (including, without limitation, misappropriation of trade secrets) based on any software, program, Services and/or other materials furnished to ABC by Contractor or Contractor's Assistants pursuant to the terms of this Agreement, including, without limitation, the Work or the use thereof by ABC; (b) Contractor's payment or nonpayment of compensation or salary asserted by an Assistant of Contractor; (c) any claim that Contractor or any Assistant stands in any relationship with ABC other than as an independent contractor, including but not limited to employment, co-employment and joint employment; (d) any governmental determination that Contractor has failed to maintain its independent-contractor status or litigation determining a change of Contractor's independent-contractor status, including liability for taxes and other penalties assessed upon ABC because of Contractor's change or lack of independent contractor status; (e) any errors, acts or omissions of Contractor or its Assistants in connection with performing Services to the extent resulting in death, personal injury, or damage to real or tangible personal property; (f) Contractor's or Contractor's Assistant's material breach of any obligation, duty, representation or warranty contained in this Agreement or in any SOW attached hereto; (g) the negligence or willful misconduct of Contractor or its Assistants in performing the Services or other obligations hereunder; and (h) a failure on the part of Contractor or its Assistants to comply with applicable law or regulations in performing the Services.

10.2    <u>Additional Remedy</u>.  Should ABC's use of any service, program, or other material (including, without limitation, the Work) furnished to ABC by Contractor be enjoined by any court, Contractor shall promptly obtain, at no expense to ABC, the right to continue to use the items so enjoined or, at no expense to ABC, to provide ABC promptly with modified or substitute items that are functionally equivalent to the enjoined products.  If Contractor cannot secure ABC's right to continue using such items or substitute such items as provided herein, Contractor agrees to refund all sums paid to Contractor under this Agreement relating to the provision of such items.

10.3    <u>Limitations</u>.  EXCEPT IN CONNECTION WITH A BREACH OF THE CONFIDENTIALITY OR INDEMNITY PROVISIONS HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, OR ARISING FROM ANY OTHER PROVISION OF THE AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

<u>Insurance</u>.  During the Term, if Contractor employs *more than thirty (30) individuals* as employees, Contractor shall maintain in full force and effect the following insurance coverage:  (a) Commercial General Liability insurance with limits of no less than $1 million per occurrence and $2 million annual aggregate for claims due to bodily injury (including death) or property damage caused by or arising from acts or omissions of Contractor or Contractor's Assistants (the Commercial General Liability policy should include coverage for premises and operations, products and completed operations, broad form property damage and blanket contractual liability); (b) Workers' Compensation insurance in compliance with all statutory requirements; (c) Professional Liability insurance with limits of no less than $1 million per claim and $3 million as an annual aggregate (the professional liability policy must extend coverage for copyright and trademark infringement, defamation and misappropriation of ideas as well as any other error, omission or negligent act, and coverage should include, but not be limited to, loss of data, content or indirect loss to ABC); and (d) Umbrella Liability insurance with limits of no less than $5 million per occurrence and $5 million as an annual aggregate.  If during the Term, Contractor employs *thirty (30) individuals or less* as employees, Contractor shall maintain in full force and effect the

10

OLU000012

following adequate insurance coverage: (a) commercial general liability insurance; (b) workers' compensation insurance in compliance with all statutory and regulatory requirements; and (c) professional liability insurance, in each case with insurance policy limits sufficient to protect and indemnify ABC and its subsidiaries, and each of its and their officers, directions, agents, and employees from any losses resulting from Contractor or its employees, agents, contractors, or servants conduct, acts or omissions.

With respect to the foregoing, ABC shall be named as an additional insured on all such policies with the exception of Workers Compensation.  Policies shall be written with a licensed insurance company with a Best's rating of no less than A-.  Contractor shall provide a certificate of insurance evidencing all such required coverage upon ABC's request.  The certificate shall provide:  (a) thirty (30) days' prior written notice of cancellation or any material change in any such policy to ABC's Legal and Business Affairs Department; and (b) a renewal certificate fifteen (15) days prior to the renewal of any such policy.  Insurance required by ABC shall in no way reduce or limit Contractor's actual obligation to indemnify and defend ABC for claims, suits or allegations brought as a result of, or as related to, the performance of this Agreement.  With respect to claims made policies (e.g., Professional Liability), Contractor agrees to maintain insurance for a period of two years after the Term.

