# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| OLURO OLUKAYODE,<br>individually and on behalf of all<br>others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>UNITEDHEALTH GROUP,<br>OPTUM, INC. and<br>THE ADVISORY BOARD<br>COMPANY,<br><br>　　　　　　　Defendants. | Civil Action No. 0:19-cv-01101<br>(DSD/HB)<br><br><br>**MEMORANDUM IN SUPPORT OF<br>DEFENDANTS' MOTION TO<br>DECERTIFY THE COLLECTIVE<br>ACTION** |

## INTRODUCTION

At the outset of this lawsuit, this Court held that Plaintiffs failed to meet even the minimal burden for conditional certification. Plaintiffs then renewed their motion, arguing that the Court should not consider the underlying independent-contractor factors or the individualized analysis and defenses required to adjudicate the claims at hand. Plaintiffs rationalized that if only the Court would permit early notice to go out, the Court could later decertify the collective if the evidence showed Plaintiffs are not similarly situated. That time has come. This case should be decertified because Plaintiffs are not similarly situated and their claims cannot be adjudicated collectively.

Plaintiffs worked on different projects with different project managers who ran their projects in very different ways. The predictable result is that Plaintiffs' work requirements and experiences varied substantially. Some Plaintiffs met with their project

managers three times a day and had to submit daily reports. Other Plaintiffs never met their project managers and had no reports. Some Plaintiffs received training from Defendants. Other Plaintiffs did not receive training, did not need training, and believed Defendants could not train them because the project managers did not understand Plaintiffs' roles. Some Plaintiffs entered their time into a time-keeping system on projects, while others did not track their time at all. Some projects required uniforms, while Plaintiffs chose their own professional attire on other projects. Many Plaintiffs supplied their own equipment on projects; others did not.

Plaintiffs also worked different hours on different schedules set by different clients. Some projects involved more than 40 hours worked in a week while some did not. Plaintiffs were paid different rates for the same projects—some Plaintiffs negotiated those rates, some tried but were unsuccessful, and yet others did not even try. Plaintiffs' number of projects and length of engagement ranged from one project for five days to multiple projects and more than 24 weeks of engagement. Plaintiffs also varied in the level of investment and operations of their own consultant businesses.

Plaintiffs' actual work differed as well. Defendants engaged Plaintiffs because of their particular medical and technological backgrounds. Plaintiffs needed to know practice-specific language, workflows, and day-to-day operations of different medical providers to teach the providers how to use practice-distinct modules on the EMR systems. The specialty-centric nature of the work resulted in different job duties, working conditions, and terms of engagement—all acknowledged by Plaintiffs.

On this record, Plaintiffs are anything but similar, and they cannot carry their burden of showing a uniformity conducive to collective treatment. The Plaintiffs' vastly different testimony and experiences means the only way for the Court to resolve liability on the independent-contractor issues is to hold mini-trials—which defeats the purpose of a collective action. Similarly, the only way for Defendants to defend this matter is on a Plaintiff-by-Plaintiff basis, given the fact-specific nature of the economic-realities test and Plaintiffs' varied experiences. In short, decertification is necessary to evaluate the merits, as a matter of manageability, and for procedural fairness.

## FACTS

### I.  FACTS REGARDING DEFENDANTS' BUSINESS OF "AT-THE-ELBOW" SUPPORT SERVICES

#### A.  Implementation of EMR Systems

This case involves Defendants' use of independent contractors to assist hospitals and healthcare organizations with the implementation of Electronic Medical Records ("EMR") systems. When a hospital implements an EMR system, the hospital cannot shut down while its medical providers learn the new system; instead, providers must navigate the new system in real time while treating patients. (Clark 21:9-15; Kamieniecki 13:4-20.)[1] For these "go live" events, hospitals frequently bring in consultants to assist their providers—side-by-side, or "at-the-elbow"—in using the new EMR system. (Clark 21:9-15; Kamieniecki 14:4-15.) Defendants Advisory Board Company ("ABC") and Optum are in the business of providing such implementation support services. (Clark Decl. ¶¶ 5-

---

[1] Transcripts and exhibits are attached to the Declaration of Jason Hungerford.

6.)[2] UnitedHealth Group is not in the EMR implementation business. (Optum, Dep. 64:8-14.)

EMR implementation work is episodic by nature, given that it only occurs when a new EMR system is rolled out. (Optum 108:22-25; Clark Decl. ¶ 7.) The projects are so sporadic that they are "not great enough in number to keep anybody for any period of time working full time." (Optum 108:22-25.) EMR implementation also requires specialization and expertise in the particular EMR software. (Kamieniecki 14:4-15; Clark Decl. ¶¶ 7, 11.) Because of the episodic and specialized nature of the work, Defendants engage independent contractors to perform the EMR support services. (Clark Decl. ¶ 7.)

### B.     Defendants' Unique Business Model

Unlike other EMR implementation companies, Defendants exclusively contract with medical clinicians for EMR implementation. (Clark Decl. ¶ 9; Clark 20:22-21:8, 23:23-24:2.) The clinicians (also called "consultants") include licensed and practicing physicians, foreign medical graduates, resident physicians, physician researchers, nurses, pharmacists, and other medical professionals. (Clark 20:22-21:8; Clark Decl. ¶ 8.) Using contractors with medical backgrounds allows Defendants to provide "like-to-like" at-the-elbow support during the EMR implementation phase. For example, Defendants engage oncologists to provide at-the-elbow support to oncologists, registered nurses to provide at-the-elbow support to registered nurses, and pharmacists to provide at-the-elbow

---

[2] The Declaration of Daniel Clark (Doc. No. 41) was submitted on June 26, 2019 in support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Conditional Certification.

support to pharmacists, providing support tailored to the specific EMR challenges applicable to the position. (Clark Decl. ¶ 8.)

Defendants' use of clinicians for implementation work offers a number of advantages. First, clinicians communicate more effectively with medical providers because they use the same language and terminology. Opt-in Plaintiff Folakemi Oredeko explains:

> [T]hey needed doctors who can communicate with doctors, who understood -- I mean, understands the language of doctors. And so it wasn't, like, the general project. This was, like, a physician project where they wanted their doctors to be properly trained on the use of the EHR.
>
> So for physician support, you know, as a physician, you're supporting physicians. So you have to bring in your expertise and communicate with them in the language they understand.

