# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

OLURO OLUKAYODE,
individually and on behalf of all
others similarly situated,

          Plaintiffs,

   v.

UNITEDHEALTH GROUP,
OPTUM, INC. and
ADVISORY BOARD COMPANY,

          Defendants.

Civil Action No. 0:19-cv-01101
(DSD/HB)

**DEFENDANTS' MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS
CERTIFICATION**

## INTRODUCTION

Class actions are the exception, not the rule. They are available only if a court, after rigorous analysis, holds that liability can be resolved in one stroke by the same evidence for every class member. It is not sufficient for there to be common questions—there must be *common answers* and *common proof* to liability questions, which must predominate over all individual issues. The class representative and counsel must adequately represent class interests; it cannot be a case where a "lawyer located a plaintiff and brought a class action in the hope of a fee." *In re Teflon Products Liab. Litig.*, 254 F.R.D. 354, 369 (S.D. Iowa 2008). Even then, a class mechanism must be more than just as good as individual litigation—it must be the superior method for determining liability. Plaintiff cannot satisfy any of these requirements, and certification should be denied.

Plaintiff puts forth the same alleged common proof of liability for three putative classes: (1) the independent contractor agreements, which he contends show Defendants

retained and exercised control over the consultants; and (2) the purported "same work" that the consultants do which, according to Plaintiff, proves that the class members' claims are common and typical. But the agreements are not common proof of control; they reflect numerous material differences, revealing the absence of common proof, and vest discretion in the consultants on how to perform their work. The class definitions also include consultants who provided services to Defendants through a third-party staffing agency, and the agreements tell the Court nothing about Defendants' level of control of these consultants who did not enter into any agreements with Defendants.

There is also no single source of evidence that proves consultant job duties are the same or indicative of common experiences. The agreements show that consultant job duties, deliverables, and timing of performance varied by consultant and by project. Defendants engage consultants for their particular expertise and experience, and Plaintiff testified (as did others) that the practice-specific nature of implementation services means consultant duties changed based on the type of medical practice and the Electronic Medical Records ("EMR") systems and modules for the different practices.

The flaws in Plaintiff's position are clear, but he advances them to avoid the best evidence of the relationship between the consultants and Defendants—class members' sworn testimony. Plaintiff knows that the testimony, including his own, betrays any suggestion of common proof, common experiences, or common issues that can be resolved on a class-wide basis. Some consultants were heavily supervised by project managers, while others did not even meet their project manager. Some consultants worked independently, yet others were given specific instructions on how to perform

4815-3152-2776

their work. Plaintiff only had a brief, two-hour orientation that covered basic logistics, while other consultants received specific training on the EMR systems and were told not to deviate from the training. Still others recalled neither an orientation nor training.

Common evidence is lacking on other important factors. There is no common proof regarding the class members' consulting businesses and opportunity for profit. Many consultants invested in their businesses and ran them accordingly; others did not. Some consultants successfully negotiated their rates; some tried to negotiate but were unsuccessful; some did not try to negotiate at all. Length of engagement on Defendants' projects varied, as did the degree to which consultants worked for Defendants' competitors. The class definitions also cover a period of time when Defendants provided implementation services only sporadically, so there is no collective evidence on whether the services provided by each class member were integral to Defendants' business. Perhaps most important, dozens of putative class members did not work any hours over 40 in a week for Defendants—the entire point of this suit—and suffered no injury in fact.

Having little in common with the putative class, Plaintiff cannot adequately represent their interests, particularly those consultants who must prove joint employment and overcome arbitration agreements to be part of this suit, neither of which Plaintiff must do. Proposed class counsel delayed a year and a half in seeking class certification, which bears directly on the zeal with which they will uphold their duties to the class. And the shrinking number of Opt-Ins in the corresponding collective action—down from 59 to 31, a reduction of nearly half of the collective—shows that proposed counsel are inadequate to represent hundreds of consultants among three different classes.

3

# FACTS

## I.     FACTS REGARDING DEFENDANTS' IMPLEMENTATION BUSINESS

### A.     Plaintiff and EMR Implementation Work

The facts of this case are well known to the Court. Named-Plaintiff Oluro Olukayode and the putative class he seeks to represent are clinician-consultants who Defendants engaged to assist various clients with the implementation of new EMR systems. Defendants' business model of contracting exclusively with medical clinicians is unique in the industry, and allows Defendants to provide practice-specific support to medical providers on implementation projects. The practice-specific nature of the work means the consultants' working conditions, duties, and experiences vary from practice-to-practice and project-to-project—which Olukayode and several Opt-In Plaintiffs admit. Even the same consultant could have markedly different duties and experiences on different projects for Defendants. For a more detailed recitation of these facts with citations to the record, see Defendants' Motion to Decertify the Collective Action. (Dkt. 176, pp. 3-11.)

### B.     Defendants' Varied Ways of Engaging Consultants

#### 1.     Prior to September 15, 2018, Defendants used three different methods of engaging consultants.

From August 2012 through September 15, 2018—which dates back to Clinovations, Defendant Advisory Board Company's ("ABC") predecessor—Defendants engaged consultants in three different ways: (a) as individuals; (b) as LLCs or similar single-member businesses; and (c) through business-to-business contractor arrangements

4

with third-party staffing services. (Clark Decl. ¶ 17.)[1] For example, Olukayode maintains a legal entity called Jedidiah Holdings LLC, a Virginia corporation, and Defendants contracted with this legal entity. (*Id.* ¶ 18, Ex. A.) In contrast, Christy Rivera, Charlotte Kennedy, and Kerrin Sojourner—all Opt-In Plaintiffs in this matter—provided services to Defendants through Harmony Healthcare, a third-party staffing company. (Ex. A, Rivera Harmony Healthcare Contract; Ex. B, Kennedy Harmony Healthcare Contract; Ex. C, Sojourner Harmony Healthcare Contract.)[2] Under this arrangement, Defendants had no contractual relationship with Rivera, Kennedy, or Sojourner. (*Id.*; Clark Decl. ¶ 19.) Instead, Harmony Healthcare employed Rivera, Kennedy and Sojourner; paid their hourly rates, including a regular rate and an overtime rate for hours worked over 40 hours a week; paid for their lodging on projects; and reimbursed them for other travel expenses. (Ex. A; Ex. B; Ex. C.) The process was the same when Defendants engaged consultants through other third-party staffing companies as well. (Clark Decl. ¶ 19.)

       **2.**     **Since September 15, 2018, Defendants have used Optum's procurement process.**

Since September 15, 2018, Defendants have used Optum's procurement process for engaging consultants, through which Defendants exclusively use outside vendors MBO Partners, Equity Staffing Group, and/or Contech Systems, Inc. to procure

---

[1] The Declaration of Daniel Clark (Doc. No. 41) was submitted on June 26, 2019 in support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Conditional Certification.

[2] Exhibits and transcripts are attached to the Declaration of Jason Hungerford.

consultants for projects. (*Id.* ¶ 20; Pelant Decl. ¶¶ 4-6.)[3] To perform implementation services for Defendants, an individual must initially contact third-party vendor MBO Partners. (Pelant Decl. ¶ 7.) MBO Partners then determines whether the individual should be appropriately classified as an independent contractor or an employee. (*Id.*) If MBO Partners approves the individual as an independent contractor—a decision about which Defendants provide no input—the consultant executes an independent contractor agreement, which is between the consultant and MBO Partners. (*Id.* ¶ 8.) The independent contractor agreements contain an arbitration provision, requiring consultants to resolve any disputes between the consultant, MBO Partners, and MBO Partners' clients (including Defendants) through arbitration. (*Id.* ¶ 16.) The arbitration provision also includes a class and collective waiver, requiring the consultants to arbitrate their claims on an individual basis. (*Id.*) Upon execution of the agreement, the consultant is then added to a pre-approved list of contractors. (*Id.* ¶ 8.)

Alternatively, if MBO Partners determines the consultant should be classified as an employee, MBO Partners directs the individual to Equity Staffing Group, another third-party vendor. (*Id.* ¶ 9.) Subject to Equity Staffing Group's approval, it enters into a contractual employment relationship with the consultant and pays them as an employee via Form W-2. (*Id.*) Whether MBO Partners determines the consultant is an independent contractor or an employee, Defendants do not contract with the consultant in any way, and the consultants are compensated by MBO or Equity Staffing Group. (*Id.* ¶¶ 9, 13.)

---

[3] The Declaration of Krystal Pelant (Doc. No. 42) was submitted on June 26, 2019 in support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Conditional Certification.

Other staffing agencies or businesses who seek to place consultants on Defendants' projects must go through the approval system of Contech Systems, Inc., another third-party vendor that manages some of Defendants' business-to-business relationships. (*Id.* ¶ 10.) In these circumstances, the staffing agency—which contracts with its own independent contractors—enters into a contractual relationship with Contech Systems, which contracts with Defendants. (*Id.*) Under this arrangement, Defendants have no contractual relationship with the staffing agency or its independent contractors. (*Id.*) Instead, the independent contractors are paid by the staffing agency (which is paid by Contech Systems). (*Id.*)

> ### 3.   Olukayode's services for Defendants pre-date the transition to Optum's procurement process.

Olukayode last performed services for ABC on April 21, 2017. (Wright Decl. ¶ 5.)[4] Thus, Olukayode has not provided services to Defendants since the transition to Optum's procurement process. (Pelant Decl. ¶ 14.)

## II.   PROCEDURAL HISTORY

### A.   The Collective Action Under the FLSA

After initially denying Plaintiffs' motion, the Court conditionally certified the following FLSA collective:

> all individuals who worked for Defendants during the past three years providing support and training to Defendants' clients in connection with the implementation of new electronic recordkeeping systems, were classified as independent contractors, and who signed contracts to provide such services prior to September 15, 2018.

---

[4] The Declaration of Charles Wright (Doc. No. 43) was submitted on June 26, 2019 in support of Defendants' opposition to Plaintiff's initial motion for conditional certification.

(Dkt. 87, pp. 18-19.) Notably, the Court excluded consultants who performed services for Defendants through third-party staffing agencies prior to September 15, 2018, and all consultants who performed work after Defendants transitioned to Optum's procurement process on September 15, 2018. (*Id.*, pp. 15-16.) The Court found there was no colorable basis to suggest a common policy or plan of unlawful misclassification with respect to these excluded consultants, even under the lenient conditional-certification test. (*Id.*)

There were 145 individuals within the putative collective. (Defendants' Motion to Decertify the Collective Action, Dkt. 176, p. 11.) A total of 59 Plaintiffs opted into this case, but many have withdrawn or dismissed their claims. (Dkt. 124, 140, 146, 159, 160.) Including Olukayode, only 32 Plaintiffs remain. In other words, a vast majority of the collective—roughly 80%—either declined to bring, or withdrew, their claims.

## B.     The Parties Conducted Substantial Discovery

Although Olukayode makes scant reference to it in his Motion, the Parties engaged in over a year of discovery in this case, including depositions of several Opt-In Plaintiffs. The discovery tells a much different story than what Olukayode alleges.

Olukayode and the Opt-In Plaintiffs worked on four different projects in four states with six different project managers during the Opt-In period—which includes the states and projects at issue on class certification. (Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 12-18.) The way each project manager ran their projects (or portions of the project) and the different methods used to track and organize projects

was "highly variable" and "not consistent amongst projects." (*Id.*) These differences are evident in the Plaintiffs' contrasting experiences, summarized as follows:

- <u>Supervision</u>. Olukayode testified that the level of supervision varied depending upon the project manager (among other factors), and he admitted he was not supervised at all on one of his projects for Defendants. Another consultant who worked with Olukayode on the same project testified that his project manager checked in on him two to three times a day. The level of supervision experienced by other Opt-In Plaintiffs ranged from frequent but not daily interaction with project managers; to meeting with a project manager only once a week; to only seeing the project manager once on the entire project.

