UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 19-1101(DSD/HB)

Oluro Olukayode,
individually and on behalf
Of all others similarly situated,

       Plaintiff,

v.                                                    ORDER

UnitedHealth Group, Optum, Inc.,
and The Advisory Company,

       Defendants.


David Blanchard, Esq. and Blanchard & Walker, 221 North Main Street, Suite 300, Ann Arbor, MI 48104, counsel for plaintiff.

James G. Schmitt, Esq. and Nilan Johnson Lewis, PA, 120 South 6th Street, Suite 400, Minneapolis, MN 55402, counsel for defendants.


This matter is before the court upon defendants UnitedHealth Group (UHG), Optum, Inc., and the Advisory Company's (ABC) motion to decertify the collective action, defendants' motion for summary judgment, and plaintiff Oluro Olukayode's motion for Rule 23 class certification. Based on a review of the file, record, and proceedings herein, and for the following reasons, the motion for decertification of the collective action is granted, the motion for summary judgment is granted in part, and the motion for Rule 23 class certification is denied.

**BACKGROUND**

**I.   Electronic    Medical    Record    Implementation    and Consultants**

This Fair Labor Standards Act (FLSA) dispute arises out of Olukayode's and the putative class members' electronic medical record (EMR) software work on behalf of defendants ABC and Optum.[1] Clark Decl. ¶ 5, ECF No. 41. The EMR implementation work at issue includes hands-on training, referred to as "at-the-elbow (ATE) support," at hospitals. ATE support means that "at the time an electronic medical record or electronic health record is implemented ... at a hospital, physicians and nurses find it valuable to have a colleague ... quite literally standing at the elbow while they navigate this new computer system." Clark Dep. at 21:9-15. ABC and Optum contracted with clinicians, known as consultants, to provide the ATE support to their clients. Id. at 20:25-21:8; Clark Decl. ¶ 7. The consultants trained medical personnel to use new EMR software. Olukayode Dep. at 83:22-24, ECF No. 165-3.

ABC and Optum sought clinicians with medical backgrounds and knowledge about particular EMR software to provide support. Clark Decl. ¶ 8; Olukayode Dep. at 54:8-21, 82:17-25. Defendants aimed

---

[1] In 2014, ABC purchased Clinovations, which performed EMR implementation work. Clark Decl. ¶ 5. In 2018, Optum acquired ABC. Clark Dep. at 13:16-22, ECF No. 165-1. Both parties sometimes refer to it as "legacy Clinovations" work. Clark Decl. ¶ 5.

to provide "like-to-like" support, such as nurses providing support to nurses and pharmacists providing support to pharmacists, depending on the client's needs.  Clark Decl. ¶ 10; Olukayode Dep. at 51:14-52:5, 53:22-54:21, 55:9-21, 57:1-13.

According to defendants, their business model had a distinct marketplace advantage because other healthcare IT firms contract with IT professionals who do not have medical training.  Clark Decl. ¶ 9.  Defendants assert that they did not need to train consultants about third-party EMR software because they already had familiarity with such software.[2]  Optum Dep. at 104:22-105:2.

Defendants did not hire any consultants full-time because projects were too infrequent.  Id. at 108:22-25.  Defendants would primarily hire and classify consultants as independent contractors.  Clark Dep. at 31:19-25, 32:12-33:3.  Consultants were free to work for defendants' competitors before or after performing services for them, and they did not sign non-competition agreements.  Clark Decl. ¶¶ 13-14.

Defendants paid consultants hourly.  Clark Dep. at 94:24-95:12.  During projects, consultants worked with "project managers" and "team leads" employed by defendants.  Olukayode Dep. at 58:10-14, 135:11-18.  Project managers would convey to

---

[2]  Olukayode received one software training from a client, but it was not conducted by defendants.  See Olukayode Dep. at 156:17-157:2.

consultants what type of support clients needed, as well as which instructions to emphasize.  Clark Dep. at 55:23-56:2.  Project managers created project schedules to give to consultants, and consultants needed to seek permission to work beyond those hours. Id. at 48:22-49:6, 51:16-24.  Project managers also encouraged consultants to log interactions with hospital staff during projects into defendants' logging platform.  Id. at 61:9-18, 62:1-4.

At issue here are five projects in three different states. In Maine, defendants hired consultants for the MaineHealth hospital system project in 2017.  Hungerford Decl. Ex. D., Interrogs. 3, 4, and 10, ECF No. 192-1.  In New York, defendants hired consultants for the Hospital for Special Surgery (HSS) project, the New York City Health and Hospitals (NYHH) project, and Our Lady of Lourdes Memorial Hospital (Lourdes) project, which spanned from 2016 to 2018.  Id. Ex. E,  Interrogs. 3, 4 and 10. In Maryland, defendants hired consultants for the MedStar Health project, which spanned from 2016 to 2017.  Id. Ex. F,  Interrogs. 3, 4 and 10.

## II.  Oluro Olukayode

Olukayode worked five total projects in Maine, Maryland, and New York.[3]  Olukayode Dep. at 33:20-34:9; Olukayode Decl. ¶ 4, ECF

---

[3]    Defendants assert that Olukayode only worked three projects.  See James Decl. Ex. I.

No. 170-5.  Olukayode last worked for defendants on April 21, 2017.
Wright Decl. ¶ 5, ECF No. 43; James Decl. Ex. I; Olukayode Dep. at
169:15-17.  During these projects, Olukayode worked more than forty
hours a week and was not paid time-and-a-half for the additional
time.  Olukayode Dep. at 80:4-6.  Olukayode would work up to twelve
hours a day during a project.  Id. at 80:2-7.