**11.**   **Communications**.

11.1   Notice.  Any notice required under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes:  (a) on the delivery date if delivered by confirmed facsimile; (b) on the delivery date if delivered personally to the Party to whom the same is directed; (c) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt; or (d) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available.

In the case of ABC, such notice will be provided to both the ABC Project Manager and ABC Legal and Business Affairs (fax no. 202-266-5700), each at the address of ABC set forth in the first paragraph of this Agreement, or another address as specified by like notice.

In the case of Contractor, except as otherwise specified herein, the notice address shall be the address for Contractor set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax number as provided to  ABC.

11.2   Duty to Inform.  Contractor shall promptly inform ABC of any information related to the Services, including, without limitation, the Work, which could reasonably lead to a claim, demand or liability of or against ABC and/or its Subsidiaries by any third party.

11.3   Publicity.  Contractor agrees that it will not, without the prior written consent of ABC in each case, use in advertising, publicity, or otherwise the name or logo of ABC, or images of ABC facilities and employees, or refer to the existence of this Agreement in press releases, advertising, or materials distributed to prospective customers.

11.4   Statements to Third Parties.  During the Term, Contractor shall not make, publish, or otherwise communicate, or cause to be made, published, or otherwise communicated, any deleterious remarks whatsoever to any third parties concerning ABC, its Subsidiaries or its or their directors, officers,

11

OLU000013

employees or agents, including, without limitation, ABC's business projects, business capabilities, performance of duties and services, or financial position.

**12.**     <u>**Non-solicitation**</u>.  During the Term and for a period of one (1) year thereafter, unless ABC expressly authorizes in writing in advance, Contractor shall not solicit, offer work to, employ, or contract with, directly or indirectly, on its own behalf, any of ABC's Personnel or the Personnel of ABC's  Subsidiaries. For purposes of this Section, "**Personnel**" means any individual or entity whom or which ABC employs or has employed as a partner, employee or independent contractor and with whom or which the Contractor comes into direct contact in the course of performing its obligations under this Agreement.  This Section shall not apply with respect to Personnel who respond to indirect, general solicitations for employment (such as employment agency referrals and Internet postings), as opposed to solicitations targeted to Personnel.

**13.**     <u>**Audits; Right to Examine**</u>.

     13.1    <u>Maintenance of Records</u>.  Contractor will keep, at its principal place of business, accurate books and records (in whatever form or medium such books and records are stored) regarding the Services performed under each SOW.  Contractor will preserve all books and records for a period of at least seven (7) years from the completion or termination of the applicable SOW or until all pending matters relating to this Agreement are closed.

     13.2    <u>Audit Right</u>.  ABC or its authorized representatives will have the right to perform regular audits to examine Contractor's performance of the Services with respect to Contractor's:  (a) compliance with ABC-approved security standards and procedures; (b) compliance with Contractor's internal practices and procedures; (c) use of the systems utilized to provide the Services;  (d) security, disaster recovery and back-up procedures; and (e) fulfillment of any other Contractor obligations (including the obligations of Assistants) under this Agreement.  ABC may elect, at its own expense, to have a full or part-time employee, contractor, or authorized representative on-site at Contractor's facilities for the purpose of ensuring compliance with the terms and conditions of this Agreement.  Contractor agrees to provide such person with all necessary assistance including unrestricted access to Contractor's facilities, dedicated space and a suitable computer workstation. Contractor shall not be relieved of its responsibility to comply with security provisions even if ABC inspects and detects system failures, fails to inspect, or has the right to inspect, Contractor's facilities, systems and procedures.

**14.**     <u>**Protected Health Information**</u>.  Contractor shall comply with the terms and conditions contained in the Business Associate Agreement, attached hereto as <u>**Exhibit C**</u> and incorporated herein by this reference. Any PHI or EPHI, as defined therein, shall be deemed Confidential Information.