(Oredeko 43:5-44:12.) Because they speak the same language and share the same point of view, clinicians have more credibility with medical providers. (Reyes-Cortes 31:10-19; 32:23-33:6.) Thus, medical providers are more comfortable with and more likely to listen to clinicians. (*Id.*; Hutton 142:1-9.)

Second, clinicians understand the day-to-day operations of medical providers and can better meet provider needs:

> [O]ne thing we might be selling is -- is support for those end users with a group of folks that are specialized in that particular software and able to provide those end users with support, not necessarily the technical -- but also the clinical and operational work flows. Meaning it helps to have a clinician supporting a clinician, right. There's certain things that a clinician does every day that -- that we in this group don't do every day. And so someone with that level of expertise is beneficial.

(Kamieniecki 14:11-24.) Understanding provider operational workflows allows clinicians to help the providers adjust workflows that are impacted by technology changes. (Optum 89:16-25.)

Third, each EMR system has specialized modules that are practice-specific and require a subset of expertise. (Kamieniecki 28:1-12.) Matching clinicians to providers with similar medical backgrounds ensures the clinicians can support providers with the practice-specific modules:

> We worked for providing support for clinicians. And clinicians use certain modules within Epic, inpatient procedure orders, Epic care ambulatory, OpTime, Radiant, Cupid, et cetera. And so in order to provide support for those clinicians in those areas, you need to know specifically those modules, otherwise, general experience, let's say with a scheduling module would not be beneficial to a physician that is trying to place postoperative orders.

(*Id.*, 86:24-87:8.) Named-Plaintiff Oluro Olukayode is a specialist in oncology and the particular software, Beacon, used in Oncology. (Olukayode 51:19-52:1.) He also specializes in Optime, a software suite for operating rooms. (*Id.*, 57:10-13.) Opt-in Plaintiff Reyes-Cortes explained how the different modules impact the work:

> When you're using the medical record or the electronic medical record, each different person within the healthcare system, be it a nurse or an anesthesiologist or surgeon or inpatient physician, they have a different series of tools that they use depending on the roles they have in the hospital. And if you are not trained in -- in a hospital, you might not be aware of that, so some people might assume that they all have the same type of workflow. So understanding the different types of workflow provides a unique insight into helping the physician use the record more efficiently.

(Reyes-Cortes 31:21-32:7.)

To that end, Defendants selected clinicians for projects based on their particular skills. Among other factors, Defendants considered the clinician's expertise in the EMR system, medical background, and expertise in practice-specific modules:

> As it pertains to assembling this group of contractors, my primary role was to listen to the client's needs, to understand what type of specialties they had, obviously what was the number of providers that needed support or clinicians, more broadly, understanding the scope of the implementation. There's certain modules within Epic that require even a subset of expertise beyond provider consulting itself. So then I would review resumes that were provided to me and I would see what type of experiences potential candidates had and if they aligned with the client needs.

(Kamieniecki 28:1-12.)

### C.    The Consultant Work Varies Substantially

Given Defendants' unique business model of like-to-like support with an emphasis on specialization, the consultants' implementation work varies markedly. In their own words, the consultants are "a high-skilled team…not like general consultants." (Olukayode 51:14-15.) Olukayode testified that different hospital settings, such as an operating room versus a clinic, result in different working conditions:

> Q.   Okay. So working in the OR, is that different from working just in the general clinic?
>
> A.  Yes. It's -- yes.
>
> Q.    Different software. Different working conditions. Different doctors. Right?
>
> A.  Yes.
>
> Q.  And those are all different from if you're just working in a general clinic.
>
> A.  Yes.

(*Id.* 131:25-132:8.)

Olukayode further testified that consultant working conditions and duties varied not only by practice and project, but team-to-team and person-to-person:

> Q.  So the knowledge of the particular software suite is important to the project, right?
>
> A.  Yes.
>
> Q.  You also said in your answer to my original question that the terms of employment are -- you don't know the terms of employment, right?
>
> A.  Yes.
>
> Q.  And those are different from person to person, right?
>
> A.  Yes.
>
> Q.  And from team to team, right?
>
> A.  Yes.
>
> Q.  And the circumstances of the work are different from person to person, right?
>
> A.  Yes.
>
> Q.  And from team to team?
>
> A.  Yes.

(*Id.* 56:6-23.)   The other consultants also acknowledged that—consistent with Defendants' business model and understanding practice-specific workflows—their work varied depending on the type of medical provider:

***Chiedu Ogbechie*** (54:16-55:3)

Q.     But are there specific things that maybe like a neurosurgeon would need help with versus somebody that is doing OB-GYN?

A.  Yes, sir.

Q.  You could be supporting the providers in different ways depending on the providers?

A.  The providers' specialties.

Q.  So there are some differences in the job depending on the specialty; is that fair?

A.  Yes, sir.

**Marc Nadreau** (67:21-68:9)

Q.     So your job as a consultant might be different depending on the type of medical practice you're supporting; is that correct?

A.     Yes. Basically practice or areas of the hospital. So if I was in physical therapy, I'm trying to get them to implement pounds, weight, and, you know, how many times they did the duration of their work, just like if you are doing X-ray, how many, you know, view of a certain area of the body.

So every area is different….

**Bridget Azera** (45:6-17)

Q. Tell me what you mean by work flow.

A. So work flow would be if a patient was admitted from the ED, what do you go through to be able to admit the patients to the floor. So things like that.

Q. Does that change by department?

A. Yes, work flow change by department.

> Q. So then is it fair to say that when you're doing implementation work as a consultant, your job changes depending on the department you're placed in?
>
> A. Yes.

The consultants' work also varied depending on the EMR software. For example, Opt-In Bridget Azera has expertise and experience with Epic, but not Cerner; thus she did not seek out Cerner projects. (Azera 31:3-12.) Even the same EMR system can differ among various health systems and require different expertise: "So if you go to one hospital versus the next, they may have the same product but they're not using the same features." (Hutton 97:11-19; *see also* Emelue 21:24-22:9.) Some projects require customization of the EMR system, which necessitates yet another set of skills: "I also had a very strong set as far as, like, designing notes, for example. Like, I'm really good with the smart phrases, stuff like that. So if they had some physician who really wanted intense customization, they might send somebody like me there." (Reyes-Cortes 107:20-24; *see also* Hutton 97:11-19.)