- <u>Training</u>. Some Opt-In Plaintiffs received pre-project training, while others recalled only an orientation that covered logistics like parking and lunch with no training on the actual work. Still others recalled no training at all, and Opt-In Plaintiff Paschal Emelue testified that Defendants *could not* show consultants how to do their jobs because project managers did not understand the consultants' work.

- <u>Job Requirements</u>. Olukayode testified that he "meticulously" recorded his hours in Defendants' timekeeping system, and some Opt-In Plaintiffs also used Defendants' timekeeping system. Many other Opt-In Plaintiffs, however, were not required to enter their time. Some hospital clients provided branded shirts for the consultants to wear, while Plaintiffs used their own professional judgment regarding attire on other projects. Some Plaintiffs supplied their own equipment on projects; some did not provide any equipment. A number of Plaintiffs testified they had to attend meetings and/or send daily reports to project managers, while some testified they did not have to do so. As to such meetings with and/or reports to project managers, Opt-In Plaintiff Tamara Hutton testified that "[t]here wasn't any reason for us to talk to them everyday about the project."

- <u>Schedules, hours, and pay</u>. Plaintiffs' schedules varied because Defendants' clients decided how many consultants were needed on each project, what the consultants' schedules would be, what hours consultants worked, and whether the consultants could work additional hours. Plaintiffs worked different amounts of time on different projects, ranging from one week on one project, to 20-plus weeks on multiple projects. Consultant pay varied as well, not only from project to project, but among consultants on the same project—the result of the distinct negotiation experiences with Defendants,

with some consultants negotiating their rates, some trying unsuccessfully to negotiate rates, and other not trying to negotiate at all.

- Plaintiffs' investments in their consulting businesses. Each Plaintiff ran their business differently. Olukayode and Opt-In Plaintiff Emmanuel Reyes-Cortes each invested heavily in their healthcare IT consulting businesses. Others invested in Epic and health informatics certifications and professional memberships. But some Opt-In Plaintiffs made no investments in their business, neither forming an LLC or other business entity, nor pursuing certifications or other coursework to enhance their marketability.

(*Id.*) This summary shows how the class members' experiences differed in general. Below is how their experiences differed on each project in the proposed classes.

## III.   FACTS REGARDING THE PROPOSED CLASSES

Olukayode seeks to certify three Rule 23 classes of consultants in this case—a Maine class, a New York class, and a Maryland class. The respective time periods differ, but the class definition is the same for each proposed class: all individuals who worked for Defendants providing training and support to Defendants' clients in connection with the implementation of electronic recordkeeping systems and were classified as independent contractors.

### A.   The Proposed Maine Class

The proposed Maine class relates to a large, multi-phased, multi-location project for the MaineHealth medical system in 2017. (Ex. D, Rog 3, 4, 10 Response, Filtered to MaineHealth and by the Opt-Ins.) Olukayode and several Opt-In Plaintiffs worked on this project—sometimes together, sometimes on different phases. (*Id.*) Olukayode and all of the Opt-Ins deposed in this cases who worked on the MaineHealth project had the same project manager: Lukasz Kamieniecki. (*Id.*) The record shows that Olukayode and the

10

Opt-Ins (and, thus, the putative class) had varied experiences, even when working on the same phase and for the same project manager.

        **1.**      **Training.**

Olukayode testified that the sole training he received on the MaineHealth project was an orientation session conducted by hospital leadership and Defendants explaining what they wanted to achieve with the project. (Olukayode 127:13-24.) This was a two-hour online meeting. (*Id.* 201:13-22, 204:14-24.) Opt-In Plaintiff Folakemi Oredeko had a similar experience, participating in the webinar jointly conducted by MaineHealth and Defendants; there was no other on-site training. (Oredeko 29:10-16.) Meanwhile, Opt-In Plaintiff Bridget Azera also recalled an orientation on the project, but she worked on a different phase than Olukayode and her orientation session was in person, covering only project logistics with no substantive training. (Ex. D; Azera 55:21-56:16.)

Conversely, Opt-In Plaintiff Paschal Emelue worked on the same phase as Olukayode, and he did not recall any orientation or any type of training. (Ex. D; Emelue 86:14-16; 64:24-65:2.) Emelue did not believe his project manager could provide any training in the first instance because "they don't know the kind of work we do." (Emelue 83:9-13.)

Opt-In Plaintiffs Ejike Achumba and Marc Nadreau worked on a different MaineHealth phase than Olukayode, and their training experiences also contrast with his. Achumba received specific training on how to do his job and was told not to deviate from Defendants' expectations:

> Q.      Right.  But they're not telling you on a daily basis how to do your job; they're just telling you where to go do it?
>
> A.      So at the beginning of the project you're told how to do because that's the training.  And they tell you what your -- what their goal -- the company's goal is and what the client's goal is.  So that's the aspect where we're told.  Then if for any reason you derail from that objective, you'll be reminded as to what direction we are going with this project.

(Achumba 52:5-16; Ex. D.) Nadreau also recalled a substantive training on Epic, stating consultants "always need training":

> Q.      And at that point are you comfortable with Epic or do you still need some training?
>
> A.      You always need training.
>
> Q.      Why is that?
>
> A.      Because they could put me at the front desk and reception now, and that I don't anything about, they have to train you about that, or they put you on payroll, and they put you, let's say, to help physicians or nurses, or if you go to any of the physical or respiratory therapy, radiology, or anything on cancer, you have to have -- or pharmacy, or lab, you have -- they have to give you training for each of these individual modalities or areas, because just a few people that know everything, but -- I don't think anyone know all of it, they may be able to help you, but they don't know all of it.

(Nadreau 63:9-24; 90:9-17.)

Opt-In Plaintiff Chiedu Ogbechie tells conflicting stories about his training at MaineHealth. In his declaration, Ogbechie states that during his orientation, he "learned about the specifics of the software we would be using." (Pl. Ex. 12, ¶ 5.) But at his deposition, he testified that orientation only covered project basics such as scheduling and where to go, not specific software training:

Q.     Let me ask specifically for the ABC orientation, do you remember what was covered?

A.     No, I can't remember what was covered, but most orientations they just tell you about the project, about -- diverse schedules, and if anybody has a problem, if there is any -- and most time during orientation, they tell you what you're supposed to do, tell you about the project, what you're supposed to do, and if there's any deficiency in your on-boarding, you'll finish it there.

Q.     So you're just getting basic information about the project during orientation; is that correct?

A.     Yes, sir.

(Ogbechie 87:18-88:10.) Ogbechie also specifically denied getting any training on the

software the hospital was using:

Q.     So you brought a lot of knowledge of the Epic system to this particular job; right?

A.     Yes, sir.

Q.     And you were able to just hit the ground running? You didn't need any training from Advisory Board on how to use Epic?

A.     No.  I didn't need any training from Advisory Board.

(*Id.* 81:9-18.)

**2.     Supervision.**

Olukayode testified that he was not supervised by Kamieniecki on the

MaineHealth project:

Q.     Did anybody supervise you?  You know, tell you what to do from moment to moment during the project?

A.     No.

13

(Olukayode 126:13-16.) Nadreau had the exact opposite experience: Kamieniecki checked in on Nadreau two to three times as day:

> Q.      How frequently -- whoever it was, how frequently did you communicate with your project manager on this Maine Health project?
>
> A.      They will come to my station maybe two or three times a day.
>
> Q.      So the project managers would come to your station two to three times a day?
>
> A.      Either the project manager or the helper. So someone is checking up on the area that we working in at least two, three times a day.

(Nadreau 92:8-19.)

The other Opt-In Plaintiffs on the project experienced a mix of supervision from Kamieniecki. Oredeko saw Kamieniecki only once on the project. (Oredeko 98:18-99:3.) Ogbechie also only interacted with Kamieniecki once on the project, but asserts that Kamieniecki checked in with him regularly via email, phone, and text. (Ogbechie 84:5-8; Pl. Ex. 12, ¶ 10.) Azera testified that she interacted with Kamieniecki, but he did not check in on her from day-to-day. (Azera 56:20-57:19.) Emelue interacted with Kamieniecki "sometimes" but not daily. (Emelue 81:10-82:2.)

### 3.      Duties.

Olukayode testified that he "meticulously" recorded his hours in Defendants' timekeeping system on the MaineHealth project. (Olukayode 46:17-22; 122:23-123:2.) Achumba and Oredeko were also required to enter their time into a timekeeping system.

(Achumba 98:14-16; Oredeko 85:22-24.) Azera, Emelue and Nadreau, on the other hand, were not required to enter their time. (Azera 65:21-66:10; Emelue 93:9-13; Nadreau 106:2-5.)

Some Plaintiffs had to attend meetings and/or send daily reports on the project; others did not. Olukayode testified that he attended team huddles from "time to time" to address "how the work was going and what other areas needed more help." (Olukayode 209:21-25.) Achumba claimed to attend weekly huddles and daily end-of-shift meetings. (Achumba 49:24-50:7.) Azera did not attend meetings, but was required to send a daily report. (Azera 24:5-10; 63:4-10.) In contrast, Nadreau did not attend meetings or send reports. (Nadreau 94:17-96:1.) Ogbechie did not have to send any reports. (Ogbechie 84:9-12.)

### 4. Project Length, Rates and Negotiations.

The Plaintiffs on the MaineHealth project worked varying lengths of time at different rates. Nadreau worked one week on the project; Azera worked three weeks. (Ex. D.) Both earned $130 an hour. (*Id.*) Olukayode worked for four weeks on the project at $125 an hour. (*Id.*) Achumba worked five weeks at $120 an hour. (*Id.*) Ogbechie and Emelue worked for two weeks and three weeks, respectively, at $120 an hour. (*Id.*) Oredeko worked four weeks at $130 an hour. (*Id.*)

The different rates Plaintiffs earned are a result of their distinct negotiation experiences with Defendants. Oredeko successfully negotiated her rate on the MaineHealth project. (Oredeko 106:9-107:4.) Azera, Ogbechie and Achumba could not negotiate their rates. (Azera 12:16-13:2; Ogbechie 50:15-22; Achumba 126:14-25.)

15

Nadreau and Olukayode did not try to negotiate their rates on this project. (Nadreau 103:2-14; Olukayode 108:23-109:14.)

## B.     The Proposed New York Class

The proposed New York class involves three different projects between 2016 and 2018: Hospital for Special Surgery ("HSS"), New York City Health and Hospitals ("NYHH"), and Our Lady of Lourdes Memorial Hospital ("Lourdes"). (Olukayode 128:6-131:19; Ex. E, Rog 3, 4, 10 Response, Filtered to NYHH and Lourdes.) Olukayode only performed implementation services on the HSS project. (*Id.*)

### 1.     Olukayode's experience on the HSS project.

The only evidence in the record regarding the 2016 HSS project is Olukayode's testimony and declaration. (See Pl. Br., p. 9.) Olukayode's sole training on the HSS project was the same type of orientation session he attended on the MaineHealth project, provided by the HSS hospital in conjunction with the project manager. (Olukayode 134:21-135:2.) Olukayode does not recall who his project manager was, but admits that he was allowed to work independently with no supervision:

> Q.     Okay.  For the New York project can you recall any directions that the project manager offered to you?
>
> A.     Not really.
>
> Q.     Can you recall anything that the supervisor -- the project manager told you to do?
>
> A.     So we are allowed to work as independently as possible.  We are not micromanaged.  You are supposed to show up at your assigned place and then do the work.  If you have any problems or concerns with the providers or

anything, you then escalate it to your -- to your lead or to the project manager.  So...

Q.    So the project manager or the lead is there as a resource for you?

A.    Yes.

Q.    If you need something, you can go to them?

A.    Yes.

Q.    But they're not telling you what to do?

A.    No.

Q.    You're working independently on your own?

A.    As much as possible.

(*Id.* 128:23-25; 135:19-136:16.) Olukayode testified that even with the project manager on site and daily "huddles" to discuss the next day's work, supervision was nominal at best:

A.    And, you know, we do huddles at the end of the day every day and say, "Hey, this person needs help.  This person needs help.  This is what I want you to do, or this is what we want you to concentrate" – there was some form of directions and instructions of what to do; but, overall, we are not micromanaged.