Olukayode entered into an agreement with ABC for his ATE
services (Agreement) in which defendants classified him as an
independent contractor.  See James Decl. Ex. F; Olukayode Decl.
¶ 3.  He also separately entered into contractor agreements and
statement of works for subsequent projects.  James Decl. Ex. G.
The Agreement provided that Olukayode: had an independent
contractor relationship; had the right to control the method and
manner of his performance; could work for other businesses, even
competitors; must provide his own equipment and materials; could
not participate in ABC's benefit plans; and was paid for authorized
fees that were properly invoiced.  See Id. Ex. F.

Olukayode has a medical degree from Nigeria, and he passed
written exams to become certified to practice medicine in the
United States, pending completion of a residency program.  Id. at
69:8-21, 91:14-23.  He specializes in oncology and Beacon software,
as well the operating-room software Optime.  Id. at 51:19-52:1,
57:10-13.  With his medical background, he explained that he
relates better to doctors.  Id. at 51:14-15, 87:7-12, 219:10-16.

Despite the advantage of having a medical background, Olukayode admits that the work he did for ABC was basic, that "anyone could do it," and that he did not use his medical degree.  Id. at 83:9-16, 87:7-10.

Olukayode negotiated contracts with EMR implementation providers, and providers would usually cap their pay rate based on what the client was willing to pay.  Id. at 195:16-23. Nevertheless, Olukayode once negotiated a raise in his hourly rate. Id. at 108:23-109:13.  Olukayode also once accepted a project mid-stream because he had travel plans at the outset of the project. Id. at 148:8-18.  He could decline projects if he did not accept the hourly rate.  Id. at 195:16-196:13; Clark Decl. ¶ 16.

Olukayode learned about EMR software by training himself and through previous work experience.  Clark Decl. ¶ 12; Olukayode Dep. at 53:2-9, 142:13-19.  Defendants did not train Olukayode about third-party EMR software.  Optum Dep. at 104:22-105:2.

Olukayode performed ATE consulting on various other EMR implementation projects for defendants' competitors, and he also worked as a clinic manager at an urgent care center in Virginia between ATE projects.  Olukayode Dep at 65:2-19, 67:17-68:13; Pl.'s Answer to Interrog. Nos. 5, 7.  He did not work for any other company while working for defendants, but he worked for other businesses between projects.  Olukayode Dep. at 64:19-65:1.

Olukayode testified that his work hours were both "mutually scheduled" with project managers and, on particular projects, scheduled solely by project managers. Id. at 190:2-10; Kamieniecki Dep. at 31:2-6. Olukayode only received schedules from project managers or team leads, never from clients. Olukayode Dep. at 124:10-14, 133:25-134:1, 145:10-16, 152:24-153:1, 158:22-23. On at least one occasion, a client asked Olukayode to work longer hours than he was scheduled, but the project manager did not allow him to do so. Id. at 165:3-25, 167:7-168:6; Clark Dep. at 48:22-49:1.

Olukayode's interaction with project managers and team leads varied from project to project. When Olukayode arrived onsite, he was assigned to different areas based on client need. Olukayode Dep. at 131:3-11, 133:18-22. According to Olukayode, project managers were sometimes onsite, but not always. Id. at 124:7-9, 140:7-10. For two projects, Olukayode admitted he never interacted with the project manager and was not supervised. Id. at 126:13-16, 163:18-23.

Olukayode attended orientation meetings and "huddles" during projects. Before each project, Olukayode attended an orientation session conducted by hospital leadership and ABC, during which ABC explained the project's objective. Id. at 127:12-24, 134:21-135:6, 148:19-149:5, 201:13-22, 204:14-24; Clark Dep. at 60:6-9. Defendants required daily "huddles" for some projects during which

project managers would give general directions and instructions, as well as address rules, responsibilities, and expectations. Olukayode Dep. at 136:17-23, 209:21-210:14.  For one project, Olukayode had daily morning and evening "huddles" during which consultants received instructions from project managers due to the specialized nature of particular software.  Id. at 157:15-158:13.

Defendants set rules for Olukayode regarding dress code, work conduct, interaction with hospital staff, and confidentiality. Id. at 209:14-18, 210:8-211:18.  Olukayode was not allowed to speak with the hospital management directly, but instead had to ask questions to project leads to relay to the clients.  Id. at 60:4-9, 145:10-16.

Project managers did not tell Olukayode how to provide support, but they would provide tip sheets that consultants referred to for common issues.  Id. at 136:7-137:25.  For one project, Olukayode testified that he worked independently:  "we are allowed to work as independently as possible.  We are not micromanaged.  You are supposed to show up at your assigned place and then do the work."  Id. at 135:25-136:3.  If he could not solve a problem, he would "escalate issues" to defendants' command center.  Id. at 144:7-24.

Defendants did not formally evaluate or discipline Olukayode. Id. at 228:2-6; Clark Dep. at 82:5-6.  Rather, defendants received

feedback from clients on which they based rehiring decisions for future projects.  Clark Dep. at 82:1-20.

Olukayode did not need equipment to do his work, as the clients supplied the computers and the software.  Olukayode Dep. at 126:19-127:3, 142:23-25.  Olukayode, however, incurred business expenses for liability insurance, office maintenance, education, and phone bills for which he was not reimbursed.  Id. at 185:1-16.  He incurred these expenses "to be on top of [his] game to be able to compete and be available for [companies]."  Id. at 185:1-16.  Consequently, Olukayode took these expenses into account when negotiating his hourly rate.  Id. at 188:7-14.  Olukayode entered his time into defendants' timekeeping system, and defendants reimbursed Olukayode for travel and lodging expenses.  Id. at 46:17-22, 160:2-24, 210:7-14.