**15.**     <u>**Miscellaneous**</u>.

     15.1    <u>Force Majeure</u>.  Neither Party shall be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of fire, strike, war, terrorism, insurrection, government restriction or prohibition, or any other causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence (a "Force Majeure Event").  A Party whose performance is impacted by a Force Majeure Event shall give notice to the other Party, stating the period of time the occurrence is expected to continue and shall use diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event.  During the Force Majeure Event, the non-impacted Party may suspend its performance obligations until such time as the impacted Party resumes performance.  The non-impacted Party may terminate this Agreement

12

OLU000014

or any applicable SOWs if such failure or delay continues for a period of thirty (30) days or more and, if the non-impacted Party is ABC, receive a refund for any amounts paid to Contractor in advance for the impacted Services.

15.2    No Waiver.  The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement shall not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same shall be and remain in full force and effect.

15.3    Entire Agreement.  This Agreement, together with all Schedules, Exhibits, SOWs and any other documents incorporated herein by reference, set forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein.  Neither Party shall be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.  For clarification, any additional or different terms appearing on any invoice or other document including terms and conditions in standard or preprinted documents or on Contractor's website that are inconsistent with this Agreement shall be void and have no force or effect.

15.4    Amendment.  No change, amendment or modification of any provision of this Agreement shall be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment.

15.5    Further Assurances.  Contractor shall take such action (including, without limitation, the execution, acknowledgment and delivery of documents) as may reasonably be requested by ABC for the implementation or continuing performance of this Agreement.

15.6    Assignment.  Contractor shall not assign this Agreement or any right, interest or benefit under this Agreement, nor delegate any of its duties or obligations hereunder, without the prior written consent of ABC.  Assumption of the Agreement by any successor to Contractor (including, without limitation, by way of merger, consolidation or sale of all or substantially all of Contractor's stock or assets) shall be subject to ABC's prior written approval.  Except as permitted by the foregoing, any attempted assignment or delegation shall be null, void, and of no effect.  Subject to the foregoing, this Agreement shall be fully binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective successors and permitted assigns.

15.7    Construction; Severability.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement:  (a) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law; and (b) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect.

15.8    Interpretation.  For purposes of this Agreement, unless the context otherwise requires, references herein: (i) to Sections, Schedules, Exhibits and SOW(s) refer to the Sections of, and Schedules, Exhibits and SOW(s) attached to this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and

13

any regulations promulgated thereunder. The Schedules, Exhibits and SOW(s) referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

15.9   <u>Remedies</u>.  Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity.

15.10   <u>Applicable Law; Jurisdiction</u>.  This Agreement shall be interpreted, construed and enforced in all respects in accordance with the laws of the District of Columbia except for its conflicts of laws principles.  Each Party irrevocably consents and submits to the exclusive jurisdiction of the courts situated in the District of Columbia, in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

15.11   <u>Export Controls</u>.  Contractor agrees to fully comply with all applicable export control laws, regulations, rules, and orders of the United States, and will not export, re-export, release, or transfer (collectively, "**Export**"), directly or indirectly, any commodities, software or technology, including any direct products thereof, or enter into any transactions, for any proscribed end-use, or to or with any proscribed country, entity, or person (wherever located), including but not limited to those entities and persons listed on the U.S. Government's Denied Persons List, Unverified List, Entity List, Debarred Parties List or Specially Designated Nationals List, without first obtaining at its own expense written authorization from the U.S. Government.  Contractor further agrees to provide all technical and operational information and documentation necessary for ABC to Export any Work produced by Contractor and to obtain any required U.S. Government authorizations for the same.

15.12   <u>Headings; Interpretations</u>.  The captions and headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement.  This Agreement shall be construed fairly according to its terms, without regard to the drafter of any provision hereof.  The Parties acknowledge and agree that each of them has participated in the negotiation of this Agreement.  The Parties agree that any rule of law requiring construction of a document against a Party by reason of such Party having prepared such document shall not apply to this Agreement.

15.13   <u>Subsidiary</u>.  "**Subsidiary**" means any entity in which a Party owns, directly or indirectly, at least 50% of the equity securities or other ownership interest.  ABC shall have the right to share all or any part of this Agreement (as may be amended) and all associated Work (pursuant to ABC's ownership of such Work) with any of its Subsidiaries.  ABC Subsidiaries located in the United States shall be entitled to purchase Services from Contractor in accordance with the pricing and other terms and conditions of this Agreement.  Any such Subsidiary may obtain Services pursuant to a SOW executed by Contractor and the Subsidiary, and will be bound to the terms of this Agreement, and shall be solely responsible for fulfillment of the respective obligations, and shall have the sole right to exercise the respective rights, conferred upon ABC under this Agreement.  ABC shall have no liability for any of its Subsidiary's actions or failure to comply with any obligations hereunder.