The work performed by Opt-In Paschal Emelue on two different projects for Defendants exemplifies the substantial variations of the consultant role. For the MaineHealth project, Emelue attended a session to become acclimated to the MaineHealth system. (Ex. A, Emelue MaineHealth Scope of Work.) There was no corresponding requirement for the Lourdes project. (Ex. B, Emelue Lourdes Scope of Work.) While both projects required at-the-elbow support and training of hospital staff, Lourdes also expected consultants to capture interactions with providers; track patient safety concerns, build issues and workflow concerns; and discuss issue resolution with

leadership. (Ex. B.) The MaineHealth project did not require such work. (Ex. A.) On the Lourdes project, Emelue was expected to assess the operational efficiency of medical office processes, and modify workflows based on the hospital's environment and organizational goals; he did not do so on the MaineHealth Project. (Ex. B; Ex. A.) Finally, the Lourdes project was a Cerner implementation with Cerner-specific tasks, including collaborating with the Cerner Client Results Executive, providing guidance on Cerner-specific modules, providing coaching to "super users" on the system, and evaluating Cerner Ambulatory Functionality. There was no corresponding requirement for the Epic implementation on the MaineHealth project. (*Id.*) Other Plaintiffs had similarly different work expectations on their various projects. (*See*, *e.g.*, (Ex. C, Ogbechie Lourdes Scope of Work; Ex. D, Ogbechie MaineHealth Scope of Work.)

## II.   FACTS REGARDING THE COLLECTIVE

### A.   Scope of the Collective and Opt-Ins

After initially denying Plaintiffs' motion, the Court conditionally certified the following collective:

> all individuals who worked for Defendants during the past three years providing support and training to Defendants' clients in connection with the implementation of new electronic recordkeeping systems, were classified as independent contractors, and who signed contracts to provide such services prior to September 15, 2018.

(Dkt. 87.) There were 145 individuals within the putative collective. (Ex. E, Class List.) At the time of the Court's Order, five individuals had already opted in, including Suzanne Lacy, who Plaintiffs now concede is not properly part of the collective. (Ex. F, Email from Olena Re. Lacy.) Fifty-four additional Plaintiffs opted-into the case, but many have

withdrawn or dismissed their claims. (Dkt. 124, 140, 146, 159, 160.) Including the named Plaintiff and the first five opt-ins, only 32 Plaintiffs remain. In other words, a vast majority of the collective who received notice—more than 80%—declined to bring or withdrew their claims.

### B.  Plaintiffs' Disparate Experiences

#### 1.  Projects and Project Managers

The Plaintiffs worked on four different projects in four states with six different project managers during the class period. (Ex. G, Response to Interrogatories 3, 4, 10.) The way each project manager ran their projects (or portions of the project) and the different methods used to track and organize projects was "highly variable" and "not consistent amongst projects." (Optum 94:10-95:13.) These differences are evident in the Plaintiffs' contrasting experiences.

##### a.  Supervision varied by project and project manager.

As Olukayode explained, the level of supervision varied depending upon the project manager (among other factors):

> Q.  Was there anybody supervising you during this one?
>
> A.  We had -- we had team leads, you know, in some places; but it was more of an independent thing –
>
> Q.  Okay.
>
> A.  -- that you would work.
>
> Q.  This project was even more independent than the others?
>
> A.  Yeah, a little bit.

Q.  Okay. Did that sort of thing vary from project to project depending upon whether you had a project manager that was on-site?

A.  Yes.

Q.  And did it vary from project to project depending upon whether there were multiple facilities involved?

A.  Yes.

Q.  And did it vary from project to project depending upon who the project manager was?

A.  Yes.

Q.  In other words, some project managers were more directive about the work than others?

A.  Yes...

(Olukayode 151:25-152:23.) Some Plaintiffs interacted with project managers frequently on-site; some only saw their project managers once, or not at all.

For example, Opt-In Marc Nadreau testified that his project manager checked in on him two to three times a day. (Nadreau 90:8-13.) Opt-In Tamara Hutton's experience varied by project—on one project she interacted with her project manager frequently but not daily; she had more interaction with a different project manager on another project. (Hutton 123:3-124:12.) Azera testified that she ran across her project manager, but he did not check in on her from day-to-day. (Azera 56:20-57:19.). Emelue interacted with his project manager "sometimes" but not daily. (Emelue 81:10-82:2.) Opt-In Reyes-Cortes met with his project manager "at least once a week, if not more" who was "making sure, A, that I'm doing my job, and, B, that he's getting the information he needs to relay to his

management." (Reyes-Cortes 102:4-14.) Oredeko and Opt-In Chiedu Ogbechie each saw their project manager only once on the entirety of their projects. (Oredeko 98:18-99:3; Ogbechie 84:5-8; 89:18-23.) Olukayode admits he was not supervised at all on the MaineHealth project—the same project that Nadreau worked on, with the same project manager that checked in on Nadreau two to three times each day. (Olukayode 123:13-16; Ex. H, Response to Interrogatories 3, 4, 10 filtered by the deposed Plaintiffs.)

### b.    Plaintiffs' training experiences differed.

Opt-In Ejike Achumba and Reyes-Cortes received pre-project training. (Reyes-Cortes 226:10-16; Achumba 52:5-16.) Nadreau also recalled receiving training, stating consultants "always need training":

> Q. And at that point are you comfortable with Epic or do you still need some training?
>
> A.  You always need training.
>
> Q.  Why is that?
>
> A.  Because they could put me at the front desk and reception now, and that I don't anything about, they have to train you about that, or they put you on payroll, and they put you, let's say, to help physicians or nurses, or if you go to any of the physical or respiratory therapy, radiology, or anything on cancer, you have to have -- or pharmacy, or lab, you have -- they have to give you training for each of these individual modalities or areas, because just a few people that know everything, but -- I don't think anyone know all of it, they may be able to help you, but they don't know all of it.

(Nadreau 63:9-24; 90:9-17.)