Q.    All right.  So the huddles would -- they'd identify "here are things that need to happen the next day"?

A.    Yes.

Q.    They didn't tell you how to do them, right?

A.    That's what we're supposed to know how to do.

(*Id.* 129:4-10; 136:17-137:6.) Olukayode did not receive a performance evaluation or discipline from Defendants on the HSS project. (*Id.* 228:2-6.) He recalls entering his time into a timekeeping system. (*Id.* 134:5-11.)

Olukayode asserts there were 6-10 other consultants working with him on the HSS project. (Dkt 60-3, ¶ 5.) He alleges that he worked 12 hours a day for the four weeks on the project, and speculates that the other consultants worked the same hours. (*Id.*, ¶ 17; Olukayode 134:2-4.) Olukayode cites to no declarations from others alleged to have worked on the HSS project. Besides Olukayode's mere speculation, there is no evidence in the record as to the hours others worked or their experiences on the HSS project.

## 2.    The NYHH project.

The NYHH project was a multi-phased project that ran for several years between 2016 and 2018. (Ex. E.) The phases on the project were (1) Epic Implementation Extension, (2) Epic Implementation Ext. April 2017, and (3) Epic EMR and Rev. Cycle Roll-Out. (*Id.*)

Olukayode did not work on the NYHH project. (*Id.*) His Motion to Certify the Class contains no allegations as to this project, nor do any of the declarations Olukayode filed in support of his Motion. (See generally Dkt. 170.) None of the Opt-In Plaintiffs in this matter worked on the NYHH project. (Ex. E.) The record is devoid of any evidence about whether the consultants on this project were supervised, received any training or orientation, had to record their time, or other relevant facts.

What the record does show, however, is that hours varied by consultant and phase, including whether consultants worked any hours over 40 in a week. For example,

putative class member Eric McGuire worked on the Epic Implementation Ext. April 2017 and Epic EMR & Rev Cycle Roll-Out phases, and he did not work any hours over 40 a week during his entire time on the project. (*Id.*) Kailin Bass and Matt Lambert also worked on the Epic Implementation Ext. April 2017 phase—their only work on this project—and did not work any hours over 40 in a week. (*Id.*) Jared Hill and Hilton Payne similarly did not work any hours over 40 a week on the Epic Implementation Ext. April 2017 phase, but did work over 40 hours a week on the Epic EMR & Rev Cycle Roll-Out phase. (*Id.*) In comparison, David Butler did not work any hours over 40 a week on the Epic EMR & Rev Cycle Roll-Out phase, but did exceed 40 hours a week on the other two phases. (*Id.*)

The record also shows that Rajeeb Khatua was the project manager on the NYHH project. (*Id.*) While there is no evidence as to how Khatua ran this particular project and phases, Olukayode had a separate experience with Khatua who he described as "very hands on"—a stark contrast to Olukayode's experience on the HHS project where he was not supervised and allowed to work as independently as possible. (Olukayode 203:9-18.)

### 3. The Lourdes project.

The Lourdes project was a short project in 2017 with two smaller phases and one larger phase. (Ex. E.) Olukayode did not work on this project. (*Id.*)

The two smaller phases, Cerner Dynamic Documentation Services and Cerner Support, were staffed with one consultant and two consultants, respectively. (*Id.*) None of the consultants on these phases worked any hours over 40 in a week. (*Id.*) There were 17 consultants on the third phase, Cerner Implementation Support. (*Id.*) Seven of the third-

phase consultants worked no hours over 40 a week, and working more than 40 hours a week was a rarity for the other 10 consultants. (*Id.*) For example, Opt-In Plaintiff Mario Teran worked for five weeks on the third phase, and only worked two hours over 40 in a week once, with no other hours over 40 in a week. (*Id.*) Putative class member Babajide Adewumi worked six weeks on the phase and only worked five hours over 40 in a week once, with no other hours over 40. (*Id.*) And while Opt-In Plaintiff Rishi Sarna alleges that she worked "between 60 and 70 hours a week on the Lourdes project" (Pl. Ex. 23, ¶ 6), the time records reflect that out of her six weeks on the project, she worked two hours over 40 in a week only twice, with no other hours over 40. (Ex. E.) The same is true for Opt-In Nelson Ambe—he alleges that he worked 40-50 hours a week on the project (Pl. Ex. 13, ¶ 8), but only worked two hours over 40 in a week once during his three weeks at Lourdes. (Ex. E.)

Opt-In Plaintiffs Chiedu Ogbechie and Emmanuel Reyes-Cortes also both worked on the Lourdes project. (*Id.*) Neither worked any hours over 40 in a week, though both claim to have done so in their declarations. (*Id.*, Pl. Ex. 12, ¶ 8; Pl. Ex. 22, ¶ 7; Reyes-Cortes 83:6-18; Ogbechie 23:10-25.) Besides jointly getting their hours wrong, Ogbechie and Reyes-Cortes had no common experiences at Lourdes. Reyes-Cortes reports receiving training at an orientation on the project. (Pl. Ex. 22, ¶ 5.) Ogbechie did not receive any training at Lourdes:

Q.    And this was Cerner project; correct?

A.    Yes, sir.

> Q.    Okay.  By that time you had lots of --
>
> A.    Lots of experience.
>
> Q.    -- with Cerner?
>
> A.    Yes.
>
> Q.    You didn't get any training from Advisory Board or Cerner about how to do your job as consultant?
>
> A.    I don't think so.

(Ogbechie 94:5-16.)

Reyes-Cortes states that the project manager frequently checked in on him and other consultants with specific instructions for the job. (Pl. Ex. 22, ¶ 6.) Conversely, Ogbechie testified that the project manager was not on site and he could not remember even meeting the project manager:

> Q.    Tell me about your interactions with Samantha Goldman.  Let's start with was she on site there with you at Lourdes?
>
> A.    In the clinic?  No, she wasn't in the clinic with me.
>
> Q.    And then how many times while you were working in the clinic did you see Samantha?
>
> A.    I'm not sure.  I'm not sure I did see her there.  I don't think so.

4815-3152-2776

(Ogbechie 93:5-14.) While Ogbechie did exchange a "few" emails with the project manager, the email and communications were less frequent than his previous experiences on other projects for Defendants. (*Id.*, 93:15-24.)[5]

Reyes-Cortes's rate for the project was $120 an hour. (Ex. E.) In his declaration, he claims that he could not negotiate his rate (Pl. Ex. 22, ¶ 4), but at his deposition Reyes-Cortes testified he did not try to negotiate his rate:

> Q.     Okay.  At any point during your relationship with defendants, did you ask them for more money, for an increase in your hourly rate?
>
> A.     I did not.

(Reyes-Cortes 140:7-10.) Ogbechie, on the other hand, made $130 an hour—a rate that he actually tried to negotiate but was unsuccessful at doing so:

> Q.     Do you remember, when you did work for Advisory Board, did you negotiate your rates with them?
>
> A.     No, not really.
>
> Q.     Did you ask?  Did you try?
>
> A.     I did try.
>
> Q.     And what did they say?
>
> A.     They can't do more than that.

(Ogbechie 50:15-22.)

---

[5] Ogbechie's declaration contains many of the same boilerplate allegations that are in Reyes-Cortes' declaration, but Ogbechie's sworn testimony conflicts with much of what his declaration says about the Lourdes project.

### C.     The Proposed Maryland Class

The proposed Maryland class relates to the 2016-2017 MedStar Health project in Columbia, Maryland that spanned across several months and 10 different phases/assignments, at different hospitals, with multiple project managers. (Ex. F, Rog 3, 4, 10 Response, Filtered to MedStar.) Specifically, the 10 distinct phases on the MedStar project were

- Cerner Ambulatory Go-Live Support

- Cerner Ambulatory Go-Live Support Extension

- Cerner Ambulatory Go-Live Command Center

- Cerner Ambulatory Post Conversion - Wave One

- MD--Cerner Ambulatory Post Conversion - Wave Two

- Cerner Ambulatory Post Conversion - Wave Three

- Cerner Ambulatory Go-Live Ortho

- Harbor Hospital Inpatient MC3 Go-Live

- Inpatient MedConnect 3 Go-Live

- Inpatient MedConnect 3 Go-Live Nursing

(*Id.*)

### 1.     Olukayode' MedStar experience.

Olukayode worked on exactly one phase of the MedStar project—Cerner Ambulatory Go-Live Support Extension—which was a relatively small portion of the overall project. (*Id.*) Stephanie Murrill was the project manager for this phase, but Olukayode recalled that Christina Chan took over for Murrill at some point during the

4815-3152-2776

five weeks he was on the project. (*Id.*, Olukayode 149:6-23.) Whether it was Murrill or Chan, Olukayode testified that he was not supervised on the MedStar project at all. (Olukayode 151:3-152:9.) Neither Murrill or Chan were on-site with Olukayode, and Olukayode only met his project manager one time at the team dinner at the beginning of the project. (*Id.*) While Olukayode said he was "allowed to work as independently as possible" and "not micromanaged" on the New York project, he described the MedStar project as *even more independent* than in New York:

> Q.    Was there anybody supervising you during this one?
>
> A.    We had -- we had team leads, you know, in some places; but it was more of an independent thing –
>
> ****
>
> Q.    This project was even more independent than the others?
>
> A.    Yeah, a little bit.

(*Id.* 135:25-136:3; 151:25-152:9.) Olukayode did not receive a performance evaluation or discipline from Defendants on the MedStar project. (*Id.* 228:2-6.)

While consultant duties on the MedStar project generally involved at-the-elbow support and training of hospital staff, the project required substantial practice-specific work, such as guiding different providers on chart navigation, order entry, documentation and e-prescribing; tracking patient safety concerns, build issues and workflow concerns; assessing the operational efficiency of medical office processes; and modifying practice workflows based on the hospital's environment and organizational goals. (Ex. G, Oluro Olukayode's September 16, 2016 Independent Contractor Agreement and MedStar Scope

24

of Work) Olukayode and other Opt-In Plaintiffs acknowledge that the practice-specific nature of the work means that implementation jobs on the same project involve different duties and different working conditions, requiring varying expertise and sub-specialties. (Olukayode 51:14-15, 56:6-23, 131:25-132:8; Ogbechie 54:16-55:3; Nadreau 67:21-68:9; Azera 45:6-17; Kamieniecki 28:1-12; see also Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 3-11.)

Olukayode's rate on the MedStar project was $125 an hour—which was an increase Olukayode negotiated from his previous rate. (Ex. F; Olukayode 108:23-109:14.) Contrary to the blanket assertion that "consultants worked for Defendants up to 12 hours a day, 7 days a week on the MedStar project" (Pl. Br. p. 6.), Olukayode never worked 12-hour days and never worked seven days a week on this project. For four out of his five weeks on the project, Olukayode worked five days a week. (Ex. F; Olukayode 162:1-22.) He worked six days only once. (*Id*.) While Olukayode did work more than 40 hours a week each week on the project, his hours ranged from just one hour over 40 hours in a week to 10 hours over 40 in a week. (*Id.*) Similar to his other projects for Defendants, Olukayode recorded his hours in a timekeeping system on the MedStar project. (Olukayode 46:17-22; 153:15-18.)

### 2.  The putative class members' MedStar experiences.

The putative class members had much different experiences on the MedStar project than Olukayode—experiences that also varied by project manager and the specific phase the class member was engaged for. Linus Kpaduwa was supervised by Lucasz Kamieniecki on the MedStar project. (Pl. Ex. 6, ¶ 11.) In contrast with Olukayode, who

testified he worked entirely independent of his project manager (Chan and/or Murrill) and only saw the manager once at a dinner, Kpaduwa reports frequent interactions and updates from Kamieniecki, who gave Kpaduwa specific instructions on how to perform the implementation work. (*Id.*, ¶ 12.) Olukayode did not receive feedback from his project manager, whereas Kpaduwa was subject to feedback and oversight from Kamieniecki. (*Id.*) Olukayode was required to enter his time into a timekeeping system; Kpaduwa does not allege he had to do so. (See generally, *id.*) Similarly, Stephanie Wall does not allege that she was required to enter her time on the MedStar project, even though she had the same project manager as Olukayode. (See generally, Pl. Ex. 7.)