## III. Consultants' Varying Experiences During Projects[4]

Consultants' experiences varied considerably in four key respects:  (1) the amount of interaction between consultants and defendants' employees; (2) the amount and kind of training; (3)

---

[4]  The record is unclear as to the number of hours worked by consultants.  Some assert that they worked up to "12 hours a day, seven days a week," or some variation above forty hours.  See, e.g., Olukayode Decl. ¶ 8; Wall Decl. ¶ 7; Hutton Decl. ¶ 9; Azera Decl. ¶ 5.  Defendants' timekeeping records seem to contradict the frequency and intensity of consultants' overtime work, however.  Hungerford Decl. Exs. D, E, F.

project managers' expectations; and (4) consultants' hours and
wage negotiations.

### A.   Maine Consultants

Training, interactions with projection managers, job duties,
project length, and negotiations varied on the MaineHealth
project. For example, some consultants recall attending an online
orientation session with no onsite training, while another
consultant testified that her orientation session was in person.
Azera Dep at 55:21-56:16; Olukayode Dep. at 127:13-24, 201:13-22,
204:14-24; Oredeko Dep at 29:10-16.   Two Maine consultants
specifically refuted the idea that defendants trained them
substantively.  Emelue Dep. at 64:24-65:2, 83:9-12; Ogbechie Dep.
at 81:9-18, 87:18-88:10.   Two other consultants, however,
explained that they received specific and substantive training,
with one consultant explaining that they "always need training."
Achumba Dep. at 52:5-16; Nadreau Dep. at 63:7-25; 90:9-17.

The amount of interaction with project managers varied
significantly as well.  MaineHealth consultants testified that
they interacted with their project manager two to three times a
day, regularly via electronic and telephonic communication, less
than daily, or only once during the entire project.  Nadreau Dep.
at 92:8-19; Oredeko Dep. at 98:18-99:3; Ogbechie Dep. at 84:5-8;
Azera Dep. at 56:20-57:19; Emelue Dep. at 81:10-82:2.

Defendants imposed starkly contrasting timekeeping and meeting requirements during the MaineHealth project as well. Some consultants had to enter their time consistently within defendants' timekeeping system, but other consultants did not have to enter their time at all. Compare Olukayode Dep. at 46:17-22; 122:23-123:2; Achumba Dep. at 98:14-16; Oredeko Dep. at 85:22-24, with Azera Dep. at 65:21-66:10; Emelue Dep. at 93:9-13; Nadreau Dep. at 106:2-5. Meeting requirements ranged from attending weekly meetings and sending daily reports, sending daily reports, or not having any mandated meetings or reporting. See Achumba Dep. at 49:24-50:7; Azera Dep. at 24:5-10, 63:4-10; Nadreau Dep. at 94:17-96:6; Ogbechie Dep. at 84:9-12.

MaineHealth consultants worked between one to five weeks on the project. Hungerford Decl. Ex. D, Interrogs. 3, 4, and 10. One consultant successfully negotiated a higher pay rate on the project, while other consultants testified that they were unable to negotiate a pay raise. Azera Dep. at 12:16-13:2; Ogbechie Dep. at 50:15-22; Achumba Dep. at 126:14-25. A number of consultants on the MaineHealth project worked for defendants' competitors. Ogbechie Dep. at 15:11-19; Olukayode Dep. at 63:2-65:24; Azera Dep. at 52:25-53:10; Nadreau Dep. at 62:15-18. Some of the consultants furnished their own equipment, while others did not. Compare Achumba Dep. at 119:23-120:20; Azera Dep. at 64:21-65:5;

Nadreau Dep. at 98:24-99:4; Oredeko Dep. at 97:1-10, with Ogbechie
Dep. at 82:20-83:8.

**B.   New York Consultants**

Consultants worked on three different projects in New York
from 2016 to 2018.  Hungerford Decl. Ex. E, Interrogs. 3, 4, and
10.  Like the MaineHealth project, some consultants attended
orientation sessions, while others received no substantive
training at all.  Compare Olukayode Dep. at 134:21-135:2; Reyes-
Cortes Decl. ¶ 5, with Ogbechie Dep. at 94:5-16.  As in Maine, the
level of interaction between project managers and consultants
varied significantly.  Some consultants attended daily huddles to
receive advice and instructions from project managers, others
received frequent check-ins from managers, and some never
interacted with the project manager at all, receiving only
electronic communications.  Compare Olukayode Dep. at 129:4-10;
Reyes-Cortes Decl. ¶ 6, with Ogbechie Dep. at 93:5-24.

**C.   Maryland Consultants**

The several-month MedStar Health project involved different
locations with different project managers.  Hungerford Decl. Ex.
F, Interrogs. 3, 4, and 10.  Consultants worked between five and
nineteen weeks.  Id.  Although one consultant only met his project
manager once at the beginning of the project and received no daily
supervision, other consultants received specific instructions and
feedback, attended frequent meetings, and were under constant

supervision.  Compare Olukayode Dep. at 135:25-136:3, 151:3-152:9; Hutton Dep. at 123:3-124:12, with Kpaduwa Decl. ¶ 12.   One consultant successfully negotiated a higher pay rate on the MedStar project, but another consultant was unable to do so.   Compare Olukayode Dep. at 108:23-109:14, with Achumba Dep. at 126:14-25. One consultant received specific training on how to do his job, while others did not.  Achumba Dep. at 52:5-14.[5]  One consult left in the middle of the project to work for a competitor and later returned to work on the MedStar project.  Hutton Dep. at 31:2-34:12.