15.14   <u>Counterparts; Facsimile</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile shall be effective to the same extent as if such Party had delivered a manually executed counterpart.

14

OLU000016

15.15   <u>Surviving Sections.</u>  The following Sections shall survive the expiration or termination of this Agreement: 2.1; 2.4; 4.4; 4.5; 6.5; 7; 8; 9; 10; 11; 12; 13; 14; and 15.  In addition, any provisions of this Agreement which expressly or by implication are intended to survive or by implication are intended to survive termination or expiration of the Agreement will survive and continue to bind the Parties.

15.16   <u>Prohibition on Discrimination and Affirmative Action.</u> **As applicable, ABC and Contractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

15.17   <u>Time.</u>  All references to 'days' in this Agreement refer to calendar days unless other provided herein**.**

15

OLU000017

**IN WITNESS WHEREOF**, each Party's duly authorized representative has executed this Agreement as of the Effective Date.

**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**


By:_____          By:_____

Print Name: Amy Schartner                          Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                         Title: Contractor

*Confidential*                                                        Updated 04/2015

OLU000018

**EXHIBIT A**

**SCOPE OF WORK**

**SCHEDULE NO. 1 EFFECTIVE FEBRUARY 17, 2017**
**TO**
**INDEPENDENT CONTRACTOR AGREEMENT**
**BETWEEN**
**THE ADVISORY BOARD COMPANY ("ABC") AND**
**JEDIDIAH HOLDINGS LLC ("Contractor")**
**DATED AS OF FEBRUARY 4, 2016 the "Agreement")**

1.     **Detailed description of project to be accomplished by Contractor:**

During Phase Two, Clinovations will partner with Banner Health resources to implement the HCC solution to select Internal and Family Medicine practices, including technical rollout, training and overall adoption support. Clinovations will lead and deliver, in collaboration with Banner Health, the team's activities to support successful execution. Phase Two activities supported by Banner Health in partnership with Clinovations resources will include the following:

- Provide several clinical informaticist resources to train and support the rollout and go live across remaining primary care practices (and select specialty practices);
- Optimize and provide ongoing monitoring of early adopters performance;
- Provide on-demand support from a central command center led by Clinovations, in coordination with Banner Health's existing Cerner support model.

2.     **Deliverables to be produced by Contractor:**

N/A

3.     **Time for Performance/Delivery for each Deliverable:**

N/A

4.     **Acceptance testing criteria for each Deliverable:**

Not Applicable

5.     **Payments:**

(a)     Fee (Choose one)

Time and Materials

Regular Time:  $125/hour

17

*Confidential*

Updated 04/2015

OLU000019

Contractor will submit weekly time reports via OpenAir reflective of billable hours according to approved SOW and Client guidelines. In addition, Contractor will submit an invoice according to reimbursement schedule and after Project Manager approval.

(b)   <u>Expenses</u>

Contractor shall be entitled to reimbursement for expenses preapproved by ABC while performing Services outlines in the Statement of Work in Exhibit A, Expenses are not to exceed $1,500 per week. Approved travel expense reimbursements are paid per ABC and its Clients' policies, provided Contractor has submitted expenses on time, with proper supporting documentation and Project Manager approval.

(c)   <u>Payment SOW</u>

All fees and expenses due shall be invoiced by Contractor in arrears:

| | |
|---|---|
| _____ | Monthly |
| _____ | Upon Completion |
| ___X___ | Other (describe: Weekly) |
| _____ | Progress Payments as follows: |

| Progress Payments | Progress Milestones |
|---|---|
| $_____ | _____ |
| $_____ | _____ |
| $_____ | _____ |
| $_____ | _____ |

(d)   <u>Maximum Amount</u>

Not Applicable

**7.   <u>Contractor Project Manager:</u>**        Name:  Paul Pancoast
                                             Ph#:    214-799-6073
                                             Email:  PancoasP@advisory.com