Other Plaintiffs, however, received no training from Defendants. (Azera 55:25-56:16; Hutton 132:12-133:2.) Oredeko received an orientation that covered logistics like

parking and lunch, but she did not receive any training on actual work—she had to figure that out on her own. (Oredeko 79:2-14.) Ogbechie received no training and proclaimed, "I didn't need any training from Advisory Board." (Ogbechie 81:13-18; 94:13-16.) Emelue did not receive any training and testified that Defendants *could not* show consultants how to do their jobs because project managers did not understand consultants' work:

> Q. So the project managers aren't checking in on you, and they're not walking around sort of telling you how to do your job, right?
>
> A. No, because they don't know the kind of work we do.

(Emelue 64:24-65:2; 82:21-83:13.)

### c.      Job expectations varied by project and project managers.

Plaintiffs also experienced different work expectations. Olukayode testified that he "meticulously" recorded his hours in Defendants' timekeeping system. (Olukayode 46:17-22.) Hutton, Reyes-Cortes, Achumba, and Oredeko also used a timekeeping system. (Hutton 136:2-12; Reyes-Cortes 83:6-18; Achumba 98:14-16; Oredeko 85:22-4.) Azera, Emelue, and Nadreau, on the other hand, were not required to enter their time. (Azera 65:21-66:10; Emelue 93:9-13; Nadreau 106:2-5.)

Some hospital clients provided branded shirts for the Plaintiffs to wear. (Optum 109:14-110:6.) On other projects, Plaintiffs used their own professional judgment regarding attire. (Olukayode 205:11-206:24.) Some Plaintiffs supplied their own equipment on projects. (Achumba 119:23-120:20; Azera 64:21-65:5; Nadreau 98:24-

99:4; Oredeko 97:1-10.) Some did not provide any equipment. (Ogbechie 82:20-83:8; Hutton 138:5-11.)

Some Plaintiffs had to attend meetings and/or send daily reports to project managers; others did not. Olukayode attended team huddles from "time to time" to address "how the work was going and what other areas needed more help." (Olukayode 209:21-25.) Achumba attended daily calls and was "expected to report back and say how things are going at your facility." (Achumba 76:1-77:15.) Reyes-Cortes also attended daily calls. (Reyes-Cortes 117:13-18.) Azera did not attend meetings, but was required to send a daily report. (Azera 24:5-10; 63:4-10.) In contrast, Nadreau did not attend meetings or send reports, but believes other may have. (Nadreau 94:17-96:1.) Emelue remembered Defendants asking him to send reports. (Emelue 83:14-24.) Ogbechie did not have to send any reports. (Ogbechie 84:9-12.) Hutton did not send any reports because "[t]here wasn't any reason for us to talk to them everyday about the project." (Hutton 125:5-128:21.)

### d.    Plaintiffs had different schedules, hours, and pay.

Plaintiffs' schedules varied because Defendants' clients decided the schedules and hours of the consultants. (Kamieniecki 31:7-12.) The clients also decided how many consultants were needed on each project, and whether the consultants could work additional hours. (*Id.* 29:19-23; 32:20-33:9.)

Plaintiffs' volume and length of projects varied substantially. Nadreau and Azera only worked on one project for Defendants—MaineHealth. Nadreau worked one week on the project; Azera worked three weeks. (Ex. H.) Both earned $130 an hour. Olukayode

worked on the MaineHealth project, but for four weeks at $125 an hour. (*Id.*) Achumba worked five weeks on the MaineHealth Project at $120 an hour. (*Id.*)

Achumba worked 19 weeks on the MedStar project at $120 an hour. (*Id.*) Achumba worked 40 or fewer hours in eleven of those weeks. (*Id.*) Hutton also worked on the MedStar project (her only project for Defendants) for 14 weeks. (*Id.*) Hutton's rate was $95 an hour on the project, and she too worked 40 or fewer hours in several weeks. (*Id.*) Olukayode earned $125 an hour during his five weeks on the MedStar project. (*Id.*)

Defendants engaged Reyes-Cortes for the Baptist Health and Lourdes projects, both at $120 an hour. (*Id.*) He worked two weeks on the Baptist Health project, which included more than 40 hours per week; and six weeks on the Lourdes project with 40 or fewer hours worked. (*Id.*) Ogbechie and Emelue also worked on the Lourdes project, but at a rate of $130 an hour. (*Id.*) Both worked just one week on the project. (*Id.*)

Ogbechie and Emelue were also on the MaineHealth project for two weeks and three weeks, respectively at $120 an hour. (*Id.*) Oredeko's only project was MaineHealth were she worked four weeks at $130 an hour. (*Id.*)

The different rates Plaintiffs earned on projects are a result of their distinct negotiation experiences with Defendants. Olukayode and Oredeko both successfully negotiated their rates. (Olukayode 108:23-109:14; Oredeko 106:9-107:4.) Azera, Ogbechie, and Achumba could not negotiate their rates. (Azera 12:16-13:2; Ogbechie 50:15-22; Achumba 126:14-25.) Hutton, Nadreau, and Reyes-Cortes did not try to negotiate. (Hutton 92:25-93:3; Nadreau 103:2-14; Reyes-Cortes 140:7-10.)

### 2.      Plaintiffs' Consulting Businesses Varied.

Each Plaintiff ran their business differently. Olukayode has his own LLC and incurred a variety of unreimbursed business expenses, including liability insurance, office maintenance, education, and phone bills, "to be on the top of [his] game to be able to compete and be available for [companies to engage him]." (Olukayode 98:16-25; 185:1-16.) He managed his hourly rate to account for these expenses. (*Id.* 188:7-14.) Reyes-Cortes similarly owned his own healthcare IT consulting business that "generated over $250,000 in revenue over the last year and provided implementation work across "20+ institutions." (Reyes-Cortes 52:13-54:24; Ex. I, Reyes-Cortes LinkedIn Profile.)

Ogbechie invested in an LLC and paid for courses at Columbia University and earned a certificate in health informatics that he uses in his implementation business. (Ogbechie 39:25-41:7; 46:12-17.) Ogbechie further pays for professional membership in the American Medical Informatics Association, which he uses to market himself. (*Id.* 44:19-45:2.) Emelue operates a d/b/a, and paid for courses towards an Epic certification. (Emelue 42:17-43:25; 45:17-46:6.)