Opt-In Plaintiff Ejike Achumba's experience was also different than Olukayode's, notwithstanding that Achumba and Olukayode had the same two project managers, Chan and Murrill. (Achumba 42:20-22; 109:2-110:9.) In contrast to Olukayode's single interaction with his project manager at dinner, Achumba had daily, end-of-shift "huddles" during which he and other consultants would receive feedback about how things were going on the job. (*Id.* 76:1-24.) And as compared to Olukayode, who worked independently and only went through orientation, Achumba received specific training on how to do his job and was told not to "derail" from the training. (*Id.* 52:5-14.) Achumba's different experience with the same project managers as Olukayode is unsurprising, given that they worked on entirely different phases of the MedStar project. (Ex. F.)

Opt-In Plaintiff Tamara Hutton also had both Chan and Murrill as project managers on the MedStar project. (Ex. F; Hutton 123:3-124:12.) Hutton worked on four phases of the project, including the same phase that Olukayode worked on, and two of the

26

same phases that Achumba worked on. (Ex. F.) Yet, Hutton's experience was different than both Olukayode's and Achumba's. Hutton did not have the daily meetings that Achumba had, but she interacted with Chan and Murrill more frequently than Olukayode did. (Hutton 123:3-124:12.) Hutton's practice-specific work also differed from Olukayode's. While Olukayode worked with ambulatory or outpatient providers, Hutton worked with inpatient providers. (Compare Ex. G with Ex. H, Hutton MedStar Scope of Work.) The two distinct practices involve different Cerner modules and required a different set of expertise from Olukayode and Hutton. (*Id.*, Kamieniecki 28:1-12; see also Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 3-11.)

Hutton's testimony and declaration conflict as to what was covered at orientation. In her declaration, Hutton states, "I was required to attend an orientation during which I learned the specifics of the software I would be assisting with on the project." (Pl. Ex. 8, ¶ 8.) But at her deposition, Hutton testified she could not remember whether orientation covered anything but logistics:

> Q.     And so the orientation is more about logistics and just the specific things that the client wants; is that fair?
>
> A.     Yeah, and if there's something specific the client wants us to make sure that they know how to do, they may cover that too.
>
> Q.     Do you remember anything specifically being covered at this MedStar orientation that the client wanted?
>
> A.     No.  I don't remember the details of the orientation.

4815-3152-2776

(Hutton 132:17-133:2.) Also at her deposition, Hutton disagreed that she or other consultants would even need the type of job-specific training that she claims to have received in her declaration:

> Q.      But in terms of training, at this point you're not getting any training on the system?
>
> A.      I don't need any specific training anyway. You're there because they thought you were fit for the role, and you're able to provide the information to the clients liking.
>
> If you're asking about full-fledged, okay, you're going to come for one week, it's not like that. That's not required.
>
> Q.      That is what I'm getting at is if at these different projects where you're there for a couple weeks or whatever, whether or not you're getting specific training on the system that you're helping implement.
>
> A.      You're not getting any full-fledged, in-depth training on those.
>
> Q.      Right. The expectation is that you already know it and that's why they hired you; is that fair?
>
> A.      When they hire you, they vet you, so they verify the information.
>
> Q.      And part of that information that they verify is that you already know how to utilize these systems, correct?
>
> A. Right.

(*Id.* 103:13-104:18.) Whichever story is true, Hutton's experience was different from others: either she received specific training, unlike Olukayode; or she did not receive specific training, unlike Achumba.

Olukayode, Achumba, and Hutton were all paid different rates on the MedStar project as well: $125, $120, and $95 per hour, respectively—again, the result of different negotiation experiences each had with Defendants. As mentioned above, Olukayode's rate was an increase he successfully negotiated with Defendants. Achumba testified that he tried to negotiate a higher rate but was unsuccessful at doing so. (Achumba 126:14-25.) Hutton did not try to negotiate a higher rate. (Hutton 92:25-93:3.)[6] The rates for other putative class members show there was no set rate or common plan for rates. On the overall project, rates ranged from $49 to $225 an hour. (Ex. F.) On just Olukayode's phase, rates ranged from $90 to $130 an hour. (*Id.*)

Just as the consultants' rates on the MedStar project differed, whether or not a consultant worked any hours over 40 in a week varied substantially. On the same phase that Olukayode worked, Gezzer Ortega did not work over 40 hours a week. (*Id.*) Achumba did not work over 40 hours a week in three of his four phases. (*Id.*) Hutton worked over 40 hours a week on some but not all of her phases. (*Id.*) Thus, while Olukayode worked more than 40 hours a week on his phase, there were numerous

---

[6] Hutton's declaration conflicts with her testimony here as well. She states in her declaration, "I was not able to negotiate this rate." (Pl. Ex. 8, ¶ 7.) At her deposition, however, she testified that she did not try to negotiate her rate:

> Q.     Did you try to negotiate your rate with Advisory Board
> and Clinovations and they told you no, or did you just not try?
>
> A.     I didn't try.

(Hutton 92:25-93:3.)

4815-3152-2776

putative class members who did not work more than 40 hours a week on their phase or phases:

- Cerner Ambulatory Go-Live Ortho: Samuel Khozin.

- Cerner Ambulatory Go-Live Support: Akilah Jefferson.

- Ambulatory Go-Live Command Center: Linda Houston and Tiffany Turner.

- Cerner Ambulatory Post Conversion Wave One: Delaram Taghipour, Fatima Paruk, Mohammad Aslam, Rashid Altafi, and Wei Ma-Krupa.

- Cerner Ambulatory Post Conversion Wave Two: Mohammad Aslam, Wei Ma-Krupa, and Rashid Altafi.

- Cerner Ambulatory Post Conversion Wave Three: Sonia Hyare and Tiffany Turner.

- Inpatient MedConnect 3 Go-Live: Mark Wicker, Jason Fehr, Melanie Key, Michelle Hudson, and Steven Kebejian.

- Inpatient MedConnect 3 Go-Live Nursing: Linda Houston, Lisa Huse, Moses Braimoh, Patricia Strickland, Steven Wolverton, Thomas Upton, and Tonya Owen.

(*Id.*) There were also at least three consultants on the MedStar project who provided services through a third-party staffing agency. (Ex. A; Ex. B; Ex. C.) These individuals received an overtime rate from the staffing agency for all hours they worked over 40 in a week. (*Id.*)

## ARGUMENT

## I.   PLAINTIFF'S BURDEN FOR CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 131

S. Ct. 2541, 2550 (2011) (internal marks and quotation omitted). "In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Luiken v. Domino's Pizza, LLC*, 705 F.3d. 370, 372 (8th Cir. 2013). Specifically, "plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016).

Notably, the Rule 23 standard is considerably more rigorous than the FLSA Section 216(b) standard for conditional certification. *Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 65 (E.D.N.Y. 2016) ("[C]ourts have repeatedly stated that Section 216(b)'s 'similarly situated' requirement is 'considerably less stringent' than the requirements for class certification under Federal Rule of Civil Procedure 23 ...."). Indeed, it is not uncommon for a court to grant a motion for conditional certification under Section 216(b) but nevertheless deny a motion for Rule 23 class certification. *See Frazier v. PJ Iowa, LLC*, 337 F. Supp. 3d 848, 869-70 (S.D. Iowa 2018).

"Under Rule 23(a), a district court may certify a class only if it 'is satisfied, after a rigorous analysis,' that the four threshold requirements are met: numerosity of plaintiffs, commonality of legal or factual questions, typicality of the named plaintiff's claims or defenses, and adequacy of representation...." *Id.*, quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "How one articulates the claims in any given case could artfully carry the day on the issue of commonality, since any competently crafted class complaint literally raises common 'questions.' But merely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2)." *Ebert*,

823 F.3d at 478. Instead, the "common contention ... must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*

## II.    CLASS CERTIFICATION FAILS UNDER RULE 23(A)

### A.    Plaintiff Cannot Show Numerosity Because Joinder is Practicable

Class actions are only appropriate if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P; *see generally Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1539 (8th Cir. 1996). The numerosity requirement requires "examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 330 (1980).

Olukayode contends that the three classes are sufficiently large because there were at least three dozen consultants on the MedStar project; up to 30 consultants on MaineHealth; and more than 20 consultants on the New York projects. (Pl. Br. p. 19.) He also asserts these numbers may increase upon the discovery of additional projects within the limitation periods.[7] (*Id.*) Olukayode's emphasis of the respective class numbers is

---

[7] Olukayode is wrong that the class numbers will increase in any meaningful way, at least with respect to post-September 15, 2018 projects. After September 2018, Optum and/or

misplaced because no rigid rule of thumb has been developed in the Eighth Circuit as to how many potential class members is needed to satisfy the numerosity requirement. *Emanuel v. Marsh*, 828 F.2d 438, 444 (8th Cir. 1987) ("This court has not established any rigid rules regarding the necessary size of classes."), *vacated on other grounds*, 487 U.S. 1229, 108 S. Ct. 2891, 101 L. Ed. 2d 925 (1988); *Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983) ("[N]o arbitrary rules regarding the necessary size of classes have been established."). In addition to the size of the class, courts also consider "the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–60 (8th Cir. 1982).

Under these additional numerosity factors, Olukayode's class claims fail. First, as Olukayode concedes, Defendants have records of the putative class members—their identities and addresses are known. Indeed, Defendants produced a class list and several other similar lists in this case. Where the identity and addresses of the class members are known, joinder is practicable and numerosity is defeated, irrespective of the class size. For example, in *Sanft v. Winnebago Indus., Inc.*, 214 F.R.D. 514, 526 (N.D. Iowa), amended in part, 216 F.R.D. 453 (N.D. Iowa 2003), the court denied class certification, holding that joinder was practicable for a class of 51 members if their identities were known: "While the numerical size of the prospective class is sufficiently large to meet the

---

ABC have engaged independent contractors on two projects in Maine, zero projects in Maryland, and zero projects in New York. A total of three contractors worked on the projects in Maine—two of these three contractors have previously been identified as part of the FLSA putative collective; one is additional. (*See* Ex. Z, Optum's Supplemental Answers to Interrogatory 3.)

numerosity requirement, the significance of the factor is greatly diminished by the fact that the identity of each member of the class is known." Courts outside of this Circuit have reached the same conclusion. *See, e.g.*, *Block v. First Blood Assocs.*, 691 F. Supp. 685, 695 (S.D.N.Y. 1988) (ruling that joinder was practicable where the plaintiffs knew the names and addresses of all 57 members of the proposed class); *Spectrum Fin. Cos. v. Marconsult, Inc.*, 608 F.2d 377, 382 (9th Cir. 1979) (holding that the district court did not abuse its discretion in ruling that joinder of 92 class members was practicable where the plaintiffs were able to contact all members about joinder).

Second, joinder is demonstrably not impractical and in fact has, to a large extent, already occurred. As Olukayode points out, the Opt-In Plaintiffs in this matter reside all over the United States and have still joined this lawsuit. (Pl. Br. p. 20.) All of them participated in discovery, and many of them were deposed. Clearly, any alleged "geographic dispersion" has not made it impractical for putative class members to join this suit. *Bartleson v. Winnebago Indus., Inc.*, 219 F.R.D. 629, 639 (N.D. Iowa 2003) ("Here, joinder is not only practicable, but has in essence already been accomplished, as only the twenty-one members of the FLSA 'opt-in' class could possibly be members of the Rule 23 class on the IWPCL claim.").