## IV.  Defendants' Investigation of Employment Status

Before defendants purchased Clinovations, Clinovations hired independent contractors for ATE support.  Clark Decl. ¶¶ 5, 8; Optum Dep. at 22:20-23.  Clinovations determined that workers were independent contractors based on the Internal Revenue Service's (IRS) independent contractor guidelines and under the FLSA.  James Decl. Ex. J; Optum Dep. at 29:20-30:15.  Clinovations' general counsel believed that workers were properly classified as independent contractors because they did work on a project-by-

---

[5] One consultant gave conflicting testimony about the training she received.  In her declaration, she said that she learned the "specifics of the software [she] would be assisting with" during orientation.  Hutton Decl. ¶ 8.  During her deposition, however, she explained that orientation only covered logistics, and she denied that she needed training on the software.  Hutton Dep. at 103:13-104:18.

project basis and could also work for competitors. James Decl. Ex. K; Clark Decl. ¶ 13; Optum Dep. at 31:13-23, 34:9-16. Clinovations had never been sued for its independent-contractor classification. James Decl. Ex. L.

ABC sought legal advice from outside counsel to evaluate Clinovations' independent-contractor classification. Id. Ex. K. Counsel analyzed the classification under the FLSA, and determined that it was appropriate because consultants "engaged in short-term focused projects, who serve other clients." Id. Ex. K; Optum Dep. at 35:24-36:19.

ABC's in-house labor and employment counsel reviewed and affirmed independent contractor status on an ongoing basis. Optum Dep. at 41:13-22. To assist in doing so, they created a worker status questionnaire aimed at determining whether each consultant was properly classified as an independent contractor. James Decl. Ex. N; Optum Dep. at 42:3-18. Before defendants engaged a consultant, in-house counsel had to review the questionnaire and determine the appropriate classification. James Decl. Exs. O, P. In-house counsel made classification determinations on a case-by-case basis. Optum Dep. at 42:10-18.

In 2015 and 2016, defendants hired outside labor and employment counsel to review their independent contractor assessments. James Decl. Ex. S; Optum Dep. at 50:8-16. After reviewing the worker status questionnaire, the scope of work

documents, and the independent contractor agreements, counsel determined that independent contractor status was appropriate. James Decl. Ex. S; Optum Dep. at 50:8-16.

## V.   This Lawsuit

On April 23, 2019, Olukayode commenced this action against defendants, alleging overtime compensation violations under the FLSA, Me. Stat. tit. 26, § 664, the New York Minimum Wage Act, and the Maryland Wage and Hour Law.  On June 10, 2019, Olukayode moved for conditional certification under the FLSA.  ECF No. 24.  The court denied the motion without prejudice.  ECF No. 49.  On August 29, 2019, Olukayode moved again for conditional certification under the FLSA.  The court granted the motion in part and limited the conditional class "to individuals who, either, in their individual capacity or through their business entity, signed contracts to work as independent contractors providing ATE services for defendants prior to September 15, 2018."  ECF No. 87, at 16;  ECF No. 95.  There are currently 145 possible class plaintiffs.  See Hungerford Decl. Ex. E, ECF No. 177.

Defendants now move for summary judgment on Olukayode's individual claims and to decertify the collective action. Olukayode moves for Rule 23 certification of Maine, New York, and Maryland classes.

## DISCUSSION

### I.   Decertification of the FLSA Collective Action

"Section 216(b) of the FLSA allows one or more employees to bring a collective action to collect unpaid overtime compensation against an employer for and [o]n behalf of himself or themselves and other employees similarly situated." Ahle v. Veracity Res. Co., 738 F. Supp. 2d 896, 921 (D. Minn. 2010) (citation and internal quotation marks omitted).  The FLSA does not define the term "similarly situated," however "this district has adopted the two-stage approach" to determine whether putative collection action members are similarly situated.  Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1017 (D. Minn. 2007) (citation omitted). During the first step, the court determines whether the class should be conditionally certified for notification and discovery purposes "using a fairly lenient standard, and [it] typically results in 'conditional certification' of a representative class." Id. (citation omitted).

During the second step, the decertification stage occurs after discovery, and the court analyzes three factors to determine whether the putative class members are similarly situated under a stricter standard.  Id.; see also Smith v. Heartland Auto. Servs., Inc., 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005).  The three factors include "(1) the extent and consequences of disparate factual and employment settings of the individual plaintiffs; (2)

16

the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."   Id. at 1018 (citations omitted).   "Another question the [c]ourt considers is if [p]laintiffs can demonstrate that the [d]efendant[] had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in [p]laintiffs."   Cruz v. Lawson Software, Inc., 764 F. Supp. 2d 1050, 1057 (D. Minn. 2011) (quoting Burch v. Qwest Commc'ns Int'l, Inc., 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009)).

Plaintiff has the burden to establish that the members of the collective action are similarly situated.   Id.   They need not be identical.   Id.   If the plaintiff does not meet its burden, the court will decertify the class and dismiss the opt-in plaintiffs without prejudice.   Id. at 1017-18.   "It is not uncommon for courts in FLSA cases to certify a conditional class only to decertify that class during the second phase," and the decision "is within the court's discretion."   Lindsay v. Clear Wireless LLC, No. 13-cv-834, 2016 WL 916365, at *3 (D. Minn. Mar. 10, 2016) (citation omitted).   The court finds that decertification is appropriate in these circumstances.