**8.   <u>ABC Project Manager:</u>**           Name:  Paul Pancoast
                                             Ph#:    214-799-6073
                                             Email:  PancoasP@advisory.com

**9.   <u>Term of this SOW:</u>**              This term of this SOW is February 20, 2017 to February 26, 2017.

*Confidential*                                                                      Updated 04/2015

OLU000020

10.    **Additional Terms and Conditions:**  None

**THE ADVISORY BOARD COMPANY**                    **JEDIDIAH HOLDINGS LLC**

By:_____                      By:_____

Print Name: Amy Schartner                         Print Name: Oluro Olukayode Oladimeji, MD

Title: Senior Vice President                      Title: Contractor

19

OLU000021

## <u>EXHIBIT B</u>

**RATE SCHEDULE**

N/A

*Confidential*

Updated 04/2015

OLU000022

## EXHIBIT C

### BUSINESS ASSOCIATE AGREEMENT

This Business Associate Subcontractor Agreement ("**BA Agreement**"), effective as of February 17, 2017 (the "**Effective Date**"), is entered into by and between Jedidiah Holdings LLC ("**Provider**") and The Advisory Board Company ("**Advisory Board**") (each a "**Party**" and collectively the "**Parties**").

1.  **BACKGROUND AND PURPOSE.**  The Parties have entered or are entering into one or more agreements for the provision by Provider of Consulting ("**Services**") (**"Underlying Agreements"**) that are in fulfillment of services that the Advisory Board is obligated to provide for or on behalf of Covered Entities (each a "**Covered Entity**"), which Covered Entities are Advisory Board members.  Each Covered Entity has an arrangement directly with the Advisory Board under which Covered Entity has provided or may provide to the Advisory Board, or the Advisory Board may create, Protected Health Information ("**PHI**") (as defined in 45 C.F.R. § 160.103) subject to the federal privacy regulations ("**Privacy Rule**") and federal security regulations ("**Security Rule**") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 and its implementing regulations, ("**HITECH Act**") as each is amended from time to time (collectively referred to herein as **"HIPAA")**, to the Advisory Board and pursuant to which the Advisory Board, or the Covered Entity, on behalf of the Advisory Board, is providing or may provide the PHI to Provider and/or Provider may create PHI in its performance of the Services.  The purpose of this BA Agreement is to allow for the Advisory Board's compliance with its obligations under HIPAA and its agreements with its Covered Entity members.

2.  **DEFINITIONS**.  Unless otherwise specified in this BA Agreement, all capitalized terms used in this BA Agreement not otherwise defined have the meanings established for purposes of HIPAA, as is amended from time to time.

2.1  "Breach" shall mean the acquisition, access, use or disclosure of PHI in a manner not permitted by the Privacy Rule that compromises the security or privacy of the PHI as defined, and subject to the exceptions set forth, in 45 C.F.R. § 164.402.

2.2  "EPHI" shall mean Electronic Protected Health Information, as defined in 45 C.F.R. § 160.103, limited to the information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.3  "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information Provider receives from, or creates, receives, maintains, or transmits on behalf of the Advisory Board in connection with the Services.

2.4  "Privacy Rule" shall mean the federal privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & E).

2.5  "Security Rule" shall mean the federal security regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & C).

*Confidential*

Updated 04/2015

OLU000023

3.          **OBLIGATIONS OF THE PARTIES WITH RESPECT TO PHI.**

3.1    <u>Permitted Uses and Disclosures of PHI by Provider</u>. Provider may use and disclose PHI only as permitted by Section 3.2(a) of this BA Agreement.