Nadreau does not have an LLC and did not invest in training, certifications, or professional memberships. (Nadreau 46:10-47:18.) Oredeko did not have an LLC when she contracted with Defendants. (Oredeko 104:1-6.) Azera similarly did not have an LLC at the time she worked for Defendants, and did not invest in any training, certifications, or professional memberships. (Azera 39:17-20; 41:14-42:10.) Hutton did not invest in any certifications, but did receive training before coming to Defendants. (Hutton 78:4-82:22.)

<u>**ARGUMENTS AND ANALYSIS**</u>

**I.    STANDARD FOR DECERTIFICATION**

"It is not uncommon for courts in FLSA cases to certify a conditional class only to decertify that class during the second phase." *Lindsay v. Clear Wireless LLC*, No. CV 13-834 (DSD/FLN), 2016 WL 916365, at *3 (D. Minn. Mar. 10, 2016). This is because at the conditional-certification stage, the court "has minimal evidence before it, [and] this determination is made using a fairly lenient standard." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1017 (D. Minn. 2007). A plaintiff requires only a "colorable basis" that the putative collective is similarly situated at the initial stage. *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014).

At the second stage, however, "the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Nerland*, 564 F. Supp. 2d at 1017. The similarly-situated question is considered "under a stricter post-discovery standard" and [t]he similarities required to sustain a collective action "must extend beyond the mere facts of job duties and pay provisions." *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1150 (D. Minn. 2005), *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009). "If the claimants are similarly situated, the district court allows the representative action to proceed to trial" *Nerland*, 564 F. Supp. 2d at 1017-18. "If the claimants are not similarly situated, the district court decertifies the class and the opt-in plaintiffs are dismissed without prejudice." *Id.*

The Plaintiffs bear the burden of showing they are similarly situated under this "fact intensive" second-stage inquiry. *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1057 (D. Minn. 2011). Relevant factors include (1) disparate factual and employment settings of the individual plaintiffs; (2) defenses which are individual to each plaintiff; and (3) fairness and procedural considerations. *Id.*; *Smith*, 404 F. Supp. 2d at 1150. "Another question the court considers is if plaintiffs can demonstrate that the Defendant had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in Plaintiffs." *Lindsay*, 2016 WL 916365, at *3.

The Court is also "tasked with looking more critically at whether the collective-action mechanism is an effective way to resolve the claims." *Harris v. Express Courier Int'l, Inc.*, No. 5:16-CV-05033, 2017 WL 5606751, at *3 (W.D. Ark. Nov. 21, 2017) (*citing Smith*, 404 F. Supp. 2d at 1148). In an independent-contractor misclassification case, the Court must determine "whether the factual variations in the class members' work conditions and methods of pay are so great that a fact-finder would be unable to apply the economic-realities test and make a one-size-fits-all decision on liability." *Harris*, 2017 WL 5606751, at *3; *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003 n.182 (D. Kan. 2018) (decertifying and noting that "[t]his conclusion is typical in cases where it must be determined whether the putative plaintiffs are employees or independent contractors…. because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole.") Thus, Plaintiffs must be capable of proposing a "feasible litigation plan" for trying collective claims in a manner that will not require the "district judge to

embark on a shapeless, freewheeling trial." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013).

## II.     PLAINTIFFS ARE NOT SIMILARLY SITUATED

### A.     Plaintiffs' Disparate Work and Work Experiences Preclude Collective Treatment

Prior to discovery, Plaintiffs argued they were similarly situated because they had the same job duties, same hourly compensation structure, and same workplace rules. (Dkt No. 59, p. 4.) There is now a record to test the Plaintiffs' assertions—and on this record, Plaintiffs are not similarly situated.

#### 1.     Plaintiffs' Work Experiences Were Markedly Different.

The seven projects had six different project managers, each of whom ran their projects differently. Some Plaintiffs interacted regularly with their project managers, others rarely saw them, while some *never* saw the project manager. Some Plaintiffs report receiving EMR training on projects—general and hospital-specific training—and that consultants always need training. Others testified that they received no training, did not need any training, and that Defendants could not train them because the project managers "don't know the kind of work we do."

Some Plaintiffs had to enter their time into a timekeeping system on projects; others did not track their time at all. Some projects required uniforms for Plaintiffs, while Plaintiffs exercised their professional judgment on attire for different projects. A number of Plaintiffs testified that they supplied their own equipment on projects, while others testified the opposite.

Some Plaintiffs had to attend meetings and/or send daily reports to project managers in order to report "how the work was going and what other areas needed more help." Others did not have to attend meetings or send reports because "[t]here wasn't any reason for us to talk to them everyday about the project."

Plaintiffs worked different hours on different schedules set by different clients. They were paid different rates for the same project—a result of some Plaintiffs successfully negotiating their rates, some unsuccessful at negotiations, and others not trying to negotiate. Some projects involved more than 40 hours worked in a week; some did not. The number of projects and length of engagement for Plaintiffs range from one project for five days, to multiple projects for upwards of 24 weeks.

Plaintiffs' experiences running their own implementation businesses differed as well. Many Plaintiffs operated an LLC and incurred expenses. Other Plaintiffs did not. Several Plaintiffs invested in training, certifications, and professional associations in furtherance of their implementation businesses. Others made no such investments.

### 2.    Plaintiffs' Actual Work Varied Substantially.

Defendants engaged consultants based on their particular medical expertise, so that they could understand the practice-specific language of medical providers, understand the practice-specific workflows and day-to-day operations of the providers, make adjustments to those practice-specific workflows and operational models, and teach the providers practice-specific EMR modules. Plaintiffs admit that the like-to-like nature of Defendants' business results in different job duties, working conditions, and terms of

engagement. The evidence shows that even the same consultants could and did have different job duties on different projects.

Plaintiffs' duties also differed depending on the EMR system. Plaintiffs who did not have Cerner expertise and experience could not be engaged for Cerner projects. Even the same EMR system could be different at different hospitals/projects, and would require varying experience and understanding of the hospital-specific build-out. Other projects would require consultants to customize the EMR system and its modules, yet another individualized skill for which Defendants would engage one consultant over another.