Another factor is the financial resources of the class members to initiate individual lawsuits. *Caroline C. By & Through Carter v. Johnson*, 174 F.R.D. 452, 463 (D. Neb. 1996) ("Relevant considerations include… financial resources of class members.") Here, the class members are not low wage earners—they are medical professionals with their own consulting businesses, some of whom made up to $225 per hour consulting for

Defendants. There is no credible argument that financial considerations are an impediment to joinder. *Deen v. New Sch. Univ.*, No. 05 CIV.7174(KMW), 2008 WL 331366, at *4 (S.D.N.Y. Feb. 4, 2008) ("Plaintiffs also fail to demonstrate that the proposed class members lack the financial resources to join in Plaintiffs' lawsuit."). This is especially so given that Plaintiff's counsel is representing the class members on a contingency basis and the class members "will not have to pay out-of-pocket costs for the representation." (Pl. Ex. 1, p. 4.) Also, the vast majority of the putative class either declined to opt-in to this case or abandoned their claims once they did, indicating that cost is not a barrier and that a failure to participate is unrelated to cost. *Spectrum*, 608 F.2d at 382 ("Appellants have asserted that joinder of the limited partners is impracticable. Following denial of class status, however, Spectrum was able to reach all 92 limited partners, 56 of whom joined in the second lawsuit that was later consolidated with the original action. This indicates that joinder was not impracticable. Moreover, it may indicate that several potential members of the class did not wish to pursue their claims, despite the fact that it would cost them nothing.").

> ### B.     Liability Cannot be Determined in One Stroke Because Olukayode Lacks Commonality and Typicality

The commonality and typicality requirements address the sufficiency of the nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification. *Jenkins v. Gen. Collection Co.*, No. 8:06CV743, 2008 WL 4104677, at *8 (D. Neb. Aug. 28, 2008). Traditionally, "commonality" refers to the group characteristics of the class as a whole, while "typicality" refers to the individual

characteristics of the named plaintiff in relation to the class. *Id.* The United States Supreme Court has commented that:

> [t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). "Any discussion of the commonality of the class members' claims, therefore, is related to an analysis of whether the class representative's claim is typical of the class he seeks to represent." *Glenn v. Daddy Rocks, Inc.*, 203 F.R.D. 425, 429 (D. Minn. 2001).

Olukayode contends commonality and typicality are satisfied because this case comes down to a single common question—whether the consultants were misclassified as independent contractors.[8] But common questions do not carry the day on commonality and typicality; there must be *common answers* to those questions: "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350; *see also Harris v. Express Courier Int'l, Inc.*, No. 5:16-CV-05033, 2017 WL 5606751, at *8 (W.D. Ark. Nov. 21, 2017) (reasoning in an analogous wage-and-hour context that "[a]lthough the exempt/non-exempt question is common to all the class members and is,

---

[8] Accepting this logic, all cases involving a common cause of action are ripe for class certification, which is absurd.

in fact, the threshold question that must be answered with respect to liability, a classwide determination on this very issue will be extremely onerous, if not impossible.")

Stated another way, commonality and typicality turn on whether the proper classification of the consultants can be answered through common proof. *Saleem v. Corp. Transp. Grp., Ltd.*, No. 12 CIV. 8450 JMF, 2013 WL 6061340, at *4–6 (S.D.N.Y. Nov. 15, 2013) ("[W]hether the commonality requirement is met turns on whether the 'most important question'—namely, whether CTG correctly classified the franchisors' drivers as independent contractors—can be answered through common evidence.") On this record, answers and proof to the underlying classification questions are anything but common—they vary by consultant, project, and project manager.[9]

### 1. Commonality and typicality fail under Maine's right-to-control test.

Under Maine state law, the employee/independent contractor question is resolved through an eight factor "right to control" test:

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

---

[9] Prior to *Dukes*, the commonality prong of Rule 23 was too often simply a "check the box" proposition. That is no longer the case, as the U.S. Supreme Court gave teeth to the commonality prong. Olukayode apparently believes commonality and typicality are simply rubber-stamp formalities, as he dedicates a total of four paragraphs—only two of which are substantive—discussing these requirements for all three of the proposed classes. (Pl. Br. pp. 20-23.)

*Venegas v. Glob. Aircraft Serv., Inc.*, 159 F. Supp. 3d 93, 101 (D. Me. 2016). "The factors need not all be present for a Court to find an independent contractor relationship, however, nor is any one particular factor controlling." *Larson v. Johnson*, 184 F. Supp. 2d 26, 38 (D. Me. 2002); *see also Peerless Ins. Co. v. Hannon*, 582 A.2d 253, 255 (Me. 1990) (noting that Maine courts have emphasized that "no factor conclusively establishes the existence of an employment relationship" and holding an individual to be an employee based on "the totality of these circumstances".) Nevertheless, courts emphasize the right-to-control factor. *Noll v. Flowers Foods, Inc.*, No. 1:15-CV-00493-LEW, 2019 WL 206084, at *3 (D. Me. Jan. 15, 2019), leave to appeal denied, No. 19-8001, 2019 WL 3423463 (1st Cir. Apr. 3, 2019) ("These factors must be applied with a particular emphasis on their tendency to reflect whether or not the employer has the 'right to control' or the 'right to interfere' in the performance of the work.").

a.      Right to control

Olukayode relies primarily on the independent-contractor agreements to suggest there is common proof of Defendants' right to control the consultants, stating "Defendants common policies (including with respect to dress code, scheduling, and consultants' conduct) will provide common evidence for several factors." (Pl. Br. p. 30.) But the contracts are not common proof of Defendants' right to control the consultants. In fact, they say the opposite—Defendants had no right to control the consultants: "Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services." (Ex. I, Olukayode February 4, 2016, Independent Contractor Agreement; Ex. J, MaineHealth

4815-3152-2776

Scope of Work to the February 4, 2016 Independent Contractor Agreement.) Moreover, the provisions Plaintiff relies on relating to dress code and scheduling do not show a right to control. Defendants' clients—not Defendants—set schedules and dress codes, those decisions vary from client to client, and such customer requirements are irrelevant to a determination of control because they entail the "final results" to be obtained, not the "details of the performance." *Legassie v. Bangor Pub. Co.*, 1999 ME 180, ¶ 6, 741 A.2d 442, 444 ("The right to control the details of the performance, present in the context of an employment relationship, must be distinguished from the right to control the result to be obtained, usually found in independent contractor relationships."); *C.C. Eastern, Inc. v. Nat'l Lab. Relations Bd.*, 60 F.3d 855, 860 (D.C. Cir. 1995) (when "a company's control over an aspect of the worker's performance is motivated by a concern for customer service, that control does not suggest an employment relationship because it is addressed to the ends to be achieved rather than the means to achieve that result"); *see also Fed-Ex Home Delivery v. NLRB*, 563 F.3d 492, 501 (D.C. Cir. 2009) ("[C]onstraints imposed by customer demands . . . do not determine the employment relationship.").

Olukayode's broad class definition also includes consultants who performed services for Defendants through third-party staffing agencies, both before and after the September 15, 2018 switch in procurement practices.[10] The independent contractor

---

[10] As previously noted, this Court has already held that the post-2018 consultants do not even meet Section 216(b)'s lower "similarly situated" standard for conditional certification. (Dkt. 87.) Given that courts in the Eighth Circuit have established that the Rule 23 standard is considerably more rigorous than the Section 216(b) standard for initial conditional certification, *see Frazier*, 337 F. Supp. 3d at 869-70, there is simply no way that Plaintiff can now argue that these consultants meet the higher Rule 23 standard.

agreements say nothing about Defendants' purported control over consultants who did not sign an independent contractor agreement with Defendants. *See Magalhaes v. Lowe's Home Centers, Inc.*, No. CIV.A. 13-10666-DJC, 2014 WL 907675, at *4 (D. Mass. Mar. 10, 2014) ("Even assuming that each class member signed an identical contract with Lowe's, this does not demonstrate that there are common issues of fact.").

The only actual evidence regarding Defendants' right to control the consultants is the testimony about whether Defendants actually exercised controlled over them. *Legassie*, 1999 ME 180, ¶ 12, 741 A.2d at 446 ("The essence of the 'independent nature of the business' and the 'right to control the progress of the work' factors is the freedom of the employee or independent contractor to do the work without direction."). The testimony is *not* common as to whether Defendants actually exercised such control. Olukayode, Oredeko and Azera received no actual training on the MaineHealth project; they only recalled an orientation covering project logistics. In comparison, Achumba and Nadreau both received substantive training on how to do their jobs and the particular EMR software at MaineHealth. Olukayode was not supervised at all on the project; Nadreau's project manager checked in on him two to three times daily. Other consultants experienced some supervision, but not daily oversight. Olukayode had required meetings from time to time; others had meetings daily; some had no meetings at all. Some consultants were required to send daily reports on the projects, while others did not. Olukayode, Achumba and Oredeko were required to enter their time on the project. Azera, Emelue and Nadreau, on the other hand, were not required to enter their time.

Olukayode also argues that the "standard work" performed by consultants is evidence of Defendants' right to control them. But consultants do not engage in "standard work." Defendants select the consultants based on their particular medical expertise, understanding of practice-specific workflows, and sub-expertise regarding practice-specific modules within the different EMR systems. Olukayode and several other Opt-In Plaintiffs in this matter testified that the actual job the consultants do changes depending on the provider and particular practice the consultant is supporting. (Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 3-11.) Olukayode himself testified that the working conditions are different from person to person and team to team, betraying the idea of "standard work":

> Q.     So the knowledge of the particular software suite is important to the project, right?
>
> A.     Yes.
>
> Q.  You also said in your answer to my original question that the terms of employment are -- you don't know the terms of employment, right?
>
> A.     Yes.
>
> Q.     And those are different from person to person, right?
>
> A.     Yes.
>
> Q.     And from team to team, right?
>
> A.     Yes.
>
> Q.     And the circumstances of the work are different from person to person, right?
>
> A.     Yes.

41

Q.     And from team to team?

A.     Yes.

(Olukayode 56:6-23.) On the most important factor in the analysis, there is no common evidence that Defendants had the right to control or actually controlled the consultants.

> b.     The existence of a contract, and the employment of assistants with the right to supervise their activities

The different arrangements for engaging consultants also shows there is no common proof as to the existence-of-a-contract factor. The independent contractor agreements are not common proof as to consultants who were engaged through third-party vendors and have no contract with Defendants.

Nor do the independent contractor agreements provide common evidence as to the class members' right to employ assistants and supervise their activities. In fact, the contracts differ in that regard depending on whether the consultant provided services through his or her own LLC or business, or whether the services were provided in an individual capacity. By way of example, Olukayode provided services to Defendants on the MaineHealth project through his LLC, and his contract explicitly permits Olukayode to hire and supervise assistants:

2.2 <u>Control, Supervision, and Training</u>. Contractor shall have the sole and exclusive right and responsibility to control and to determine the method and manner of Contractor's performance of the Services. Contractor shall also be solely responsible for the supervision and training of its Assistants.

2.3 <u>Compensation of Assistants</u>. Contractor is solely responsible for the payment or non-payment of compensation or salary, including any required overtime payments, to Contractor's Assistants. Contractor is responsible and shall comply with all federal, state and local laws and regulations

42

regarding compensation, hours of work, workplace safety and other conditions of employment.

2.5 <u>Assistant Substitution or Removal</u>. Substitutions of Assistants that are essential to the Services are not permitted without the prior approval of ABC. Any proposed substitutions must include an explanation of the circumstances necessitating the substitution, and other information requested by ABC necessary to consider the proposed substitution. All proposed substitutes must have qualifications that are equal to or higher than the personnel being substituted. ABC will promptly notify the Contractor of approval or disapproval thereof. ABC retains the right to approve or disapprove all Assistants, and, to request the removal of any Assistant.

(Ex. I; Ex. J.) Achumba, on the other hand, provided services in his individual capacity,

and his contract is silent on hiring and supervising assistants:

2.1. Contractor's relationship to ABC is that of independent contractor, and this Agreement shall not be construed to create any association, partnership, joint venture, employee or agency relationship between ABC and the Contractor for any purpose. Contractor shall not represent him/herself or hold him/herself out to third parties as an agent, employee or servant of ABC, notwithstanding the fact that Contractor and ABC may refer to Contractor as a team member for some purposes. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party.