### A.   Disparate Factual and Employment Settings/Individualized Defenses

At issue is whether each consultant was properly classified as an independent contractor.   To determine employment

classification, the court must evaluate "the economic reality of the arrangement."  Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005).  This fact-intensive inquiry, referred to as the economic reality test, involves an evaluation of the following factors:

> (1) the degree of control over the manner in which the work is performed; (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.

Le v. Regency Corp., 957 F. Supp. 2d 1079, 1089 (D. Minn. 2013). The economic reality test looks at the "totality of the circumstances," and "not any one factor ... determines whether a worker is the employee of a particular alleged employer."  Id.

Defendants argue that consultants' work experiences were materially different and varied considerably among consultants and projects.  Defendants specifically point out variations in (1) the amount of control defendants' employees exercised over consultants; (2) the ability for consultants to negotiate wages; (3) consultants' use of their own equipment; and (4) the transient nature of the consultants' relationship with defendants. Olukayode responds that defendants' distinctions are superficial, and that opt-in plaintiffs are similarly situated because they were all paid hourly, provided ATE support to defendants' clients,

18

had a dress code, and attended pre-project orientations.  The court agrees with defendants.[6]

It is not enough for opt-in plaintiffs to have "generalized similarities," such as "perform[ing] the same basic duties," being "subject[ed] to the same employment terms and conditions," or "ha[ving] the same dress code." Lindsay, 2016 WL 916365, at *5. Here, the consultants' varying experiences  have a direct bearing on four of the six elements of the economic realities test.  First, defendants exerted different levels of control over consultants, as evidenced by their contrasting experiences regarding substantive software training, defendants' supervision, timekeeping, meeting, and reporting requirements, and work for competitors.  Second, consultants had different opportunities for profit, as established by their varying testimony about the ability to successfully negotiate a higher pay rate.  Third, the permanency of the relationship varied given the dissimilarities in project length, the ability to work for competitors simultaneously during projects, and the inconsistency of daily hours.  Fourth, some consultants furnished their own equipment while others did not. Given the disparate work experiences among consultants, the court

---

[6] Olukayode cites Kiley v. MedFirst Consulting Healthcare Staffing, LLC, 297 F. Supp. 3d 1260 (N.D. Ala. 2018), to support his argument that these facts are enough for certification.  But Kiley is distinguishable because it applied the more lenient conditional certification standard.  See id. at 1263-64.

would have to "hold[] mini-trials for each plaintiff to determine liability on these bases," and the result would be "cumbersome and unmanageable."  Id. at *5-6.

The court also finds that individualized defenses would make a collective action unmanageable.  As discussed above, significant material differences between consultants' work experiences will require defendants to present individualized evidence for each consultant in order to establish each consultant's classification status.  This consideration weighs in favor of decertification.

**B.   Uniform Policy or Practice**

Olukayode argues that certification is appropriate because defendants had a uniform policy of classifying consultants as independent contractors.  The court rejects this argument.  As a preliminary matter, "the classification process is not strong evidence when evaluating whether employees are similarly situated."  Cruz, 764 F. Supp. 2d at 1058 (citing Oetinger v. First Residential Mortg. Network, Inc., No. 3:06-CV-381-H, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009)).  Moreover, the record reflects that defendants engaged in an individualized review of each consultant in order to determine their classification.  See, e.g., id. (finding that defendants' thorough yearly analysis of consultants' classifications further undermined plaintiffs' argument of a common policy).  The court concludes that this consideration does not weigh in favor of certification.

### C.   Fairness and Procedural Considerations

The court cannot conclude that fairness and procedural concerns weigh in favor of certification because the facts strongly support a finding that plaintiffs are not similarly situated. Although the court notes that individual proceedings may be difficult for some plaintiffs, the court is convinced that proceeding on a class-wide basis would be unwieldly. Accordingly, the court concludes that decertification is appropriate.

## II.   Summary Judgment

### A.   Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

The court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial; that is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249-50; Celotex v. Catrett, 477 U.S. 317, 324 (1986).

Defendants move for summary judgment on Olukayode's employment misclassification claims under the FLSA, Maine law, New York law, and Maryland law. Defendants argue that Olukayode's FLSA claim is barred by the FLSA's statute of limitations. Defendants also argue that Olukayode is an independent contractor, and therefore, the court should dismiss all of his misclassification claims.

**B.   Statute of Limitations under the FLSA**

The FLSA has a two-year statute of limitations, but it may be extended to three years if the violation was "willful." 29 U.S.C. § 255(a). A violation is willful when defendants "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). Plaintiff bears the burden of showing that defendants' conduct was willful. Smith v. Heartland Auto Servs., Inc., 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006). It is not enough for defendants' conduct to be unreasonable or negligent. See McLaughlin, 486 U.S. at 135 n.13; Johnson v. Derhaag Motor Sports, Inc., No. 13-cv-2311, 2014 WL 5817004, at *21 (D. Minn. Nov. 10, 2014). Courts have found no willfulness as a matter of law when defendants reviewed classifications of workers several

times with legal counsel.  See Nerland v. Caribou Coffee Co., No. 05-cv-1847, 2007 WL 1170770, at *3-4 (D. Minn. Apr. 19, 2007).

Here, the record supports a finding that defendants did not willfully violate the FLSA.  Defendants engaged both in-house and outside counsel to regularly review its consultants' classifications, reviewed every consultant's employment classification status, and were never sued for misclassification.

Olukayode argues that defendants willfully violated the FLSA because they should have been aware of misclassification lawsuits against other parties for their use of similar ATE consultants. Olukayode cites no support for this argument, and the court is unpersuaded.  "[E]vidence of other lawsuits ... in this case is insufficient to establish willfulness."  See Schmidt v. DIRECTV, LLC, No. 14-cv-3000, 2017 WL 3575849, at *7 (D. Minn. Aug. 17, 2017) (explaining that existence of other FLSA actions against defendant itself does not establish willfulness).