3.2    <u>Obligations of Provider</u>.  With regard to its use and/or disclosure of PHI, Provider agrees to:

A.      use and/or disclose PHI only as necessary to provide the Services set forth in the Underlying Agreements, as permitted or required by this BA Agreement, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e) or as otherwise Required by Law;

B.      use appropriate safeguards to prevent use or disclosure of PHI other than as permitted or required by the BA Agreement;

C.      implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the EPHI that it creates, receives, maintains, or transmits on behalf of the Advisory Board in compliance with the Security Rule;

D.      secure all PHI by rendering all PHI unusable, unreadable, or indecipherable to unauthorized individuals in accordance with the United States Department of Human Services Guidance to Render Unsecured Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals, including by encrypting PHI;

E.      without unreasonable delay, and in any event no later than one (1) business day after discovery, report to the Advisory Board in writing: (i) any use or disclosure of PHI of which it becomes aware that is not permitted by this BA Agreement; and/or (ii) any Security Incident of which Provider becomes aware;

F.      without unreasonable delay, and in any event no later than two (2) business days after its discovery by Provider, notify the Advisory Board in writing of any incident that involves an unauthorized acquisition, access, use, or disclosure of PHI, even if Provider believes the incident will not rise to the level of a Breach. The notification shall include: (i) the identification of all individuals whose PHI was or is believed to have been involved, (ii) a brief description of what happened, including the date of the incident and the date of the discovery of the incident, (iii) a description of the types PHI that were involved in the incident, (iv) a brief description of what Provider is doing to investigate the incident, to mitigate harm to individuals, and to protect against any further breaches, (iv) all other information reasonably requested by the Advisory Board to enable the Advisory Board or the applicable Covered Entity to perform and document a risk assessment in accordance with HIPAA and any applicable state breach notification laws with respect to the incident to determine whether a Breach occurred, and (v) all other information reasonably necessary to provide notice to individuals, HHS, state agencies, and/or the media, as required by applicable law. Notwithstanding the foregoing, in the Advisory Board's sole discretion and in accordance with its directions, Provider shall conduct, or pay the costs of conducting, an investigation of any incident required to be reported under this Section 3.2(f) and shall provide, and/or pay the costs of providing, the required notices as set forth in this Section 3.2(f).

G.      require all of its subcontractors and agents that create, receive, maintain, or transmit PHI to agree, in writing, to the same restrictions, conditions, and requirements that apply to Provider under this BA Agreement, including but not limited requiring any subcontractor or agent to implement reasonable and appropriate safeguards in compliance with the Security Rule to protect the EPHI consistent with the requirements of this BA Agreement;

22

H.   make its internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS or to the Advisory Board or applicable Covered Entity within a reasonable timeframe for purposes of determining compliance with HIPAA;

I.   document such disclosures of PHI as would be required for the applicable Covered Entity to respond to a request by an Individual for an accounting of disclosures in accordance with 45 C.F.R. § 164.528 and provide, within ten (10) days after the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) requests the information in writing, the information necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to make an accounting of disclosures of PHI about an Individual, in accordance with 45 C.F.R. § 164.528;

J.   make available within ten (10) days after receiving a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) all PHI necessary for the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to respond to an Individuals' request for access to PHI about them, in accordance with 45 C.F.R. § 164.524, in the event that the PHI in Provider's possession constitutes a Designated Record Set, and, when directed by the Covered Entity or the Advisory Board, make the PHI available directly to the Individual;

K.   make available PHI for amendment and incorporate within ten (10) days after a written request by the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) any amendments or corrections to the PHI in accordance with 45 C.F.R. § 164.526, in the event that the PHI in Provider's possession constitutes a Designated Record Set;

L.   request, use and/or disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure in compliance with the Privacy Rule's minimum necessary standard and any guidance issued by the United States Department of Health and Human Services;

M.   not directly or indirectly receive remuneration in exchange for any PHI as prohibited by the HITECH Act;

N.   not make or cause to be made any communication about a product or service that is prohibited by the HITECH Act;

O.   not make or cause to be made any written fundraising communication that is prohibited by the HITECH Act;

P.   to the extent Provider is to carry out, on behalf of the Advisory Board, one or more of a Covered Entity's obligations under HIPAA, comply with the requirements of HIPAA that apply to Covered Entity in the performance of such obligations; and

Q.   promptly return to the Advisory Board or destroy (and retain no copies), all PHI in its possession, including such information in the possession of its subcontractors, following the termination and expiration of this BA Agreement, if it is feasible to do so. If Provider determines, and if and only if the Advisory Board agrees, that return or destruction is infeasible, Provider agrees to extend any and all protections, limitations, and restrictions contained in this BA Agreement to Provider's use and/or disclosure of any retained PHI, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the PHI infeasible.