### 3. *Cruz* and *Lyndsay* are Dispositive.

This Court's decisions in *Cruz* and *Lyndsay* are controlling here. In *Cruz*, the defendant developed software that it sold to clients. *Cruz*, 764 F. Supp. 2d at 1055. The defendant also offered consultants to assist clients with the software. *Id.* The defendant classified the consultants as exempt from the FLSA's overtime requirement. *Id.* at 1061. This Court decertified the collective because the consultants were not similarly situated, finding that the consultants' job duties, training, assignments, and sub-specialties varied. *Id.* at 1058-1061. In decertifying the case, this Court found "[t]he evidence shows that consultants are not interchangeable; they often cannot function outside their area of expertise, even having sub-specialties in particular products." *Id.*

In *Lyndsay*, the plaintiffs alleged a common policy of off-the-clock work and unpaid overtime. 2016 WL 916365, at *4. The plaintiffs argued that despite varied experiences, class treatment was "appropriate because they all performed the same basic

duties, sold the same products, were subject to the same employment terms and conditions, and had the same dress code." *Id.* at *5. This Court held that "these generalized similarities, most of which are irrelevant for present purposes, are dwarfed by plaintiffs' different experiences with respect to the off-the-clock work and overtime alleged." *Id.* This Court noted that "there is no consistency among plaintiffs regarding the kinds of off-the-clock work performed, the circumstances requiring the work, [or] the amount of such work performed." *Id.* This Court decertified, holding that "[t]his lack of uniformity seriously undermines the court's ability to maintain a manageable class action." *Id.* at *4.

The same is true here: Plaintiffs have different medical and technical backgrounds, with distinct experience and expertise in separate EMR systems and practice-specific workflows and modules. Plaintiffs acknowledge that their specializations result in substantial variations in their job duties—variations not only between different Plaintiffs, but also on different projects performed by the same Plaintiffs. Plaintiffs also had different project managers and their experiences changed accordingly. They were paid different rates. Some projects required Plaintiffs to work more than 40 hours a week and some did not. The number of projects and length of time providing services for Defendants changes from Plaintiff to Plaintiff. Under *Cruz* and *Lyndsay*, the lack of uniformity in this case shows Plaintiffs are not similarly situated. *See also Keef v. M.A. Mortenson Co.*, No. 07-CV-3915 (JMR/FLN), 2009 WL 465030, at *3 (D. Minn. Feb. 24, 2009) (decertifying and noting "differences between the responsibilities" of the plaintiffs: "the plaintiffs work in different groups or on different projects within a group,

and they report to different supervisors."); *Carlson v. C.H. Robinson Worldwide, Inc.*, No. CIV 02-3780 JNE/JJG, 2006 WL 2830015, at *7 (D. Minn. Sept. 26, 2006) (noting "substantial variations in the duties performed" by the Plaintiffs, and holding "the Named Plaintiffs and the Opt-in Plaintiffs are not similarly situated."); *Kumar v. Tech Mahindra (Americas) Inc.*, No. 4:16-CV-00905-JAR, 2019 WL 1330935, at *5 (E.D. Mo. Mar. 25, 2019) ("Given that members work in different offices, on different projects, for different clients, and under different supervisors, the differences far exceed any similarities they share. Accordingly, this factor weighs against a finding that the collective-action members are similarly situated and in favor of decertification."); *Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *9 (E.D. Mo. Mar. 31, 2017) (decertifying where "Plaintiffs' claims are dependent upon factors such as site location, work state, supervisor, [and] individual technicians' practice…."

## B.    There is No Common Policy or Plan

Relying on boilerplate declarations at the initial stage, Plaintiffs argued there was a common plan because Plaintiffs were allegedly "uniformly classified as independent contractors… routinely worked 40 or more hours a week and did not receive overtime for hours worked in excess of 40 a week." (Dkt. 59, p. 13.) The evidence now shows that Plaintiffs were wrong.

### 1.    Defendants' Engagement of Independent Contractors is Not a Common Policy or Plan.

The mere fact Defendants classified the consultants as independent contractors is not evidence of a common plan or policy. *Andel v. Patterson-UTI Drilling Co., LLC*, 280

F.R.D. 287, 289 (S.D. Tex. 2012) ("[T]he Court cannot only look to [Defendant's] uniform classification of the workers .... Instead, it must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole."); *Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339 ALC JLC, 2014 WL 5039431, at *4 (S.D.N.Y. Sept. 29, 2014) ("Blanket misclassification arguments are insufficient.") This is particularly true at the second stage. *Cruz*, 764 F. Supp. 2d at 1058 (rejecting the argument that making "one decision regarding exemption status for each group of consultants, rather than evaluating the consultants' job responsibilities on an individual basis, [is] evidence that collective determination is appropriate," holding "[t]he classification process is not strong evidence when evaluating whether employees are similarly situated.").

Even if the classification decision was evidence of a common policy or plan—it is not—the record belies Plaintiffs' claims. Defendants determined independent-contractor status on a person-by-person and project-by-project basis—not wholesale or as a matter of uniform policy. Defendants used a Worker Status Questionnaire (or equivalent information) to determine the appropriate classification status for each consultant on each project. (Ex. J, Worker Status Questionnaire Template; Optum, Dep. Tr. 41:13-22; 42:10-18.) The Questionnaire made individualized and project-specific inquiries into whether a consultant would need training from Defendants; choose the order or sequence of his or her work; provide services to Defendants on a substantially full-time basis; and made services available to the general public, among other questions. (*Id.*) Defendants' in-house legal counsel had to review the Questionnaire and sign off before the business

could engage a consultant. (Ex. K, Depew October 2017 Email; Ex. L, Depew March 2017 Email; Ex. M, Contractor Engagement Training; Optum, Dep. Tr. 42:10-18.)

In *Cruz*, the plaintiffs argued that there was a common policy because the defendant "made one decision regarding exemption status for each group of consultants, rather than evaluating the consultants job responsibilities on an individual basis." 764 F. Supp. 2d at 1058. This Court rejected the idea that the defendant's classification process was itself evidence of a common policy and held the plaintiffs were wrong because the defendant "did conduct a thorough analysis to evaluate exemption status" and that "exemption determinations were made each year." *Id.* Here, Defendants' project-by-project and individualized review of contractor status means there is no common policy or plan for classification. Also, while Plaintiffs signed an independent contractor agreement, such agreements do not show a common policy or plan. *Id.*, at 1064 (holding that although "[t]here are common job description for each of the three types of consultants," the "common policy evidence is not strong."); *see also Hernandez v. Fresh Diet, Inc*., No. 12-CV-4339 ALC JLC, 2014 WL 5039431, at *4 (S.D.N.Y. Sept. 29, 2014) (holding that the plaintiffs could not demonstrate a common policy or plan even though "independent contractor status is supported, for example, by the facts that the drivers signed purported independent contractor agreements.").