2.2 Contractor acknowledges and agrees that he/she is not eligible for, and shall not participate in, any of ABC's employee benefit plans or programs, including, without limitation, bonus, vacation, health, retirement fund, incentive compensation or other employee programs or policies ("Benefits Plans"). If, for any reason, Contractor is deemed to be a statutory or common law employee of ABC by any governmental agency, court, or other entity, Contractor hereby waives any right to, and agrees to neither seek nor accept, any benefits under the Benefits Plans.

2.3 Contractor has the right to perform services for others during the Term (as defined below) as long as such other engagement or performance does not interfere in any way with the timely and professional performance of the Services to be performed hereunder or compromise ABC's Confidential Information.

4815-3152-2776

(Ex. K, Achumba Independent Contractor Agreement.) And neither form of the agreement is common evidence as to whether consultants engaged through third-parties have the right to hire and supervise assistants.

> c.  The independent nature of the consultants' businesses

Another factor courts emphasize is the independent nature of the contractor's business. *Noll*, 2019 WL 206084, at *3 ("However, deserving of somewhat greater weight in the context of this litigation, i.e., in the context of a claim asserting that worker-protective statutes have been violated, are the two factors that involve the nature of the work and its importance to the employer's business operations.") On this important element, Olukayode makes no attempt to identify common evidence, and for good reason—there is none. Plaintiffs' consulting businesses and business practices varied. Some created LLCs or other entities, invested in the businesses, and shrewdly ran them to maximize profits; others did none of those things. (Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 3-11.) To the point of maximizing profits, some Plaintiffs successfully negotiated their rate on the MaineHealth project, some tried but were unsuccessful, and other did not try. And as noted above, some consultants contracted with Defendants through LLCs, while some did so as individuals—which impacted whether the consultant retained independence in hiring and supervising assistants.

The consultants who worked on the MaineHealth project also provided services to a number of Defendants' competitors to varying degrees. (Ogbechie 15:11-19;

Olukayode 63:2-65:24; Azera 52:25-53:6; Nadreau 62:15-18; Oredeko 19:13-15.) Unlike cases where the contractor is assigned to the Defendant's company 100% of the time, *see Rich v. Brookville Carriers, Inc.*, 256 F. Supp. 2d 26, 28 (D. Me. 2003), the variation among the class here means the Court will have to make individualized inquiries as to whether the class members are sufficiently independent under this factor. *See Scovil v. FedEx Ground Package Sys., Inc.*, 886 F. Supp. 2d 45, 55 (D. Me. 2012) ("[T]o the degree this factor goes beyond what the FXG documents provide, there could be individualized evidence about the 'calling' or 'business' of various drivers.").

### d.     The remaining factors

Common evidence is lacking for the remaining factors as well. On the obligation to furnish tools, and particular to the MaineHealth project, Achumba, Azera, Nadreau, and Oredeko all testified as to providing their own equipment when necessary. (Achumba 119:23-120:20; Azera 64:21-65:5; Nadreau 98:24-99:4; Oredeko 97:1-10.) Ogbechie, in contrast, did not provide his own equipment. (Ogbechie 82:20-83:8.)

Regarding the length of engagement, the record does not reflect any set or common amount of time the Plaintiffs worked on the MaineHealth project—some worked only one week, while others worked multiple weeks.

Finally, there is no common evidence on the importance of the work to the company's business. While implementation services were historically a large part of Defendant ABC's business, implementation is now only an "occasional service" that has been "sporadically provided" since Defendant Optum acquired ABC in 2018. (Clark 16:20-17:11; Optum 41:18-22.) Because Olukayode's class covers implementation work

45

both before and after Optum acquired ABC, the Court will be forced to make individualized inquiries as to when the work occurred and whether the work was of significant or only marginal importance to Defendants' business.

### 2.   Commonality and typicality fail under New York's control test.

Independent contractor classification is governed by a fact-intensive analysis under the New York Labor Law, which includes consideration of whether the worker worked at his/her own convenience; was free to engage in other employment; received fringe benefits or was on the employer's payroll; was on a fixed schedule; was required to wear a uniform; was required to follow company procedures, attend meetings, and sign in and out of work. *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003); *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415 (2d Dep't 1998). Ultimately, however, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog*, 1 N.Y.3d at 198; *Suvill v. Bogopa Serv. Corp.*, No. 11-CV-3372 SLT RER, 2014 WL 4966029, at *10 (E.D.N.Y. Sept. 30, 2014) (noting that the classification issue turns on the degree of control).

Here, too, Olukayode relies primarily on the independent contractor agreements as common proof of control. But, again, the agreements point only to Defendants' lack of control, and they differ in material ways. Olukayode provided services on the HSS project through his LLC, while Opt-In Plaintiff Rishi Sarna provided services on the Lourdes project in her individual capacity. (Pl. Ex. 26.) As explained above, the

differences in the individual and LLC contracts directly impact what freedoms the consultants have in hiring assistants for help with the work.

The agreements also show that the work performed by the consultants in New York varied by project. On Lourdes, consultant duties included capturing interactions with providers and staff on certain software tools; collaborating with the Client Results Executive; and providing advanced guidance to hospital "super users" on the system. (Ex. L, Ogbechie Lourdes Scope of Work.) Olukayode did not have those corresponding duties on the HSS project. (Pl. Ex. 26.) Lourdes consultants had specific deliverables to be accomplished: "Complete the provider interaction log every time a provider/clinic staff person is supported"; and "Capture and share observations and recommendations for provider post go-live personalization and enhancement requests, as well as clinic operational workflows." (Ex. L.) Olukayode did not have any deliverables on the HSS project. (Pl. Ex. 26.) Lourdes consultants had a specific timetable for performance of their duties; Olukayode did not. (*Id.*; Ex. L.) Additionally, the HSS project was an Epic EMR project while Lourdes was a Cerner EMR project. (*Id.*) Each system has practice-specific modules that the consultants were hired to assist with, and Olukayode and others admit that the practice-specific nature of the work changes consultant duties from practice to practice and project to project. (Defendants' Motion to Decertify the Collective Action, Dkt. 176, pp. 3-11.)

Even if the independent contractor agreements were identical, they still would not suffice to show control because "while forms of agreement and other standardized documents surely are pertinent to the analysis, they are not necessarily dispositive of

4815-3152-2776

what, ultimately, would be an individualized determination of the degree of control that [the defendant] actually exercised over each of the putative class members."[11] *Edwards v. Publishers Circulation Fulfillment, Inc*., 268 F.R.D. 181, 184 (S.D. N.Y. 2010). As is the case with the Maine class, the only evidence of control here is the varying consultant experiences reflected on the record. Olukayode was not supervised at all on the HSS project and was allowed to work as independently as possible. Olukayode did not work on the NYHH project, but he knew that the project manager on NYHH was "very hands on." (Olukayode 154:14-155:5.) The consultants on the Lourdes project (which Olukayode also did not work on) report varying degrees of supervision: Reyes-Cortes stated that his manager frequently checked in on him and other consultants with specific instructions for the job, while Ogbechie testified that the project manager was not on site and he could not remember even meeting him. Olukayode claims that all consultants on the HSS project were required to work the same schedule and same hours, but the schedules and hours on Lourdes were "dependent on the clinic you're assigned to." (Ex. L.) Olukayode's attempt to avoid the facts about the contrasting levels of control on the New York projects speaks volumes on the merits of commonality and typicality. *See Edwards*, 268 F.R.D. at 181. ("[P]laintiffs' effort to avoid consideration of what actually occurred with each putative class member by reference to the form ICA and the training materials is insufficient to show that there are common issues, that they predominate, or that the named plaintiffs' claims are typical of the putative class members.")

---

[11] Indeed, it is ironic that Plaintiff relies so heavily on the text of the agreements, given that they specifically affirm that Plaintiff and Opt-Ins are independent contractors and not employees.

Olukayode wholly failed to develop any record about other consultants on the HSS project beyond his own speculation—which is not evidence, *Reed v. Experian Info. Sols., Inc.*, 321 F. Supp. 2d 1109, 1115 (D. Minn. 2004)—and he does not even mention the NYHH project, let alone offer probative proof of commonality or typicality. Defendants' records further reveal that several consultants on the NYHH project worked no hours over 40 in a week, even where the consultants worked on the same phase. And half of the consultants did not work over 40 a week on the Lourdes project, regardless of which phase the consultant worked on. Olukayode does not, and cannot, explain how his claims are common and typical of consultants on different projects he did not work on, with different experiences regarding supervision, and who did not work any hours over 40 in a week. *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 76–77 (E.D.N.Y. 2015) ("[T]he question of whether the class members worked in excess of 40 hours per week would require the Court to make individual determinations with respect to each class member, and thus does not satisfy the commonality requirement."); *Velasquez v. Digital Page, Inc*., 303 F.R.D. 435, 442 (E.D.N.Y. 2014) ("The issue for this case is whether ... each individual plaintiff was entitled to overtime that they did not receive. In this case, that is not a 'common question,' nor are there common answers.")

*Salem*, which involved a proposed Rule 23 New York class of delivery drivers classified as independent contractors, is instructive here. 2013 WL 6061340, at *1. As Olukayode attempts in this case, the plaintiffs in *Salem* argued that "substantially identical franchise agreement[s]" showed commonality of the class. *Id.*, at *4. The court rejected the plaintiffs' contention, finding their argument "overlooks that 'the critical

49

determinant' of employment status under New York law is not the *right* of a purported employer to control a purported employee, but 'the degree to which the purported employer *exercises* control *in fact* over the results produced or the means used to obtain them." *Id.*, *5 (emphasis in original). Reviewing the conflicting experiences of the plaintiffs on the record, the court held that:

> the common question—whether CTG drivers were misclassified as independent contractors—will not yield a common answer. Instead, answering that question as to each driver will require a fact-specific and driver-specific examination of the degree of control that CTG exercised in fact. Plaintiffs have therefore failed to carry their burden to prove that the commonality requirement is met—a failure is fatal to their motion for class certification.

*Id.* at *6. (S.D.N.Y. Nov. 15, 2013.) The same result is compelled in this matter. The independent contractor agreements do not show control, and the distinct experiences of Olukayode and the putative class members defeat class certification.

### 3.   Commonality and typicality fail under Maryland's economic-realities test.

Maryland applies the familiar economic-realities test to the independent contractor question, under which courts analyze six factors:

(1)   the degree of control that the putative employer has over the manner in which the work is performed;

(2)   the worker's opportunities for profit or loss dependent on his managerial skill;

(3)   the worker's investment in equipment or material, or his employment of other workers;

(4)   the degree of skill required for the work;

(5)   the permanence of the working relationship; and

> (6)     the degree to which the services rendered are an integral part of the putative
> employer's business.

*Guerra v. Teixeira*, No. CV TDC-16-0618, 2018 WL 3756716, at *4 (D. Md. Aug. 8,
2018). While no single factor is dispositive, the "touchstone of the 'economic realities'
test is whether the worker is economically dependent on the business to which he renders
service or is, as a matter of economic reality, in business for himself." *Id.* (quotation
marks omitted).

Olukayode advances the same unavailing arguments under Maryland law:
common proof exists because the consultants are all subject to an independent contractor
agreement, perform the same work, and worked over 40 hours a week without overtime
compensation. But these claims are factually incorrect and legally insufficient:
consultants' experiences are far too different to provide common answers under the
economic-realities test.