Olukayode also argues that defendants never inquired about obtaining FLSA-specific legal advice, but the record belies that assertion.  As explained in Optum's 30(b)(6) deposition testimony, defendants did receive specific legal advice regarding FLSA classification.  As a result, the court also rejects this argument.

Because the court finds that defendants did not willfully violate the FLSA, the limitations period is two years rather than three.  Olukayode commenced this action on April 23, 2019 – just

over two years since he last worked for defendants.  Olukayode's
FLSA claim is therefore time-barred.[7]

C.   **Classification of Employment Status**

1.   **Maryland Law**

In order to determine whether a person is an employee or an
independent contractor under Maryland law, the court evaluates
"the economic reality of the arrangement," which involves
consideration of the six factors set forth above.[8]  Blair, 420 F.3d
at 829; see also McFeeley v. Jackson St. Ent., LLC, 47 F. Supp. 3d
260, 267 (D. Md. 2014), aff'd, 825 F.3d 235 (4th Cir. 2016)
(applying economic reality test and factors to both FLSA and
Maryland state-law claims).  The economic reality test looks at
the "totality of the circumstances," and no one factor is
determinative.  Id.

The first factor, degree of control, presents a genuine issue
of material fact.  On the one hand, Olukayode exercises a degree
of control over his work that suggests he is an independent
contractor.  Olukayode testified that he: rarely interacted with
project managers and team leads on multiple projects; did not

---

[7] Because the court dismisses Olukayode's FLSA claim, it need
not evaluate whether defendants are subject to liquidated damages
under the FLSA.

[8]  The parties agree that Olukayode's misclassification claim
under Maryland law is subject to the economic realities test.

receive evaluations from defendants;[9] and had the ability to decline projects and negotiate his pay rate for different projects.[10]   Most notably, Olukayode worked for defendants' competitors performing the same ATE support that he did for defendants.  See Saleem v. Corp. Transp. Grp., 854 F.3d 131, 141 (2nd Cir. 2017) (explaining that working for competitors simultaneously and without consequence suggests defendant exercise minimal control over worker).  Defendants did not train Olukayode on the EMR software, but rather he self-trained.

On the other hand, defendants exercised a degree of control that suggests that Olukayode was an employee.  Before every project, defendants required Olukayode to attend an orientation. Defendants also controlled Olukayode's schedule: project managers set the schedule, Olukayode was required to carefully track his hours, and project managers had to approve any requests to deviate from the set schedule.  See Bey v. WalkerHealthCareIT, LLC, 2018 WL 2018104, at *9 (S.D. Ohio May 1, 2018) (finding that ATE worker plausibly alleged employee status because defendants conducted orientation and on-boarding activities, determined plaintiff's

---

[9]   The court is not persuaded that defendants' decision not to rehire a consultant after poor performance is equivalent to termination, as Olukayode contends.

[10]   Olukayode argues that his pay rate is set based on the negotiations between defendants and the client.   Despite this contention, Olukayode admits that he successfully negotiated a pay raise on a project.

work schedule, and approved schedule changes). Additionally, Olukayode attended daily "huddle" meetings to discuss project objectives and problem solving with defendants' employees, and was required to present difficult problems to defendants' command center. See Schwind v. EW & Assocs., Inc., 357 F. Supp. 2d 691, 700 (S.D.N.Y. 2005) (finding that the control factor was in favor of employee status when worker consulted with defendant frequently about daily schedule and work).

The second factor, the worker's opportunity for profit or loss depending on his managerial skill, also presents a genuine issue of material fact. Olukayode incurred business expenses that defendants did not reimburse, and he takes those expenses into account when he negotiates his pay. Additionally, Olukayode's right to work for competitors, and consequently how many projects he works, also supports a finding of independent contractor status. Lester v. Wildwood Fin. Grp., Ltd., No. 4:97CV2422 RWS, 1999 WL 35793739, at *5-6 (E.D. Mo. Mar. 10, 1999), aff'd, 205 F.3d 1346 (8th Cir. 2000). The ability to "choose different types of jobs with different prices, take as many jobs as [he] see[s] fit, and negotiate the price of [his] jobs" demonstrates an opportunity for profit or loss. WHD Opinion Letter Fair Labor Standards Act (FLSA), FLSA2019-6, 2019 WL 1977301, at *9 (Apr. 29, 2019) (citing Saleem, 854 F.3d at 144).

Nevertheless, defendants rigidly scheduled Olukayode's hours and paid him an hourly wage based on his time and expense reports. Olukayode had to seek permission from defendants to work more hours, which limited his ability to exercise managerial discretion to earn more money.  See Bey, 2018 WL 2018104, at *8.  Moreover, defendants did not permit Olukayode to negotiate or communicate directly with clients.  These circumstances indicate that Olukayode did not have an opportunity to earn more money while working on defendants' projects.

The third factor favors a finding of employee status.  The parties agree that no equipment was necessary for Olukayode's work, and nothing in the record suggests that Olukayode hired his own employees.  See Acosta v. Off Duty Police Servs., 915 F.3d 1050 (6th Cir. 2019) ("The limited investment by [] workers in specialized equipment also supports employee status ....").