3.3     Effect of Changes to the Law or Contractual Obligations.  To the extent that any relevant provision of HIPAA is amended in a manner that changes the obligations of Provider or the Advisory Board that are embodied in the terms of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these revised obligations.  If the Advisory Board is required to comply with any provision under the terms of its business associate agreement with any Covered Entity that is not already included in this BA Agreement or is more stringent than a provision of this BA Agreement, the Parties agree to negotiate in good faith appropriate amendment(s) to this BA Agreement to give effect to these additional or more stringent obligations.

4.     **TERMINATION BY ADVISORY BOARD**.  In the event of a material breach of the terms of this BA Agreement by Provider, the Advisory Board shall provide Provider written notice of that breach and may either (i) immediately terminate this BA Agreement and the underlying services agreement with Provider, or (ii) afford Provider an opportunity to cure the breach, provided, however, that if Provider fails to cure the breach within a reasonable time specified by the Advisory Board, the Advisory Board may terminate this BA Agreement and the Underlying Agreements with Provider.

5.     **INDEMNIFICATION**.  Provider shall indemnify, defend and hold harmless the Advisory Board and its officers, directors, trustees, employees and agents (the Advisory Board's "**Personnel**") from any and all third party claims, liabilities and expenses which the Advisory Board or its Personnel may incur as a result of, arising out of, or relating to, a breach of the Provider's obligations under this BA Agreement.

6.     **MISCELLANEOUS.**

6.1     Construction of Terms:  Any unclear terms of this BA Agreement shall be construed in a manner that allows the applicable Covered Entity (or the Advisory Board on behalf of the applicable Covered Entity) to comply with HIPAA.

6.2     Survival.  Sections 1, 2, 3, 4, 5 and 6 of this BA Agreement shall survive termination of this BA Agreement and continue indefinitely solely with respect to PHI Provider retains in accordance with Section 3.2(q).

6.3     No Third Party Beneficiaries.  Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

[Remainder of page intentionally left blank.]

*Confidential*                                                                    Updated 04/2015

OLU000026

IN WITNESS WHEREOF, each of the undersigned has caused this BA Agreement to be duly executed in its name and on its behalf.

**Jedidiah Holdings LLC**                                        **The Advisory Board Company**

By: _____                 By: _____

Print Name: Oluro Olukayode Oladimeji, MD        Print Name: Amy Schartner

Print Title: Contractor                           Print Title: Senior Vice President

25

# Signature Certificate



🔒 **Document Reference:**  `WFZ6G6JEW2BKXUA23YB9PI`



**Oluro Olukayode**
Party ID: HSSEKCJ6YKZXRD8RPJPNDN
IP Address: 172.58.72.49

| VERIFIED EMAIL: | yehudak12@yahoo.com |



| Multi-Factor Digital Fingerprint Checksum | `ad07e0d42afd51e9e699688cf05d692df9a22e37` |





**Amy Schartner**
Party ID: C98CZ2IL43J5A7P737Y9IK
IP Address: 74.96.167.155

| VERIFIED EMAIL: | schartna@advisory.com |



| Multi-Factor Digital Fingerprint Checksum | `32001250faf4e8cb4d76175ab5afebd2a0b8384f` |



| Timestamp | Audit |
|---|---|
| 2017-02-20 19:56:32 -0800 | All parties have signed document. Signed copies sent to: Jeremy geneaux, Charles Wright, Neil Rothberg, Megan Linehan, Jacqueline Dagg, Oluro Olukayode, and Amy Schartner. |
| 2017-02-20 19:56:32 -0800 | Document signed by Oluro Olukayode (yehudak12@yahoo.com) with drawn signature. - 72.201.202.7 |
| 2017-02-20 19:35:33 -0800 | Document viewed by Oluro Olukayode (yehudak12@yahoo.com). - 172.58.72.49 |
| 2017-02-20 16:29:50 -0800 | Document signed by Amy Schartner (schartna@advisory.com) with drawn signature. - 74.96.167.155 |
| 2017-02-20 16:29:37 -0800 | Document viewed by Amy Schartner (schartna@advisory.com). - 74.96.167.155 |
| 2017-02-19 18:18:44 -0800 | Document created by Jacqueline Dagg (daggj@advisory.com). - 76.106.84.170 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

OLU000028