### 2. Plaintiffs Have Neither Alleged Nor Shown Any Other Common Policy or Plan.

Plaintiffs must allege and show a common policy or plan beyond Defendants' mere engagement of independent contractors—which itself does not violate the FLSA

because "classification as an [independent contractor] is a defense to a claim for unpaid overtime wages, not a basis for the cause of action under the FLSA." *Oetinger v. First Residential Mortg. Network, Inc.*, Civ. No. 3:06–CV–381–H, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009); *see also Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009) (requiring "a common policy or plan *in violation of the FLSA*.") (emphasis added). Plaintiffs cannot meet their burden.

Plaintiffs cannot identify any other common policy or plan that purportedly violates the FLSA. (Azera 65:6-11; Emelue 91:8-25; Hutton 138:16-139:11; Nadreau 102:5-103:1; Ogbechie 97:6-98:10.) There is no common policy or plan regarding consultant hours. Varying clients, not Defendants, determined the number, hours and schedules of consultants for a project. There is no common policy or plan for consultant pay. Defendants paid the consultants different amounts for the same projects. There is no common policy or plan for consultants tracking their time. There is no evidence of uniform or common training or supervision.

Again, *Cruz* is dispositive. The plaintiffs in *Cruz* alleged similar jobs and job descriptions satisfied the common policy/plan requirement. 764 F. Supp. 2d at 1057. The evidence, however, showed varying experiences among the plaintiffs. *Id.* Specifically, the plaintiff's "jobs were dissimilar" and they "could not move from one type of consultant job to another." *Id.* 1057–58. The plaintiffs "did not undergo similar training" because [w]hile the very basic introduction to working at Lawson is the same for all Plaintiffs, the rest of the training received varies." *Id.* at 1060. The *Cruz* plaintiffs also "cannot function

outside their area of expertise, even having sub-specialties in particular products." *Id.* Plaintiffs' different experiences mandate the same result as in *Cruz*: decertification.

That Plaintiffs cannot meet their burden of showing a common policy or plan is sufficient, by itself, to warrant decertification. *Lyndsay*, 2016 WL 916365, at *5 ("[T]he court cannot conclude that plaintiffs have established a uniform policy or practice requiring off-the-clock work, and finds that *decertification is appropriate on this basis alone*.") (emphasis added). Notably, there are only 32 Plaintiffs here, making the absence of a common policy or plan outcome determinative. *White v. 14051 Manchester Inc.,* 301 F.R.D. 368, 374 (E.D. Mo. 2014) ("This case does not involve a large class. Where there are only 57 plaintiffs, the Court expects more uniformity regarding the policy at issue.")

## III.   THIS CASE CANNOT BE TRIED ON A COLLECTIVE BASIS

Plaintiffs' work and work experiences are also too varied for collective adjudication—an issue that goes to the manageability of this matter as a collective action, Defendants' individualized defenses, and fairness and procedural considerations.

The sole question on liability is whether Defendants properly engaged Plaintiffs as independent contractors. To answer that question, the fact-finder must examine "the economic reality of the arrangement." *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005). As this Court has explained:

> The factors in this economic realities test, although not exhaustive, include:
> (1) the degree of control over the manner in which the work is performed;
> (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.

*Le v. Regency Corp.,* 957 F. Supp. 2d 1079, 1089 (D. Minn. 2013). "[T]he employee-independent contractor inquiry is fact-intensive." *Schwieger v. Farm Bureau Ins. Co. of NE*, 207 F.3d 480, 484 (8th Cir. 2000). "It is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Le,* 957 F. Supp. 2d at 1089. Indeed, "any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Womack v. RCM Tech. (USA), Inc.*, No. 07-2111 (DWF/AJB), 2008 WL 5382318, at *10 (D. Minn. Dec. 23, 2008).

The Court must determine, then, whether this fact-intensive inquiry can be done on a collective basis. *See Blair*, 309 F. Supp. 3d 977 at 1003 (decertifying where "relevant facts that must be considered under the 'economic realities' test widely vary between Leased Drivers, and thus, the 'totality of the circumstances' is unique to each Leased Driver."); *Harris*, 2017 WL 5606751, at *5 (At "decertification, the Court's task is simply to consider whether the economic-realities inquiry may be performed by the fact-finder on a classwide basis. If there are too many differences among class members, particularly with respect to how they were treated and paid by LSO, then the Court will conclude that it will be inefficient, if not impossible, to attempt to try all the class members' claims at once in a collective action."); *see also Cruz*, 764 F. Supp. 2d at 1062 ("Collective application of the computer professional exemption will be difficult because there is conflicting testimony regarding whether the TCs actually write computer code, which is critical to the analysis of this exemption.") Even if just one or two of the factors

are not subject to collective determination, the case must be decertified. *Harris*, 2017 WL 5606751, at *5 ("[T]he Court finds that the first and third factors of the test are not capable of being decided on a classwide basis, and therefore, the ultimate decision as to whether LSO's couriers were misclassified cannot be made except on an individual basis.").

### A.   The Independent-Contractor Factors Cannot Be Collectively Adjudicated

#### 1.   Control Over the Manner in Which the Work is Performed.

How the project manager oversaw their projects was "highly variable" and "not consistent amongst projects." The differences include (1) frequent interactions with project managers to never meeting the project manager; (2) end-of-day meetings or no meetings; (3) daily reports or no reports; (4) specific EMR training or no training; and (5) variations in timekeeping and dress-code requirements. This variation necessitates individual inquiries and comparative analysis; therefore, this element cannot be resolved through common proof. *Blair*, 309 F. Supp. 3d at 1003 ("TransAm exerted varying degrees of control over the Leased Drivers, and this factor cannot be analyzed with collective evidence.").