### a.     Degree of control

As previously explained, the independent contractor agreements do not establish
that Defendants exercised control over the consultants. At most, the agreements show a
*lack* of control over the consultants, with meaningful variations depending on whether the
consultant provides services through an LLC or other entity, or though his or her
individual capacity. (Compare Ex. M, Olukayode MedStar Independent Contractor
Agreement with Ex. N, Altafi MedStar Independent Contractor Agreement.) Even if the
agreements hypothetically did evidence some reservation of a right to control the
consultants, the "reservation of some control over the manner in which work is done does

not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties." *Schweizer v. Keating*, 150 F. Supp. 2d 830, 840 (D. Md. 2001). As such, even where common contracts exist, "[t]he determination as to whether or not sufficient control has been retained rests upon the peculiar facts of each case." *Id.*

The peculiar facts of this case show substantial differences in whether Defendants controlled the consultants. Olukayode was not supervised on the MedStar project, which he described as even more independent than other projects he worked on for Defendants. Olukayode's project manager (either Chan or Murrill) was not on site with him, and he only met his project manager once at a pre-project dinner. Olukayode attended an orientation session on MedStar, but received no training. In contrast, Achumba—who had the same two project managers as Olukayode—reports attending daily, end-of-shift "huddles" during which he and other consultants would receive feedback from project managers about how things were going on the job. Achumba also received specific training on how to do his job and was told not to deviate from Defendants' expectations.

Hutton also had Chan and Murrill as project managers, and her experience differed from both Olukayode and Achumba: Hutton did not have the daily meetings that Achumba had, but she interacted with Chan and Murrill more than Olukayode did. Kpaduwa had a different project manager (Kamieniecki), and his experience was distinct from Olukayode's as well. Kpaduwa had frequent interactions and updates with Kamieniecki who gave Kpaduwa specific instructions on how to perform the implementation work. There is no way to find common proof of control on this record.

*See Westfall v. Kendle Int'l, CPU, LLC*, No. 1:05-CV-00118, 2007 WL 486606, at *13 (N.D. W.Va. Feb. 15, 2007) ("A class where class members' claims are dependent upon establishing whether each claimant is an independent contractor or an employee cannot be certified.").

Nor do the consultant's job duties somehow show control. First, the consultants performed different types of practice-specific implementation work on the MedStar project. As an illustration, Olukayode worked with ambulatory or outpatient providers, while Hutton worked with inpatient providers. The record is replete with testimony as to how the practice-specific nature of the work changes the actual duties performed by consultants. Second, even if consultant job duties were the same in that they all involved implementation work to meet MedStar's specifications, that would still not show control:

> It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client. For example, a builder will build a building according to the specifications of an architect. That does not make the builder an employee. A painter will paint a house the colors dictated by the homeowner. That does not make the painter an employee. In short, requiring a contractor to meet the client's technical specifications is not the type of "control" which bestows "employee" status on the contractor.

*Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667, 672–73 (D. Md. 2000), aff'd sub nom. *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001).

### b.    Opportunities for profit or loss

The evidence betrays any suggestion of common proof for this element, the key question for which is whether Olukayode and the putative class were able to negotiate their rates with Defendants. *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 670 (E.D. Pa. 2010 ("With respect to the Martin factor regarding profit or loss, evidence that

may be relevant to its evaluation includes the workers' abilities to negotiate their pay."); *Sinclair v. Mobile 360, Inc.*, No. 1:07CV117, 2009 WL 9073080, at *9 (W.D. N.C. Jan. 16, 2009), vacated and remanded on other grounds, 417 F. App'x 235 (4th Cir. 2011) ("Kitchen controlled his own opportunity for profit or loss by having the freedom to negotiate the price of each contract for auto body repair work and having the freedom to employ other workers."). Olukayode negotiated his rate on the project. Achumba tried to negotiate a higher rate but was unsuccessful at doing so. Hutton did not try to negotiate a higher rate.

### c.    The degree of skill required for the work

According to Olukayode, consultants who performed work for Defendants are "a high-skilled team...not like general consultants." (Olukayode 51:14-15.) Defendants engage consultants based on their practice-specific skills in order to place the consultants with providers in the same field. Olukayode admits that different skills with different software modules on different practices changes the working conditions for the consultants. But two other consultants on the Medstar project, Hutton and Achumba, opined that their medical expertise did not necessarily change their roles, and that their duties were the same across projects. (Hutton 140:24-142:6; Achumba 31:5-24.). Far from common proof, the testimony shows this element cannot be decided on a class-wide basis with one stroke. *Gough v. Bankers Life & Cas. Co.*, No. CV PJM 17-2341, 2019 WL 585715, at *4 (D. Md. Feb. 12, 2019), aff'd, 781 F. App'x 251 (4th Cir. 2019), cert. denied, 141 S. Ct. 95, 207 L. Ed. 2d 176 (2020), reh'g denied, 141 S. Ct. 217, 207 L. Ed.

2d 1161 (2020) (finding this factor "indeterminate" amid conflicting allegations regarding the skill required for the job).

d. Permanence of the working relationship

There are no common answers for this factor. Consultant engagement on the MedStar project ranged from one week to 30 weeks. Some consultants even split their time on the project like Hutton, who worked on MedStar, left in the middle of the project to provide implementation services to another company, and then returned to continue working on MedStar. (Hutton 31:2-34:12, Ex. O, Hutton Resume.) As the number of projects and length of engagement are the core of this element, the differences here make collective adjudication impossible. *See Adami v. Cardo Windows, Inc.*, No. 12-2804 (JBS/JS), 2016 WL 1241798, at *9 (D.N.J. Mar. 30, 2016) ("The Court finds this short term inconsistent with the length and continuity characteristic of employment, and instead suggestive of the window installers' independent contractor status. In any event, the factor will likely lead to different results for Adami than for the Opt-In Plaintiffs, making collective adjudication of their claims inappropriate.")

e. Whether the services are an integral part of the Defendants' business

As with the Maine class, there is no common evidence on this factor because implementation services ceased to be an important part of Defendants' business once Optum acquired ABC in 2018. With the Maryland class covering implementation work both before and after Optum's acquisition of ABC, the Court must make individualized inquiries on this factor.

55

        f.       Whether consultants worked more than 40 hours a week

Though not a factor under the economic-realities test, Olukayode asserts that commonality and typicality are satisfied for the Maryland class because all class members worked more than 40 hours a week. This is false. Whether or not a consultant worked any hours over 40 in a week varied substantially on this project, and dozens of consultants across all of the project phases worked no hours over 40 in a week at all. Even on the same phase, some consultants worked more than 40 hours a week while other did not. And there were at least three consultants on the MedStar project who provided services through a third-party staffing agency and received an overtime rate from the staffing agency for all hours they worked over 40 in a week. Olukayode's claims are neither common nor typical to consultants who did not work any hours over 40 in a week and/or who received an overtime rate. *Callari,* 307 F.R.D. at 76–77.

## C.    Olukayode and Proposed Class Counsel are Not Adequate to Represent the Classes

"Rule 23(a)(4) permits certification of a class action only if the representative will fairly and adequately protect the interests of the class." *Rattray v. Woodbury County*, 614 F.3d 831, 835 (8th Cir. 2010). Courts "must conduct a 'rigorous analysis' to determine whether the prerequisites for a class action under Rule 23(a) are satisfied. The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Id.* (internal citations omitted).

### 1.  Olukayode cannot adequately represent those whose claims differ from his.

The absence of commonality and typicality for all three proposed classes precludes Olukayode from adequately representing the classes. *Yapp v. Union Pac. R.R. Co.*, 229 F.R.D. 608, 623 (E.D. Mo. 2005) ("The issue of adequacy of representation is lacking in this case because of the lacking numerosity requirement, and because of the lacking commonality and typicality requirements…. [W]ithout commonality or typicality, these plaintiffs cannot adequately represent others with different issues of law and fact among them.").

Olukayode also cannot adequately represent those consultants who provided services to Defendants through third-party agencies, both pre- and post-September 2018. Regarding the former group, these consultants must argue and prove that Defendants are their joint employers. Because Olukayode does not share the joint-employer claim with that group, he cannot credibly advocate for joint employment on their behalf. The same is true for the latter group, who also have arbitration agreements with collective and class waivers preventing them from joining this action. As Olukayode does not share the arbitration predicament with these consultants, he is not equipped to adequately represent them. *See Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) ("[B]ecause Lawson is in a position unique from all but one other driver in California, his claims are not typical of the putative class members nor can he adequately represent the interests of those members, who are potentially bound by the arbitration and class action waiver provisions. For example, Lawson—having opted out

of two separate agreements— would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that delivery drivers felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable."); *Morangelli v. Chemed Corp.*, No. 10 CIV. 0876 (BMC), 2010 WL 11622886, at *3 (E.D.N.Y. June 17, 2010) ("Opt-in plaintiffs who cannot bring suit in federal court are simply not similarly situated with those who can.").

### 2.   Counsel delayed in seeking class certification and could not manage a 60-plaintiff collective.

Proposed class counsel must also demonstrate they will provide adequate representation for the class. *Rattray v. Woodbury Cty.*, IA, 614 F.3d 831, 835 (8th Cir. 2010) "This factor generally requires ... that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit." *Fielder v. Credit Acceptance Corp.*, 175 F.R.D. 313, 320 (W.D. Mo. 1997). "[I]t is not reputation built upon past practice, but rather competence displayed by present performance, which demonstrates the adequacy of counsel in a class action." *Abby v. City of Detroit*, 218 F.R.D. 544, 548 (E.D. Mich. 2003).

For example, in *Rattray*, 614 F.3d at 834, certification was denied because the district court was "not convinced" counsel would adequately represent the class where she allowed "nearly six months" to elapse "between the filing of the amended complaint and the filing of the motion to certify." In light of the due process concerns which

animate Rule 23's adequacy requirements, the Eighth Circuit affirmed this ruling, finding counsel's:

> failure to move to certify with alacrity undermines confidence in the zeal with which she would represent the interests of absent class members. The failure of the putative class representative to assure the court that it will vigorously pursue the interests of class members is a sufficient basis to deny certification.... We also cannot quarrel with the district court's suggestion that counsel with any experience litigating class actions could reasonably be expected to assess pertinent evidence and to file a motion to certify a class in much less than six months after filing a class claim.

*Id.* at 835-836 (citations omitted).

*Rattray* is directly applicable here. Olukayode moved to certify the Maryland class only on October 16, 2020—*a year and a half* after the filing of the Complaint. (See Dkt. 1, 128.) Although briefing on class certification was subsequently postponed so that Olukayode could move for all three class certifications at once instead of piecemeal, the postponement for efficiency does not explain or excuse the initial year-and-a-half delay that undermines confidence class counsel will adequately represent the interests of absent class members. *See also Gries v. Standard Ready Mix Concrete, L.L.C.*, 252 F.R.D. 479, 488 (N.D. Iowa 2008) ("[A] delay in filing for class certification bears on the adequacy of representation.").

Counsel have also demonstrated an inability to manage the representative proceedings that are already pending. They failed to ensure that the Opt-In Plaintiffs fulfilled their discovery obligations, resulting in (1) an order to compel discovery responses, and (2) dismissal of the claims of nineteen (over 32%) of the 59 Opt-Ins for failing to comply with the Court's order. (Dkt. 135, 139, 157, 159.) Several more Opt-Ins

withdrew for undisclosed reasons, bringing what was once a collective of 60 plaintiffs down to 32. (Dkt. 124, 140, 146, 159, 160.) If Plaintiffs' counsel cannot manage a collective action involving 60 (and now 32) individuals, they are not adequate to represent a class involving the same claims for hundreds of class members across the country. As such, certification should be denied on grounds of counsel's inadequacy.

## III.   PLAINTIFF CANNOT SHOW PREDOMINANCE OR SUPERIORITY

Plaintiffs seeks to certify the Maine, New York, and Maryland state-law claims pursuant to Rule 23(b)(3). Under Rule 23(b)(3), certification is only warranted where "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As compared to the commonality requirement of Rule 23(a), the "predominance criterion is far more demanding." *Ebert*, 823 F.3d at 478. "The requirement of predominance under Rule 23(b)(3) is not satisfied if 'individual questions ... overwhelm the questions common to the class.'" *Id.* at 478-479, quoting *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing.'" *Ebert*, 823 F.3d at 479, quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ebert*, 823 F.3d at 479.