The fourth factor, whether the service rendered requires a special skill, favors a finding of employee status.  Olukayode's work, ATE support, does not require him to have a special skill or a medical degree.  See Ware v. CKF Enterprises, Inc., No. CV 5:19-183-DCR, 2020 WL 2441415, at *12 (E.D. Ky. May 12, 2020) (brackets omitted) (finding, when examining the merits for approval of a class settlement, that ATE work was "a relatively simple task" primarily consisting of "pointing on the computer screen and showing healthcare staff where to click").  Defendants' contention

27

that their business model is "unique" is usurped by the record. Olukayode, who is medically trained, testified to working for defendants' competitors performing ATE services at other hospitals. Moreover, other consultants hired by defendants – who also had medical backgrounds – testified about providing ATE services to other EMR implementation businesses. This contradicts defendants' assertion that their business model was unique. The court cannot find that Olukayode's medical background sets him apart in the field and is a special skill.

The fifth factor, the degree of permanence of the working relationship, also presents a genuine issue of material fact. Olukayode worked for defendants on a project-by-project basis, for a total of twelve weeks in a two-year period. On its face, Olukayode's sporadic work seems to indicate that he was an independent contractor. See Parrish v. Premier Directional Drilling, L.P., 917 F.3d 369, 387 (5th Cir. 2019) (holding that project-based work tips heavily in favor of independent contractor status). However, because Olukayode worked twelve hours a day on projects for defendants, he was unable to hold other employment during those periods. See Catani v. Chiodi, No. 00-cv-1559, 2001 WL 920025, at *5 (D. Minn. Aug. 13, 2001) ("The degree of permanence factor generally looks to whether the individual works simultaneously for two employers, as would be the case with an independent contractor."). Although Olukayode was allowed to work

28

for competitors during defendants' projects, he was not able to do so as a practical matter.  See Bey, 2018 WL 2018104, at *8 (finding that the relationship between an ATE consultant and defendant was exclusive despite performing project-based work).

Defendants concede that the sixth factor, whether the service rendered is an integral part of the employer's business, supports a finding of employee status.

In sum, three factors weigh in favor of employee status, and three factors are inconclusive.  Based on the economic realities test and the evidence before the court, there are genuine issues of material fact as to whether Olukayode was an independent contractor under Maryland law.

### 2.  **New York and Maine Law**

The employee classification tests under New York and Maine law focus on the element of control.  See Bynorg v. Cipriani Grp., Inc., 802 N.E.2d 1090, 1092-93 (N.Y. 2003); Affo v. Granite Bay Care, Inc., No. 2:11-CV-482-DBH, 2013 WL 2383627, at *16 (D. Me. May 30, 2013) (citing Murray's Case, 154 A. 352, 354 (Me. 1931)). Under New York law, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  Bynorg, 802 N.E.2d at 1092-93.  New York law examines the following relevant factors under this inquiry: "whether the worker (1) worked at his own

convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule" Id. at 1093 (citations omitted). "Minimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship." Bhanti v. Brookhaven Mem'l Hosp. Med. Ctr., Inc., 260 A.D.2d 334, 335 (N.Y. App. Div. 1999). These factors are not exhaustive, and a holistic evaluation is appropriate. Rose v. Northwestern Mut. Life Ins., 220 F. Supp. 3d 363, 373 (E.D.N.Y. 2016). "There is general support for giving FLSA and the New York Labor Law consistent interpretations," and, seemingly, there is not a case where a worker was an employee under the FLSA but not under New York law. Hart v. Rick's Caberet Int'l, Inc., 967 F. Supp. 2d 901, 904 (S.D.N.Y. 2013) (internal citations omitted).

As discussed above, there are genuine issues of fact as to whether Olukayode worked at his own convenience and the degree of control exercised by defendants. Olukayode was free to bid on projects as he saw fit, he was required to work a strict schedule, seek permission to change his schedule, and to attend daily huddles and pre-project orientations. See Hernandez v. Chefs Diet Delivery, LLC, 915 N.Y.S.2d 623, 625 (N.Y. App. Div. 2011) (finding employee status where "defendants, among other things, provided

daily delivery manifests directing the drivers as to where deliveries were to be made, reimbursed the drivers for mileage, and required the plaintiffs to attend mandatory meetings, to obtain approval for vacation time, to undergo approximately one to two weeks of training"); but see Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 602 (E.D.N.Y 2012) (citation omitted) ("The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor."). On the other hand, Olukayode was free to, and frequently did, work for other competitors and did not receive fringe benefits or substantive training from defendants. See Bynorg, 802 N.E.2d at 1092-93 (finding waiters as independent contractors when waiters worked at their own discretion, worked for competitors, and received limited instructions); but see Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 925 (S.D.N.Y. 2013) (explaining that many employees "are free to carry second jobs[,] [and] [l]ack of fringe benefits or payroll inclusion is likewise unimportant."). Given these factual issues, the court cannot find as a matter of law that Olukayode was an independent contractor under New York law at this stage.

Under Maine law,[11] courts evaluate the following eight factors to determine control:

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

Affo, 2013 WL 2383627, at *16 (quoting Murray's Case, 154 A. at 354). The fulcrum inquiry is the right to control, and no factor is controlling. Id. (citing Scovil v. FedEx Ground Package Sys., Inc., 886 F. Supp. 2d 45, 52 (D. Me. 2012)). The two factors given the most weight are "the nature of the work ... and its importance to the employer's business...." Id. (citing Legassie v. Bangor Pub. Co., 741 A.2d 442, 445 n.4 (Me. 1999)).