#### 2.   Opportunity for Profit or Loss.

The key question for this element is whether Plaintiffs were able to negotiate their rates with Defendants. *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 670 (E.D. Pa. 2010 ("With respect to the *Martin* factor regarding profit or loss, evidence that may be relevant to its evaluation includes the workers' abilities to negotiate their pay.")

Plaintiffs had diverging experiences negotiating their rates: some were successful, others were not, and some did not try. Additionally, Plaintiffs all ran their implementation businesses differently, with some investing heavily in their businesses and others not so much. A class-wide determination of this factor is impossible. *Harris*, 2017 WL 5606751, at *6 (finding "that there would be no way for a fact-finder to decide on a classwide basis the degree to which LSO affected the couriers' collective opportunity for profit and loss" where "one courier testified that LSO paid him one amount for certain deliveries, but paid a different courier another, higher amount for the exact same route," and "one courier claimed that he was able to negotiate a pay raise from LSO on his own behalf.").

### 3.    Investment in Equipment or Materials.

Again, Plaintiffs' experiences are too different to collectively adjudicate this element. Some Plaintiffs provided their own equipment while others did not.

### 4.    Special Skill.

Most Plaintiffs acknowledge that implementation work substantially changes project-by-project depending on their medical expertise and particular skills, in conjunction with the type of medical provider and specific EMR system. But other Plaintiffs believed none of that mattered. Hutton and Achumba opined that their medical expertise did not necessarily change their roles, and that their duties were the same across projects. (Hutton 140:24-142:6; Achumba 31:5-24.) In Ogbechie's words, "it doesn't change." (Ogbechie 54:9-15.) The only way for the factfinder to resolve this conflict is to have individual mini-trials over Plaintiffs' opportunity to utilize their special skills on projects. *Cruz*, 764 F. Supp. 2d at 1062 ("The jury will need to assess each Plaintiff's

level of discretion in carrying out the consulting work and whether it relates to matters of significance… Analysis on a collective basis will be difficult because Plaintiffs have little supervision, interact with customers in different manners, and give conflicting testimony regarding the extent to which they independently solve problems versus follow an established Lawson process to resolve issues.").

### 5.   Permanence of the Working Relationship.

Different Plaintiffs worked for Defendants on a different number of projects for different amounts of time, ranging from one project for five days to multiple projects and 24-plus weeks of engagement. As the number of projects and length of engagement are the core of this element, Plaintiffs' differences here make collective adjudication inappropriate. *See Adami v. Cardo Windows, Inc.*, No. 12-2804 (JBS/JS), 2016 WL 1241798, at *9 (D.N.J. Mar. 30, 2016) (The Court finds this short term inconsistent with the 'length and continuity characteristic of employment, and instead suggestive of the window installers' independent contractor status. In any event, the factor will likely lead to different results for Adami than for the Opt-In Plaintiffs, making collective adjudication of their claims inappropriate.")

### B.   Defendants' Defenses and Procedural Fairness Favor Decertification

Defendants contend that each Plaintiff is an independent contractor under the economic-realities test. This defense requires Defendants to introduce individualized evidence as to each Plaintiff. Individualized defenses under the economic-realities test mandate decertification. *See Blair*, 309 F. Supp. 3d at 1012 ("The fairness factor necessitates decertification. While there are many Leased Drivers who have exhibited

characteristics of an 'independent contractor,' TransAm cannot possibly present individualized evidence to allow the jury to correctly determine which Leased Drivers were covered by the FLSA and which were not."); *Spellman v. Am. Eagle Exp., Inc.*, No. CIV.A. 10-1764, 2013 WL 1010444, at *5 (E.D. Pa. Mar. 14, 2013) ("AEX has an individualized defense as to each member of the class based on the economic realities of his or her dependence on AEX."); *see also Cruz*, 764 F. Supp. 2d at 1063 ("FLSA exemptions cannot be efficiently adjudicated en masse because the exemption analysis is fact-driven and Plaintiff-specific.").

Even the Plaintiffs' varying work and work experiences requires individualized defenses, further counseling in favor of decertification because Defendants "cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other." *Hernandez*, 2014 WL 5039431, at *6 ("[W]here the evidence suggests a wide disparity in the relevant factual circumstances, the individualized defenses prong of the decertification analysis mirrors the disparate employment settings prong.") (quotation marks omitted); *see also Cruz*, 764 F. Supp. 2d at 1063; *Hernandez v. United Auto Credit Corp.*, No. C-08-03404 RMW, 2010 WL 1337702, at *5 (N.D. Cal. Apr. 2, 2010) ("[W]here there appears to be substantially different employment experiences among the various Collections and Administrative Supervisors, the procedural advantages of a collective action cannot be realized.")

As such, procedural fairness also favors decertification so Defendants can present individualized defenses. *Smith*, 404 F. Supp. 2d at 1155. ("[G]iven the Court's determination that Plaintiffs are not similarly situated with respect to key issues in the

exemption analysis, the pursuit of individual actions is a necessary result."); *Blair*, 309 F. Supp. 3d at 1010 ("Available defenses and procedural fairness go hand-in-hand, as the efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of a defendant's due process rights."); *United Auto Credit Corp.*, No. C-08-03404 RMW, 2010 WL 1337702, at *5 ("It is difficult to see how a class action could proceed fairly and efficiently, given that each plaintiff's work situation will have to be examined to see what duties he or she performed. The potential for a class-wide ruling on liability seems slim. And even if liability could be determined on a class-wide basis, the court would still face the prospect of having to determine individualized damages.")

## CONCLUSION

For the reasons stated herein, the Court should decertify this case as a collective action.

NILAN JOHNSON LEWIS PA

Dated: January 15, 2021        By: *s/ Joseph G. Schmitt*
                                    Joseph G. Schmitt (Reg. No. 231447)
                                    Sandra L. Jezierski (Reg. No. 267132)
                                    David A. James (Reg. No. 337389)
                                    Jason P. Hungerford (Reg. No. 0395908)
                                    120 South Sixth Street, Suite 400
                                    Minneapolis, MN 55402-4501
                                    Phone: 612-305-7500
                                    Fax: 612-305-7501
                                    jschmitt@nilanjohnson.com
                                    sjezierski@nilanjohnson.com
                                    djames@nilanjohnson.com
                                    jhungerford@nilanjohnson.com

                                    ATTORNEYS FOR DEFENDANTS

4823-9211-5925