### A.      Class-Wide Liability Cannot be Determined Through the Same Evidence

For the same reasons that commonality and typicality fail, common questions do not predominate over individual considerations: under the respective tests from all three classes, the dispositive issue of independent-contractor status cannot be determined through the same evidence for each putative class member.

The independent contractor agreements are not common proof of control—they differ in material ways, vest discretion in consultants, and are not dispositive of the level of control Defendants did or did not exercise over each particular class member. *Carroll v. Lowes Home Centers, Inc.*, No. 12-23996-CIV, 2014 WL 1928669, at *9 (S.D. Fla. May 6, 2014) ("In the face of contractual provisions identifying installers as independent contractors and vesting the right to control the method and manner of the work in the installers, it cannot be determined from the standard form agreements themselves that Carroll and the proposed class are employees.") For each class, some consultants were heavily supervised by project managers who checked in on them up to three times a day and provided specific instructions how to perform their work. Others worked independently and some never even met their project manager. Still others experienced a level of supervision somewhere between constant and none. Some consultants received detailed training on the specific EMR system and were told not to deviate from Defendants' plans, others attended only a logistical orientation, and some recall neither. *Holick v. Cellular Sales of New York, LLC*, No. 112CV584NAMDJS, 2019 WL 1877176, at *12 (N.D.N.Y. Apr. 26, 2019) ("[R]elevant issues of material fact exist among the

Plaintiffs and their employment relationships with Defendants…. These pervasive dissimilarities are also fatal in the predominance analysis. In other words, Plaintiffs have failed to show that common issues predominate over individual issues as required by Rule 23(b), for the very same reasons that frustrated commonality under Rule 23(a)(2).")

There is no single source of evidence demonstrative of consultant job duties or the degree of skill required for implementation services. The independent contractor agreements themselves establish variation among job duties, deliverables, and timing of performance. Many consultants confirm the practice-specific nature of the work results in different job functions and working conditions, requiring specific skills, experience, and expertise. Other consultants testified that the job is the same irrespective of skill or practice the consultant is supporting. *Jones v. Corp. Bank Transit of Kentucky, Inc.*, No. 13-00484-CV-W-BP, 2015 WL 12733475, at *4 (W.D. Mo. Sept. 22, 2015) ("Plaintiff drove routes for bank customers, while other drivers drove routes for automotive parts customers or film company customers. Plaintiff does not discuss how the differences between the various customers served by Defendant's drivers would affect a class action, particularly in light of the fact specific inquiry required for evaluating whether independent contractors are actually employees under Kansas and Missouri law.").

There is no collective proof as to whether the implementation work was an integral part of Defendants' business because the class definitions cover a period where Defendants ceased offering implementation services except sporadically. No common evidence establishes the independent nature of each consultant's business or opportunity for profit. Some consultants invested heavily in their businesses and ran them

accordingly, others did not. Some consultants successfully negotiated their rates with Defendants, some were unsuccessful, and some did not try to negotiate. Some consultants worked on multiple projects for Defendants for multiple weeks; some worked on one project for one week. *Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339 ALC JLC, 2014 WL 5039431, at *8 (S.D.N.Y. Sept. 29, 2014) ("[C]lass certification is inappropriate given that any driver's case will, at best, be a close question that will turn on considerations which do not admit of common and representative proof.").

Common evidence is also lacking as to the consultants who the Court excluded on conditional certification under the FLSA that Plaintiff now seeks to include in all three classes: those who provided services through a third-party staffing agency prior to September 2018, and those who did so afterwards who also have arbitration agreements. Olukayode does not argue, let alone show, that liability with respect to the third-party consultants can be established in one stroke by the same evidence—especially where liability determinations involve claims as to joint employment and validity of the arbitration agreements for which Olukayode is not an adequate representative. *Jones*, 2015 WL 12733475, at *4. ("In addition, Plaintiff does not address variations in the contracts between drivers and Defendant, including Defendant's contention that some contracts include arbitration clauses. Thus, it is unclear whether common questions predominate and whether a class action could generate class-wide answers regarding the relationship between the proposed class members and Defendant.").[12]

---

[12] Plaintiff's attempt to include these consultants is also barred by the of law of the case. Magistrate Bowbeer determined there was no basis to include these consultants under the

This case is similar to *Holick*, where the plaintiffs (like Olukayode) argued that certification was appropriate by common proof of a "uniform classification and relevant factors of control through [CSNY's] own uniform policies and procedures that affected all Sales Representatives." 2019 WL 1877176, at *10. But the evidence showed "notable differences among Plaintiffs with regard to: (1) the level of supervision and discipline exerted by CSNY over Plaintiffs; (2) Plaintiffs' ability to set prices and negotiate with customers; (3) the permanence and duration of the contractual relationship between Plaintiffs and CSNY; (4) their ability to work for other employers; and (5) the purposes for which Plaintiffs formed and used their Sales Companies." *Id.* at 7. The court rejected the idea that uniform classification was dispositive, finding that "the record is replete with material discrepancies among the Plaintiffs and their relationships with Defendants, that are directly relevant to resolving this litigation." *Id.*, at * 11. As a result, the court held that the plaintiffs could satisfy neither the commonality nor predominance requirements of Rule 23. *Id.*, at *11-12. The evidence here shows the same differences among the consultants that nullified predominance in *Holick*. Certification should be denied because class claims and proof do not predominate in this case. *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 500 (N.D. Ill. 2008) ("[A]lthough Plaintiffs allege Defendants uniformly characterized rotators as independent contractors to exclude

---

FLSA's lower similarly-situated standard. Defendants appealed that decision and Your Honor upheld Magistrate Bowbeer's determination. (Dkt. 95.) Given that this Court has already held these individuals are not similarly situated, Plaintiff cannot re-litigate that issue when it has been decided and upheld on appeal. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 326 F.R.D. 513, 527–28 (D. Minn. 2018) (denying a motion to amend the class complaint that attempted to revive portions of the class the court previously excluded).

them from receiving various benefits, Plaintiffs have not shown that liability turns predominately on the common issue of whether Defendants controlled the manner and means of the rotators' work. Rather, Defendants have shown that liability would turn on individual issues."); *Harris*, 2017 WL 5606751, at *8 ("Although the exempt/non-exempt question is common to all the class members and is, in fact, the threshold question that must be answered with respect to liability, a classwide determination on this very issue will be extremely onerous, if not impossible.").

### B.     Project Manager Discretion Forecloses Predominance

Project managers had complete discretion on how to run their projects, and how they did so was "highly variable" and "not consistent amongst projects." (Clark 94:21-95:13.) Their discretion resulted in different experiences for consultants, including whether consultants were supervised, received training, had to record their time, attend meetings, or send reports. The discretion Defendants gave project managers on how to run their various projects undermines both commonality and predominance. *Frazier v. PJ Iowa, L.C.*, 337 F. Supp. 3d 848, 871–72 (S.D. Iowa 2018) ("The only corporate policy that the plaintiffs' evidence convincingly establishes is PJ Iowa's 'policy' of allowing discretion by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices."); *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 382 (E.D. Mo. 2014) (finding that plaintiffs had shown neither commonality nor predominance in a tip-sharing case because evidence showed that "dissimilar rules seem to have applied to employees at the same

store, depending on factors such as who was working (in particular which manager), the amount the server/bartender earned, and the amount of assistance received"); *see also In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013) ("The district court did not abuse its discretion in finding that *Dukes* forecloses the instant proposed class from establishing commonality. Both cases challenge policies that grant broad discretion to local agents.")

### C. Class treatment is Not the Superior Method for Resolving the Disputes At Hand

"Under the superiority test of Rule 23(b)(3), a class action must be better than, not merely as good as, other methods of adjudication." *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 606 (D. Minn. 2005). Rule 23 identifies four non-exhaustive factors pertinent to the Court's determination of superiority: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id.*; Fed. R. Civ. P. 23(b)(3).

A class action is not the superior method of fairly and efficiently adjudicating this case. Specifically, in an FLSA and state law matter, where the FLSA conditional class certification and opt-in period have been completed, and only a small portion of the potential class consents to join the FLSA class, a state-law class is not the superior method of adjudication. In *Garcia v. Freedom Mortgage Corp.*, the case's procedural

posture was the same as this one—conditional certification under the FLSA was granted

before Rule 23 class certification was sought. 274 F.R.D. 513, 517 (D.N.J. 2011). "Less

than 44%" of one putative sub-collective and "less than 17%" of the other putative

subcollective opted in to the FLSA litigation. *Id.* The court found that, because the state

wage and hour claims were "substantively identical" to the FLSA claims, and "both arise

from the same set of operative facts, . . . it would therefore be unfair to certify [a state law

class] and drag the putative class members into this Court when they have already

demonstrated an interest to not be involved in this litigation." *Id.* The court ruled that the

plaintiffs could not establish superiority, finding that the low opt-in rate made it "clear

that a large number of such putative class members have an interest in the individual

control of the prosecution of their FLSA claims." *Id.*

Here, 59 of the 145-person putative collective opted into the FLSA action, but 28

either voluntarily withdrew or dismissed their claims. As such, only 31 opt ins remain in

this case—21% of the putative collective, which is a far lower opt-in rate than the 44%

for one of the sub-collectives in *Garcia*, and remarkably close to the 17% for the other

sub-collective in *Garcia*. Hence, all but a small number of the proposed classes have

elected to take "an interest in the individual control of the prosecution" of their claims,

whether by declining to opt in to the FLSA collective or affirmatively

withdrawing/dismissing their participation therein. Olukayode, therefore, cannot meet the

superiority requirement. *See also White*, 301 F.R.D. 368, 384 (E.D. Mo. 2014) ("[T]he

low opt-in rate of the collective FLSA action, the Court discerns that at least some

members of the putative class do not support the class resolution of the state wage and

hour claims and would prefer individual claims or not to pursue claims."); *Shayler v. Midtown Investigations, Ltd.*, No. 12 CIV. 4685 KBF, 2013 WL 772818, at *9 (S.D.N.Y. Feb. 27, 2013) ("[T]his Court finds no judicial efficiencies to be furthered by class treatment. Indeed, class treatment at this stage, and given how few additional people it would bring in (most of whom have already been notified of their opportunity to join this action as opt-in FLSA plaintiffs and have not)….").

This case is also unmanageable as a class action. Because there is no common proof on the underlying facts relevant to independent-contractor status, the Court will have no choice but to hold mini-trials on liability. Here, each Plaintiff has a unique combination of experiences regarding control, training, negotiation, duration, work for Defendants' competitors, and other facts bearing on the contractor classification tests. Ultimately, "the class action mechanism is not superior to holding individual trials on the issue of liability." *Harris*, 2017 WL 5606751, at *8; *Hernandez*, 2010 WL 1337702, at *5 ("It is difficult to see how a class action could proceed fairly and efficiently, given that each plaintiff's work situation will have to be examined to see what duties he or she performed. The potential for a class-wide ruling on liability seems slim. And even if liability could be determined on a class-wide basis, the court would still face the prospect of having to determine individualized damages.").

## CONCLUSION

For the reasons stated herein, the Court should deny Plaintiff's Motion for Class Certification.

4815-3152-2776

NILAN JOHNSON LEWIS PA

Dated: February 15, 2021          By: s/ Joseph G. Schmitt
                                  Joseph G. Schmitt (Reg. No. 231447)
                                  Sandra L. Jezierski (Reg. No. 267132)
                                  David A. James (Reg. No. 337389)
                                  Jason P. Hungerford (Reg. No. 0395908)
                                  250 Marquette Avenue South, Suite 800
                                  Minneapolis, MN 55401
                                  Phone: 612-305-7500
                                  Fax: 612-305-7501
                                  jschmitt@nilanjohnson.com
                                  sjezierski@nilanjohnson.com
                                  djames@nilanjohnson.com
                                  jhungerford@nilanjohnson.com

                                  ATTORNEYS FOR DEFENDANTS

4815-3152-2776