As previously discussed, the record reflects genuine issues of fact as to Olukayode's ability to control his work and the independent nature of his work. Olukayode worked episodically for defendants, and he had considerable discretion as to how he would support clients in their EMR implementation work. Nevertheless, defendants controlled his schedule, and he was mandated to attend

---

[11] Although the parties initially disputed the proper analysis under Maine law, defendants now seem to concede that Maine applies an eight-factor "right to control" test. See ECF No. 191, at 37.

daily meetings.  Cf. Legassie, 741 A.2d at 446 (denying motion for summary judgement, under Maine law, when there was disputed material facts as to the level of independence by worker). Regarding the other elements of the Maine test, four issues bear in favor of employee status and two in favor of independent contractor status.  In favor of employee status, ATE support did not require a particular specialty, the work was important to defendants' business, he was paid hourly, and he did not hire assistants or furnish materials.   In favor of independent contractor status, Olukayode had independent contractor agreements for fixed durations and worked on projects infrequently for defendants.

Given these factual issues, the court cannot find as a matter of law that Olukayode was an independent contractor under Maine law at this stage.

## III. Rule 23 Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (citation and quotations omitted).  In order to obtain class certification under Rule 23, plaintiff must satisfy all four requirements of Rule 23(a) and one of the requirements under Rule 23(b).  In re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005).  The Rule 23(a) requirements are: "numerosity of plaintiffs,

33

commonality of legal or factual questions, typicality of the named plaintiff's claims or defenses, and adequacy of representation by class counsel." Ebert v. Gen. Mills, Inc., 823 F.3d 472, 477 (8th Cir. 2016) (citation omitted); Fed. R. Civ. P. 23(a).   In this case, plaintiff must meet the requirements of predominance and superiority under Rule 23(b)(3), meaning that "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Olukayode moves under Rule 23 for class certification of "all individuals who worked for [d]efendants providing training and support to [d]efendants' clients in connection with the implementation of electronic recording systems in [Maryland, Maine, and New York] from April 23, 2016 to the present and were classified as independent contractors ...."  Savytska Decl. Exs. 1-3.  Olukayode moves for three classes: a Maine class, a New York class, and a Maryland class.  Id.  The court will analyze the three classes together under Rule 23 because the analysis is "often equally applicable" to each state's class.  See Carr v. Flowers Foods, Inc., No. 15-cv-6391, 2019 WL 2027299, at *8 (E.D. Pa. May

7, 2019).  Because Olukayode does not satisfy the predominance prong, the court denies class certification.[12]

### A.   Predominance

The predominance prong cannot be met if "individual questions ... overwhelm the questions common to the class."  Ebert, 823 F.3d at 478-79 (quoting Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 468 (2013)).  "An individual question is one where members of a proposed class will need to present evidence that varies from member to member ..."  Id. at 479 (internal quotations and citations omitted) (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016)).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Id. (quoting Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).  This inquiry also "goes to the efficiency of a class action as an alternative to individual suits."  Id. (quoting Parko v. Shell Oil Co., 739 F.3d 1083, 1085 (7th Cir. 2014)).  The issue of predominance is "qualitative rather than quantitative" and "is far more demanding" than the commonality requirement under Rule 23(a).  Id. at 478 (quoting Amchem, 521 U.S. at 624).

---

[12]  Because Olukayode does not satisfy any of the requirements under Rule 23(b), the court need not address the other Rule 23 requirements for class certification.  Johannessohn v. Polaris Indus., Inc., 450 F. Supp. 3d 931, 985 n.27 (D. Minn. 2020).

As discussed above, significant and material disparities exist amongst the consultants' experiences.[13]   Under Maryland's economic realities test, as well as Maine and New York's right to control inquiries, there are significant discrepancies from consultant to consultant.   The most glaring dissimilarities involve the element of control, as the court would need to parse through variations regarding substantive software training, defendants' supervision, timekeeping, meeting, and reporting requirements, and ability to work for competitors.[14]   In addition to the fulcrum element of control, varying testimony about the ability to successfully negotiate a higher pay rate, dissimilar project lengths, the ability to work for competitors simultaneously during projects, daily hours worked, and furnishing one's own equipment all have significant impacts on the determination of whether consultants were properly classified under each test.[15]   The court finds that these individual questions

---

[13]   The tests for employment classification under Maine, New York, and Maryland are discussed above.

[14] These facts bear on two of the New York factors of "whether the worker worked at his own convenience, [and] was free to engage in other employment," Bynorg, 802 N.E.2d at 1092-93 (numbers omitted), and the Maine factor of the worker's "right to control the progress of the work except as to final results." Affo, 2013 WL 2383627, at *16 (quoting Murray's Case, 154 A. at 354).

[15]   These facts also bear on the New York factors of "whether the worker worked at his own convenience, [and] was free to engage in other employment," Bynorg, 802 N.E.2d at 1092-93 (numbers omitted), and the Maine factors of "his obligation to furnish necessary tools, supplies, and materials and the time for which

will overwhelm any questions common to the class because plaintiffs
need to submit evidence that varies from member to member.  <u>Ebert</u>,
823 F.3d at 478-79.  Under these circumstances, the proposed class
actions could not proceed efficiently.  Therefore, the court denies
class certification.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED**, that:

1.   Defendants' motion to decertify the collective action
[ECF No. 173] is granted;

2.   The collective action is decertified;

3.   All opt-in plaintiffs of the collective action are
dismissed from this action without prejudice;

4.   Defendants' motion for summary judgment [ECF No. 162] is
granted in part;

5.   Plaintiff Oluro Olukayode's FLSA claim is dismissed; and

6.   Plaintiff's motion for Rule 23 class certification [ECF
No. 166] is denied.

Dated: August 2, 2021

s/David S. Doty
_____
David S. Doty, Judge
United States District Court

---

the workman is employed."  <u>Affo</u>, 2013 WL 2383627, at *16 (numbers
omitted)(quoting <u>Murray's Case</u>, 154 A. at 354).